UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RACHEL WELTY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-00768 |
| | ) | District Judge Aleta A. Trauger |
| BRYANT C. DUNAWAY, et al., | ) | Magistrate Judge Jeffrey S. Frensley |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

---

# INTRODUCTION

In *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Supreme Court confirmed that the regulation of abortion is a matter the Constitution leaves to "the people's elected representatives," *id.* at 232. And for centuries, Tennesseans have repeatedly affirmed through the democratic process the importance of safeguarding fetal life. *See, e.g.*, 1883 Tenn. Pub. Acts, Ch. 140, pp. 188-89 (generally criminalizing abortions); Tenn. Const. art. I § 36 (2014) ("Nothing in [Tennessee's] Constitution secures or protects a right to abortion" and reserving the people's "right through their elected representatives to enact, amend, or repeal statutes regarding abortion"); Tenn. Code Ann. § 39-15-213 (generally prohibiting abortion, subject to certain exceptions to protect the life or health of the mother). Tennessee also has a compelling interest in protecting the "fundamental right of parents to make decisions regarding the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (collecting cases); *see also Bellotti v. Baird*, 443 U.S. 622, 640 (1979) (recognizing that "parental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions" and that States may find such requirements "particularly desirable" with respect to "the abortion decision").

To further those compelling interests, Tennessee's elected representatives passed the Underage Abortion Trafficking Act. *See* Public Chapter No. 1032, 113th General Assembly (2024). The Act prohibits adults from "intentionally recruit[ing], harbor[ing], or transport[ing]" a pregnant, unemancipated minor within this state for the purpose of obtaining an abortion prohibited by Tennessee law—whether through use of an "abortion-inducing drug" or other "act," and regardless of where the abortion is obtained—without the consent of the "minor's parent or legal guardian." The Act, though, nowhere prohibits merely counseling, fundraising, or talking about abortion with anyone, including a pregnant minor.

1

Just three business days before the Act's effective date of July 1, 2024, Plaintiffs filed their motion asking this Court to temporarily and preemptively enjoin its enforcement. Plaintiffs say that they want to share information with underage clients or constituents about how to access to out-of-state abortions or abortion-inducing drugs, and that they want to raise money for those seeking them. Compl., D.E. 1, PageID# 4–5, 7–8. But the Act, Plaintiffs believe, stops them from doing these things. And, they claim, it is unconstitutional—both on its face and as applied to them—because the term "recruits" is impermissibly vague, restricts speech, and is overbroad, in violation of the First and Fourteenth Amendments. Plaintiffs' motion falls flat for several reasons.

Start with the merits. For one thing, the Act poses no constitutional problem. The term "recruits" (like "harbors" and "transports") is found in numerous criminal trafficking statutes at both the state and federal level. *See, e.g.*, Tenn. Code Ann. §§ 39-13-308 (human trafficking), 39-13-309 (sex trafficking); 18 U.S.C. §§ 1590(a) (human trafficking), 1591(a) (sex trafficking). This oft-used term does not become "vague" simply because it now appears in an abortion-related context. A pre-enforcement vagueness challenge, particularly one seeking preliminary relief, is doomed where the word or phrase alleged to be vague appears in federal statutes enforced countless times. How can a court conclude that Plaintiffs are likely to succeed on the merits with a novel argument that would, by implication, retroactively undo the federal criminal convictions of human and sex traffickers? *Cf. L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) (observing that plaintiffs' efforts to "extend [] constitutional guarantees to new territory . . . suggest the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing").

For another, the Act targets *conduct*—not "pure speech." Properly construed, culpability under the Act for "recruit[ing]" attaches only when speech accompanies or seeks to induce a minor's obtaining a criminal abortion without parental consent. *Cf. United States v. Williams*, 553 U.S. 285, 294 (2008). Merely providing information about out-of-state abortion services or abortion drugs is

insufficient. But speech used to commit or induce a crime is not protected by the First Amendment. *Id.* at 297. And regardless of the level of scrutiny applied, the Act is narrowly tailored to serve the State's compelling interests in protecting the wellbeing of children and safeguarding fetal life.

Aside from their inability to demonstrate a clear likelihood of success on the merits, Plaintiffs' motion ignores Article III's limits, as well as Defendants' entitlement to sovereign immunity. Plaintiffs also have not shown the "immediate and irreparable injury" required for judicial intervention, as no First Amendment violation exists. And what's more, Plaintiffs' requested injunction would immediately and irreparably harm Tennessee by preventing it from enforcing its duly enacted laws, safeguarding fetal life, and preserving the role of Tennessee parents in caring for and directing the upbringing of their children.

Equitable principles also weigh against preliminary relief. After an unjustified delay in filing their suit and seeking relief, Plaintiffs' demand for speed at the expense of deliberation should be rejected. And abstention principles counsel that Tennessee's state courts should be the first to construe the Act's "recruit[ing]" prohibition challenged here. Further, even if preliminary relief were warranted, the injunction sought by Plaintiffs would improperly extend to non-parties and sweep beyond the "recruit[ment]" provision challenged here.

## ARGUMENT

### I. Strategic delay bars Plaintiffs' emergency request for injunctive relief.

Plaintiffs' eleventh-hour request for a temporary restraining order cannot be granted because those seeking equitable relief cannot engage in litigation gamesmanship designed to prejudice the defendant and the Court by imposing a dramatically shortened time frame for a decision. Courts have sometimes used the term "laches" to describe this general equitable principle. Laches is "an equitable doctrine which may be applied to deny relief to a party whose unconscionable delay in enforcing his rights has prejudiced the party against whom the claim is asserted." *Memphis A. Phillip Randolph Inst.*

*v. Hargett*, 473 F.Supp.3d 789, 792 (M.D. Tenn. 2020). The doctrine applies when the defendant shows (1) unreasonable delay by the plaintiff, and (2) prejudice to the defendant. *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000); *see Memphis*, 473 F.Supp.3d at 793.

