## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **RACHEL WELTY, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 3:24-cv-00768** |
| | ) | **District Judge Aleta A. Trauger** |
| **BRYANT C. DUNAWAY, et al.,** | ) | **Magistrate Judge Jeffrey S. Frensley** |
| | ) | |
| Defendants. | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

---

# INTRODUCTION

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court "return[ed] the issue of abortion to the people's elected representatives." 597 U.S. 215, 232 (2022). And in the wake of *Dobbs*, Tennessee's elected representatives, like many others across the country, passed laws to safeguard the State's long-recognized interest in protecting fetal life. One of those laws was the Underage Abortion Trafficking Act. S.B. 1971, Gen. Assemb., Sec. Reg. Sess. (Tenn. 2024) ("the Act"). The Act prohibits adults from "intentionally recruit[ing], harbor[ing], or transport[ing]" a pregnant, unemancipated minor within this state for the purpose of obtaining an abortion prohibited by Tennessee law—through use of an "abortion-inducing drug" or other "act," and regardless of where the abortion is obtained— without the consent of the "minor's parent or legal guardian." The Act thus protects more than fetal life. It also safeguards the "fundamental right of parents to make decisions regarding the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality); *see also Bellotti v. Baird*, 443 U.S. 622, 640 (1979) (recognizing that "parental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions"). Specifically, it ensures that adults cannot intrude into the "constitutionally protected" "relationship between parent and child," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), by facilitating a minor's abortion without the express consent of that minor's own parent.

Plaintiffs dispute none of this—nor could they. Still, just days before the Act went into effect, they sued to block its enforcement. Plaintiffs claim the Act is unconstitutional, both on its face and as applied. They assert that the Act violates the Fourteenth Amendment because its use of the term "recruits" is impermissibly vague. They further assert that it violates the First Amendment because it encroaches on their right to free speech and is overbroad. Plaintiffs' claims fail for several reasons.

Start with the merits. For one thing, the Act poses no constitutional problem. The term "recruits" (like "harbors" and "transports") is found in numerous criminal trafficking statutes at both

the state and federal level. *See, e.g.,* Tenn. Code Ann. §§ 39-13-308 (human trafficking), 39-13-309 (sex trafficking); 18 U.S.C. §§ 1590(a) (human trafficking), 1591(a) (sex trafficking). This oft-used term does not become "vague" simply because it now appears in an abortion-related context. A pre-enforcement vagueness challenge is doomed where the statute's terms are commonly used and routinely applied without issue. To conclude otherwise would call into question a host of convictions for human- and sex-trafficking offenses that rest on analogous statutory language.

Plaintiffs' First Amendment claims suffer from fatal flaws, too. First, the Act targets *conduct*—not speech. Properly construed, it targets each step involved with abortion trafficking: the recruiting, harboring, and transporting of a minor for a specific purpose and under specific circumstances. The Act is thus not concerned with speech about abortion in the abstract, or even with the sharing of information about out-of-state abortion services. And to the extent it covers speech at all, it poses no constitutional problem. Speech used to commit or induce a crime is not protected by the First Amendment. *See United States v. Williams*, 553 U.S. 285, 294 (2008). Under any standard, then, Plaintiffs' free-speech claim fails. Second, Plaintiffs' overbreadth claim fails because they have made no effort to carry their burden of showing that the Act's "unconstitutional applications are substantial compared to its constitutional ones." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024).

Aside from the merits, Plaintiffs have failed to establish standing, cannot overcome Defendants' entitlement to sovereign immunity, and have given this Court no reason to weigh in on the constitutionality of a newly enacted state law that no Tennessee court has had the opportunity to interpret. Plaintiffs' Complaint against these Defendants should be dismissed as a matter of law.

## LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570(2007)).

Meeting this standard requires "more than the bare assertion of legal conclusions" and instead demands "either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Hughes v. Sanders*, 469 F.3d 475, 477 (6th Cir. 2006) (internal quotations omitted). When a complaint fails to allege "*fact*[*s*]" that "raise [the] right to relief above the speculative level," *Twombly*, 550 U.S. at 555 (emphasis added), defendants in federal court are "spar[ed] … a time-consuming and expensive discovery process," *Agema v. City of Allegan*, 826 F.3d 326, 332 (6th Cir. 2016); *see also New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011).

Similarly, "threshold question[s]" regarding immunity defenses must be "resolve[d]" at the outset of a case "before permitting discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). For challenges based on sovereign immunity, "[t]he case law is conflicted regarding the subsection of Rule 12 under which … a motion should be brought," but this Court has treated such motions as "factual challenges" to jurisdiction under Rule 12(b)(1). *See Hlfip Holding, Inc. v. Rutherford Cnty.*, 2021 WL 4502833, at *2 n.5 (M.D. Tenn. 2021); *see also JLF v. Tenn. State Bd. of Educ.*, 2022 WL 1571307, at *3 (M.D. Tenn. 2022); *Durham v. Martin*, 388 F. Supp. 3d 919, 929 (M.D. Tenn. 2019). In a factual challenge, this Court has "broad discretion over what evidence to consider," and "the burden is on the *plaintiff* to prove that jurisdiction exists." *JLF*, 2022 WL 1571307, at *3.

## ARGUMENT

Plaintiffs' Complaint does not state a viable claim to relief because it fails under the applicable law and runs headlong into well-settled jurisdictional bars. Because no amount of repleading could cure these legal deficiencies, the Court should dismiss this suit as a matter of law.

## I.     The Act Is Constitutional.

Plaintiffs claim that the Act is unconstitutional, both facially and as applied. First, they assert that the Act is unconstitutionally vague, in violation of the Fourteenth Amendment. Compl. D.E. 1,

3

PageID# 9–11.  Second, they say it violates the First Amendment because it criminalizes or chills constitutionally protected speech and because it is overbroad.  *Id.* at PageID# 11–14.

Plaintiffs' facial challenge necessarily fails.  When a plaintiff chooses "to litigate … cases as facial challenges, … that decision comes at a cost."  *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).  "Even in the First Amendment context, facial challenges are disfavored" and "hard to win."  *Id.* at 2397, 2409.  To succeed in their facial challenge, Plaintiffs would need to show that the Act "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep."  *Id.* at 2397.  "The need for [Plaintiffs] to carry [that] burden … is the price of [their] decision to challenge the [Act] as a whole."  Plaintiffs cannot carry that burden, nor have they tried.

Plaintiffs' as-applied challenge fares no better.  Plaintiffs have failed to allege with any specificity the speech or conduct in which they intend to engage.  That is fatal to their as-applied challenge.  "In order for the [C]ourt to determine whether" the Act is unconstitutional "as applied to [Plaintiffs'] particular case, the [C]ourt must first know the nature and extent" of their intended future speech and conduct.  *United States v. Kettles*, No. CR 3:16-00163-1, 2017 WL 2080181, at *3 (M.D. Tenn. May 15, 2017), *aff'd*, 970 F.3d 637 (6th Cir. 2020).  Without that sort of specificity, the Court "cannot determine" whether the Act is unconstitutional as applied to that speech or conduct.  *Id.* Plaintiffs' Complaint thus fails to demonstrate that the Act, properly construed, is unconstitutional as applied to them.  These fatal problems aside, Plaintiffs' claims also fail on their own terms.

### A.    The Act is not unconstitutionally vague.

Plaintiffs zero in on the Act's use of the term "recruits," suggesting that its inclusion poses constitutional vagueness problems.  That term, they say, is "not defined" in the Act and is "susceptible to a wide range of potential meanings."  Compl., PageID# 10.  Plaintiffs also complain that the Defendant District Attorneys General declined to respond to their "specific request to clarify the meaning of the word … and define its scope."  *Id.*  And "based on both the undefined nature of the

word . . . and the Defendants' refusal to clarify their own interpretation of [it]," they conclude, the Act is unconstitutionally vague. These arguments all fail.

The Due Process Clause's "void for vagueness" doctrine ensures only that a "person of ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law. *Grayned v. Rockford*, 408 U.S. 104, 108 (1972). "Perfet clarity and precise guidance have never been required," even for laws "that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Indeed, the law is full of "flexible" "standards," *id.*, and "[c]lose cases can be imagined under virtually any statute," *Williams*, 553 U.S. at 306. The vagueness doctrine thus serves a narrow purpose: to protect against those rare laws that altogether fail "to give ordinary people fair notice of the criminalized conduct" or are "so standardless as to invite arbitrary enforcement." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (cleaned up).

With these principles in mind, several of Plaintiffs' misgivings about the Act can be rejected out of hand. The fact that the law does not define "recruits," for instance, is hardly unusual, let alone cause for vagueness concerns. *See Smith v. United States*, 508 U.S. 223, 228 (1993) (observing that "[w]hen a word is not defined by statute," courts "normally construe it in accord with its ordinary or natural meaning."); *see also* Tenn. Code Ann. § 1-3-105(b) (providing that "undefined words shall be given their natural and ordinary meaning."). And Defendants' choice to decline Plaintiffs' invitation to opine on their interpretations of the term is not proof that it is unconstitutionally vague. The relevant question is whether the law is clear enough to provide ordinary people with reasonable notice of what it prohibits, *Grayned*, 408 U.S. at 108, not what an individual district attorney—or even an individual legislator—believes it to mean.

Plaintiffs' remaining vagueness arguments fail as well. *First*, the term "recruits" is "widely used and well understood." *Cameron v. Johnson*, 390 U.S. 611, 616 (1968). Start with its common dictionary definitions, which define the verb "recruit" to mean "to fill up the number of with new members,"

"to increase or maintain the number of," or "to secure the services of." *Recruit*, Merriam-Webster's Dictionary Online; *see also* American Heritage Dictionary of the English Language 1471 (5th ed. 2016) ("To enlist (persons) in military service"; "[t]o hire or enroll, or seek to hire or enroll (new employees, members, or students."); *Recruit*, Webster's Ninth New Collegiate Dictionary 985 (1986) ("[T]o secure the services of: ENGAGE, HIRE."); *see also In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005) ("The dictionary definition of 'recruit' means 'to secure the services of ... [or to] enlist new members.'"); *United States v. Withers*, No. 3:16-cr0005-wmc, Doc. 126-2, at 12 (W.D. Wis. Apr. 28, 2017) ("To recruit means to persuade someone to join in or to help with some activity").

These common definitions of "recruit" confirm that the Act prohibits the affirmative conduct associated with the first step of abortion trafficking—enlisting a minor for a specific purpose—and not purely pro-abortion speech or expression. This commonsense reading is supported by the "canon of *noscitur a sociis*," which "counsels that a word is given more precise content by the neighboring words with which it is associated." *Williams*, 553 U.S. at 294; *see also Noscitur a sociis*, Black's Law Dictionary (11th ed. 2019) ("A canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the words immediately surrounding it."). Said another way, "words are known by the company they keep." *United States v. Hill*, 963 F.3d 528, 534 (6th Cir. 2020).

Plaintiffs' mistake is attempting to pluck the word "recruits" from its context and analyzing it in a vacuum. But that's not how statutory interpretation works. "Statutory language must be read in context." *Jones v. United States*, 527 U.S. 373, 389 (1999). And statutory terms—especially those "capable of many meanings"—must be read "in light of [their] accompanying words in order to avoid giving the statutory [provisions] unintended breath." *Hill*, 963 F.3d at 534 (quoting *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013)) (cleaned up). The key verbs accompanying "recruits" in the Act— "harbors" and "transports"—plainly refer to conduct, not speech. *See Harboring*, Black's Law Dictionary (11th ed. 2019) ("The act of affording lodging, shelter, or refuge to a person, esp. a criminal

or illegal alien."); *Transport*, Black's Law Dictionary (11th ed. 2019) ("To carry or convey (a thing) from one place to another."). The takeaway? The term "recruits" in the context of the Act should be understood to target conduct intended to facilitate a minor's elective abortion without the consent of that minor's parent or guardian—not pure speech or advocacy, such as mere "informational campaigns," "distribut[ing] literature about abortion access," or "publicly shar[ing] information" about abortion services. Compl., PageID# 4, 7.

As further proof, consider the numerous state and federal trafficking statutes that use *the same* term Plaintiffs challenge here. *See, e.g.*, Tenn. Code Ann. §§ 39-13-308 (making it a crime to "recruit," "harbor," or "transport" another person for the purpose of human trafficking), 39-13-309 (same for sex trafficking); 18 U.S.C. §§ 1590(a) (human trafficking), 1591(a) (sex trafficking).[1] In fact, the federal code uses "recruit" (and "harbor" and "transport") to *define* the term "trafficking." 22 U.S.C. § 7102(11)(B), (12). And some of these statutes' trafficking prohibitions sweep even broader than the Act by adding the qualifier "by any means." *E.g.,* 18 U.S.C. §§ 1590(a), 1591(a). Consider, too, that courts have repeatedly rejected vagueness challenges to trafficking statutes that use the *same term* challenged here. *See, e.g., United States v. Snead*, No. 21-4333, 2022 WL 17975015, at *4 (4th Cir. 2022) (concluding that "each of the verbs at issue in [18 U.S.C.] § 1591"—including "recruits, harbors, [and] transports"—"has an ordinary meaning that would provide a person of ordinary intelligence fair notice of what conduct is prohibited."); *Commonwealth v. McGhee*, 35 N.E. 329, 339 (Mass. 2015) (rejecting challenge to ban on "recruit[ing], entic[ing], harbor[ing], [or] transport[ing] … by any means" for sex trafficking); *Alonso v. State*, 228 So.3d 1093, 1101–02 (Ala. Crim. App. 2016) (upholding sex-trafficking

---

[1] *See also* Ala. Code § 13A-6-152; Ark. Code § 5-18-103; Colo. Rev. Stat. § 18-3-504; Ga. Code Ann. § 16-5-46; 720 Ill. Comp. Stat. § 5/10-9; Ind. Code § 35-42-3.5-1; Ky. Rev. Stat. § 529.110; La. Stat. Ann. § 14:46.2; Mass. Gen. L. Ann. 265 § 50(a); Mich. Comp. L. Ann. § 750.462e; Miss. Code Ann. § 97-3-54.1; N.C. Gen. Stat. § 14-43.11; Neb. Rev. Stat. § 28-830; Nev. Rev. Stat. § 201.300; N.Y. Penal Law § 135.35; Ohio Rev. Code Ann. § 2905.32; Tex. Penal Code Ann. § 20A.01; Utah Code Ann. §§ 76-5-308-308.5; Wash. Rev. Code § 9A.40.100; Wis. Stat § 948.051.

7

law that prohibited "recruit[ing]," "harbor[ing]," and "transport[ing]"); *see also People v. Cardenas*, 338 P.3d 430, 436–37 (Colo. App. 2014) (listing numerous trafficking statutes that use "recruiting," "transporting," and other similar verbs).[2]

This routine use of the term "recruits" and its history of straightforward application, paired with the ready availability of commonly accepted meanings, dooms Plaintiffs' vagueness claim. To hold otherwise would call into question the validity of dozens of state and federal trafficking statutes— and the criminal convictions attendant to each of them. Choosing a broader, constitutionally suspect reading would also defy the longstanding requirement that courts "resort to" "reasonable construction[s] … in order to save [statutes] from unconstitutionality." *Déjà Vu v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 786 (6th Cir. 2005); *see also Hooper v. California*, 155 U.S. 648, 657 (1895).

*Second*, even if the scope of the term "recruits" remained uncertain, any constitutional concerns would be alleviated by the Act's scienter requirement. The Supreme Court has recognized that scienter requirements "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also Boyce Motor Lines v. U.S.*, 342 U.S. 337 (1952) (reasoning that the "requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the [law] would be so unfair that it must be held invalid"). This is because, "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States*, 325

---

[2] Other courts have likewise applied this more-focused reading of "recruit" when interpreting similarly worded statutes. *See, e.g.*, *Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019) (explaining that "the term 'recruit' in the TVPA means that the perpetrator somehow secured the services of the victims"); *People v. Martinez*, 55 Cal. App. 5th 428, 444–45 (2020) ("'[T]o recruit a target to actively participate in a criminal street gang would mean, among other things, to fill up the gang with new members including that target, to increase or maintain the number of the gang, to secure the services of the target for the gang, and to seek to enroll the target in the gang.").

U.S. 91, 102 (1945).

Here, the Act applies only when "[a]n adult *intentionally* recruits … a pregnant unemancipated minor within this state." Compl. Ex. 1, D.E. 1-1, PageID# 16 (emphasis added). That scienter requirement sets a high bar. Under Tennessee law, "[i]ntentional" is the most culpable mental state. *See* Tenn. Code Ann. § 39-11-302(a). It "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* And when the Act is read with that steep requirement in mind, it's hard to see how anyone could accidentally violate the law's "recruit[ment]" prohibition. Again, the law does not prohibit "recruit[ment]" in the abstract; it prohibits "recruit[ing] … *for the purpose* of*" obtaining what would constitute a criminal abortion in Tennessee without parental consent. *See* Compl. Ex. 1, D.E. 1-1, PageID# 16 (emphasis added). A person, then, would violate the Act only if he or she "conscious[ly] … desire[s]," Tenn. Code Ann. § 39-11-302(a), to "recruit[]" an unemancipated minor for that specific purpose and under that specific circumstance.

*Finally*, even if the Act's reference to "recruit[ing]" could be considered impermissibly vague in certain applications, Plaintiffs cannot carry their burden of establishing *facial* invalidity. Normally, "litigants mounting a facial challenge to a statute … must establish that *no set of circumstances* exists under which the [statute] would be valid." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (cleaned up). In the context of a facial-vagueness challenge, that generally means "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 497. True, this rule has been relaxed in cases implicating First Amendment rights, but that doesn't help Plaintiffs here. The Supreme Court has now made clear that even under the First Amendment overbreadth test—which no court has ever applied to a facial-vagueness analysis— "neither parties nor courts can disregard the requisite inquiry into how a laws works in *all* of its applications." *Moody* 144 S. Ct. at 2409.

9

Against the weight of numerous state and federal statutes with the same terms, interpretive case law, and dictionary definitions, Plaintiffs offer nothing more than *ipse dixit*. Indeed, they have not shown *any* vague applications—much less established that the Act's "unconstitutional applications are substantial compared to its constitutional ones." *Moody*, 144 S. Ct. at 2394. And that is unsurprising. Indeed, it is easy to imagine scenarios that would fall well within the heartland of the Act's "recruiting" prohibition. Take, for example, a rapist who coerces his victim into crossing state lines to get an abortion without parental consent. Or consider a coach who bribes his star player with financial incentives in exchange for her doing the same. Or think of a schoolteacher who promises her struggling student that she will receive a perfect score on an upcoming exam if she agrees to follow suit. Or imagine a youth-group leader who convinces a teen to have his wife take her to obtain an abortion so that she can keep her pregnancy hidden from her religious parents. Examples abound. Yet Plaintiffs have not acknowledged the Act's many constitutional applications, let alone shown that the alleged *un*constitutional applications "are substantial" in comparison. *Id.* Thus, at a bare minimum, this Court should dismiss Plaintiffs' claim that the Act is *facially* invalid.

## B. The Act does not burden constitutionally protected speech.

Plaintiffs also argue that the Act, through its "recruit[ment]" prohibition, "criminalizes pure speech" about the availability of abortion. *See* Compl., PageID# 2; *see also id.* at PageID# 11–13. But, as explained in detail above, well-settled and "commonsense" principles of statutory interpretation mandate that the law's reference to "recruit[ment]" be read to require more than "pure speech." *See Williams*, 553 U.S. at 294; *supra* at 5–6.

And any speech the Act does cover can be constitutionally prohibited. "Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297. There is, of course, "an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality," *id.* at 298–99 (citations omitted), but the Act does not prohibit

10

"recruit[ing]" in the abstract. It prohibits recruiting an unemancipated minor "for the purpose of" procuring an abortion that is illegal in Tennessee without parental consent. *See* Compl. Ex. 1, D.E. 1-1, PageID# 16.

Tennessee is well within its rights to prohibit that sort of "recruit[ing]." Governments have long prohibited "speech … that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298. As noted above, federal and state codes are replete with criminal statutes that involve some element of speech in their commission. And it is, in fact, the *speech* itself that is prohibited, not just the crime the speech is intended to induce. *See id.* at 300 (explaining that it would not be unconstitutional to punish offers to distribute child pornography even where the offerors had no child pornography to distribute). This remains true even when the underlying criminal act takes place in a jurisdiction where it is legal. So long as an essential element of the charged offense—here, abortion trafficking—takes place within Tennessee, it can be prosecuted here, even if the abortion itself takes place elsewhere. This concept is not unusual; states routinely extend their jurisdiction to conduct occurring elsewhere so long as some element of a criminal offense occurs within their borders. *See, e.g.*, Wash. Rev. Code Ann. § 9A.04.030(1); Or. Rev. Stat. § 131.215(1), (6); Mont. Code Ann. § 46-2-101(1), (2); Utah Code Ann. § 76-1-201(1), (2); Cal. Penal Code §§ 778, 778(a), 781, 782. The same principle applies in the context of sex trafficking; Tennessee could surely prohibit the "recruit[ing], entic[ing], harbor[ing], [or] transport[ing]" of another person within this state for the purpose of providing a "commercial sex act," Tenn. Code Ann. § 39-13-309, even if the ultimate act would take place in Nevada. Tennessee would likewise be well within its authority to prohibit trafficking in marijuana, even if the drug itself was going to be used in Colorado.

Finally, to the extent any protected speech may still arguably be covered by the Act, the doctrine of constitutional avoidance requires a reading that excludes that speech and thus would not

render the statute unconstitutional. *See Déjà Vu*, 411 F.3d at 786; *Hooper*, 155 U.S. at 657. Plaintiffs' free-speech claim, then, necessarily fails.

### C.     The Act is not unconstitutionally overbroad.

Finally, Plaintiffs—recycling many of their previous arguments—claim that the Act is unconstitutionally overbroad. *See* Compl., PageID# 13–14. The First Amendment overbreadth doctrine allows courts to invalidate a statute as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted); *see Moody*, 144 S. Ct. at 2397. Invalidation for overbreadth, though, is "strong medicine" that courts dispense "with hesitation, and … only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quotations omitted); *see also Virgina v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating).").[3] The Supreme Court has thus "vigorously enforced" the requirement that the challenger demonstrate a *substantial* number of unconstitutional applications. *Williams*, 553 U.S. at 292. Plaintiffs do not come close to carrying that burden here.

"To judge whether a statute is overbroad," this Court "must first determine what it covers." *Hansen*, 599 U.S. at 770. Plaintiffs, for their part, insist that the Act—specifically its "recruit[ment]" prohibition—"criminalizes a great deal of pure speech about legal abortion care" and thus "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *See* Compl., PageID# 14. But this claim, like their free-speech claim, rests on an overly expansive reading of "recruit[ing]" that "ignore[s] the text of the statute," the "principle of *noscitur a sociis*," *Parker*, 121 F.3d

---

[3] Indeed, the doctrine is openly "disfavored," *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009), and should be reconsidered, *see Hansen*, 599 U.S. at 785–93 (Thomas, J., concurring). Given the "cogent[] critici[sm]" of the doctrine, this Court should decline to "expand it." *United States v. Yung*, 37 F.4th 70, 76 (3d Cir. 2022).

12

at 1014, and the constitutional-avoidance canon, *see Hooper*, 155 U.S. at 657; *see also Williams*, 553 U.S. at 294 (concluding that a statute was not overbroad, in part, based on the presence of a scienter requirement and the "the commonsense canon of *noscitur a sociis*," which "narrow[ed]" the statute's scope). Read with these interpretive principles in mind, the text of the Act does not sweep nearly as broadly as Plaintiffs suggest. Rather, as explained above, the law's reference to "recruit[ment]" is properly read to prohibit affirmative conduct—i.e., intentionally convincing a minor to cross state lines, without parental consent, to obtain an abortion Tennessee law prohibits, or transporting or harboring a minor for that purpose—not pro-abortion advocacy or the mere provision of information about where elective abortions remain available.

The next step in the overbreadth analysis is to determine "whether a law's unconstitutional applications are substantial compared to its constitutional ones." *Moody*, 144 S. Ct. at 2394. And here, a plethora of constitutional applications exist. *See supra* at 10. Plaintiffs cannot show that these lawful applications of the Act—to conduct and speech intended to induce or commence criminal activity—are outweighed by its *un*lawful applications. *Hansen*, 599 U.S. at 784. And Plaintiffs do not even try to analyze how the Act "works in *all* of its applications"—a necessity for overbreadth claims. *Moody*, 144 S. Ct. at 2409 (emphasis added). Instead, they offer pure *ipse dixit*, simply asserting that the Act's "'recruitment' provision prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." Compl., PageID# 14. That conclusory assertion—not backed up by even a single real or imagined application—cannot satisfy *Moody*'s clear command that plaintiffs and courts "explore the [Act's] full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Moody*, 144 S. Ct. at 2398. Thus, this claim fails, too.

## II. Plaintiffs Lack Standing.

To invoke federal jurisdiction, a plaintiff must prove "an injury in fact … fairly traceable to the challenged conduct of the defendant … that is likely to be redressed by the requested relief." *FEC*

13

*v. Cruz*, 142 S. Ct. 1638, 1646 (2022). Pre-enforcement standing comes with additional hurdles. In this context, a plaintiff must first prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act. *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quotations omitted). Next, it must prove "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct." *Id.* at 455. Plaintiffs' Complaint flunks both requirements.

*First*, the Complaint fails to present facts demonstrating that Plaintiffs intend to engage in conduct arguably proscribed by the Act. Plaintiffs' Complaint focuses exclusively on the Act's "recruitment" provision. That provision, they say, either directly criminalizes or chills their constitutionally protected speech. But, as explained above, the law's text—properly interpreted—does not prohibit pure speech or advocacy about abortion at all. It prohibits only affirmative conduct intended to convince a minor to cross state lines, without parental consent, to obtain an abortion that Tennessee law prohibits, or transporting or harboring a minor for that purpose. They have not come close to demonstrating an intent to engage in that sort of conduct.

Plaintiffs' Complaint does not "articulate[] with *any* amount of specificity" the course of conduct in which they intend to engage. *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 964 (6th Cir. 2009) (emphasis added). Instead, the Complaint vaguely alludes to Plaintiffs' desire to "help[] pregnant, unemancipated minors access legal abortion care," Compl., Page ID# 5, "advoca[te] for safe and healthy access to legal abortion," *id.* at 6, "advoca[te] for young people who need legal abortion care," *id.* at 8, and "express [themselves] on matters of current public importance," *id.* at 9. These cryptic allegations make it impossible to predict with any certainty what Plaintiffs intend to say or do, much less determine whether their intended speech or conduct is "affected with a constitutional interest" or "proscribed by" the Act. *Crawford*, 868 F.3d at 454.

*Second*, Plaintiffs' Complaint fails to demonstrate the "certain threat of prosecution" necessary

to establish Article III standing. *Id.* at 455. As just explained, Plaintiffs have failed to demonstrate an intention to violate the Act, so they necessarily cannot show a certain threat of prosecution. But setting that fatal failure aside, courts faced with pre-enforcement challenges do not assume that every violation of the law will be prosecuted. *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016). Instead, they assess the imminence of enforcement through a holistic, four-part framework that considers the following factors: "(1) 'a history of past enforcement against the plaintiffs or others'; (2) 'enforcement warning letters sent to the plaintiffs regarding their specific conduct'; (3) 'an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action'; and (4) the 'defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.'" *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869). Here, all four factors cut against Plaintiffs' standing.

*History of past enforcement*. "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014). But Plaintiffs sued before the Act even went into effect, so they necessarily cannot establish a history of prior enforcement.

*Receipt of enforcement letters*. "[E]nforcement warning letters," had they been "sent to" Plaintiffs "regarding [their] specific conduct," could lend credibility to their fear of prosecution and thus bolster their standing-related arguments. *Online Merchs.*, 995 F.3d at 550 (quotations omitted). But Plaintiffs' Complaint points to no such letters. So, this factor, too, cuts against standing.

*Ease of enforcement*. The Act does not allow just "any member of the public to initiate an enforcement action." *Id.* The "universe of potential" enforcers is limited to "state officials who are constrained by … ethical obligations." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). "Only law enforcement officials can investigate" potential violations of the Act, and "only prosecutors can bring charges." *Plunderbund Media, LLC v. DeWine*, 753 F. App'x 362, 371 (6th Cir. 2018). The

Act is thus no easier to enforce than any other Tennessee criminal law and poses no unique enforcement risk.

*Refusal to disavow enforcement.* There has been no "refusal to disavow enforcement" of the Act, *Online Merchs.*, 995 F.3d at 550 (quotations omitted), let alone as to Plaintiffs' "*specific* speech" or conduct. *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022). True, Plaintiffs allege that they demanded an interpretation of the Act's "recruit[ing]" prohibition and asked the Defendant district attorneys to "disavow all enforcement" of that provision. *See* Compl., PageID# 5-6. But what matters for pre-enforcement-standing purposes is not simply the refusal to disavow enforcement "in the *abstract*," but the refusal to disavow enforcement against the Plaintiffs' "*specific* speech." *Davis*, 51 F.4th at 174. Indeed, only that situation-specific refusal to disavow could possibly shed light on the likelihood of enforcement against *Plaintiffs*, which is the very reason the *McKay* factors exist. *See Online Merchs.*, 995 F.3d at 550. Here, the Complaint does not identify Plaintiffs' intended future activities with any specificity, so there is naturally nothing to disavow enforcement against. And in any event, as the State has explained at length, the Act does not criminalize "pure speech." *Contra* Compl., PageID# 2. So, everything that can be disavowed, has been. Any impairment of Plaintiffs' protected speech cannot be attributed to these Defendants.

## III.    Defendants Are Entitled to Sovereign Immunity.

Defendants, all of whom are sued in their official capacities only, are entitled to sovereign immunity from suit. The exception to sovereign immunity under *Ex parte Young*, 209 U.S. 123 (1908), does not apply. This, too, requires dismissal.

Generally, a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). A suit against a state official in his official capacity is considered to be a suit against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Wells v. Brown*, 891 F.2d 591, 592–94 (6th Cir. 1989). There

16

is, of course, "an exception to the State's sovereign immunity under *Ex Parte Young* … whereby 'a suit challenging the constitutionality of a state official's action is not one against the State." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046-47 (6th Cir. 2015) (cleaned up). But that exception "has been read narrowly." *EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019). To successfully invoke it, "a claim must seek prospective relief to end a continuing violation of federal law." *Russell*, 784 F.3d at 1047. A plaintiff, moreover, must show that the state official has threatened and is "about to commence proceedings" in order to overcome the sovereign immunity defense. *EMW*, 920 F.3d 421, 445 (6th Cir. 2019). Plaintiffs' Complaint does not carry that burden.

Plaintiffs have sued eleven district attorneys, but their Complaint fails to demonstrate that any of these Defendants has "enforced []or threatened to enforce" the Act against them. *See Russell*, 784 F.3d at 1047. Rather, they allege only that Defendants have "criminal enforcement authority and an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto." Compl., PageID# 3 (quoting Tenn. Code Ann. § 8-7-103(1)). While that is true, more is required to invoke the *Ex parte Young* exception. Plaintiffs must show that enforcement against them is "likely." *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018). They have not done that. Instead, Plaintiffs have merely identified a statute and offered their own (misguided) legal theory about how that statute could hypothetically be used to prosecute them for unspecified future speech. That type of vague, multi-layered speculation is woefully insufficient to overcome Defendants' entitlement to sovereign immunity.

## IV. Abstention Principles Counsel in Favor of Dismissal.

Plaintiffs' request for this Court to weigh in on a new Tennessee law that no state court has interpreted ignores well-established abstention principles. When faced with a "federal constitutional claim … premised on an unsettled question of state law," the appropriate course is to abstain and give "the state courts an [o]pportunity" to weigh in. *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83

(1975); *see R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941). Indeed, cases "in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law," are "[a]mong the cases that call *most insistently* for abstention." *Harris Cnty.*, 420 U.S. at 84 (emphasis added). And that makes sense. "If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim," the Supreme Court has explained, "the argument for abstention is strong." *Id.* Abstaining in such situations thus "avoid[s] the possibility of unnecessarily deciding a constitutional question," *id.* at 83, and "affords the [state] courts the respect they are due as … equals in a federalist judicial system." *Gottfried v. Med. Plan. Servs.*, 142 F.3d 326, 332 (6th Cir. 1998).

Here, Plaintiffs' claims implicate "an unsettled question of state law." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999). Plaintiffs object to the Act's use of the term "recruits," claiming that it is unconstitutionally vague and overbroad and prohibits protected speech. These claims opportunistically rest on the absence of Tennessee case law interpreting the challenged language. But of course, there is a solution: Allow the Tennessee state courts to interpret the statute in the first instance. Doing so may very well result in an interpretation "that would avoid or modify the constitutional question," *Zwickler v. Koota*, 389 U.S. 241, 249 (1967), and "remove the federal issue by making unnecessary a constitutional decision," *Traughber v. Beauchane*, 760 F.2d 673, 682 (6th Cir. 1985); *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 511 (1972). This Court, then, should "stay its hand," *Harris Cnty.*, 420 U.S. at 83, and dismiss Plaintiffs' claims, *see Brown*, 169 F.3d at 332–33 (affirming dismissal based on *Pullman* abstention).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Complaint against Defendants should be dismissed.

18

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN (BPR# 040708)
Senior Counsel for Strategic Litigation

MATTHEW D. CLOUTIER (BPR# 036710)
Assistant Solicitor General

DONNA L. GREEN (BPR# 019513)
Managing Attorney and Senior Assistant Attorney
General

Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN  37202
(615) 741-9598
Steven.Griffin@ag.tn.gov
Matt.Cloutier@ag.tn.gov
donna.green@ag.tn.gov

19

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2024, a copy of the foregoing document was filed using the

Court's electronic court-filing system, which sent notice to the following counsel:

Daniel A. Horwitz
Melissa Dix
Sarah L. Martin
Horwitz Law, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
melissa@horwitz.law
sarahmartin1026@gmail.com
(615) 739-2888

*Counsel for Plaintiffs*

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN