# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| RACHEL WELTY and | § | |
| AFTYN BEHN, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 3:24-cv-00768 |
| | § | |
| BRYANT C. DUNAWAY, | § | |
| JASON LAWSON, | § | |
| JENNINGS H. JONES, | § | |
| ROBERT J. CARTER, | § | |
| RAY WHITLEY, ROBERT J. NASH, | § | |
| GLENN FUNK, STACEY EDMONSON, | § | |
| BRENT COOPER, RAY CROUCH, and | § | |
| HANS SCHWENDIMANN, | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# I.  INTRODUCTION

The Defendants—District Attorneys with the authority and obligation to enforce the vague content- and viewpoint-based criminal speech restriction challenged here—have moved to dismiss the Plaintiffs' Complaint for failure to state a claim and for lack of subject matter jurisdiction.  But their arguments for dismissal depend on misconstruing: (1) the challenged statute, (2) the law that governs the Plaintiffs' merits claims, (3) standing jurisprudence, (4) immunity jurisprudence, and (5) abstention jurisprudence.  Thus, the Defendants' motion to dismiss should be **DENIED**.

# II.  FACTS

## A.      PLAINTIFF RACHEL WELTY

Plaintiff Rachel Welty is an outspoken and unapologetic advocate for safe and healthy access to abortion care.  *See* Doc. 1 at ¶ 12.  In her role as an advocate for safe and healthy access to abortion care, Ms. Welty has on many occasions participated in informational campaigns and distributed literature about abortion access, including how to access legal abortion-inducing drugs. *Id.* at ¶ 13; *see also* Doc. 1-2.  Most of Ms. Welty's advocacy is concentrated in the Middle Tennessee area, including in each of the Defendants' judicial districts.  Doc. 1 at ¶ 14.  Ms. Welty is also a member of an abortion fund that provides resources to clients who need safe and healthy access to legal abortion medication and legal out-of-state abortion care that they can no longer obtain in Tennessee.  *Id.* at ¶ 15.  Ms. Welty's advocacy for safe and healthy access to legal abortion care is not hidden, and it is not intended to be.  *Id.* at ¶ 16.  Ms. Welty advocates—accurately—that "'[a]bortion is safe, common, and normal[.]'" *Id.* at ¶ 17.

Ms. Welty also advocates for and helps facilitate Tennesseans' access to legal abortion care, including out-of-state abortion care and abortion-inducing drugs.  *Id.* at ¶ 18.  Her advocacy is not limited to emancipated minors or to Tennesseans who happen to be over the age of 18, and

it is not intended to be. *Id.* at ¶ 19. Ms. Welty—an attorney—is well-known in Tennessee for helping pregnant, unemancipated minors receive access to legal abortion care, having handled "'judicial bypass'" representations for years. *Id.* at ¶ 20 (citing Doc. 1-3 (discussing Ms. Welty's work helping young teens—many of whom were victims of rape and incest—obtain judicial bypasses to access abortion care)). As a result of that work, Ms. Welty still receives calls from pregnant, unemancipated minors who want assistance accessing legal abortion care but do not have parental consent to access it. *Id.* at ¶ 21. Ms. Welty has historically helped those clients access legal abortion care, and she would like to continue helping pregnant, unemancipated minors access legal abortion care. *Id.* at ¶ 22–23.

Given the foregoing, in anticipation of Public Chapter No. 1032 taking effect, Ms. Welty developed serious concerns that the law—which directly affects her day-to-day operations—would criminalize her advocacy and subject her to civil wrongful death liability. *Id.* at ¶ 24. Thus, Ms. Welty sought reasonable notice of what Public Chapter No. 1032 prohibits from the Defendants. *Id.* at ¶ 25. In particular, on June 6, 2024, Ms. Welty—through counsel—sent a letter to the Defendants regarding Public Chapter No. 1032's "'recruit[ment]'" prohibition. *Id.* at ¶ 26 (quoting Doc. 1-4). Ms. Welty asked the Defendants to "'define the proscribed behavior with sufficient particularity to provide a person of ordinary intelligence with reasonable notice of the conduct that is prohibited.'" *Id.* (quoting Doc. 1-4 at 2). Ms. Welty asked for a response from the Defendants by 4:30 p.m. CST on June 20, 2024. *Id.* at ¶ 27. None of the Defendants responded. *Id.* at ¶ 28.

Through counsel, Ms. Welty also expressed her "'significant concerns that Public Chapter No. 1032 is constitutionally infirm.'" *Id.* at ¶ 29 (quoting Doc. 1-4 at 2). She noted:

> Even setting aside vagueness issues, any reasonable interpretation of the law appears to criminalize pure speech and *advocacy*—a viewpoint-based speech restriction. Worse: the law appears to criminalize advocating for and facilitating access to *legal* abortion care, including abortion care provided out-of-state in

compliance with the laws of sovereign jurisdictions.

*Id.* (quoting Doc. 1-4 at 3).

Based on these infirmities, Ms. Welty asked each Defendant to "disavow all enforcement of Public Chapter No. 1032's 'recruit[ment]' prohibition against Ms. Welty once the law takes effect." *Id.* at ¶ 30 (quoting Doc. 1-4 at 3). None of the Defendants disavowed enforcement of Public Chapter No. 1032's "recruit[ment]" prohibition against Ms. Welty, however. *Id.* at ¶ 31.

The scope of Public Chapter No. 1032's "recruit[ment]" prohibition also gives rise to additional criminal liability well beyond its terms, including for related inchoate offenses like criminal attempt, solicitation, and conspiracy, *see* Tenn. Code Ann. § 39-12-107(a)–(c), and for additional crimes like criminal responsibility, *see* Tenn. Code Ann. § 39-11-402(1)–(3). *Id.* at ¶ 32. Thus, unless the Act's "recruit[ment]" prohibition is declared unconstitutional and enjoined, Ms. Welty cannot safely continue her advocacy for safe and healthy access to legal abortion care without risking criminal prosecution. *Id.* at ¶ 33. Ms. Welty's fear of being subjected to criminal prosecution for violating Public Chapter No. 1032's recruitment prohibition if she does not restrict her speech is both objectively and subjectively credible. *Id.* at ¶ 34. Especially when paired with the availability of civil enforcement by private parties, the criminal nature of the threat that Ms. Welty faces—a lengthy mandatory-minimum jail sentence following a criminal charge that may be initiated by any law enforcement officer or by an individual citizen through Tennessee's citizen grand jury process—significantly heightens the risk of chilled expression. *Id.* at ¶ 35.

**B.    PLAINTIFF AFTYN BEHN**

Plaintiff Aftyn Behn is an elected Representative of the Tennessee General Assembly. *Id.* at ¶ 36. Before the bill that ultimately became section 39-15-220(a) was considered for a final floor vote, Representative Behn posted publicly in opposition to the bill, pledging to "'exercise

[her] right to publicly share information about how to seek an abortion which could be considered illegal under this law.'" Doc. 1 at ¶ 37 (quoting Doc. 1-5 at 4). Representative Behn further stated that she "'welcome[s] the opportunity to take a young person out of state who wants to have an abortion even if it lands [her] in jail.'" *Id.* at ¶ 38 (quoting Doc. 1-5 at 5).

During the Tennessee House of Representatives' discussion of the bill that ultimately became section 39-15-220(a), another Representative sought clarification about the meaning of "'recruit[ment]'" under the bill. Doc. 1 at ¶ 39 (quoting Doc. 1-6 at 20:9–12). On the Tennessee House floor, the primary sponsor of the bill answered that Representative's question as follows:

> REPRESENTATIVE ZACHARY: "[U]nfortunately, there's even a member of this body that recently tweeted out, 'I welcome the opportunity to take a young person out of state who wants to have an abortion, even if it lands me in jail.' . . .
>
> REPRESENTATIVE ZACHARY: And so answering the question of recruitment, I'm answering the question of recruitment. Representative, that is what recruitment looks like."

*Id.* at ¶ 40 (quoting Doc. 1-6 at 21:9–17).

According to the sponsor of Public Chapter No. 1032, merely stating: "I welcome the opportunity to take a young person out of state who wants to have an abortion, even if it lands me in jail"—even when that statement is not directed to any specific person—is a criminal violation of Public Chapter No. 1032's "recruit[ment]" prohibition. *Id.* at ¶ 41. Representative Behn wants to continue her advocacy for young people who need legal abortion care, but she cannot do so safely without risking criminal prosecution. *Id.* at ¶ 42. Representative Behn's fear of being subjected to prosecution for violating Public Chapter No. 1032's recruitment prohibition is objectively and subjectively credible. *Id.* at ¶ 43. Further, when paired with the availability of civil enforcement by private parties, the criminal nature of the threat that Representative Behn faces significantly heightens the risk of chilled expression. *Id.* at ¶ 44.

-4-

As an elected official and legislator, Representative Behn's chilled expression regarding a matter of obvious public importance is especially destructive. *Id.* at ¶ 45. Chilling Representative Behn's speech interferes with her role and duty as an elected official and simultaneously violates her constituents' right to hear and receive information from her. *Id.* at ¶ 45. Based on the credible threat of Public Chapter No. 1032 being enforced against her, Ms. Behn cannot safely express herself on matters of current public importance. *Id.* at ¶ 46.

### III. LEGAL STANDARDS

The Defendants' motion to dismiss is subject to familiar standards. "Under Rule 12(b)(6), the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs." *Nwanguma v. Trump*, 903 F.3d 604, 607 (6th Cir. 2018) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). "To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gulfside Casino P'ship v. Churchill Downs Inc.*, No. 20-6423, 2021 WL 2550402, at *2 (6th Cir. June 22, 2021) (cleaned up). Separately,

> "[a] Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)). This distinction is important because if the defendant makes a facial attack, the Court must take all of the allegations in the complaint as true to determine "whether the plaintiff has *alleged* a basis for subject matter jurisdiction." *Id.* (emphasis added). But if the defendant makes a factual attack, the Court may consider and weigh evidence, including evidence outside of the pleadings, to determine whether the plaintiff has "carrie[d] the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Ready for the World Inc. v. Riley*, No. 19-10062, 2019 WL 4261137, at *2 (E.D. Mich. Sept. 9, 2019) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S. Ct. 780, 80 L. Ed. 1135 (1936)).

*Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 562 (M.D. Tenn. 2020).

## IV. ARGUMENT

**A.** **THE PLAINTIFFS HAVE STATED COGNIZABLE CLAIMS THAT TENNESSEE CODE ANNOTATED § 39-15-220(a)'S "RECRUIT[MENT]" PROHIBITION IS UNCONSTITUTIONAL.**

The Defendants' motion asserts that the Plaintiffs' Complaint should be dismissed because section 39-15-220(a)'s recruitment provision is constitutional. Doc. 26 at 4–14. But section 39-15-220(a) restricts protected speech, and the Defendants have failed to meet their heavy burden of establishing its constitutionality. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *United States v. Alvarez*, 567 U.S. 709, 726 (2012) (noting "the Government's heavy burden when it seeks to regulate protected speech.").

**1.** **The Plaintiffs have stated a cognizable vagueness claim.**

"The void-for-vagueness doctrine requires that [a] statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Kerns*, 9 F.4th 342, 351 (6th Cir. 2021) (quoting *United States v. Farah*, 766 F.3d 599, 614 (6th Cir. 2014)) (alteration in original). "To withstand a facial challenge [that a statute is unconstitutionally vague], an enactment must define the proscribed behavior with sufficient particularity to provide a person of ordinary intelligence with reasonable notice of prohibited conduct and to encourage non-arbitrary enforcement of the provision." *Am. Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010) (quoting *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999)) (alterations in original).

When—as here—"a statute 'interferes with the right of free speech . . . , a more stringent vagueness test should apply.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). The standard of

certainty is also higher still when, as here, a speaker risks *criminal* punishment.  *Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement.  The crime 'must be defined with appropriate definiteness.'") (cleaned up); *see also Maldonado v. Morales*, 556 F.3d 1037, 1045 (9th Cir. 2009); *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) ("[W]here criminal sanctions are involved and/or the law implicates First Amendment rights such as here, a 'more demanding' standard of scrutiny applies.").

The Plaintiffs have contested § 39-15-220(a)'s vagueness, asserting that: (1) the statute's failure to define the term "recruits," (2) that term's unclarified meaning, and (3) its susceptibility to arbitrary enforcement contravene the Fourteenth Amendment's prohibition against vague laws.  Doc. 1 at ¶¶ 47–57.  In response, the Defendants contend that none of that matters.

Beginning with section 39-15-220(a)'s failure to define the term "recruits," the Defendants acknowledge that failure.  *See* Doc. 26 (conceding "[t]he fact that the law does not define 'recruits'").  The Defendants have also earlier conceded that the term "recruits" is "susceptibl[e] to a wide array of possible meanings[.]"  Doc. 22 at 11.

The undefined nature of a *criminal* prohibition that is "susceptibil[e] to a wide array of possible meanings" notwithstanding, though, *id.*, the Defendants claim the defect "can be rejected out of hand" because the term "shall be" given its "'natural and ordinary meaning'" under state law.  Doc. 26 at 6 (citing Tenn. Code Ann. § 1-3-105(b) ("[U]ndefined words shall be given their natural and ordinary meaning, without forced or subtle construction that would limit or extend the meaning of the language, except when a contrary intention is clearly manifest.")).  The problem, though—which the Defendants have conceded—is that the natural and ordinary meaning of the term "recruits" is susceptible to a "wide array" of potential definitions, Doc. 22 at 11, any of which

-7-

would criminalize some pure speech, including, for instance, mere encouragement or persuasion.[1] Thus, it is impossible to determine "with sufficient definiteness" the meaning of the word "recruits" just by reading the statute and consulting a dictionary. *Am. Booksellers*, 601 F.3d at 627. The Defendants do not contest that fact, either. Doc. 26 at 7 (suggesting that the Court should apply the *noscitur a sociis* canon because the term at issue is "'capable of many meanings'").

Given the uncertainty involved, Plaintiff Welty sought clarification from the Defendants, who declined to provide it. *See supra*, at 2. The Defendants concede that, too, but they assert again that it does not matter. *See* Doc. 26 at 6. Indeed, they claim that even their own beliefs

---

[1] *See, e.g.*, Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) ("[T]he plain meaning of 'recruit' . . . is synonymous with 'induce or encourage to come into this state for the purpose of employment' as employed in SB202[.]"); Doc. 19-1, *United States v. Withers*, No. 3:16-cr-00005-wmc, Doc. 126-2, at 12 (W.D. Wis. Apr. 28, 2017) ("***To recruit means to persuade someone to join in or to help with some activity.***"); *In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005) ("The dictionary definition of 'recruit' means 'to secure the services of . . . [or to] enlist new members.' As such, the construction of 'recruit' most likely correct under Colorado law requires a direct request or plea.") (internal citation omitted); *Contreras v. Mt. Adams Orchard Corp.*, 744 F. Supp. 1007, 1007 (E.D. Wash. 1990) ("[T]he term 'recruit' . . . shall be interpreted as meaning 'to hire or otherwise obtain or secure the services of,' and shall include all pre-employment discussions that relate to a worker's employment."); *Escobar v. Baker*, 814 F. Supp. 1491, 1503 (W.D. Wash. 1993) ("'[R]ecruitment' includes 'indirect recruitment.'"); *id.* at 1504 ("'Recruiting' encompasses not only direct contacts with prospective workers but also indirect efforts to attract or solicit workers for agricultural employment."); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001), ("'Recruit' means to 'hire or otherwise obtain to provide services . . . secure the services of.'" (quoting Webster's Third New International Dictionary 1899 (1986))), *abrogated on other grounds by Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116 (Colo. 2007); *State v. Cartee*, 577 N.W.2d 649, 652 (Iowa 1998) ("The court instructed the jury that 'recruit' means 'to seek out a person to perform a specific task or service.'" (quoting Webster's Ninth New Collegiate Dictionary 985 (1986) ("recruit" defined as "to secure the services of: ENGAGE, HIRE"))); *Commonwealth v. Dabney*, 90 N.E.3d 750, 764 (Mass. 2018) ("[T]o 'recruit' means to 'hire or otherwise obtain to perform services,' to 'secure the services of' another, to 'muster,' 'raise,' or 'enlist.' Such recruitment does not require force or coercion.") (internal citation omitted); *Sandoval v. Rizzuti Farms, Ltd.*, 656 F. Supp. 2d 1265, 1277 (E.D. Wash. 2009) ("[I]ndirect recruitment includes situations where the farm 'puts out the word' that work is available and workers respond by showing up at a farm to work"); *State v. Gregg*, 834 N.W.2d 871 (Iowa Ct. App. 2013) ("The district court instructed the jury that 'recruit' means 'to seek out a person to perform a specific task or service.'")

-8-

about section 39-15-220(a)'s meaning—or the bill sponsor's beliefs—are irrelevant.  *See id.* (arguing that "what an individual district attorney—or even an individual legislator—believes it to mean" does not matter).

This underscores the problem, though.   During this litigation, the Defendants have proposed various definitions of the term "recruits."  The definitions they propose *conflict with their own examples*, however, *see infra* at 9–10, and they also conflict with how the bill sponsor defined the same term while enacting § 39-15-220(a) into law, *see supra*, at 4.   The Defendants also assert, simultaneously, that what any of them believes the term means does not matter.  Doc. 26 at 6.

This leaves speakers in a quandary.   To understand the meaning of "recruits," speakers cannot just consult the statute itself, which does not define the term.  *See* § 39-15-220(a).  Because the term "recruits" is susceptible to a wide range of normal, ordinary definitions, *see* Doc. 22 at 11, standard interpretive sources do not clarify the problem with "appropriate definiteness," either. Speakers also apparently cannot look to the bill's legislative history for guidance, because according to the prosecutors who are tasked with prosecuting violations, what the bill's sponsor "believes" the term "recruits" means does not matter.  Doc. 26 at 6.  Nor can a speaker rely on the Defendants to clarify the unresolved ambiguity, both because they refused to do so, *see supra*, at 2, and have taken the position that "what an individual district attorney" thinks the term "recruits" means is irrelevant, *see* Doc. 26 at 6.  Under these circumstances, then, the Plaintiffs have not merely stated a cognizable vagueness challenge—they have stated a *meritorious* one.

The Defendants' own attempts to clarify the meaning of the term "recruits" for the purpose of this litigation compound the problem.  Four times now, the Defendants have presented examples of recruitment that restrict pure speech.  *See id.* (arguing that "recruit means to persuade"); *id.* at 11 ("convinc[ing]" a minor to get an abortion out of state is recruitment); *id.* at 14 (same); Doc. 22

-9-

at 16 ("reaching out to and convincing a minor" to get an abortion out of state is recruitment). The Defendants also have maintained that "any speech the Act does cover can be constitutionally prohibited." Doc. 26 at 11. At the same time, though, the Defendants assert that the Act "targets *conduct*—not speech[,]" *id.* at 3, and should only "be understood to target conduct[,]" *see id.* at 7—a conclusion incompatible with their own proposed examples.

In summary: No reasonable person can determine with necessary specificity what "recruits" means as used in section 39-15-220(a). The Defendants do not know themselves, and they cannot settle on a coherent definition even in heavily lawyered briefing designed to address a vagueness challenge. The Plaintiffs have stated a cognizable vagueness claim as a result.

The Defendants' various other arguments do not help them, either. For instance, they insist that a scienter requirement that prohibits only *intentionally* doing something that no reasonable person can discern avoids vagueness problems. *See* Doc. 26 at 9. But a scienter requirement does nothing to clarify *what* the proscribed conduct is, and a speaker's mistake about what section 39-15-220(a) proscribes is no defense to prosecution. *See State v. Jones*, No. W2009-01478-CCA-R3-CD, 2010 WL 1687785, at *5 (Tenn. Crim. App. Apr. 27, 2010) ("mistake of law is no defense to criminal prosecution"). Unlike mere civil penalties, the consequence of the uncertainty is also severe and all but controls the outcome of the Plaintiffs' vagueness claim—something the very Supreme Court case the Defendants cite acknowledges. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99 ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); Doc. 26 at 9–10 (citing *Vill. of Hoffman Ests.*, 455 U.S. at 497, 499).

Separately, the Defendants maintain that the Plaintiffs "have not shown *any* vague applications—much less established that the Act's 'unconstitutional applications are substantial

compared to its constitutional ones.'" Doc. 26 at 10–11. The Plaintiffs acknowledge they have not yet "shown" or "established" anything, which is true enough. The reason, of course, is that the function of a Complaint is to give the Defendants "fair notice of the basis for [the Plaintiffs]' claims[,]" not to prove them. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002). The merits of the Plaintiffs' claims will thus be "established" at a later stage in proceedings after the Defendants answer. The Defendants' apparent contrary belief—that plaintiffs must brief, analyze, and establish the merits of their case within their complaint—may safely be rejected.

### 2. The Defendants' attempt at statutory interpretation fails—and it supports the opposite reading than the one they advocate.

The Defendants' attempt at statutory construction is unpersuasive, too. They begin by asserting that the Plaintiffs have attempted "to pluck the word 'recruits' from its context and analyz[e] it in a vacuum," which the Defendants maintain is "not how statutory interpretation works." Doc. 26 at 7. Instead, the Defendants insist that "[t]he key verbs accompanying 'recruits' in the Act—'harbors' and 'transports'—plainly refer to conduct, not speech[,]" and as a result, the term "recruits" "should be understood to target conduct" alone. *Id.* at 7–8.

This analysis is reductive to an extreme. To be sure, the *noscitur a sociis* canon is useful in illuminating a statutory term "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *United States v. Buluc*, 930 F.3d 383, 390 (5th Cir. 2019) (cleaned up). But it "is no help absent some sort of gathering with a common feature to extrapolate." *See S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 379–80 (2006); *cf. United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 432 (6th Cir. 2021) ("[H]alf of the terms on the list can refer to former employees, thereby reducing the value of the noscitur a sociis canon in this case."); *Soc'y Ins. v. Cermak Produce No. 11, Inc.*, 684 F. Supp. 3d 739, 752 (N.D. Ill. 2023) ("[T]he *noscitur a sociis* doctrine is equally unhelpful in

resolving the Employment Exclusion's ambiguity because there is no consistency among the employment practices listed that the court can use to narrow the scope of the catch-all provision.").

Put another way: "For the associated-words canon to apply, the terms must be conjoined in such a way as to indicate that they have some quality in common[.]" *Buluc*, 930 F.3d at 391 (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 196 (2012)). "That principle defeats application of the canon here," *id.*, because the term "recruits"—which the Act criminalizes separately from the terms "harbors" or "transports"—has nothing in common with the terms "harbors" or "transports[,]" which have little in common, either. Indeed, the Defendants do not even suggest such a commonality, other than noting that "harbors" and "transports" refer generally to an action. The takeaway? Applying the *noscitur a sociis* canon to the dissimilar terms here—all of which are criminalized independently—"would unjustifiably 'rob' [the term "recruits"] 'of its independent and ordinary significance.'" *Id.* (citing *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288, (2010)).

The Defendants' reference to other criminal statutes that use the term "recruits" also helps *the Plaintiffs* here, rather than the other way around. Take Tennessee's human trafficking statute, for instance, which provides that: "A person commits the offense of trafficking persons for forced labor or services who knowingly: (1) Recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport, provide, or obtain by any means, another person, intending or knowing that the person will be subjected to involuntary servitude[.]" Tenn. Code Ann. § 39-13-308(a). The reason the term "recruits"—as used in Tennessee's human trafficking statute—poses no constitutional problem is not because it does not encompass speech. Plainly, it *does* encompass speech, because both the natural and ordinary meaning of the term and the context in which it is used indicate as much. Instead, the issue is that speech that is intended

to subject a person "to involuntary servitude" *is not constitutionally protected*, given that slavery is unlawful and "[s]peech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *United States v. Hansen*, 599 U.S. 762, 783 (2023); *cf.* Tenn. Code Ann. § 39-13-309(b) (listing examples of unlawful acts that constitute "means" of sex-trafficking).

Section 39-15-220(a)'s recruitment provision falls into a different category entirely. It, too, prohibits "recruit[ment]." Doc. 1-1 at 1. But it prohibits recruitment intended to bring about *lawful* conduct. *See* Doc. 1 at ¶¶ 61–62. Thus, unlike Tennessee's human-trafficking and sex-trafficking statutes, "Public Chapter No. 1032's 'recruit[ment]' prohibition is not limited to speech that is integral to, or that is intended to bring about, unlawful conduct." *Id.* at ¶ 62. Further, these "unconstitutional applications of Public Chapter No. 1032's 'recruit[ment]' provision are the heart of the law[,]" "intended by" it, and "integral to" it. *Id.* at ¶¶ 80, 82.

For these reasons, the Defendants' insistence that rejecting their proposed interpretation "would call into question the validity of dozens of state and federal trafficking statutes—and the criminal convictions attendant to each of them"—is nonsense. Doc. 26 at 9. Indeed, *the opposite* is true. Persons who have been convicted of "recruit[ing]" victims of human trafficking and sex trafficking should remain convicted even if their recruitment was strictly speech-based. Under the Defendants' proposed view, though, pure speech *would not be within the scope of* state and federal trafficking statutes that criminalize recruitment, because (the Defendants claim) the term "recruits" refers only to conduct. *Id.* at 3; *see also id.* at 11 (asserting that "principles of statutory interpretation mandate that the law's reference to 'recruit[ment]' be read to require *more than* 'pure speech.'") (emphasis added). Thus, if this Court is concerned about preserving the integrity of criminal convictions under state and federal trafficking statutes, then it should reject Defendants' position that the meaning of the word "recruits" "targets *conduct*—not speech[.]" *Id.* at 3.

-13-

3.    **Section 39-15-220(a)'s recruitment provision criminalizes pure speech, and the Defendants have not met (or attempted to meet) their burden of proving its constitutionality.**

The Defendants next insist that "the Act does not burden constitutionally protected speech" because "well-settled and 'commonsense' principles of statutory interpretation mandate that the law's reference to 'recruit[ment]' be read to require more than 'pure speech.'" *Id.* at 11. As noted, though, the Defendants' attempts at statutory interpretation are clumsy, and accepting their view would undermine a host of trafficking-related criminal convictions to boot.

Competent statutory interpretation also yields a clear conclusion: The term "recruits," as used in section 39-15-220(a), restricts some amount of pure speech. Because section 39-15-220(a) does not define the term "recruits," Tennessee Code Annotated § 1-3-105(b) provides the starting point. *Id.* ("[U]ndefined words shall be given their natural and ordinary meaning, without forced or subtle construction that would limit or extend the meaning of the language, except when a contrary intention is clearly manifest."). Some definitions of the term can also be rejected out-of-hand here, because they don't make sense in context. For example, while the definition "to fill up the number of with new members" is natural and ordinary when the term "recruitment" is used in connection with a membership-based organization—for instance, the army, or a "street gang," *see* Doc. 26 at 9, n.2—it makes little sense when used in the context of *obtaining a medical procedure*. Thus, context precludes that definition here, even though it is a common one. *See Waldschmidt v. Reassure Am. Life Ins. Co*., 271 S.W.3d 173, 177 n.2 (Tenn. 2008) ("While consulting a dictionary may help identify the possible meanings of a word or phrase, the search for the General Assembly's purpose calls for an appropriate consideration of the statutory context in which the words are used, the underlying facts, the legislative history, and prior judicial decisions.").

When used in connection with an *activity*, the natural and ordinary meaning of the term

"recruits" encompasses pure speech—including mere encouragement and persuasion. *See, e.g.*, Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) ("[T]he plain meaning of 'recruit' . . . is synonymous with 'induce or encourage to come into this state for the purpose of employment' as employed in SB202[.]"); Doc. 126-2, *United States v. Withers*, No. 3:16-cr-00005-wmc, at 12 (W.D. Wis. Apr. 28, 2017) ("***To recruit means to persuade someone to join in or to help with some activity***.") (emphasis in original); *Escobar v. Baker*, 814 F. Supp. 1491, 1503–04 (W.D. Wash. 1993) ("'[R]ecruitment' includes 'indirect recruitment.' . . . . 'Recruiting' encompasses not only direct contacts with prospective workers but also indirect efforts to attract or solicit workers for agricultural employment."). As noted above, the Defendants' own examples also reflect agreement on this point. *See* Doc. 26 at 6 (arguing that "recruit means to persuade"); *id.* at 11 ("convinc[ing]" a minor to get an abortion out of state is recruitment); *id.* at 14 (same); Doc. 22 at 16 ("reaching out to and convincing a minor" to get an abortion out of state is recruitment).

The rest of section 39-15-220(a) confirms this reading. *Cf. Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 897 (Tenn. 2011) ("In interpreting statutes, . . . we are required to construe them as a whole, read them in conjunction with their surrounding parts, and view them consistently with the legislative purpose." (quoting *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995))). Section 39-15-220(f)(1) expressly exempts from the statute's criminal liability two examples of pure speech: (1) "the provision of a medical diagnosis[,]" and (2) "consultation regarding pregnancy care of an unemancipated minor." *See id.* ("This section does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor."). Under the Defendants' proposed "conduct-only" reading of the term "recruits," though, such speech was *already* exempt from liability under section 39-15-220(a). Thus, the Defendants' proposed reading "would violate the rule against surplusage[,]" *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 248 n.7

-15-

(Tenn. 2009), and it treats the entire subsection as purposeless, *but see State v. Strode*, 232 S.W.3d 1, 11–12 (Tenn. 2007) ("This Court presumes that the General Assembly used each word in a statute deliberately, and that the use of each word conveys a specific purpose and meaning. . . . Accordingly, we 'must give effect to every word, phrase, clause, and sentence in constructing a statute.'") (internal citation omitted). By contrast, the Plaintiffs' speech-inclusive reading of section 39-15-220 properly gives section 39-15-220(f)(1) meaning and effect.

If there were still doubt about whether 39-15-220(a) restricts pure speech, though, then the legislative history settles it. *See Beckham v. City of Waynesboro*, No. M2023-00654-COA-R3-CV, 2024 WL 2153536, at *5 (Tenn. Ct. App. May 14, 2024) ("[W]hen a statute is ambiguous, a court may reference . . . the history of the legislation . . . to determine the statute's meaning. . . . Generally, a statute is ambiguous when the parties derive different, reasonable interpretations from the statutory language.") (cleaned up). Here, the legislative history is clear: Section 39-15-220(a)'s "recruitment" provision not only prohibits pure speech; it prohibits Plaintiff Behn's specific speech. *See* Doc. 1 at ¶ 40 (quoting Doc. 1-6 at 21:9–17).

Once more, the Defendants' proposed conduct-only interpretation of section 39-15-220(a) requires this Court to disregard this crystal-clear contrary indication of legislative intent. That is why the Defendants insist that what "an individual legislator"—in this case, the bill's own sponsor—"believes [recruitment] to mean" does not matter. *See* Doc. 26 at 6. But "[w]hen the statutory language is ambiguous, the legislative history often offers guidance in discerning the General Assembly's purpose and intent[,]" *Powers v. State*, 343 S.W.3d 36, 50 (Tenn. 2011), and Tennessee law routinely considers a bill sponsor's statements about legislative intent when interpreting statutes. *See, e.g.*, *Donovan v. Hastings*, 652 S.W.3d 1, 8 (Tenn. 2022); *Strode*, 232 S.W.3d at 13; *Perrusquia v. Bonner*, No. W2023-00293-COA-R3-CV, 2024 WL 1026395, at *10

(Tenn. Ct. App. Mar. 11, 2024). Thus, the sponsor's indication that section 39-15-220(a) criminalizes pure speech—and Plaintiff Behn's speech, specifically—matters here.

In summary: Section 39-15-220(a) criminalizes some amount of pure speech. Moreover, it does so based on both "its communicative content[,]" *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and the viewpoint a speaker expresses. As the Plaintiffs have noted:

> Whatever "recruit" means, as used in Public Chapter No. 1032, the law does *not* criminalize recruiting unemancipated minors for the purpose of *forgoing* legal abortion care. But it *does* criminalize recruiting unemancipated minors for the purpose of *procuring* legal abortion care. Thus, Public Chapter No. 1032 targets speech based not only on the subject matter involved, but also based on the viewpoint a speaker expresses.

Doc. 19 at 14–15.

That is enough for the Plaintiffs to overcome the Defendants' motion to dismiss. Content- and viewpoint-based speech restrictions are *presumptively* unconstitutional and trigger strict scrutiny, so the burden of proving section 39-15-220(a)'s constitutionality rests with the Defendants. *See Reed*, 576 U.S. at 163; *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

The Defendants have not met—nor even attempted to meet—that burden here. *See generally* Doc. 26 (making no argument about least restrictive means). They also have not attempted to address section 39-15-220(a)'s speaker-based waivers, which doom any claim of narrow tailoring. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional[.]"). Thus, the Defendants' motion to dismiss should be denied.

The Defendants alternatively suggest that section 39-15-220(a) criminalizes only *un*protected speech; specifically: "'[o]ffers to engage in illegal transactions [that] are categorically excluded from First Amendment protection.'" Doc. 26 at 11–12. In doing so, though, they claim

-17-

inaccurately that section 39-15-220(a) only "prohibits recruiting an unemancipated minor 'for the purpose of' procuring an abortion that is illegal in Tennessee without parental consent." *Id.* at 16. In reality, however, the Act applies to recruitment "regardless of where the abortion is to be procured" and "regardless of where the abortion-inducing drug is obtained[.]" *See* Doc. 1-1 at 1.

Alternatively, the Defendants suggest that cases arising under the Act "can be prosecuted here even if the abortion itself" *is legal* and "takes place elsewhere." Doc. 26 at 12. The Defendants cite no authority for that extraordinary proposition, though, which the Supreme Court has rejected in almost exactly this context. *See Bigelow v. Virginia*, 421 U.S. 809, 822–24 (1975) ("[T]he placement services advertised in appellant's newspaper were legally provided in New York at that time. The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State. Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded, prosecute them for going there."); *id.* at 827–28 ("Here, Virginia is really asserting an interest in regulating what Virginians may hear or read about the New York services. It is, in effect, advancing an interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers *do not reach*.") (emphasis added). It also is "not especially difficult" to understand why the Defendants are wrong. *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 346 (2022) (Kavanaugh, J., concurring) ("[S]ome of the other abortion-related legal questions raised by today's decision are not especially difficult as a constitutional matter. For example, may a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel.").

Apart from the fact that Tennessee lacks authority to impose its abortion policy extraterritorially to other states, Tennessee's abortion policy is not even the central issue here. The

-18-

issue, instead, is that section 39-15-220(a) criminalizes speech. And while "[s]peech intended to bring about a particular unlawful act . . . is unprotected[,]" *Hansen*, 599 U.S. at 783, speech intended to bring about a *lawful* act is not.

That distinction controls here. *Dobbs* "returned" the issue of abortion regulation to the States and "their elected representatives." *Dobbs*, 597 U.S. at 292; *see also id.* at 338 (Kavanaugh, J., concurring) ("The Constitution is neutral and leaves the issue for the people and their elected representatives to resolve through the democratic process in the States or Congress[.]"). That means that—while Tennessee may criminalize abortion—other states may permit it, and many of them have done so. Accordingly, abortion in a host of other sovereign states is a *lawful* act. Tennessee thus has no authority to criminalize speech intended to bring it about, because obtaining an abortion in states that permit abortion is not "unlawful[,]" *Hansen*, 599 U.S. at 783, and there is no comparable First Amendment exception for speech that the State of Tennessee dislikes. The Supreme Court's holding in *Bigelow* thus controls the matter. *See Bigelow*, 421 U.S. at 811−29 (holding that Virginia's conviction of speaker for providing information about legal abortion services available in New York contravened the First Amendment notwithstanding Virginia law criminalizing "encourag[ing] or prompt[ing] the procuring of abortion").

### 4. The Plaintiffs have stated a cognizable overbreadth claim.

The Defendants also seek to dismiss the Plaintiffs' facial overbreadth claim, complaining that "Plaintiffs do not even try to analyze how the Act 'works in all of its applications'—a necessity for overbreadth claims." Doc. 26 at 14. Once more, though, the Defendants misapprehend the function of a Complaint, which is not "to analyze" claims, but to provide "fair notice" of them. *Swierkiewicz*, 534 U.S. at 514. "Analy[sis]"—which does not belong in a complaint—comes later. *See id.* If the Defendants need it now, though, section 39-15-220(a)'s recruitment provision is

-19-

unconstitutional as applied to all speech about legal out-of-state abortion care and legal medication abortion—proscriptions that "are the heart of the law[,]" "intended by" it, and "integral to" it. Doc. 1 at ¶¶ 80, 82. As a content- and viewpoint-based criminal speech restriction that cannot withstand strict scrutiny, it is also facially unconstitutional and thus unlawful in all of its applications.

## B. THE PLAINTIFFS HAVE STANDING.

"When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that [s]he claims deters the exercise of his constitutional rights.'" *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Friends of George's, Inc. v. Mulroy*, No. 23-5611, 2024 WL 3451870, at *4 (6th Cir. July 18, 2024) ("[A]t the pre-enforcement stage, FOG need not prove conclusively that its intended course of conduct violates the AEA but only that it is *arguably* proscribed by the statute."). Thus, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

"Beyond chill, a variety of facts can demonstrate a credible threat of enforcement." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022). Sixth Circuit cases

> have highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?

*Id.* (citing *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016))). "This isn't a laundry list; [plaintiffs] don't have to satisfy all the factors." *Id.* at 307–08. The factors also "are not exhaustive," *Online Merchants*

*Guild*, 995 F.3d at 550, and here, the recency of the Act, its criminal provisions, the Defendants' refusal to disavow enforcement, and its private civil enforcement mechanism each tip the scale.

      1.    **Recency of the Enactment:**  It is true that the Defendants have not yet initiated a prosecution under the Act—perhaps because this litigation was filed before the statute took effect and the Defendants have been field-testing a host of shifting and inherently conflicting definitions for the challenged term since then.  But the recency of the Act's enactment alone—which the bill's own fiscal note predicts will result in annual prosecutions, *see* **Ex. 1**, Fiscal Note, HB 1895 – SB 1971, 2024 Leg., 113th Sess. (Tenn. Feb. 4, 2024), https://www.capitol.tn.gov/Bills/113/Fiscal/HB1895.pdf—makes the threat credible.  *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) ("The contemporaneity of those enactments reinforces the inference that the legislature intends to target plaintiffs."); *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) ("[T]he threat of prosecution is greater under a statute enacted relatively recently."); *Minn. Democratic-Farmer-Lab. Party by Martin v. Simon*, 970 N.W.2d 689, 696 (Minn. Ct. App. 2022) ("When analyzing whether a 'credible threat of prosecution' exists, federal courts have considered the history of the statute's enforcement, as well as how recently it was enacted.") (collecting cases); *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) ("When dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.").

      2.    **Criminal Nature of the Threat:**  "[T]he nature of the restrictions"—namely, whether a plaintiff "challenges criminal laws"—affects the pre-enforcement standing inquiry. *Kareem v. Cuyahoga Cty. Bd. of Elections*, 95 F.4th 1019, 1025 (6th Cir. 2024).  The reason is that

"[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. Am. C.L. Union*, 521 U.S. 844, 872 (1997); *see also Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 745 (9th Cir. 2012) ("The threat to infringement of such First Amendment rights is at its greatest when, as here, the state employs its criminalizing powers."). Under such circumstances, the "danger of [a] statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393; *cf. Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965) ("We have fashioned this exception to the usual rules governing standing . . . because of the 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.'" (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963))). Thus, a threat of enforcement carries more credence when a challenged statute—especially a *vague* statute—carries criminal penalties. *See, e.g.*, *id.*; *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("[B]ecause most people are frightened of violating criminal statutes especially when the gains are slight, as they would be for people seeking only to make a political point and not themselves political operatives, there is standing."). As the Third Circuit explained recently:

> The attenuated risk of enforcement here matters less for Article III standing than in many pre-enforcement cases because the Law is exclusively civil. In *Driehaus* and every pre-enforcement case that it recounted, the statutes at issue included criminal penalties. 573 U.S. at 158–60, 166, 134 S. Ct. 2334. Indeed, as we noted at the start, much of the point of pre-enforcement challenges is to let people vindicate their constitutional rights without having to risk prosecution. *See id.* at 161, 134 S. Ct. 2334. But civil penalties lower the temperature.

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 222–23 (3d Cir. 2023)

    **3.**   **<u>Warnings:</u>**  Plaintiff Behn has been warned that her exact speech—which is in the record here, *see* Doc. 1-5, notwithstanding the Defendants' inaccurate claim that it is not alleged

with specificity, *see* Doc. 26 at 15—violates the Act's recruitment prohibition. Doc. 1 at ¶¶ 39–42. Examples of Ms. Welty's speech and intended speech are in the record here, too. *See, e.g.*, Doc. 1-2. The Defendants' own briefing also warns that if the Plaintiffs' speech—including Ms. Behn's pure advocacy and Ms. Welty's provision of truthful information about abortion medication and legal options for safe abortion—"persuade[s] someone" to get a legal abortion out of state or "convinc[es]" a minor to do so, then the Plaintiffs will be subject to criminal prosecution that the Defendants perceive no constitutional problems initiating. Doc. 26 at 7, 15.

**4.** **Private Enforcement Available:** The Act is privately enforceable. Tenn. Code Ann. § 39-15-220(e)(1)–(4). Tennessee also authorizes both citizens' arrests, *see* § 40-7-109(a)(1); *State v. Smith*, 695 S.W.2d 954, 959 (Tenn. 1985), and citizen-initiated indictments by citizen complainants who may address Tennessee's citizen grand juries directly and are encouraged to do so, *see* Tenn. R. Crim. P. 6 Adv. Comm. Cmt. (citing Tenn. Code Ann. §§ 40-12-104 – 107).

**5.** **Defendants' Refusal to Disavow Enforcement:** The Defendants refused to disavow enforcement. *See* Doc. 1 at ¶¶ 30–31. And far from providing "clear assurances that they will not prosecute" violations of section 39-15-220(a), *see Universal Life Church*, 35 F.4th at 1035, the Defendants maintain (twice) that such prosecutions would "pose[] no constitutional problem." Doc. 26 at 2, 3. Further, each Defendant—"as a district attorney general, has both a 'constitutional and statutory obligation to prosecute offenses committed in'" his jurisdiction. *Universal Life Church*, 35 F.4th at 1035 (quoting *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 208 (Tenn. 1999); Tenn. Code Ann. § 8-7-103(1) ("Each district attorney general . . . [s]hall prosecute in the courts of the district all violations of the state criminal statutes[.]")). Combining that fact with the Defendants' claims to this Court that—if Plaintiffs' speech "persuade[s] someone" to get a legal abortion out of state or "convince[es]" a minor to do so, then the Plaintiffs are properly subject to

-23-

prosecution, Doc. 26 at 7, 15—the Defendants have also refused to disavow enforcement against the Plaintiffs' specific speech during this litigation.

## C.  THERE IS NO SOVEREIGN IMMUNITY DEFECT.

There is "an important exception" to sovereign immunity under *Ex Parte Young*: "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).  That exception applies here.  *See Universal Life Church*, 35 F.4th at 1034–36 (official-capacity pre-enforcement suit against district attorneys permitted).  The Defendants' contrary belief—that *Young* requires more than the credible threat of enforcement necessary to establish an Article III injury—is a misstatement and "perverse reading" of controlling precedent.  *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("A plaintiff need not wait until a prosecutor initiates adverse action to have standing to sue to protect his First Amendment rights. . . . It would be a perverse reading of *Young* to say that, although Russell might have an Article III injury before the Attorney General directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar us from enjoining the Attorney General's initiating a prosecution.").

## D.  ABSTENTION IS NOT WARRANTED.

The Defendants also assert that "abstention principles counsel in favor of dismissal."  Doc. 26 at 18–19.  A host of merits reasons militate against abstention, though, which, "in general, should be applied only in 'exceptional circumstances[.]'"  *Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 491–92 (6th Cir. 2001) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)).  For instance, federal courts are "particularly reluctant to abstain in cases involving facial challenges to the First Amendment."  *Libertas Classical Ass'n v. Whitmer*, No. 20-2085, 2020 WL 6886262, at *2 (6th Cir. Nov. 20, 2020) (cleaned up).  There also is no "action pending

-24-

in state court [that] will likely resolve state law questions which are dispositive of the federal claim." *Lamb Enterprises, Inc. v. Kiroff*, 549 F.2d 1052, 1062 (6th Cir. 1977); *Tyler v. Collins*, 709 F.2d 1106, 1108 (6th Cir. 1983) ("Abstention is particularly warranted where a state proceeding is pending that challenges the law under the state constitution."). Nor is section 39-15-220(a)'s recruitment provision "susceptible" of any non-speech-based "reading that would avoid the necessity of constitutional adjudication." *Kusper v. Pontikes*, 414 U.S. 51, 54–55 (1973); *see also Jones v. Coleman*, 848 F.3d 744, 749–50 (6th Cir. 2017) ("[W]here it has seemed unlikely that resolution of the state-law question would significantly affect the federal claim, the Court has held that abstention should not be required."). That the Defendants themselves assert that there is no ambiguity in section 39-15-220(a)'s recruitment provision militates against abstention, too. *Wisconsin v. Constantineau*, 400 U.S. 433, 437–39 (1971) ("[A]bstention should not be ordered merely to await an attempt to vindicate the claim in a state court. Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim."). Thus, there is "nothing that requires federal-court abstention on this issue." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 83 (1976).

This Court need not address the merits of abstention here, though. The reason is simple: Abstention is a request for relief that must be made by motion. Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 739 (6th Cir. 2000) ("A district court's denial of a motion to abstain is reviewed by this court de novo."). The Defendants have not filed any such motion, though, nor have they conferred regarding one. *But see* Local Rule 7.01(a)(1). The request may be denied accordingly.

## V. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss should be **DENIED**.

-25-

Respectfully submitted,

/s/ Daniel A. Horwitz
DANIEL A. HORWITZ, BPR #032176
MELISSA DIX, BPR #038535
SARAH L. MARTIN, BPR #037707
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
daniel@horwitz.law
melissa@horwitz.law
sarahmartin1026@gmail.com
(615) 739-2888

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2024, a copy of the foregoing and all exhibits and attachments were sent via CM/ECF, USPS Mail, and/or via email, to:

STEVEN J. GRIFFIN (BPR# 040708)
MATTHEW D. CLOUTIER (BPR# 036710)
DONNA L. GREEN (BPR# 019513)
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-9598
Steven.Griffin@ag.tn.gov
Matt.Cloutier@ag.tn.gov
donna.green@ag.tn.gov

*Counsel for Defendants*

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176