EXHIBIT "A"

1

**U.S. DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | |
|---|---|
| **WELTY, et al,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **Vs.** ) | **Case Number:** |
| ) | **42:1983 Civil Rights Act** |
| ) | |
| **DUNAWAY, et al,** ) | |
| **Defendant.** ) | |

_____

**Transcript of Hearing**

**August 30, 2024**

**Before Aleta A. Trauger, District Judge**

_____

**APPEARANCES:**

**FOR THE PLAINTIFFS:**
        **Daniel Horwitz**
        **Melissa Dix**
        **Sarah Martin**
        **Attorney at Law**
        **Nashville, TN 37201**


**FOR THE GOVERNMENT:**
        **Donna L. Greet**
        **Matthew Cloutier**
        **Steven Griffin**
        **Assistant US Attorneys**
        **Nashville, Tennessee 37201**

_____

*Shana Crawford*

*Licensed Court Reporter*

*(615) 862-4200 *  (931) 494-1191*

2

```
 1                        *  *  *
 2              THE COURT:   Good afternoon, we are here
 3      on the plaintiffs' application for a preliminary
 4      injunction in Welty and Behn versus Bryant Dunaway,
 5      et al.  We have for the plaintiff Daniel Horwitz.
 6              MR. HORWITZ:   Good afternoon, Your
 7      Honor.
 8              THE COURT:   Good afternoon.  Melissa
 9      Dix.
10              MS. DIX:  Good afternoon, Your Honor.
11              THE COURT:  And Sarah Martin.
12              MS. MARTIN:  Good afternoon, Your Honor.
13              THE COURT:  And for the defense from the
14      Attorney General's Office, we have Steven Griffin.
15              GENERAL GRIFFIN:  Good afternoon, Your
16      Honor.
17              THE COURT:  Hello.  Matthew Cloutier.
18              GENERAL CLOUTIER:  Good afternoon, Your
19      Honor.
20              THE COURT:  And Donna Green.
21              GENERAL GREEN:  Good afternoon, Your
22      Honor.
23              THE COURT:   Thank you.  Would you like
24      to make opening statements or just get right into the
25      testimony?
```

3

1  MR. HORWITZ:   We are happy to just get
2  right into the testimony, Your Honor.
3  THE COURT:  That's fine.  Is that all
4  right with the defense?
5  GENERAL GREEN:   Your Honor, may I ask
6  the Court to address a preliminary matter?
7  THE COURT: Sure.
8  GENERAL GREEN:  Because the order
9  setting this hearing did not specifically address or
10  contemplate witness presentation, we would ask the
11  Court if we might have ten minutes of a recess after
12  direct examination so that we might confer on the
13  cross examination of the witnesses?
14  THE COURT:   See if you think you need
15  it.  Okay.
16  All right.  Go head, Mr. Horwitz.
17  MR. HORWITZ:  Plaintiffs call Rachel
18  Welty.
19
20  RACHEL WELTY,
21  was called as a witness, after first being duly
22  sworn, was examined and testified as follows:
23
24  DIRECT EXAMINATION
25  BY MR. HORWITZ:

4

1  Q.  Good afternoon, ma'am?
2  A.  Good afternoon.
3  Q.  Could you please state and spell your
4  name for the record?
5  A.  Rachel Welty.  R-A-C-H-E-L, W-E-L-T-Y.
6  Q.  Ms. Welty, what is your profession?
7  A.  I'm an attorney.
8  Q.  Please tell the Court a little bit about
9  your law practice.
10  A.  Yeah.  So I own a child advocacy focused
11  family law practice in town.  I've been a attorney
12  for 17 years.  And I've had my own firm for 15.
13  I focus on all aspects of family law.
14  So divorces, child custody, adoptions, juvenile court
15  work, dependant/neglected abused children, guardian
16  ad litem work, adoptions, not sure if I said that or
17  not.
18  But also have for years and years done
19  abortion advocacy work as well in my practice.
20  Q.  Ma'am, I want to take you back a few
21  years to a pre-Dobbs world.  In your complaint filed
22  in this case, you referred to judicial bypass
23  representations, can you tell the Court what that
24  means?
25  A.  Yeah, so judicial bypass was the

5

1  mechanism in Tennessee that a minor who wanted to
2  obtain abortion care but did not have their parents
3  consent, could go get an order from a court to be
4  able to take to a clinic to be able to obtain that
5  abortion care.
6  Q.  And that is without the consent of the
7  parents?
8  A.  Without the consent of their parent
9  because they received the consent of a judge after a
10  hearing.
11  Q.  For approximately how many years did you
12  handled judicial bypass representations?
13  A.  Five or six years, I believe.
14  Q.  Ma'am, under the law today, do pregnant
15  minors in Tennessee have any options for obtaining
16  legal abortion care?
17  A.  Not many.  They don't have really any
18  options in Tennessee.  Their options are to get
19  abortion pills and do a self manage abortion or to
20  seek abortion care outside of the State of Tennessee.
21  Q.  Is it fair to say that for many years
22  now you helped clients, including unemancipated
23  minors access legal abortion care?
24  GENERAL GREEN:  Object to the leading
25  question, Your Honor.

---

**6**

1        THE COURT: Very disputed, sustained.

2

3  BY MR. HORWITZ:

4       **Q.**  You ever helped minors access legal

5  abortion care?

6       **A.**  I have.

7       **Q.**  Have you ever helped unemancipated

8  minors access legal abortion care?

9       **A.**  I have.

10      **Q.**  Have you done that for many years?

11      **A.**  I have.

12      **Q.**  Does that include abortion care out of

13  state?

14      **A.**  It does.

15      **Q.**  Ma'am, would you like to be able to

16  continue doing that work?

17      **A.**  I would. It's very important work.

18      **Q.**  Ma'am, even though the legal landscape

19  surround abortion post-Dobbs has changed, do you

20  still receive inquires concerning minors who want

21  assistance seeking abortion care?

22      **A.**  I do from minors sometimes, but also

23  from adults on minors' behalf.

24      **Q.**  Do all of those minors have parental

25  consent to seek abortion care?

---

**7**

1      **A.**  I'm not sure.

2      **Q.**  And why is that?

3      **A.**  I don't specifically ask them.

4      **Q.**  Why not?

5      **A.**  It can be really dangerous for minors in

6  regard to the care that they are trying to get.

7  There may be a lot of reasons why they don't seen the

8  consent of their parent. Sometimes their parent is

9  their abuser. So I just don't get into that question

10  with them.

11      **Q.**  Is it fair to say that that is the

12  reason judicial bypass existed as a mechanism?

13      **A.**  Absolutely, that and for other reasons.

14  Like a lot of times minors might not know where there

15  legal guardian is. And it might take too long for

16  there to be a change of custody to who they are

17  living with for that custodian to be able to give

18  their consent.

19      **Q.**  Ma'am, do you provide your minor clients

20  accurate information about ways they can legally

21  obtain an abortion?

22      **A.**  Yes.

23      **Q.**  Would you like to continue helping

24  minors seek legal abortion care even if they do not

25  have parental consent?

---

**8**

1      **A.**  Absolutely.

2      **Q.**  Why?

3      **A.**  Because it's important. Minors need to

4  be able to be make these decisions for themselves and

5  be able to access routine, safe abortion care.

6      **Q.**  Because the defendants in the case have

7  variously asserted that recruitment encompasses

8  convincing a minor to obtain an abortion, I want to

9  talk a little bit about what your representations

10  look like. I obviously don't want to get into the

11  specifics of any individual representation that would

12  intrude on confidentiality.

13      Ma'am, is it fair to say that some

14  number of pregnant unemancipated minors --

15      GENERAL GREEN: Object to leading again,

16  Your Honor.

17      THE COURT: I haven't heard the

18  question.

19

20  By MR. HORWITZ:

21      **Q.**  Have some number of pregnant

22  unemancipated minors come to you for advice and

23  guidance about what they should do?

24      **A.**  Yes.

25      **Q.**  Are some of those minors uncertain about

---

**9**

1  the best option for them?

2      **A.**  They are at times.

3      **Q.**  In your experience, when presented with

4  accurate information about abortion care and the

5  legal options they have to obtain care, do some

6  minors make the decision to have a legal abortion?

7      **A.**  They do.

8      **Q.**  Ma'am, I noticed that in some of your

9  literature, which we will get into momentarily, it

10  states that abortion is safe, common and normal; do

11  you hold that view?

12      **A.**  I do.

13      **Q.**  Is that a view that you have

14  historically shared with your clients?

15      **A.**  Absolutely.

16      **Q.**  In your experience does informing your

17  clients that abortion is safe, common and normal

18  cause some number of your clients that were uncertain

19  about the best option for them to pursue abortion

20  care?

21      **A.**  Yes.

22      **Q.**  Ma'am, when your clients decide they

23  want an abortion, do you support and encourage that

24  decision?

25      **A.**  I do.

---

10

1    Q.    Why is?
2    A.    Because I am an advocate.  I help people
3    make choices in their lives to help better their
4    lives.  I give them information.  And once they
5    choose a path, I help them execute it.
6    Q.    Do you have a duty of loyalty as an
7    attorney?
8    A.    I definitely do.
9    Q.    Do you adhere to that duty?
10   A.    I do.
11   Q.    Stepping outside of abortion
12   specifically, I want to talk about medical care more
13   generally when it comes to your minor clients.  Can
14   you please tell the Court what Tennessee's Mature
15   Minor Doctrine is?
16   A.    Yeah.  So it is a law of sevens.  There
17   is a rebuttable presumption for 14 years old and up
18   that they can make their own medical decisions.
19   Q.    Is this Tennessee law?
20   A.    Correct.
21   Q.    Under Tennessee's Mature Minor Doctrine,
22   is it true that minors can obtain a host of medical
23   procedures, for instance, treatment for sexual
24   transmitted disease without parental consent?
25   A.    Correct.  They can get birth control

11

1    without parental consent.
2    Q.    In your practice, have you ever been
3    retained to help minors access medical care without
4    parental consent?
5    A.    I haven't been retained, but I have
6    definitely -- in the years I did all of my juvenile
7    court work and as a guardian ad litem, helped minors
8    that I represented access that sort of care.
9    Q.    To your knowledge, is there any
10   Tennessee statute that even arguably criminalizes the
11   advice and guidance you provide to minor clients when
12   it comes to medical care other than abortion care?
13   A.    No.
14   Q.    Is there a statute that arguably
15   criminalizes the advice and guidance provided to
16   minor clients when it comes to abortion care
17   specifically?
18   A.    Yes.
19   Q.    Is that the statute that we have
20   challenged in this case?
21   A.    It is.
22   Q.    Let's make this clear for the record:
23   When you are providing advice to your minor clients
24   or seeking assistance with medical care, you don't
25   have to worry about being prosecuted unless you are

12

1    talking about abortion care; is that correct?
2    A.    Correct.
3    Q.    Ma'am, are most of your clients
4    Tennessee residence?
5    A.    They are.
6    Q.    Are any of the clients represent Middle
7    Tennessee residence?
8    A.    They are, many of them.
9    Q.    I'm going to hand up a document, that we
10   have previously filed in this case, as Exhibit 1 to
11   your complaint with the Court's permission.
12
13         MR. HORWITZ:  May I approach, Your
14   Honor?
15         THE COURT:  Yes.  That's just the
16   statute, isn't it?
17         MR. HORWITZ:  Yes.
18         THE COURT:  Okay.
19
20   MR. HORWITZ:
21   Q.    Ma'am, to the best of your knowledge, is
22   this an authentic copy of Public Chapter No. 1032?
23   A.    It is.
24
25         MR. HORWITZ:  I would like to move that

13

1    into evidence, please.
2          THE COURT:  Objection?
3          GENERAL GREEN:  No objection, Your
4    Honor.
5          THE COURT:  Received.
6
7          (WHEREUPON, Exhibit No. 1 was marked.)
8
9    BY MR. HORWITZ:
10   Q.    Ms. Welty, based on public chapter 1032
11   do you have any concern that's you might be sued or
12   criminally prosecuted for the guidance you give your
13   minor clients who are considering an abortion?
14   A.    Absolutely.
15   Q.    And just to make this clear for the
16   record:  You are an adult, correct?
17   A.    Yes, I am.
18   Q.    Ms. Welty, apart from your work as an
19   lawyer, are you a member of any organizations that's
20   involved in abortion advocacy?
21   A.    I am.  I am on the board of directors of
22   Abortion Care Tennessee, which is an abortion fund in
23   town.
24   Q.    Can you please tell the Court a little
25   bit about what the organization does?

---

**14**

1    A.    Yeah.  So we are an abortion fund that
2 raises money and gives block grants to abortion
3 clinic outside of the State of Tennessee earmarked
4 for for Tennessee residences to obtain abortion
5 health services.
6    Q.    Does the organization provide resources
7 to minors seeking abortion?
8    A.    It does.
9    Q.    And what are those resources?
10    A.    Online literature many times.  Handouts
11 about abortion care, self managed abortion, abortion
12 pills.
13    Q.    Do you connect those minors with clinics
14 out of state?
15    A.    We do.
16    Q.    Does the organization inform minors
17 about their options for seeking legal abortion care?
18    A.    It does.
19    Q.    Does the organization's advocacy efforts
20 directed throughout Middle Tennessee?
21    A.    They are.
22    Q.    Are they --
23    A.    All over the State, but obviously many
24 of us are in Middle Tennessee.
25    Q.    What about your advocacy efforts

---

**15**

1 vis-à-vis the organization?
2    A.    Yeah, so my efforts mainly are in Middle
3 Tennessee.
4    Q.    And you are personally involved in that
5 advocacy?
6    A.    I am.  I go to fundraisers and sometimes
7 get interviewed or do speaking engagements.
8    Q.    We talked a little bit earlier about the
9 options that Tennessee minors have for obtaining
10 legal abortion care today.
11    A.    Uh-huh.
12    Q.    Can you remind the Court once more what
13 those options are?
14    A.    Pretty much none.  Except for if they
15 are able to obtain abortion pills and have a
16 self-managed abortion, or they are able to access
17 abortion care outside of the State of Tennessee.
18    Q.    Just to break that down:  There is a
19 legal mechanism to obtain an abortion out of state?
20    A.    Correct.
21    Q.    And there is a legal option to obtain a
22 medication abortion within the State?
23    A.    Correct.
24    Q.    Does your organization do any advocacy
25 related to those options?

---

**16**

1    A.    We do.
2    Q.    And what is that advocacy?
3    A.    We have had different talks about
4 self-managed abortion we have lots of literature
5 about abortion pills that we table and have at all of
6 our fundraisers.  We also have a website with lots of
7 information on it that anyone obviously could access.
8    Q.    Are you personally involved in that
9 advocacy?
10    A.    I am.
11    Q.    I'm going to pass up some literature
12 that we've previously filed in this case, Exhibit 2
13 to complaint with the Court's permission?
14
15    MR. HORWITZ:  May approach, Your Honor?
16
17 BY MR. HORWITZ:
18    Q.    Ma'am, do you recognize this literature?
19    A.    I do.
20    Q.    What is it?
21    A.    So it is -- the first page is literature
22 that we received through the organization from
23 Abortion Care Tennessee through PlanCPills.org that
24 we hand out at different events.  I carried lots of
25 it around sometimes in my work bag and I hand it out

---

**17**

1 different places.
2    Any time I go to the state legislature
3 for any reason, I always have some and I'm handing it
4 out to different representatives or state senators.
5 The third page are some handouts, little cards that I
6 created after the *Dobbs* decision came out.  And I
7 will hand that out to people.  Sometimes I will leave
8 it around different places, bathrooms of bars
9 sometimes.  And so yep.
10    Q.    Does this is literature appear to you to
11 be authentic?
12    A.    It is.
13
14    MR. HORWITZ:  Move this into evidence as
15 Exhibit 2, please.
16    THE COURT:  Objection?
17    GENERAL GREEN:  Your Honor, so long as
18 these are not being offered for the truth of the
19 matters asserted therein, there is no objection.
20    THE COURT:  Received.
21
22    (WHEREUPON, Exhibit No. 2 was marked.)
23 BY MR. HORWITZ:
24    Q.    You mentioned handing out this
25 literature, correct?

18

1     A.   Yes.
2     Q.   Do some of the individuals who you hand
3   out this literature, unemancipated minors?
4     A.   More likely than not.  I don't know that
5   specifically.  But there are many events we do at
6   retail stores, potentially festivals where anyone
7   could pick up the handout.  There is definitely teens
8   and young adults that come to these events.
9     Q.   Would you like to with able to continue
10   handing out literature like this?
11     A.   Absolutely.
12     Q.   And outside of your role as a lawyer and
13   as a board member of an abortion fund, do you do any
14   other abortion related advocacy?
15     A.   Yeah.  I had started just some social
16   media handles to try to educate Tennesseans about
17   the right to continue to seek abortion care.  There
18   is a lot of confusion out there about what the law is
19   and what an individual can and cannot do in regard to
20   abortion right now.  And so I felt it important in
21   2022 to start one of those social media accounts.
22     Q.   Before we get to the social media
23   account, ever given speeches?
24     A.   Absolutely.
25     Q.   Participated in other type of advocacy?

19

1     A.   Yeah.  I show up to a lot of marches and
2   have given speeches before.  Talk to a lot of
3   reporters.
4     Q.   Are minors in the audience sometimes?
5     A.   Yes.
6     Q.   Are minors receiving your messages?
7     A.   They definitely are.
8     Q.   You mention a social media account
9   concerning abortion, what was the purpose of that
10   account?
11     A.   To provide information to Tennesseeans
12   about abortion care.
13     Q.   And what kind of information did you
14   post on that account?
15     A.   That abortion is still legal, that it's
16   safe.  I posted a lot of information about abortion
17   pills and their safety and where they can be
18   accessed.
19     Q.   When did you start this account?
20     A.   In -- I believe after the Dobbs decision
21   was leaked, so it might have been late summer, early
22   fall of 2022.
23     Q.   And what is happening with the account
24   now?
25     A.   I don't use it currently.

20

1     Q.   Why not?
2     A.   After these -- the landscape started the
3   change a little bit and it started to feel like there
4   was criminalization of my advocacy, I decided it was
5   not a good use of my time.
6     Q.   Went you say "a good use", can you --
7     A.   Well, I don't need someone coming and
8   trying to sue me or prosecute me for the things I'm
9   posting online.
10     Q.   Are you concerned about being prosecuted
11   under Public Chapter No. 1032?
12     A.   Absolutely.
13     Q.   Can you please tell the Court what the
14   impact on your family would be if you were
15   prosecuted --
16     A.   Yeah.  So I'm a single mom of three
17   children.  I'm the only income in my household.  My
18   ex-husband is active duty military and deployed for
19   long periods of time and doesn't currently live in
20   the State.  And so if I, obviously, was sued civilly,
21   that could really be devastating for me and my
22   ability to practice law, keep an income and
23   finance -- financially stability for my children and.
24        Then of course if I was prosecuted, if I
25   was put in jail and it took a little bit for me to

21

1   get out, that could also have a negative impact.
2     Q.   I believe I asked about criminal
3   prosecution, but just to bring that up to the Court,
4   are you concerned about both being sued civilly and
5   being criminally prosecuted?
6     A.   Absolutely.  Both are equally concerning
7   to me.
8     Q.   Ma'am, before filing this lawsuit, did
9   you ever ask the District Attorneys in Middle
10   Tennessee to disavow prosecution against you under
11   this law?
12     A.   I did.
13     Q.   Ma'am, I would like to show you a letter
14   it's document number 14, I believe it's Exhibit 3 to
15   complaint.
16
17        MR. HORWITZ:  With the Courts
18   permission, may I approach?
19        THE COURT:  Yes.
20
21   BY MR. HORWITZ:
22     Q.   Ma'am, do you recognize this letter?
23     A.   I do.
24     Q.   Does this look like a letter that was
25   sent to the District Attorneys on your behalf?

**22**

1      **A.**   It does.

2

3         MR. HORWITZ: I would like to move this

4 into evidence as Exhibit 3, please.

5         GENERAL GREEN: No objection.

6         THE COURT: Received.

7

8         (WHEREUPON, Exhibit No. 3 was marked.)

9

10 BY MR. HORWITZ:

11      **Q.**   Ma'am, in response to this letter, did

12 any District Attorney in Middle Tennessee disavow

13 prosecution against you?

14      **A.**   No.

15

16         MR. HORWITZ: And with the Court's

17 permission, I'm going to hand up the verified

18 complaint in the case. May I approach?

19         THE COURT: Yes.

20

21 BY MR. HORWITZ:

22      **Q.**   Ma'am, do you recognize the document

23 that I just handed you?

24      **A.**   I do.

25      **Q.**   Do you recall verifying the allegations

**23**

1 in this case complaint that concern you?

2      **A.**   I do.

3      **Q.**   Sitting here today, are all of these

4 allegations still true?

5      **A.**   They are.

6

7         MR. HORWITZ: Would lake to move this

8 into evidence as Exhibit 4, please.

9         THE COURT: Any objection.

10         GENERAL GREEN: No objection.

11         THE COURT: Received.

12         MR. HORWITZ: Those are my questions,

13 Your Honor.

14         THE COURT: Ready for cross?

15         GENERAL GREEN: May we have, Your Honor,

16 just a few minutes to confer?

17         THE COURT: All right. We will take a

18 short recess.

19

20         (Recess was taken.)

21

22         THE COURT: Ready for cross?

23         GENERAL GREEN: Thank you for the

24 recess, Your Honor.

25         THE COURT: You are welcome.

**24**

1

2           <u>CROSS-EXAMINATION</u>

3 <u>BY GENERAL GREEN:</u>

4      **Q.**   Ms. Welty, I am Donna Green. I would

5 like to ask you a few questions about your testimony

6 today.

7         You testified that you helped minors

8 access abortion care. In that vein, you like to

9 provide information and provide options to sometimes

10 adults and sometimes minors; is that correct?

11      **A.**   Correct.

12      **Q.**   Is your goal to provide options so that

13 the individual, in this case let's say a minor, makes

14 her own choice given the options, or is your goal to

15 persuade the individual to obtain an abortion?

16      **A.**   My goal as an advocate is never to

17 persuade someone. It is to give them options and

18 then let them make their own decision.

19      **Q.**   And then you said once the child has

20 made her decision, then you sometimes facilitate

21 putting her decision into action; how do you do that?

22      **A.**   Sometimes it's connecting them with

23 resources whether it's donations of -- financial

24 donations or it is helping give them information

25 about what clinics are available for them to go out

**25**

1 of state potentially. Sometimes that could be

2 information about abortion pills.

3      **Q.**   Let me ask you a few questions about the

4 standing -- your standing to maintain this action.

5 Now, you really cannot point to any history of past

6 enforcement of this statute against you, can you?

7      **A.**   Luckily so far no, I cannot.

8      **Q.**   And similarly you have no knowledge of

9 any others being prosecuted under that statute, do

10 you?

11      **A.**   That I can't answer because I -- I would

12 be guessing, so I'm not sure.

13      **Q.**   Okay. But to your knowledge are there

14 any others that have been prosecuted under this

15 statute?

16      **A.**   I have not heard of any, but that

17 doesn't mean it hasn't happened.

18      **Q.**   All right. And to be clear, you have

19 not received any warning letters that this statue

20 could be enforced to you or enforced against you; is

21 that correct?

22      **A.**   I have not, but it's concerning to me

23 that we try to preemptively ask District Attorneys if

24 it's something I should be concerned about and no one

25 responded.

26

1      **Q.** And by that, you're referring to the
2 June 6th letter from counsel to the defendants in
3 this matter?
4      **A.** Yes.
5      **Q.** All right. In that letter -- and do you
6 have Exhibit 3 there in front of you?
7      **A.** I don't. They took it from me.
8
9      GENERAL GREEN: Do we have a copy of
10 Exhibit 3 for the witness?
11
12 BY GENERAL GREEN:
13      **Q.** Now, in that letter, Ms. Welty, I
14 noticed on the top of page 2 you -- you indicate that
15 you've attached some examples of the literature that
16 you sometimes provide.
17      **A.** Yes.
18      **Q.** That is not an exhaustive list of
19 literature that you have provided to individuals,
20 correct?
21      **A.** Well, the -- sort of handouts more so to
22 individuals, I might be giving them websites to go to
23 or phone numbers to call.
24      **Q.** Okay. But in this letter, you did
25 provide a couple of examples that we have been --

27

1 that you attach?
2      **A.** We did.
3      **Q.** Is it fair say that despite making these
4 eleven District Attorneys aware of the sort of
5 information that you provide, that none of them sent
6 you an enforcement warning letter about those
7 behaviors?
8      **A.** They did not. But it would have made me
9 feel better if they would have responded to this
10 letter.
11      **Q.** All right. Let me ask you -- we will
12 skip around a little bit, because it is related to
13 that fourth factor regarding standing. The -- the
14 refusal to disavow enforcement, right?
15      Now you didn't ask the District
16 Attorneys' that you addressed this letter to to
17 disavow enforcement against you regarding just the
18 examples that you provided them. You asked them to
19 disavow any prosecution under the recruitment
20 provision against you altogether; is that right?
21      **A.** The letter speak for itself. I haven't
22 memorized it. I would have to go back through and
23 read it again.
24      But if you want to point me to a
25 specific section, I don't mind reviewing it quickly

28

1 and answering the question more fully.
2      **Q.** Sure. Let me direct your attention to
3 the first paragraph on page 3.
4      **A.** Thank you.
5      **Q.** Do you see where the paragraph ends with
6 the statement, "Given these constitutional
7 infirmities, I ask you to disavow all enforcement of
8 Public Chapter No. 1032 recruitment provision against
9 Ms. Welty once the law takes affect"?
10      **A.** That's correct.
11      **Q.** So in that letter, you do not ask to be
12 exempted from prosecution for specific conduct, you
13 just asked for blanket immunity, correct?
14      **A.** I asked them to disavow enforcement of
15 Public Chapter No. 1032 recruitment provision against
16 me once the law took effect.
17      **Q.** Okay. Let's turn or attention to
18 attributes of the statute that you believe make
19 enforcement of this statue easier than other
20 statutes. So if I understand correctly, you
21 identified that there is a civil cause of action in
22 the abortion trafficking statute that allows an
23 individual to sue somebody for the wrongful death of
24 an unborn child if that individual aborted the child
25 in violation of the statute?

29

1      **A.** Yes.
2      **Q.** But that civil provision doesn't make
3 criminal enforcement any more likely, does it?
4      **A.** I see them as two separate liabilities
5 that I have.
6      **Q.** Okay. And you in fact, I believe,
7 testified that you are equally concerned about both
8 the civil penalties and the criminal penalties,
9 correct?
10      **A.** Correct.
11      **Q.** Assuming that this Court does not block
12 the civil cause of action that private individuals
13 can bring suit against you, but however did block the
14 criminal prosecution of the recruitment provision,
15 would you still engage in the conduct that you want
16 to engage in?
17      **A.** Yes, because my free speech shouldn't be
18 limited. I shouldn't have to worry as an attorney
19 that I can't advise my client or have to stop and
20 think about, am I going to get -- am I going to get
21 criminally prosecuted or am I going to get civilly
22 sued because of the advocacy I'm giving a client as
23 an attorney.
24      **Q.** So if you were still subject to the
25 civil penalties that -- you would then -- if the

---

**30**

1  criminal penalties removed, but the civil penalties

2  remained in place, you would then continue your

3  advocacy as you have in the past?

4      **A.** I don't know because I haven't really

5  contemplated that. I advocate for my clients fully

6  and will continue to do so. But obviously it is a

7  major concern of mine that I could be sued because of

8  the advice I'm giving clients.

9      **Q.** All right. There is no provision in the

10  this statute that allows individuals to bring

11  criminal charges against you, correct?

12      **A.** That's my understanding.

13      **Q.** And an injunction against the District

14  Attorneys in this case would not limit a private

15  individual's right to sue you under the civil

16  provisions, correct?

17      **A.** Correct.

18

19      GENERAL GREEN: Thank you.

20      THE COURT: Any redirect?

21

22            REDIRECT EXAMINATION

23  BY MR. HORWITZ:

24      **Q.** Very briefly.

25      You were asked about persuasion, and I

---

**31**

1  believe you told opposing counsel that your goal is

2  never to persuade. We talk a little bit in your

3  direct examination about the information that you

4  give to minor clients being persuasive; do you recall

5  that?

6      **A.** Uh-huh.

7      **Q.** Was it your testimony that you intend to

8  give information to your minor clients?

9      **A.** Absolutely.

10      **Q.** Was it your testimony that you are

11  aware, based on your experience, that providing them

12  that accurate information is persuasive to some of

13  them?

14      **A.** Absolutely. And the fact that they are

15  communicating and being advocated for by someone like

16  me could increase the likelihood they choose

17  abortion.

18      **Q.** Do you encourage your client's choices?

19      **A.** I do.

20      **Q.** Do you support them?

21      **A.** I do.

22

23      MR. HORWITZ: No further questions.

24      THE COURT: Anything else.

25      GENERAL GREEN: Nothing further, Your

---

**32**

1  Honor.

2      THE COURT: Tell me -- you talk about

3  going to various places and distributing the

4  literature that's come into evidence, festivals and

5  bars and so forth. And you have sued, one, two,

6  three, four, five, six, seven, eight, nine, ten,

7  eleven District Attorneys who represent a multitude

8  of counties in the Middle District. I would like a,

9  kind of, realistic evaluation from you about how

10  active you are in these various counties or are the

11  there just a few counties that you are extremely

12  active?

13      THE WITNESS: Yeah. So I am really

14  active in Davidson County and all counties that's

15  touch Davidson County. That's mainly where my

16  advocacy lies. That's mainly the clients that we

17  take. But that being said, in -- when I was doing

18  judicial bypass work, because I am in a role being

19  one of the only attorneys in town who does this kind

20  of work, I might be getting people from all over.

21      So -- but if you're asking specifically

22  about where, kind of, we do our advocacy with

23  Abortion Care Tennessee, it mainly would be Davidson

24  County and those surround ing counties that touch

25  Davidson County.

---

**33**

1      THE COURT: So Sumner, Robertson,

2  Rutherford.

3      THE WITNESS: Cheatham, Williamson,

4  Wilson.

5      THE COURT: And that's where most of

6  your advocacy work takes place?

7      THE WITNESS: Yes, ma'am.

8      THE COURT: Is Judge Calloway the only

9  judge in the state that did judicial bypass?

10      THE WITNESS: She is the only one I

11  worked with. I can't answer you specifically as to

12  if there were any judges in Memphis or East Tennessee

13  that had ever done it. But the only judge I worked

14  in front of was Judge Calloway.

15      THE COURT: Okay. And do you only take

16  on as clients and give the options to young people

17  who either approach you or an adult approaches you on

18  their behalf?

19      THE WITNESS: Typically that is how I

20  have contact with people.

21      THE COURT: So you operate like an

22  lawyer?

23      THE WITNESS: Uh-huh.

24      THE COURT: So you don't go out and

25  scare up clients.

34

1  THE WITNESS:  Not in regard to this sort
2  of work, yeah.
3  THE COURT:  So for instance, we used to
4  have abortion clinics in Tennessee.  We used to have
5  Planned Parenthood.
6  THE WITNESS:  Uh-huh.
7  THE COURT:  So you would not on your own
8  sort of go to those facilities and try to engage with
9  woman seeking care there?
10  THE WITNESS:  I would not go to those
11  facilities and engage with woman in that way.  But
12  those facilities would refer people to me.
13  THE COURT:  Okay.  So if someone came
14  in, found out that they were pregnant.  I want an
15  abortion.  They might give them your phone number?
16  THE WITNESS:  Correct.
17  THE COURT:  So they would be contacting
18  you?
19  THE WITNESS:  Yes.
20  THE COURT:  Okay.  Anything else as the
21  result of my question?
22  MR. HORWITZ:  Yes.  Just one, Your
23  Honor.
24
25  REDIRECT EXAMINATION

35

1  BY MR. HORWITZ:
2  Q.  Do you put the word out that you do this
3  work?
4  A.  Yes.
5
6  MR. HORWITZ:  Thank you.
7  THE COURT:  Any other questions?
8
9  RECROSS-EXAMINATION
10  GENERAL GREEN:
11  Q.  Ms. Welty, in what way to you put the
12  word out?
13  A.  Well, I've been here 17 years, right.  I
14  think I am a member of the domestic bar in many
15  different counties and I engage with lawyers on a
16  daily basis.  Most lawyers and most advocacy groups
17  know that I do this sort of work and refer people to
18  me or ask me questions often.
19  Q.  But in response to Judge Trauger's
20  questions, you said you don't actually solicit
21  clients in this realm?
22  A.  Well, I definitely make it clear, and
23  have in the past said:  Hey, if anyone has a minor
24  who need information about abortion services or the
25  state of the law in Tennessee, send them my way I

36

1  will help them.  So if -- I -- I don't advertise it
2  right.  But it is definitely known in the legal
3  community that if somebody needs to have their
4  questions answered, they can be sent to me.
5  Sometimes that occurs through them
6  getting my name through different courthouses or
7  through adults or members of the legal community.
8  Q.  I think I understand.  So you don't
9  target a pregnant minor who has not solicited the
10  information from you and said, here's information I
11  want you to have?
12  A.  I wouldn't come in contact with them
13  typically, yeah.
14
15  GENERAL GREEN:  Thank you.
16  THE COURT:  You may step down.  Thank
17  you.
18  Next witness?
19  MS. MARTIN:  Plaintiff calls Aftyn Behn.
20
21  AFTYN BEHN,
22  was called as a witness, after having first been duly
23  sworn, was examined and testified as follows:
24
25  DIRECT EXAMINATION

37

1  BY MS. MARTIN:
2  Q.  Good afternoon.  Could you please state
3  your full name for the Court?
4  A.  Aftyn Behn.
5  Q.  And where do you live?
6  A.  Nashville, Tennessee.
7  Q.  And tell me a little bit about your
8  educational background.
9  A.  I have a bachelors of arts in psychology
10  from the University of Texas at Austin.  I have a
11  masters of social work from the University of Texas
12  at Austin.
13  Q.  Do you have a license or certificate?
14  A.  I do.  I'm licensed in the State of
15  Tennessee as a licensed masters of social work LMSW.
16  Q.  Do you consider yourself a clinician in
17  that regard?
18  A.  In the social work profession there are
19  two kind of routes, but we are both licensed -- able
20  to be licensed in the State of Tennessee and practice
21  as such.
22  Q.  Is your license still active?
23  A.  It is.  It expires in November of this
24  year.
25  Q.  And can you tell me what you do for a

38

1  living?
2        A.    I am -- I work for a federal super PAC
3  RuralVote.org.  And we mobilize rural and small town
4  voters in battleground state.
5        Q.    And are you also an elected official?
6        A.    I am.  I am the State Representative for
7  House District 51, which is the district that you all
8  are sitting in right now.
9        Q.    And in your capacity as a state
10  legislator, how do you spend your time in terms of
11  constituent services?
12       A.    In a myriad of ways.  A lot of it is
13  constituent services in terms of responding to
14  e-mails, responding to voicemails.  I also help
15  constituents navigate the red tape bureaucracy of our
16  government programs such as SNAP and TennCare.
17             And I also, as a state legislator,
18  advocate for the issues that my constituents care
19  about, which are about 60,000 voters/constituents.
20       Q.    Do you serve as a resource for
21  information for your constituents?
22       A.    Yes.  I communicate every day as to the,
23  you know, the legal status of issues in the State and
24  support constituents in navigating those issues.
25       Q.    Do those issues include abortion?

39

1        A.    Yes.  And my district overwhelmingly --
2  if I received any e-mail this year in mass, it is
3  about abortion access in the State of Tennessee.
4        Q.    Do you sometimes receive communications
5  from people outside of the district you represent?
6        A.    Yes.  I believe because of my capacity
7  as an organizer in the State of Tennessee, that
8  people know that I care about abortion access and so
9  I have been contacted by folks all across the State.
10       Q.    And so tell me about some of the ways in
11  which abortion comes up in the context of your
12  constituent services?
13       A.    So during the legislative session as
14  this bill was moving through, which I know we will
15  discuss later, I received probably 5,000 e-mails from
16  my district in opposition to this bill.
17             Additionally, I am solicited by families
18  across the State asking about the legal status of
19  abortion access in Tennessee and how they can access
20  truthful and accurate information about the resources
21  that exist.
22       Q.    And have some of the people that have
23  come to you about those resources been minors?
24       A.    To my knowledge, yes.  I had a mother
25  call me from Williamson County whose daughter found

40

1  out she was pregnant.  She didn't know how far along
2  she was and was hyper-concerned navigating the legal
3  landscape in Tennessee.  So I did provide her
4  information as to how to access abortion services
5  outside the State.
6        Q.    And when you are talking with people in
7  your office or communicating over the phone or via
8  e-mail, do you proactively verify the age of the
9  person you are talking to?
10       A.    I do not.
11       Q.    Is it conceivable that some of the
12  people in those audiences would be minors then?
13       A.    Yes.  Especially since a lot of our
14  organizations or advocacy organizations in the State
15  host Day on the Hill, and many young people attend
16  those days on the hill.
17       Q.    Do you ever proactively bring up the
18  topic of abortion with any of those audience?
19       A.    On an individual basis, no.  But often
20  times for press conferences and if I'm engaged with
21  stake holders, constituents that the topic of
22  abortion does come up frequently.
23       Q.    Any like public-type of events with
24  broader audiences?
25       A.    Yes.  While this bill was making its way

41

1  through the legislature, I stood on Broadway, which
2  was in my district, and had a table with a sign that
3  read, "Need an abortion, ask me for help".
4        Q.    What about social media and things of
5  that matter?
6        A.    Yes.  I frequently use my social media
7  platforms to demystify legislation and provide
8  information as to -- especially this bill that was
9  passed this session.
10       Q.    Let's talk about some of the concrete
11  types of resource that's you provide.  Can you talk a
12  little bit about that?
13       A.    So in my office, I also have some of
14  materials that are available in the appendix or --
15  I'm sorry, don't know the legal lexicon -- for the
16  evidence that you have.  I have information about our
17  abortion fund, the services that they provide, and
18  information as to how to contact the nearest abortion
19  provider outside of the State of Tennessee.
20       Q.    You heard Ms. Welty testify about the
21  two primary ways to obtain a legal abortion, right?
22  Do you agree that those are the two methods by way
23  someone can procure a legal abortion?
24       A.    Yes, in Tennessee.
25       Q.    Do you also provide information about

---

42

1  those two methods?
2      A.  Yes, I do.
3      Q.  Is that information accurate and
4  truthful?
5      A.  Yes.
6      Q.  Has anyone ever come to you asking for
7  resources or information about how to obtain an
8  illegal abortion in Tennessee?
9      A.  No, not to my knowledge.
10     Q.  So do you have access to back ally
11  doctors or anything like that in the State of
12  Tennessee?
13     A.  No.
14     Q.  Have you ever provided resources or
15  information about how to obtain an illegal abortion?
16     A.  No.
17     Q.  So just to clarify for the record, all
18  of the information that you have given to audiences
19  that include minors, are about the methods of legal
20  abortion outside the State of Tennessee and medicated
21  abortions, correct?
22     A.  Correct.
23     Q.  If a minor is with someone they claim is
24  their parent or guardian, do you have any way of
25  knowing whether that is the truth?

---

43

1      A.  No.
2      Q.  Do you ask?
3      A.  No.
4      Q.  Why not?
5      A.  Often times it -- it just doesn't matter
6  to me, especially in my professional capacity as a
7  social worker.
8      Q.  So do you have -- do you feel like you
9  to put on that counselor/social worker hat in your
10  role as a state legislator sometimes?
11     A.  Often times the responsibilities and
12  roles are intrinsically tied.  I find that my job as
13  a social worker enables me to do a better job as a
14  legislature in terms of lobbying for my constituents
15  as I would lobby for my clients.
16     Q.  Do you have certain ethical obligation
17  as a licensed social worker?
18     A.  Yes, I do.  The National Association of
19  Social Workers and our code of ethics and
20  professional responsibilities, one of the -- two of
21  the core tenants, one is a commitment to the client's
22  wellbeing; and two, a commitment to their promoting
23  their self-determination as an individual.
24     Q.  So are there times where, in your
25  clinical judgment, an abortion would be in someone's

---

44

1  best interest?
2      A.  Yes.
3      Q.  And under what circumstances might that
4  be the case?
5      A.  In circumstances such as rape or incest,
6  if the health of the mother is at risk.  Or if it's
7  to the best -- if it's -- if that individual believes
8  that they want one, then I would provide them the
9  best information possible.
10     Q.  Do you feel you have an ethical duty to
11  convey somehow that an abortion might be in their
12  best interest?
13     A.  As a licensed social worker, yes.
14     Q.  How do you do that?
15     A.  Can you repeat the question?
16     Q.  How do you convey that you feel an
17  abortion might be in their best interest?
18     A.  By providing them information so that
19  they can make an informed decision and ensuring that
20  the space that I offer and the professional advice is
21  one that doesn't make them feel less than or
22  invaluable, or that harm will come from this
23  decision.  I try to leave it as open and inclusive a
24  space as possible so that they feel they have met the
25  decision to the best of their ability.

---

45

1      Q.  Do you validate that decision for them?
2      A.  Yes.  As a professional social worker,
3  that is how we are trained to navigate client
4  relationships.
5      Q.  So when you provide people resources and
6  accurate and truthful information about abortion and
7  obtaining a legal abortion, do you intend for these
8  folks to use that -- those resources and information?
9      A.  Often times they do use the resources to
10  obtain legal abortions, yes.
11     Q.  And again, do you validate that
12  decision?
13     A.  As a professional licensed social
14  worker, yes, it is my ethical duty to do so.
15     Q.  Support that decision?
16     A.  If they make informed decision to obtain
17  an abortion, then yes.
18     Q.  Encourage that decision if that's it is
19  choice they made?
20     A.  Ensure that they have access to the --
21  if they make that decision, yes, to support them in
22  doing so.
23     Q.  Have there been times when someone began
24  this conversation with you about abortion unsure
25  about what they wanted to do and then left the

46

1 conversation with you convinced that they should have
2 an abortion?
3     A.    Only a few incidents.  And I think
4 it's -- they look to me as a safe person who is
5 highly informed as to how to navigate a lot of these
6 resources and information, so yes.
7     Q.    When this statute you've sued over was
8 moving through the General Assembly, did you speak
9 out against it?
10     A.    Yes.
11     Q.    How so?
12     A.    I'm a member of the Health Committee,
13 and so I routinely -- I think the bill was heard
14 twice in our Health Committee, so I spoke out against
15 it then.  I would like to note that during the
16 committee proceedings, again and again we asked the
17 house sponsor to define recruitment, and he would be
18 flippant and not respond as such.
19         So we never clearly understood the
20 definition of the word "recruit".
21     Q.    Okay.  Let's start with your public
22 advocacy first.
23
24         MS. MARTIN:  May I approach, Your Honor?
25         THE COURT:  Yes.

47

1
2 BY MS. MARTIN:
3     Q.    Representative Behn, do you recognize
4 that document?
5     A.    I do.
6     Q.    Is that one of the ways that you spoke
7 out against the bill?
8     A.    Yes, this was the morning of the House
9 vote.  And so I wanted to make infographics, so that
10 I could demystify the legislation and its impact on
11 Tennesseeans.
12     Q.    And when is that specific sheet dated?
13     A.    April 10th, 2024.
14     Q.    And does it have some infographics
15 attached to it as well?
16     A.    Yes.
17     Q.    And what do those say?
18     A.    That under this new law providing
19 information about abortion resources could be
20 illegal.  This bill would criminalize supporting
21 young people in Tennessee when they are considering
22 seeking abortion and the possible of mandatory jail
23 time.  And at the end, I said:  I welcome the
24 opportunity to take a young person who wants to have
25 an abortion even if it lands me in jail.

48

1     Q.    Is that the end of the infographics?
2     A.    Yes.  I skipped one, but yes.
3     Q.    Okay.  Do you recognize that all of
4 those -- the tweet and infographics as your
5 statements?
6     A.    Yes.
7     Q.    And are they an authentic
8 representation?
9     A.    Yes.
10
11         MS. MARTIN:  I will move those into
12 evidence, Your Honor.
13         THE COURT:  Objection?
14         GENERAL GREEN:  No objection.
15         THE COURT:  Received.  This will be
16 Exhibit 5.
17
18         (WHEREUPON, Exhibit No. 5 was marked.)
19
20 BY MS. MARTIN:
21     Q.    What did you mean to convey by tweeting
22 those statements?
23     A.    So as an elected official, my job is to
24 help provide truthful and accurate information.  As a
25 politician, oftentimes I use my social media

49

1 platforms to -- you know, in this moment it was a bit
2 sensational.  But I wanted -- people who were
3 following this bill, I wanted young people,
4 Tennesseeans, to understand that I was a safe person
5 and that I was willing to risk my privilege and power
6 as an elected official to support them in seeking
7 abortion care.
8     Q.    And let's go back now to the hearing
9 when people were asking for clarification from the
10 bill sponsor about the definition of recruitment.  On
11 the House floor, did the bill sponsor respond to that
12 question?
13     A.    Yes.
14     Q.    I'm going to hand you a transcript.
15
16         MS. MARTIN:  May I approach, Your Honor?
17 This is just to refresh her memory.
18
19 BY MS. MARTIN:
20     Q.    Do you recognize that is the transcript
21 from a hearing on the floor on the bill?
22     A.    Yes.
23     Q.    And Representative Moody asks about
24 recruitment; do you see that?
25     A.    Yes.

50

1    Q.    Can you read what Representative Moody
2    asked?
3    A.    Representative Moody asked --
4
5    GENERAL GREEN:  Objection, Your Honor.
6    I will object to be hearsay.
7    MS. MARTIN:  It's for the -- thank you.
8    THE COURT:  You're offering it for the
9    fact that it was said.
10    MS. MARTIN:  That's correct, Your Honor.
11    THE WITNESS:  I would like to ask you,
12    could you explain in the bill where it talks about an
13    ado -- an adult recruiting these minors, could you
14    explain what that would look like, please?
15
16    BY MS. MARTIN:
17    Q.    And then what did the bill sponsor say
18    in response?
19    A.    Representative Jason Zachary then
20    responded:  And unfortunately there is even a member
21    of this body that recently tweeted out I welcome the
22    opportunity to take a young person out of jail who
23    wants to have an abortion even if it lands me in
24    jail.  He then proceeds to say:  So in answering the
25    question of recruitment, I'm answering the question

51

1    of recruitment.  Representative, that exactly what
2    recruitment looks like.
3    Q.    When you ready that, does it mean out of
4    state, not out of jail?
5    A.    Oh, he said -- I repeat:  "I welcome the
6    opportunity to take a young person out of state who
7    wants to have an abortion, even if it lands me in
8    jail."
9    Q.    And did you recognize this statement as
10    one of statements that you tweeted?
11    A.    Yes.
12    Q.    Was it accurate?
13    A.    Yes.
14    Q.    And what did you take that statement
15    from Representative Zachary to mean?
16    A.    That it was a threat.
17    Q.    What was the threat in your estimation?
18    A.    That they would prosecute me under this
19    law.
20    Q.    Okay.  And do you have a reasonable
21    belief that you would be prosecuted or sued for
22    convincing a minor to have an abortion?
23    A.    Yes.  This session in the legislature,
24    was conveyed multiple times that the goal of this
25    legislation is to prosecute information sharing about

52

1    abortion resources.
2    Q.    And why do you have that fear with
3    regard to yourself specifically?
4    A.    Because I am very vocal in ensuring that
5    people have information and know how to navigate the
6    legal landscape in Tennessee.  And I have been one of
7    to most vocal proponents of abortion access in this
8    state for quite some time.
9    Q.    And how would a criminal prosecution or
10    a lawsuit affect your day-to-day, your life?
11    A.    I mean, it would be difficult to
12    maintain my licensure for social work.  I know we
13    have a few convicted felons -- or maybe, I don't
14    know, in the legislature.  But it would be very
15    difficult for me to navigate that as an elected
16    official.
17    Q.    And you signed the complaint or verified
18    the complaint under penalty of perjury, right?
19    A.    Yes.
20    Q.    And are those allegations in the
21    complaint still true and accurate to the best of your
22    knowledge?
23    A.    Yes.
24
25    MS. MARTIN:  Nothing further.

53

1    THE COURT:  Cross?
2
3    CROSS-EXAMINATION
4    BY GENERAL GREEN:
5    Q.    Representative Behn, thank you for being
6    here today.  I'm Donna Green.
7    You mentioned a call from a Williamson
8    County mother about her pregnant daughter.  And I
9    believe that was in response to a question about
10    whether or not you ever speak to minors about
11    abortion.
12    A.    Uh-huh.
13    Q.    Did you ever speak to that mother's
14    child in that conversation?
15    A.    Yes, I did.
16    Q.    You did.  Okay.  Thank you for
17    clarifying that.
18    You also testify that you speak to
19    groups and larger audiences in your role.  But I did
20    not hear you say that you target individual pregnant
21    minors with information that they have not requested;
22    is that true?
23    A.    Can you repeat the question?
24    Q.    Sure.  Let me ask it a different way.  I
25    apologize, a little convoluted.

54

1        Do you specifically reach out to
2    pregnant minors regarding abortion options when those
3    minors have not reached out to you first?
4        A.    In my organizing capacity, yes.  Because
5    often times, I have access to stickers; and when I'm
6    traveling across the state in my political capacity,
7    I will place those stickers in places where there are
8    minors.
9        Q.    But you don't target a specific minor?
10    You are just putting them in places where minors
11    might see them?
12        A.    Yes.
13        Q.    Okay.  So are you seeking the right to
14    be able to target pregnant minors who have not sought
15    information from you?  Are you seeking the right to
16    target those individuals without fear of prosecution?
17        A.    Targeting is a strong word because, in
18    my role as an elected official, as a social worker, I
19    am always around minors and some of those minors are
20    pregnant and asking for resources.
21        Q.    That's fair.  In your example, your --
22    you're just in a group that may include minors, and
23    in your example, you are saying the minor is asking
24    you from information.  I'm kind of asking from the
25    other perspective.  If you see a pregnant minor, or

55

1    someone you suspect that may be a minor, do you
2    intentionally go up an provide them with abortion
3    information unsolicited?
4        A.    There was one event where the Abortion
5    Fund had a table, and there was an underage person
6    who was pregnant who looked curious.  And I did go up
7    to them and ask, you know, do they need more
8    information and tried to provide, you know,
9    open-ended questioning and provide services to them.
10        Q.    And in that example or in other
11    situations where you are communicating with pregnant
12    minors, is your goal to provide information so that
13    the minor can make a decision about abortion, or is
14    your goal to persuade that minor to get an abortion?
15        A.    Once again, as a professional social
16    worker it -- you know, it's ambiguous because
17    oftentimes these are young people who are at their
18    most vulnerable point.  They don't understand the
19    system.  They need information that they will make an
20    informed decision to seek an abortion.
21        Q.    I'm not sure you answered my question.
22    Let me try asking it a different way.  When you are
23    communicating with a pregnant minor -- in this
24    instant I'm talking about not a minor who comes to
25    you asking for information, but just unsolicited, you

56

1    see a pregnant minor.  When you communicate with that
2    girl, is your goal to provide her information about
3    abortion so that she can make her own decision; or is
4    your goal to persuade her to get an abortion?
5        A.    The former.
6        Q.    Okay.  Let me ask you a little bit of
7    the similar questions I asked Ms. Welty about what we
8    call "standing".  There has been no history of anyone
9    trying to enforce this recruitment provision against
10    you in the past; is that correct?
11        A.    Correct.  But there have been veiled
12    threats at the legislature that this would be
13    prosecuted.
14        Q.    Let me ask you about that.  You
15    mentioned Representative Zachary, and in that
16    transcript you read, the comment he made with your
17    comment, in his eyes, was recruitment, right?
18        A.    Correct.
19        Q.    He doesn't have any ability to prosecute
20    you as a legislator, correct?
21        A.    Correct.
22        Q.    Have any of the eleven District
23    Attorneys named in the lawsuit, have any of them
24    threatened to prosecute you for your statements?
25        A.    To the best of my knowledge, no.

57

1        Q.    Now, your tweets are publicly available,
2    correct?
3        A.    Yes.
4        Q.    And, in fact, I noticed that April 10
5    tweet that you -- that particular tweet got almost
6    22,000 views, right?
7        A.    Correct.
8        Q.    Is that typical of your tweets?
9        A.    It depends how relevant it is in that
10    moment.
11        Q.    But that's not unheard of apparently
12    over 20,000 views of a tweet of your's?
13        A.    Correct.
14        Q.    Despite the wide spread nature of that
15    tweet, you still did not receive any threats of
16    enforcement from any district attorney whether named
17    or unnamed in this lawsuit, correct?
18        A.    District Attorneys, correct, but
19    legislators, no.
20        Q.    Okay.  All right.  And you never asked
21    any of the defendant District Attorneys in this case
22    to forbear from prosecuting you, correct?
23        A.    Correct.
24        Q.    All right.  And there is nothing about
25    this abortion trafficking statute that would make it

58

1  easier to enforce against you than any other statute,
2  right?
3       A.   I think in my role as an elected
4  official, I'm in an elevated positionally when it
5  comes to this particular piece of legislation because
6  of how outspoken and vocal and how many people I
7  speak to via my social media platforms as well as
8  constituents.
9       Q.   Okay. And I do understand what you're
10 saying, but what I don't hear you saying is that
11 there is something in the statute itself that makes
12 it more likely to prosecute any individual?
13      A.   Correct.
14      Q.   Okay.
15      GENERAL GREEN:  If you would give me
16 just a moment to confer to co-counsel.
17           Thank you.  No further questions.
18      THE COURT:  Redirect.
19
20           REDIRECT EXAMINATION
21 BY MS. MARTIN:
22      Q.   Representative Behn, when we talked
23 earlier about violating a constituent's decision when
24 you are having that conversation; do you recall that?
25      A.   Yes.

59

1       Q.   In some situations you mentioned that
2  these folks might be extremely vulnerable.  Might
3  there be a situation where that person might not have
4  someone else to advocate for them?
5       A.   Yes.
6       Q.   In your role as a social worker or even
7  as a state legislator, do you feel compelled to give
8  that person permission to make the choice to have an
9  abortion?
10      A.   Yes.
11      Q.   Now you were asked about threats of
12 enforcements against you; do you recall that?
13      A.   Yes.
14      Q.   Are you aware this bill has a private
15 enforcement mechanism?
16      A.   Yes.
17      Q.   In addition, a criminal penalty?
18      A.   Yes.
19      Q.   Are the state legislators people who
20 could file a private lawsuit against you?
21      A.   Yes.  And I -- yes.
22      Q.   To include Representative Zachary?
23      A.   Perhaps, yes.
24
25      MS. MARTIN:  Nothing further.

60

1           THE COURT:  Any recross?
2
3           RECROSS-EXAMINATION
4  BY GENERAL GREEN:
5       Q.   Representative Behn, just to follow up
6  on your last statement, you said you believed that a
7  legislator could sue you under the civil enforcement
8  provisions of the statute?
9       A.   As its written, yes.
10      Q.   But the legislator -- unless the
11 legislator was the mother, father -- mother of the
12 fetus, father of the fetus, or the parent of the
13 minor child, there is no way for a legislator to sue
14 you under that, right?
15      A.   We have many fathers in the legislature
16 that have daughter that are under age.  And I want to
17 be a safe place for them should that need ever come.
18 So it could -- potentially they could sue me for
19 that.
20      Q.   So you're saying in the circumstance
21 that you persuaded a legislator's daughter to obtain
22 an abortion you could be sued?
23      A.   To the best of my knowledge, yes.
24      Q.   That's your circumstance, okay.  One
25 more question.

61

1           All right.  And last question
2  Representative Behn, if Judge Trauger was to -- was
3  to invalidate that portion of the statute that would
4  allow you to be prosecuted criminally, but did not
5  invalidate that portion of the statute that would
6  allow you to be sued civilly for money, would you
7  then resume the conduct, your outspoken advocacy that
8  you would not resume otherwise?
9       A.   Can you repeat the question?
10      Q.   Yes.  There is -- in your role, I
11 understand you would like to be an outspoken advocate
12 through your tweets and otherwise, correct?
13      A.   Correct.
14      Q.   Okay.  And you believe that this statute
15 is preventing you from doing that subject to fear of
16 prosecution or public penalties?
17      A.   Correct.
18      Q.   So would you continue -- or I should
19 say, would you resume your advocacy in the event that
20 Judge Trauger was able to eliminate the possibility
21 of criminal enforce so you could not be put in jail,
22 but she did not invalidate the provision that you
23 could be sued civilly for money?
24      A.   I mean, the penalties are all the same.
25 And it's -- in my role, I want to provide accurate

62

1  and truthful information. So for me, it doesn't
2  matter because these penalties are all of the same in
3  my mind.
4      Q.   Okay. So if -- if they were both
5  removed, you would continue your advocacy, right?
6      A.   I would continue my advocacy no matter
7  what. And as I said in my tweet, even if it lands me
8  in jail.
9      Q.   So even if the preliminary injunction
10 does not go into place, you will continue your
11 statements, your advocacy?
12     A.   It would make me feel better in my
13 capacity if the injunction was grated. But in my
14 role as an elected official and as a social worker, I
15 will continue to advocate for the best of my
16 constituents and clients.
17
18         GENERAL GREEN: Thank you.
19         THE COURT: Anything else?
20         MS. MARTIN: Nothing further for this
21 witness.
22         THE COURT: Your district is entirely
23 within Davidson County, correct?
24         THE WITNESS: Yes, ma'am.
25         THE COURT: And so your distribution of

63

1  any literature and so forth is focused on Davidson
2  County, I presume?
3         THE WITNESS: No, it is not. Because we
4  are the super minority, oftentimes we -- there are
5  Tennesseeans across the state that feel that we
6  represent them. Additionally, in my professional
7  capacity, I was a state-wide organizer. So I have
8  contacts all of across the state in some of the most
9  rural parts, and they know me as a safe person to
10 which they can ask information of. And I would be
11 available and ready to do that.
12         THE COURT: So if you were approached,
13 you would give information?
14         THE WITNESS: Yes. But I also
15 voluntarily give information on my social media
16 platforms, and by putting stickers out in rural
17 Tennessee with information as to how to access
18 abortion.
19         THE COURT: But you haven't included
20 the -- you've only included the District Attorneys
21 for the Middle District as defendants in this case?
22         THE WITNESS: Court.
23         THE COURT: All right. Anymore
24 questions as to my -- you may step down.
25         Any other witnesses?

64

1         MR. HORWITZ: No other witnesses, Your
2  Honor. But I have two exhibits I would like to
3  tender that are for proper for this court to take
4  judicial notice of.
5         May I approach, Your Honor.
6         THE COURT: Yes.
7         MR. HORWITZ: First is a decoration of
8  District Attorney Glenn Funk that was filed in the
9  Middle District of Tennessee case number
10 3020-CV-00740 disavowing prosecution of the statute
11 challenge in that case.
12         THE COURT: And this was a statute
13 concerning what?
14         MR. HORWITZ: Abortion.
15         THE COURT: And the relevance of this?
16         MR. HORWITZ: District Attorney Funk and
17 other District Attorneys now added this prosecutorial
18 language too.
19         THE COURT: This will be Exhibit 6. Any
20 objection?
21         GENERAL GREEN: I would object, Your
22 Honor, on the grounds of relevance.
23         THE COURT: Well, he has just given me
24 the relevance so overruled. Exhibit 6 is received.
25

65

1         (Whereupon, Exhibit No. 6 was marked.)
2
3         MR. HORWITZ: I have another similar
4  exhibit, Your Honor.
5         This is a decoration of Roger D. Moore,
6  who is a prosecutor in General Funks office,
7  disavowing prosecution of Tennessee Code Annotated
8  Section 2-19-142 filed in Davidson County Chancery
9  Court, case number 20-0312-3. Relevance is the same,
10 Your Honor.
11         THE COURT: This is about election law
12 of some sort?
13         MR. HORWITZ: It's about a false
14 statements law that is subject to criminal
15 prosecution under Tennessee Law.
16         THE COURT: This is from 2020?
17         MR. HORWITZ: I believe that's correct.
18 The file stamp on the first page says it was filed
19 July 10th, 2020, and it was executed the same day.
20         THE COURT: Any objection? Same
21 objection?
22         GENERAL GREEN: Same objection, Your
23 Honor.
24         THE COURT: Overruled. It will be
25 received as Exhibit 7.