Whatever the label, inexplicable strategic delay by Plaintiffs should end their effort to seek emergency or preliminary relief. Put in the parlance of "laches," the first element—unreasonable delay—is easily satisfied. The legislature passed the Act on April 24, 2024, and Governor Lee signed it into law on May 28, 2024. *See* Compl. Ex. 1, D.E. 1-1, PageID# 18. It takes effect Monday, July 1, 2024. *Id.* But Plaintiffs knew about the bill that became the Act well before its passage—since at least April 10—and actively advocated against it for many of the very reasons that animate this lawsuit. *See id.* at Ex. 5, D.E. 1-5, PageID# 36–40. Even so, they waited nearly a month after the Act was signed into law to file suit, and then waited another two days to move for injunctive relief, in which they request relief by July 1. *See* TRO Mem., D.E. 19, PageID# 181. Defendants and this Court, then, are left with less than three business days to sift through Plaintiffs' claims.

This lengthy delay in seeking injunctive relief was unreasonable. As another judge of this Court observed when faced with similar delay and a soon-to-be-effective state law, "every day matters—to the Court's ability to properly and thoroughly adjudicate [the] motion . . . and to Defendants' ability to respond to that motion and react" before the effective date "to [injunctive relief] if it were granted." *A.S. v. Lee*, No. 3:21-CV-00600, 2021 WL 3421182, at *6 (M.D. Tenn. Aug. 5, 2021). That judge thus concluded that a group of plaintiffs unreasonably delayed seeking a temporary restraining order where they "were aware of sufficient facts and a supporting theory to at least file suit and seek a temporary restraining order . . . on July 1, 2021 at the very latest," but "waited over one month before filing suit . . . on August 2," "a mere two business days" before the conduct they sought to restrain was set to begin. *Id.* at *3.

4

Nor is there any excuse for Plaintiffs' delay. Plaintiff Welty's demand for clarification from Defendants about how they intend to enforce the Act's "recruit[ment]" prohibition, for example, cannot justify Plaintiffs' lengthy delay in seeking injunctive relief. Plaintiffs maintain that the law is *facially* invalid. The Act, they claim, is unconstitutional "[r]egardless of how 'recruits' is defined." Compl., D.E. 1, PageID# 2; *see also id.* at PageID# 12, 14. Defendants' "specific decisions" about the scope of the Act's "recruit[ment]" prohibition, then, "would not affect the nature of validity of Plaintiffs' primary position." *A.S.*, 2021 WL 3421182, at *5; *cf.* Compl. D.E., 1, PageID# 2 (claiming that the Act is unconstitutional "[r]egardless of how 'recruits' is defined"). And it follows that Plaintiffs' "awaiting such decisions [from Defendants] does not explain or excuse the delay in filing for a TRO." *A.S.*, 2021 WL 3421182, at *5.

The second element of laches—prejudice to the defendant—is also satisfied. "There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support the defendant's position; or (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Lichteinstein v. Hargett*, 489 F. Supp. 3d 742, 754 (M.D. Tenn. 2020); *see also Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008) (noting that "prejudice in this context is normally either evidence-based or expectations-based"). This latter form of "expectations-based prejudice," can exist "when the defendants have not changed their position in a way, or taken actions, that would not have occurred if the plaintiffs had not delayed in filing suit." *A.S.*, 2021 WL 3421182, at *8.

Plaintiffs' emergency request for the Court to block enforcement of a duly enacted law on a compressed timeline of their own making has unfairly prejudiced Defendants. To begin, as many courts have recognized, "[t]he greater the delay, the less the prejudice required to show laches." *A.S.*, 2021 WL 3421182, at *7 (quoting *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va.), *aff'd*, 471 F. App'x 219 (4th Cir. 2012)); *see also Memphis A. Phillip Randolph Inst.*, 473 F. Supp. 3d at 800 ("Although [the

defendants'] declaration does not provide overwhelming evidence of actual prejudice, not much prejudice is required given the substantial delay here close to the primary election."). Thus, Defendants' burden to show prejudice is not a heavy one—and it is one that they can easily satisfy.

Tennessee has a compelling and longstanding interest in protecting the wellbeing of children and safeguarding fetal life. *See, e.g.*, 1883 Tenn. Pub. Acts, Ch. 140, pp. 188–89 (generally criminalizing abortions); Tenn. Const. art. I, § 36 (making clear that "[n]othing in [Tennessee's] Constitution secures or protects a right to abortion" and further reserving the people's "right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion."). And the Underage Abortion Trafficking Act is just one of the many ways that Tennessee has sought to further that interest. By enacting that law, the State aimed to ensure that people could not transport a minor across state lines to obtain an abortion or give a minor abortion-inducing drugs without the consent of the minor's parents. It follows that if that law were enjoined, the State would be left scrambling to address a problem that it reasonably believed it had solved. Had Plaintiffs filed suit promptly, the State could have taken additional steps to address this problem, perhaps by passing a law to target it from a different angle entirely. But "with no pending [injunction or temporary restraining order]," the State was "entitled to expect that [the] law passed by the Tennessee legislature w[ould] go into effect and remain in effect." *A.S.*, 2021 WL 3421182, at *8. Plaintiffs, though, disrupted that expectation with their eleventh-hour injunction request; a request that, if granted, would force the State to make "nuanced policy decisions" about "a sensitive and widely impactful topic" on short notice. *Id.* That disruption "imparts expectations-based prejudice." *Id.*

The upshot: Because both elements of laches are satisfied here, this Court should deny Plaintiffs' motion.

## II. Plaintiffs are not entitled to a temporary restraining order or preliminary injunction.

Setting aside Plaintiffs' strategic delay, their request should also be denied because they cannot show that they are entitled to the "extraordinary remed[ies]" they seek. *Stein v. Thomas*, 672 F. App'x 567, 572 (6th Cir. 2016).

To show entitlement to a temporary restraining order or preliminary injunction, a plaintiff must "prov[e] that the circumstances clearly demand it." *Knight v. Montgomery Cnty.*, No. 3:19-CV-00710, 2019 WL 13109761, at *1 (M.D. Tenn. Aug. 16, 2019) (citing *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). And in determining whether the circumstances demand the issuance of this extraordinary form of relief, courts must consider four factors: "(1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest." *Nelson v. Parker*, No. 3:17-CV-01270, 2018 WL 1243443, at *4 (M.D. Tenn. Mar. 9, 2018) (first citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); and then citing *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). Even then, the Court retains discretion to deny or limit relief as it deems appropriate. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982); *cf. GMA Accessories, Inc. v. Positive Impressions, Inc.*, 181 F.3d 82 (2d Cir. 1999) (unpublished) (noting that the district court could have denied equitable relief even if the plaintiff "had otherwise satisfied all of the prerequisites"). Here, each of the injunction factors strongly weigh against Plaintiffs' requested relief.

### A. Plaintiffs are unlikely to succeed on the merits.

Plaintiffs cannot show a likelihood of success on the merits, both because their claims fail under the applicable law and because they run headlong into well-settled jurisdictional bars.

### 1. The Act is constitutional.

Plaintiffs claim that the Act is unconstitutional in three ways. First, they claim that it is

unconstitutionally vague. Compl. D.E. 1, PageID# 9–11. Second, they maintain that it criminalizes constitutionally protected speech. *Id.* at PageID# 11–13. And third, they argue that it is unconstitutionally overbroad. *Id.* at PageID# 13–14. Plaintiffs are wrong on all counts.

### a.    *The Act is not unconstitutionally vague.*

Plaintiffs zero in on the Act's use of the term "recruits," suggesting that its inclusion poses constitutional vagueness problems. That term, they say, is "not defined" in the Act and is "susceptible to a wide range of potential meanings." Compl., D.E. 1, PageID# 10. Plaintiffs also complain that the Defendant District Attorneys General declined to respond to their "specific request to clarify the meaning of the word . . . and define its scope." *Id.* And "based on both the undefined nature of the word . . . and the Defendants' refusal to clarify their own interpretation of [it]," they conclude, the Act is unconstitutionally vague.

Several of Plaintiffs' complaints about the Act can be rejected out of hand. The fact that the law does not define "recruits," for instance, is hardly unusual, let alone cause for vagueness concerns. *See Smith v. United States*, 508 U.S. 223, 228 (1993) (observing that "[w]hen a word is not defined by statute," courts "normally construe it in accord with its ordinary or natural meaning."). And Defendants' choice to decline Plaintiffs' invitation to opine on their interpretations of the term is not proof that it is unconstitutionally vague. The relevant question is whether the law is clear enough to provide people with reasonable notice of what it prohibits, not what individual district attorneys believe it to mean. *See Grayned v. Rockford*, 408 U.S. 104, 108 (1972). With those points properly set aside, Plaintiffs' vagueness argument is simple: "[t]he word 'recruits' . . . is susceptible to a wide range of potential meanings," some of which could allegedly "criminalize some amount of pure speech." TRO Mem., D.E., 19, PageID# 170–71.

Plaintiffs' vagueness argument fails. The Due Process Clause's "void for vagueness" doctrine ensures only that a "person of ordinary intelligence" has "a reasonable opportunity to know what is

prohibited" by the law. *Grayned*, 408 U.S. at 108. "Perfect clarity and precise guidance have never been required," even for laws "that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Indeed, the law is full of "flexible" "standards," *id.*, and "[c]lose cases can be imagined under virtually any statute," *United States v. Williams*, 553 U.S. 285, 306 (2008). The vagueness doctrine thus serves a narrow purpose: to protect against those rare laws that altogether fail "to give ordinary people fair notice of the criminalized conduct" or are "so standardless as to invite arbitrary enforcement." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (cleaned up). The Act does not rise to this level for several reasons.

*First*, the Act's "recruit[ing]" prohibition is not nearly as broad as Plaintiffs suggest. Plaintiffs' mistake is fundamental: they pluck the word "recruits" from its context and analyze it in a vacuum. But that's not how statutory interpretation works. "Statutory language must be read in context." *Jones v. United States*, 527 U.S. 373, 389 (1999). And statutory terms—especially those "capable of many meanings"—must be read "in light of [their] accompanying words in order to avoid giving the statutory [provisions] unintended breath." *United States v. Hill*, 963 F.3d 528, 534 (6th Cir. 2020) (quoting *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013)) (cleaned up). The "canon of *noscitur a sociis*" reflects this "commonsense" notion. *United States v. Williams*, 553 U.S. 285, 294 (2008). It "counsels that a word is given more precise content by the neighboring words with which it is associated." *Id.*; *see also Noscitur a sociis*, Black's Law Dictionary (11th ed. 2019) ("A canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the words immediately surrounding it."). Said another way, "words are known by the company they keep." *Hill*, 963 F.3d at 534.

Here, the company kept by "recruits" significantly narrows its possible meanings. Recall the relevant text of the Act: "An adult commits the offense of abortion trafficking of a minor if the adult intentionally *recruits, harbors, or transports* a pregnant unemancipated minor within [Tennessee] for the

purpose of . . . [p]rocuring an act that would constitute a criminal abortion" in Tennessee or "[o]btaining an abortion-inducing drug . . . for the purpose of an act that would constitute a criminal abortion" in Tennessee and without parental consent. *See* Compl. Ex. 1, D.E. 1-1, PageID# 16 (emphasis added). The term "recruits," then, must be interpreted in light of its neighbors: "harbors" and "transports." Those two words plainly refer to conduct, not speech. *Harboring*, Black's Law Dictionary (11th ed. 2019) ("The act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien."); *Transport*, Black's Law Dictionary (11th ed. 2019) ("To carry or convey (a thing) from one place to another."). The takeaway? Despite its susceptibility to a wide array of possible meanings, "recruits" should be understood to require conduct or action, not just speech.

And conduct-focused definitions are easy to find. *See, e.g.*, *Recruit*, Merriam-Webster's Dictionary Online (defining the term to mean "to fill up the number of with new members," "to increase or maintain the number of," or "to secure the services of"); Webster's Ninth New Collegiate Dictionary 985 (1986) ("[T]o secure the services of: ENGAGE, HIRE."). Plaintiffs themselves even offer several. *See, e.g.*, *In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005) ("The dictionary definition of 'recruit' means 'to secure the services of ... [or to] enlist new members.'"); *United States v. Withers*, No. 3:16-cr0005-wmc, Doc. 126-2, at 12 (W.D. Wis. Apr. 28, 2017) ("To recruit means to persuade someone to join in or to help with some activity"). And courts, too, have used these narrower definitions when interpreting similarly worded statutes. *See, e.g.*, *Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019) (explaining that "the term 'recruit' in the TVPA means that the perpetrator somehow secured the services of the victims"); *People v. Martinez*, 55 Cal. App. 5th 428, 444–45 (2020) ("[T]o recruit a target to actively participate in a criminal street gang would mean, among other things, to fill up the gang with new members including that target, to increase or maintain the number of the gang, to secure the services of the target for the gang, and to seek to enroll the target in the gang."). All of these definitions require more than mere speech—they require *successful*

persuasion to join a group or engage in an endeavor, usually a criminal one.

Faced with the choice between definitions of "recruit" that require some act beyond speech—actually securing or enlisting an individual for a purpose—and those broad enough to sweep in pure advocacy or discussion, this Court should choose the former. To do otherwise "is to ignore the text of the statute and the principle of *noscitur a sociis*." *Parker*, 121 F.3d at 1014; *see also id.* (concluding that the terms "travel service" and "shoe repair service," when placed among a list of "office[s]" and "physical place[s]," must also refer to "physical place[s] where services may be obtained"). Choosing the constitutionally suspect reading would also defy the longstanding requirement that courts "resort to" "reasonable construction[s] . . . in order to save [statutes] from unconstitutionality." *Déjà Vu v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 786 (6th Cir. 2005); *see also Hooper v. California*, 155 U.S. 648, 657 (1895).

*Second*, even if the scope of the term "recruits" remained uncertain, any constitutional concerns would be alleviated by the law's scienter requirement. A scienter requirement, the Supreme Court has recognized, "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also Boyce Motor Lines v. U.S.*, 342 U.S. 337 (1952) (reasoning that the "requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the [law] would be so unfair that it must be held invalid"). This is because, "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States*, 325 U.S. 91, 102 (1945).

Here, the Act does contain a scienter requirement. It applies only when "[a]n adult *intentionally* recruits . . . a pregnant unemancipated minor within this state." Compl. Ex. 1, D.E. 1-1, PageID# 16

(emphasis added). That is a high bar. Under Tennessee law, "[i]ntentional" is the most culpable mental state. *See* Tenn. Code Ann. § 39-11-302(a). It "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* And when the Act is read with that steep requirement in mind, it's hard to see how anyone could accidentally violate the law's "recruit[ment]" prohibition. Again, the law does not prohibit "recruit[ment]" in the abstract; it prohibits "recruit[ing] . . . *for the purpose* of . . . [p]rocuring an act that would constitute a criminal abortion" in Tennessee or "[o]btaining an abortion-inducing drug . . . for the purpose of an act that would constitute a criminal abortion" in Tennessee. *See* Compl. Ex. 1, D.E. 1-1, PageID# 16 (emphasis added). A person, then, would violate the Act only if he or she "conscious[ly] . . . desire[s]" to "recruit[]" an unemancipated minor "for the purpose" of helping them obtain an abortion prohibited by Tennessee law without parental consent.

*Finally*, even if the Act's reference to "recruit[ing]" could be considered impermissibly vague in certain applications, Plaintiffs' cannot carry their burden of establishing *facial* invalidity. Normally, "litigants mounting a facial challenge to a statute . . . must establish that *no set of circumstances* exists under which the [statute] would be valid." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (cleaned up). In the context of a facial-vagueness challenge, that generally means "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 497. True, this rule has been relaxed in cases implicating First Amendment rights and other narrow circumstances. *United States v. Requena*, 980 F.3d 30, 41 (2d Cir. 2020). But the Supreme Court has never clearly stated that facial-vagueness challenges require courts to compare constitutional applications to unconstitutional applications, as they do in First Amendment overbreadth challenges (and Plaintiffs nowhere suggest what the proper analysis might look like—they only insist that it should be "stringent"). And if an overbreadth-style comparison is required, courts "vigorously

enforce[] the requirement that a statute's" unconstitutional applications "be *substantial . . .* relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292, and place the burden of making that showing squarely on the challenger, *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

Here, Plaintiffs did not prove any vague applications—much less establish that "the ratio of unlawful-to-lawful applications" is "lopsided enough to justify the strong medicine of facial invalidation." *Hansen*, 143 S. Ct. at 1948 (quotations omitted). Indeed, it is easy to imagine scenarios that would fall well within the heartland of the Act's "recruit[ing]" prohibition. Suppose, for example, a rapist entices or coerces their unemancipated-minor victim to cross state lines to get an abortion without parental knowledge or consent. So, at a minimum, this Court should not find the Act's "recruit[ing]" prohibition *facially* invalid.

The bottom line: Plaintiffs' vagueness claim fails. The term they take issue with, when read in context, is far from vague and has long been used in numerous similar state and federal statutes. And even if vagueness concerns remained, the Act's scienter requirement ensures that only those with culpable intent will fall within its scope. Finally, many scenarios exist in which the Act's "recruit[ing]" prohibition would squarely apply, making facial invalidation unwarranted.

>            **b.      The Act does not criminalize constitutionally protected speech.**

Plaintiffs also argue that the Act, through its "recruit[ment]" prohibition, "criminalizes pure speech" about abortion. *See* Compl. D.E. 1, PageID# 2; *see also id.* at PageID# 11–13. But as explained in detail above, well-settled and "commonsense" principles of statutory interpretation mandate that the law's reference to "recruit[ment]" be read to require more than "pure speech." *See Williams*, 553 U.S. 285, 294 (2008).

But even if the Act could be read to cover the sort of speech Plaintiffs allegedly intend to engage in, it would still pass constitutional muster. "Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297. There is, of

course, "an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality," *id.* at 298–99 (citations omitted), but the Act does not prohibit "recruit[ing]" in the abstract. It prohibits recruiting an unemancipated minor "for the purpose of" procuring an abortion that is illegal in Tennessee. *See* Compl. Ex. 1, D.E. 1-1, PageID# 16.

Tennessee is well within its rights to prohibit that sort of "recruit[ing]." Governments have long prohibited "speech . . . that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. And it is in fact the *speech* itself that is prohibited, not just the crime the speech is intended to induce. *See id.* at 300 (explaining that it would not be unconstitutional to punish offers to distribute child pornography even where the offerors had no child pornography to distribute). This remains true even when the underlying criminal act would take place in a jurisdiction where it is legal. So long as an essential element of the charged offense—here, abortion trafficking—takes place within Tennessee, it can be prosecuted here even if the abortion itself takes place elsewhere. This is not unusual; other states similarly extend their jurisdiction to crimes occurring elsewhere so long as some element occurs within their borders. *See, e.g.*, Wash. Rev. Code Ann. § 9A.04.030(1); Or. Rev. Stat. § 131.215(1), (6); Mont. Code Ann. § 46-2-101(1), (2); Utah Code Ann. § 76-1-201(1), (2); Cal. Penal Code §§ 778, 778(a), 781, 782.

And to the extent any protected speech could still be covered by the Act, the doctrine of constitutional avoidance requires a reading that excludes that speech and thus would not render the statute unconstitutional. *See Déjà Vu*, 411 F.3d at 786; *Hooper*, 155 U.S. at 657. Plaintiffs' free-speech claim, then, necessarily fails.

### c.     The Act is not unconstitutionally overbroad.

Finally, Plaintiffs—recycling many of their previous arguments—claim that the Act is unconstitutionally overbroad. *See* Compl. D.E. 1, PageID# 13–14. The First Amendment overbreadth doctrine allows courts to "invalidate[] [a statute] as overbroad if a substantial number of

14

its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted). Invalidation for overbreadth, though, is "strong medicine" that courts dispense "with hesitation, and . . . only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quotations omitted).[1] The Supreme Court has thus "vigorously enforced" the requirement that the challenger prove a *substantial* number of unconstitutional applications. *Williams*, 553 U.S. at 292. Plaintiffs do not come close to carrying that burden here.

"To judge whether a statute is overbroad," this Court "must first determine what it covers." *Hansen*, 599 U.S. at 770. Plaintiffs, for their part, insist that the Act—and specifically its "recruit[ment]" prohibition—"criminalizes a great deal of pure speech about legal abortion care" and thus "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *See* Compl. D.E. 1, PageID# 14. This claim, like their free-speech claim, rests on an overly expansive reading of "recruit[ing]" that "ignore[s] the text of the statute," the "principle of *noscitur a sociis*," *Parker*, 121 F.3d at 1014, and the constitutional-avoidance canon, *see Hooper*, 155 U.S. at 657; *see also Williams*, 553 U.S. at 294 (concluding that a statute was not overbroad, in part, based on the presence of a scienter requirement and the "the commonsense canon of *noscitur a sociis*," which "narrow[ed]" the statute's scope). Read with these interpretive principles in mind, the text of the Act does not sweep nearly as broadly as Plaintiffs suggest. Rather, as explained above, the law's reference to "recruit[ment]" is properly read to prohibit affirmative conduct—i.e., reaching out to and convincing a minor to "transport" or "harbor" them for the purpose of helping them obtain an abortion Tennessee law prohibits—not simply speaking about abortion and mentioning that other states permit the procedure.

---

[1] Indeed, the doctrine is openly "disfavored," *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009), and should be reconsidered, *see Hansen*, 599 U.S. at 785–93 (Thomas, J., concurring). Given the "cogent[] critici[sm]" of the doctrine, this Court should decline to "expand it." *United States v. Yung*, 37 F.4th 70, 76 (3d Cir. 2022).

The next step in the overbreadth analysis is to determine whether, as properly construed, the Act "criminalizes a substantial amount" of protected speech. *Williams*, 553 U.S. at 297. It does not. Because the Act is focused on conduct, not pure speech or advocacy, it necessarily does not "prohibit a substantial amount of protected speech relative to its plainly legitimate sweep." *See Hansen*, 599 U.S. at 770 (cleaned up). And what's more, as mentioned above, "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297. So, to the extent the "recruit[ing]" prohibition applies to that sort of speech at all, it is not unconstitutional. *See generally id.* at 297–98.

To nevertheless succeed in their overbreadth challenge, Plaintiffs would have to show that these lawful applications of the Act—to conduct and to speech intended to induce or commence criminal activity—are outweighed by its *un*lawful applications. Said another way, they would have to show that "the ratio of unlawful-to-lawful applications" is "lopsided." *Hansen*, 599 U.S. at 784. Plaintiffs, though, haven't even tried. They simply assert that the Act "criminalizes a great deal of speech about legal abortion care that the Government has no lawful interest in criminalizing." TRO Mem., D.E. 19, PageID# 177. That conclusory assertion—not backed up by even a single real or imagined application—cannot warrant the "strong medicine" of invalidation for overbreadth. *Ferber*, 458 U.S. at 769. This claim, then, fails.

## 2. Plaintiffs' lack standing.

To invoke federal jurisdiction, a plaintiff must prove "an injury in fact . . . fairly traceable to the challenged conduct of the defendant . . . that is likely to be redressed by the requested relief." *FEC v. Cruz*, 142 S. Ct. 1638, 1646 (2022). To be sure, an Article III injury can be established before enforcement of a statute. But to do so, a plaintiff must first prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act. *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quotations omitted). And it must

then prove "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct." *Id.* at 455. Plaintiffs flunk both requirements.

*First*, Plaintiffs failed to prove an intention to violate the Act. The Act prohibits adults from "intentionally recruit[ing], harbor[ing], or transport[ing] a pregnant unemancipated minor within [Tennessee] for the purpose of . . . [p]rocuring an act that would constitute a criminal abortion" in Tennessee or "[o]btaining an abortion-inducing drug . . . for the purpose of an act that would constitute a criminal abortion" in Tennessee and without parental consent. *See* Compl. Ex. 1, D.E. 1-1, PageID# 16. Plaintiffs focus exclusively on the law's prohibition of "recruit[ing]." *See, e.g.*, Compl., D.E. 1, PageID# 2–3; *id.* at PageID# 9–10 (claiming that the "'recruit[ment]' prohibition is unconstitutionally vague"); *id.* at PageID# 11–13 (claiming that the "'recruit[ment]' prohibition criminalizes . . . pure speech"); *id.* at PageID# 13–14 (claiming that the "'recruit[ment]' prohibition prohibits a substantial amount of protected speech relative to its plainly legitimate sweep"). That prohibition, they say, either directly criminalizes or chills their constitutionally protected speech. But as explained above, the law's text—properly interpreted—does not penalize pure speech at all; it prohibits affirmative conduct like reaching out to and convincing a minor to be "transport[ed]" or "harbor[ed]" without their parents' consent for the purpose of helping them obtain an abortion Tennessee law prohibits.

To prove an imminent future injury, then, Plaintiffs had to demonstrate an intention to engage in that sort of conduct. They haven't come close to doing so. Indeed, Plaintiffs did not "articulate[] with *any* amount of specificity" the future speech or conduct they intend to engage in. *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 964 (6th Cir. 2009) (emphasis added). Instead, they vaguely allude to their desire to "help[] pregnant, unemancipated minors access legal abortion care," Compl. D.E. 1, Page ID# 5, "advoca[te] for safe and healthy access to legal abortion," *id.* at PageID# 6, "advoca[te] for young people who need legal abortion care," *id.* at PageID# 8, and "express [themselves] on matters

of current public importance," *id.* at PageID# 9.  These cryptic allegations make it impossible to predict with any certainty what Plaintiffs intend to say or do, much less determine whether their intended speech or conduct is "affected with a constitutional interest" or "proscribed by" the Act. *Crawford*, 868 F.3d at 454.

*Second*, Plaintiffs also failed to prove the "certain threat of prosecution" necessary to establish Article III standing.  *Id.* at 455.  As just explained, Plaintiffs failed to prove an intention to violate the Act, so they necessarily cannot show a certain threat of prosecution.  But setting that fatal failure aside and assuming that the Act does "proscribe[] [Plaintiffs'] intended conduct," courts faced with pre-enforcement challenges do not assume that every violation of the law will be prosecuted.  *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016).  Instead, they assess the imminence of enforcement through a holistic, four-part framework referred to as the "*McKay* factors." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).  Courts look for "some combination" of the following factors: "(1) 'a history of past enforcement against the plaintiffs or others'; (2) 'enforcement warning letters sent to the plaintiffs regarding their specific conduct'; (3) 'an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action'; and (4) the 'defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.'" *Id.* (quoting *McKay*, 823 F.3d at 869).  Here, all factors cut against Plaintiffs' standing.

Start with the first two factors: history of past enforcement and receipt of warning letters.  "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014).  But Plaintiffs sued before the Act even went into effect, so they necessarily cannot establish a history of prior enforcement.  And "enforcement letters," had they been "sent to" Plaintiffs "regarding [their] specific conduct," could lend credibility to their fear of prosecution and thus bolster their standing-related

18

arguments. *Online Merchs.*, 995 F.3d at 550 (quotations omitted). Plaintiffs, though, point to no such letters. So this factor, too, cuts against standing.

The third factor—ease of enforcement—is similarly unhelpful. The Act does not "allow[] any member of the public to initiate an enforcement action." *Id.* The "universe of potential" enforcers is limited to "state officials who are constrained by . . . ethical obligations." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). "Only law enforcement officials can investigate" potential violations of the Act, and "only prosecutors can bring charges." *Plunderbund Media, LLC v. DeWine*, 753 F. App'x 362, 371 (6th Cir. 2018). The Act, then, is no easier to enforce than any other Tennessee criminal law and poses no unique enforcement risk. And any relief against these Defendants would not alleviate any risk of civil liability they may incur through the Act's private right of action.

Finally, consider the last factor: refusal to disavow enforcement. Like the others, this factor gets Plaintiffs nowhere because there has been no meaningful "refusal to disavow enforcement of the challenged statute." *Online Merchs.*, 995 F.3d at 550 (quotations omitted). True, Plaintiffs allege that they demanded an interpretation of the Act's reference to "recruit[ing]" and asked the Defendant District Attorneys General to "disavow all enforcement of [the law's] 'recruit[ment] prohibition." *See* Compl. D.E. 1, PageID# 5-6. But what matters for pre-enforcement-standing purposes is not simply the refusal to disavow enforcement "in the *abstract*," but the refusal to disavow enforcement against the Plaintiffs' "*specific* speech." *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022). Indeed, only that situation-specific refusal to disavow could possibly shed light on the likelihood of enforcement against *the plaintiffs*, which is the very reason the factors exist. *See Online Merchs.*, 995 F.3d at 550. Here, Plaintiffs have not identified their intended future speech with any specificity, so there is naturally nothing to disavow enforcement against. And in any event, as the State has explained at length, the Act does not criminalize "pure speech." *Contra* Compl., D.E. 1, PageID# 2. So, everything that can be disavowed, has been.

### 3. Defendants are entitled to sovereign immunity.

Finally, Defendants, all of whom are sued in their official capacities only, enjoy sovereign immunity from suit. The exception to sovereign immunity under *Ex parte Young*, 209 U.S. 123 (1908), does not apply. This, too, is fatal to Plaintiffs' chances of success on the merits.

Generally, a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). A suit against a state official in his official capacity is considered to be a suit against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Wells v. Brown*, 891 F.2d 591, 592–94 (6th Cir. 1989). There is, of course, "an exception to the State's sovereign immunity under *Ex Parte Young* . . . whereby 'a suit challenging the constitutionality of a state official's action is not one against the State." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046-47 (6th Cir. 2015) (cleaned up). But that exception "has been read narrowly." *EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019). To successfully invoke it, "a claim must seek prospective relief to end a continuing violation of federal law." *Russell*, 784 F.3d at 1047. A plaintiff, moreover, must show that the state official has threatened and is "about to commence proceedings" in order to overcome the sovereign immunity defense. *EMW*, 920 F.3d 421, 445 (6th Cir. 2019). Plaintiffs cannot carry this burden.

Plaintiffs have named eleven district attorneys as Defendants, but they have not alleged—much less proven—that a single one of them has "enforced []or threatened to enforce" the Act. *See Russell*, 784 F.3d at 1047. Rather, they allege only that the Defendants have "criminal enforcement authority and an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto." Compl. D.E. 1, PageID# 3 (quoting Tenn. Code Ann. § 8-7-103(1)). This is true, but more is required to invoke the *Ex parte Young* exception. Plaintiffs must show that enforcement is both a "realistic possibility," *Russell*, 784 F.3d at 1048, and "likely," *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018). They've done

neither. They have instead identified a statute and offered their own legal theory about how that statute could hypothetically be used to prosecute them for unspecified future speech. That is not enough.

**B.      Plaintiffs will not suffer irreparable harm if no injunction issues.**

Plaintiffs similarly have not shown that they will suffer irreparable harm in the absence of a temporary injunctive relief. Plaintiffs' irreparable-harm argument is premised exclusively on the "loss of First Amendment freedoms." TRO Mem., D.E. 19, PageID# 178. It follows that their argument rises or falls with their constitutional claims. *See Overstreet*, 305 F.3d at 578 (reasoning that where a plaintiff was "unable to demonstrate that he ha[d] a cognizable constitutional claim," his "argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation [wa]s without merit"). As discussed above, the Act does not violate Plaintiffs' constitutional rights— it is not vague, and when properly interpreted, it does not cover pure speech. Plaintiffs' failure to show a constitutional violation means that they necessarily cannot show irreparable harm.

**C.      The balance of equities and public interest favor Defendants.**

Because Defendants are government officials, the balance-of-equities and public-interest factors "merge." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). It is "in the public interest" to enforce the State's democratically enacted laws, *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020), and "[a]ny time" such a law is enjoined, the State "suffers a form of irreparable injury," *Lichtenstein*, 489 F. Supp. 3d at 787 (cleaned up).

These principles apply with unique force here. As explained, the Act helps to further Tennessee's longstanding interest in protecting the wellbeing of children and safeguarding fetal life. *See, e.g.*, 1883 Tenn. Pub. Acts, Ch. 140, pp. 188–89; Tenn. Const. art. I, § 36. Preliminary injunctive relief would undermine that interest by permitting Plaintiffs and others to facilitate abortions among Tennessee youth without parental consent. And any abortions obtained and harm to minors that

occurs while the State is prohibited from enforcing the Act, quite obviously, cannot be undone. The harm to the State's interests thus outweighs any possible harms to Plaintiffs here. At the end of the day, "[i]t is not the Court's role to second-guess" Tennessee's "reasoned public health decisions," especially on a non-existent record in an unnecessarily expedited posture. *Loc. Spot, Inc. v. Cooper*, 2020 WL 7554247, at *3 (M.D. Tenn. Dec. 21, 2020).

## III. Principles of abstention weigh against injunctive relief.

Plaintiffs' request for this Court to weigh in on a new Tennessee law that no state court has interpreted also ignores well-established abstention principles. When faced with a "federal constitutional claim . . . premised on an unsettled question of state law," the appropriate course is to abstain and give "the state courts an [o]pportunity" to weigh in. *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975); *see R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941). Indeed, cases "in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law," are "[a]mong the cases that call *most insistently* for abstention." *Harris Cnty.*, 420 U.S. at 84 (emphasis added). And that makes sense. "If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim," the Supreme Court has explained, "the argument for abstention is strong." *Id.* Abstaining in such situations thus "avoid[s] the possibility of unnecessarily deciding a constitutional question," *id.* at 83, and "affords the [state] courts the respect they are due as . . . equals in a federalist judicial system." *Gottfried v. Med. Plan. Servs.*, 142 F.3d 326, 332 (6th Cir. 1998).

Here, Plaintiffs' claims implicate "an unsettled question of state law." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999). Plaintiffs object to the Act's use of the term "recruits," claiming that it is unconstitutionally vague and prohibits protected speech. These claims opportunistically rest on the absence of Tennessee case law interpreting the challenged language. But of course, there is a solution: Allow the Tennessee state courts to interpret the statute in the first instance. Doing so may

very well result in an interpretation "that would avoid or modify the constitutional question," *Zwickler v. Koota*, 389 U.S. 241, 249 (1967), and "remove the federal issue by making unnecessary a constitutional decision," *Traughber v. Beauchane*, 760 F.2d 673, 682 (6th Cir. 1985); *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 511 (1972). This Court, then, should "stay its hand," *Harris Cnty.*, 420 U.S. at 83, and deny Plaintiffs' request for injunctive relief—a request that, given the novel state-law question, would necessarily be a "forecast rather than a determination." *R.R. Comm'n of Texas*, 312 U.S. at 499.

## IV. Any relief should be narrowly tailored.

As explained above, Plaintiffs are not entitled to the extraordinary injunctive relief they seek. But if this Court were to decide to grant Plaintiffs' request, any temporary restraining order or preliminary injunction should be narrowly tailored in two ways.

*First*, any relief here should be limited to the allegedly unconstitutional component of the Act—the "recruit[ment]" prohibition. Severability and elision are "determined by the law of [the] state." *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018). And the Tennessee Code, the Sixth Circuit has observed, "specifically provides that 'the sections, clauses, sentences and parts of the Tennessee Code are severable . . . if the code would otherwise be unconstitutional or ineffective.'" *Doe v. Lee*, 102 F.4th 330, 340 (6th Cir. 2024). So long as the "conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted," elision is appropriate. *Id.* at 340–41.

Here, the General Assembly no doubt would have passed the Act without the "recruit[ment]" prohibition. Again, the Act exists to prevent abortion trafficking. To that end, it prohibits not just recruitment, but also harboring and transportation. There is no reason to think that the members of the General Assembly would want to prohibit taking an unemancipated minor across state lines to get an abortion, *see Transport*, Black's Law Dictionary (11th ed. 2019) ("To carry or convey (a thing) from

one place to another."), only if the minor was recruited first. If anything, transporting and harboring an unwilling—or "unrecruited"—minor is *more* reprehensible. And so, if this Court does conclude that the Act's "recruit[ment]" prohibition is unconstitutional, the solution is to enjoin the enforcement of *that* provision—not the Act as a whole. *See, e.g.*, *Lowe's Companies, Inc. v. Cardwell*, 813 S.W.2d 428, 431 (Tenn. 1991) (eliding only the unconstitutional component of a single statutory tax exemption where "the remainder of the . . . exemption . . . is valid and effective"); *Willeford v. Klepper*, 597 S.W.3d 454, 471 (Tenn. 2020) (eliding a short statutory phrase where the elision allowed "[t]he overriding purpose of the statutory scheme [to] survive").

*Second*, any relief should apply only to the parties. As the Sixth Circuit recently explained: "A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L.W.*, 83 F.4th at 490; *see also DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., joined by Thomas, J., concurring). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added); *see also Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (stating that "federal courts should not issue relief that extends further than necessary to remedy the plaintiff's injury").

That Plaintiffs raised a facial challenge changes nothing. In *L.W.*, the Sixth Circuit considered a facial challenge to a Tennessee law that prohibited healthcare providers from performing certain medical procedures. 83 F.4th at 412–13. Upon finding that the statute was facially unconstitutional, the district court issued a statewide injunction. *Id.* The Sixth Circuit reversed, making clear that injunctive relief must operate in "a party-specific and injury-focused manner"—not on a statewide basis. *Id.* at 490. A sweeping injunction that applies to nonparties would be just as improper here.

## CONCLUSION

For all of these reasons, this Court should deny Plaintiffs' request for a temporary restraining

order and preliminary injunction.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN (BPR# 040708)
Senior Counsel for Strategic Litigation

MATTHEW D. CLOUTIER (BPR# 036710)
Assistant Solicitor General

Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-9598
Steven.Griffin@ag.tn.gov
Matt.Cloutier@ag.tn.gov

25

# CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, a copy of the foregoing document was filed using the

Court's electronic court-filing system, which sent notice to the following counsel:

Daniel A. Horwitz
Melissa Dix
Sarah L. Martin
Horwitz Law, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
melissa@horwitz.law
sarahmartin1026@gmail.com
(615) 739-2888

*Counsel for Plaintiffs*

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN