UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **RACHEL WELTY and AFTYN BEHN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00768** |
| | ) | **Judge Aleta A. Trauger** |
| **BRYANT C. DUNAWAY, JASON** | ) | |
| **LAWSON, JENNINGS H. JONES,** | ) | |
| **ROBERT J. CARTER, RAY WHITLEY,** | ) | |
| **ROBERT J. NASH, GLENN FUNK,** | ) | |
| **STACEY EDMONSON, BRENT COOPER,** | ) | |
| **RAY CROUCH, and HANS** | ) | |
| **SCHWENDIMANN,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiffs Rachel Welty and Aftyn Behn have filed a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 18), to which the defendants have filed a Response (Doc. No. 22), and the plaintiffs have filed a Reply (Doc. No. 23) and Supplemental Reply (Doc. No. 30).[1] The court denied the request for a temporary restraining order for procedural reasons (Doc. No. 24), but it has not previously ruled on the request for a preliminary injunction, a hearing regarding which was held on August 30, 2024. The defendants have filed a Motion to Dismiss (Doc. No. 25), to which the plaintiffs have filed a Response (Doc. No. 29), and the defendants have filed a Reply (Doc. No. 33). For the reasons set out herein, the request for a

---

[1] On September 20, 2024, when this opinion was in final draft but not yet entered, the defendants filed an Unopposed Motion for Leave to File Supplemental Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. No. 37), which the court granted (Doc. No. 38).Upon review of the Supplemental Response (Doc. No. 39), the court finds it unnecessary to revise its analysis.

preliminary injunction will be granted, the defendants' motion will be granted with regard to Welty's claims against a few defendants but otherwise denied.

## I. INTRODUCTION

"Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008) (collecting cases). Without such an exception, "[m]any long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation" would plainly violate the First Amendment's command that the government refrain from "abridging the freedom of speech." *Id.* 298. The practical effect of this exception, however, is that a state government's power to forbid certain speech pertaining to conduct depends on whether that government or another government has outlawed the conduct itself. If the conduct is illegal, then the speech knowingly and directly facilitating that conduct may be forbidden as well, without violating the First Amendment. If the underlying conduct is not illegal, however, then a conversation considering that conduct is simply ordinary speech, entitled to First Amendment protection.

From the Supreme Court's 1973 issuance of its opinion in *Roe v. Wade*, 410 U.S. 113 (1973), until its 2022 issuance of *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), binding caselaw prohibited the state of Tennessee from outright banning abortion procedures within its borders. *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 876 (1992). Because abortion was permitted, speech made in facilitation of Tennessee-based abortion care was protected by the First Amendment. When *Dobbs* changed the Supreme Court's caselaw to make territorial abortion bans permissible, however, the State of Tennessee quickly implemented such a ban, and, because it is now generally illegal to perform an abortion in

2

Tennessee, Tennessee also has the authority to punish communications made in the direct furtherance of any such illegal, Tennessee-based abortion procedure.[2]

Recently, Tennessee enacted a so-called "abortion trafficking" law ("Chapter 1032") that purports to forbid certain actions taken in connection with access to an abortion by an unemancipated minor—including, specifically, "recruit[ing]" such a minor "for the purpose of . . . procuring" an abortion. Tenn. Code Ann. § 39-15-220(a). If Tennessee had chosen to limit that prohibition to abortions performed illegally in Tennessee, then that enactment would likely have been within the tradition of prohibitions on speech facilitating unlawful acts. The Tennessee General Assembly, however, chose to take the extraordinary step of attempting to outlaw any "recruit[ment] . . . [of] a pregnant unemancipated minor within this state for the purpose of . . . [p]rocuring an act that *would* constitute a criminal abortion [in Tennessee] for the pregnant unemancipated minor, *regardless of where the abortion is to be procured*." Tenn. Code Ann. § 39-15-220(a)(1) (emphasis added). Tennessee, in other words, has chosen to outlaw certain communications made in the furtherance of abortions that are, in fact, entirely legal.

It cannot do so. "When a State enters the Union, it surrenders certain sovereign prerogatives," *Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007), including both the right to disregard the valid policy decisions of other states and the power to deny passage across state borders. Tennesseans are Americans, and, as Americans, every state in the nation is presumptively open to them. *See Saenz v. Roe*, 526 U.S. 489, 501 (1999). It is, therefore, a basic constitutional fact—which Tennessee has no choice but to accept—that, as long as there are states in which abortion is permissible, then abortion will be potentially available to Tennesseans. Because obtaining an abortion out of state is a lawful option, moreover, Tennessee

---

[2] There is still one way to terminate a pregnancy legally in Tennessee without qualifying for the very limited exception: if an individual is able to obtain an abortion medication, she can lawfully take it in order to perform what is sometimes referred to as a "self-managed abortion." (Doc. No. 35 at 15.)

cannot make it a crime to communicate freely about that option. Thus the request by the plaintiffs to enjoin the enforcement of the "recruitment" prong of Chapter 1032.

When exactly a communication regarding how to obtain a legal abortion would fall within the scope of the recruitment provision is a matter of debate, and the provision itself provides little guidance. No one associated with Chapter 1032 seems to have a particularly clear picture of what the provision is supposed to prohibit—not the prosecutors who will be called on to enforce it; not the state attorneys called on to defend the statute in court; and, it seems, not even the individuals who drafted the provision itself, who appear to have simply pulled the recruitment-focused language from other, preexisting statutes in which that language makes more sense. Whatever it means to "recruit" a person to receive a lawful abortion, however, such recruitment would inherently involve First Amendment-protected speech, meaning that the recruitment provision is subject to the ordinary restrictions that the First Amendment imposes. Because the provision fails to comply with those restrictions in multiple ways, the court will enjoin its enforcement and will not dismiss the plaintiffs' claims.

## II. BACKGROUND

### A. The Abortion Trafficking Statute and Its Recruitment Provision

Chapter 1032 was passed by the Tennessee General Assembly on April 24, 2024 and signed by Governor Bill Lee on May 28. 2024. It went into effect on July 1, 2024. (*See* Doc. No. 1-2.) The law imposes both civil and criminal liability, *see* Tenn. Code Ann. § 39-15-220(b), (e), but only its criminal application is at issue in this case.

Chapter 1032 § 1 prohibits "intentionally recruit[ing], harbor[ing], or transport[ing] a pregnant unemancipated minor within this state" for one of the following purposes:

(1) Concealing an act that would constitute a criminal abortion under § 39-15-213 from the parents or legal guardian of the pregnant unemancipated minor;

(2) Procuring an act that would constitute a criminal abortion under § 39-15-213 for the pregnant unemancipated minor, regardless of where the abortion is to be procured; or

(3) Obtaining an abortion-inducing drug for the pregnant unemancipated minor for the purpose of an act that would constitute a criminal abortion under § 39-15-213, regardless of where the abortion-inducing drug is obtained.

Tenn. Code Ann. § 39-15-220(a). The statute cited by Chapter 1032, Tenn. Code Ann. § 39-15-213, makes it unlawful in Tennessee to "perform or attempt to perform" an "abortion," as defined by the statute, unless a detailed exception involving risks to the life or "major bodily function[s]" of the pregnant woman applies. Tenn. Code Ann. § 39-15-213(a), (b). By the plain language of the statute, Chapter 1032 § 1(a)(1) applies only to attempts to conceal abortions that actually violated Tennessee law, but Chapter 1032 § 1(a)(2) and (3) would reach a person's "harbor[ing], transport[ing], or recruit[ing]" a pregnant unemancipated minor for the purpose of an abortion or potential abortion that complies with the laws of another jurisdiction, but which would be illegal in Tennessee.

Chapter 1032 provides no definition for the word "recruit." However, a review of preexisting statutes involving other kinds of "trafficking" strongly suggests that the bill's authors simply imported the term, without elaboration, from contexts in which it makes significantly more sense. For example, 18 U.S.C. § 1590 makes it unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[]" a human being for the purposes of performing forced labor. 18 U.S.C. § 1590. It is clear what that recruitment prohibition forbids: manipulating, persuading, or enticing a person into a position of working involuntarily. Another federal statute makes it unlawful to "recruit[], entice[], harbor[], transport[], provide[], obtain[], advertise[], maintain[], patronize[], or solicit[]" a person "knowing . . . that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a

commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). Again, it is clear what the recruitment provision forbids: (1) manipulating, persuading, or enticing an adult into a situation where he or she will be coerced into sex work; or (2) manipulating, persuading, or enticing a minor into any sex work, whether or not there is any additional element of coercion. Chapter 1032, however, provides no express guide to what the concept of "recruitment" is supposed to mean when the underlying action is not being "recruited" into an illicit activity, but simply obtaining a lawful abortion.

Chapter 1032 contains a handful of exceptions, including one for "the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor," as long as that consultation does not involve an actual attempt to terminate the pregnancy or arranging for travel to do so. Tenn. Code Ann. § 39-15-220(f)(1). There are also four classes of individuals who may harbor, transport, or recruit a minor for the purposes of obtaining an abortion, without incurring potential criminal liability:

(1) The parents or legal guardian of the unemancipated minor;

(2) A person who has obtained the written, notarized consent of the unemancipated minor's parent or legal guardian;

(3) A common carrier transporting passengers in the course and scope of their business; or

(4) An ambulance driver or operator and any corresponding emergency medical services personnel, as defined in § 68-140-302, acting within the course and scope of their duties.

Tenn. Code Ann. § 39-15-220(c). Chapter 1032 contains no exception for family members, other than parents or guardians, meaning that Chapter 1032 could be used to prosecute a supportive aunt, uncle, adult sibling, or grandparent whom a prosecutor believed to have improperly

contributed to an unemancipated minor's decision to receive a lawful out-of-state or self-managed abortion.

A violation of Chapter 1032, including its recruitment provision, is a Class A misdemeanor, which "shall be punished by imprisonment for eleven (11) months and twenty-nine (29) days." Tenn. Code Ann. § 39-15-220(b).

## B. The Plaintiffs

### 1. Rachel Welty

Welty is an attorney and "advocate for safe and healthy access to abortion care." (Doc. No. 1 ¶ 13.) She is "a member of an abortion fund that provides resources to clients who need safe and healthy access to legal abortion medication and legal out-of-state abortion care that they can no longer obtain in Tennessee." (*Id.* ¶ 15.) Welty performs most of her advocacy and assistance work in Middle Tennessee, and, while that has taken her throughout the region, she testified at the hearing that her work is largely concentrated in Davidson County and the adjacent counties. (*Id.* ¶ 14; Doc. No. 35 at 32–33.) Her work is not limited to unemancipated minors, but it also does not exclude them. (Doc. No. 1 ¶ 19.)

Welty's role in assisting Tennesseans, including minors, in overcoming obstacles to abortion care is well known to the public, and her work has been covered by local media. (*Id.* ¶ 20.) When Tennessee, pre-*Dobbs*, permitted some unemancipated minors to obtain abortion care without parental consent through the state's judicial bypass process, Welty was often the attorney who represented the minor. She says that many of her clients during that period were victims of rape and incest. (*Id.*)

7

Although Tennessee's policies regarding abortion within its borders have changed, Welty still receives inquiries from individuals, including unemancipated minors, who are facing unwanted pregnancies and need assistance in obtaining abortion care, if possible. And obtaining such care *is* possible, broadly speaking, because many states other than Tennessee have chosen not to outlaw abortion within their borders. Welty says that she "would like to continue helping pregnant, unemancipated minors access legal abortion care" but that she is concerned that, if she does so, she will face potential prosecution for "recruiting" the minors. (*Id.* ¶ 23.)

**2. Aftyn Behn**

Behn is a social worker, as well as an elected Representative to the Tennessee General Assembly. (*Id.* ¶ 36; Doc. No. 35 at 37.) Behn's outspoken support of abortion rights has caused her to become increasingly identified with the issue of abortion access, particularly since *Dobbs* was decided. She testified that her office now receives calls from individuals throughout the state who are personally facing the need for abortion services that Tennessee has made effectively impossible to obtain without leaving its borders. Behn, like Welty, wants to help but fears prosecution. (Doc. No. 1 ¶¶ 43–44; Doc. No. 35 at 38–40.)

One of the more striking flashpoints in Behn's public identification with these issues occurred during the legislative debate on Chapter 1032. The dispute began, as many do, on social media. On April 10, 2024, when Chapter 1032 had not yet passed, Behn posted the following to one of her social media accounts:

> This morning, the TN Senate will vote on SB1971/HB1895, which would criminalize supporting young people who are considering or seeking abortion with mandatory jail time and the possibility of an over $1 million lawsuit.
>
> Should this bill pass, I welcome arrest.

8

(Doc. No. 1-5 at 1.) The post included a graphic quoting Behn as saying, "I welcome the opportunity to take a young person out of state who wants to have an abortion even if it lands me in jail." (*Id.* at 5.)

About two weeks later, when the Tennessee House of Representatives was debating the bill, Behn spoke against it and in favor of an amendment that would have replaced the law, as proposed, with provisions addressing a number of other family-related policies. (*See* Doc. No. 1-6 at 16–18.)[3] The House voted to cut Behn's remarks short after she used language that some of her colleagues considered disparaging to the bill's principal House sponsor, Representative Jason Zachary. (*Id.* at 17.) When debate resumed, the next legislator addressing Zachary stated that she supported the bill's provisions regarding transporting and harboring, but that she would like some further explanation about what "an adult recruiting these minors . . . would look like." (*Id.* at 20.) After addressing some prefatory issues related to his perceived disparagement by Behn, Zachary responded:

> We've reached a point now where children are being recruited, Missourians specifically, where the AG just filed suit against Planned Parenthood for recruiting children.
>
> There's a video, you can go look at the video. Google the story of recruiting children to take them across state lines to abort their babies, to kill their babies in utero.[4]
>
> And unfortunately, there's even a member of this body that recently tweeted out, "I welcome the opportunity to take a young person out of state who wants to have an abortion, even if it lands me in jail." And so answering the question of recruitment, I'm answering the question of recruitment. Representative, that is what recruitment looks like.

(*Id.* at 21.) The House went on to pass the bill. (*See* Doc. No. 1-1.)

---

[3] The video of this exchange can be found at
https://tnga.granicus.com/player/clip/30327?view_id=705&redirect=true.

[4] The defendants have not filed a copy of the cited video in this case.

**C. Welty's Letter to Middle Tennessee Prosecutors**

State criminal prosecutions in Tennessee are overseen by the elected district attorneys general ("DAGs") of the state's thirty-two judicial districts. *See* Tenn. Code Ann. § 8-7-103; Tenn. Code Ann. § 16-2-506. On June 6, 2024, a lawyer representing Welty sent a letter to the defendants—who are DAGs of several Middle Tennessee districts—seeking assurances and/or clarification of their intentions regarding the enforcement of Chapter 1032. (Doc. No. 1 ¶ 26; Doc. No. 1-4.) The letter informed the prosecutors that Welty "has on many occasions participated in informational campaigns and distributed literature about abortion access" and is "a member of an abortion fund that provides resources to those who need safe and healthy access to abortion medication and out-of-state abortion care that they can no longer obtain in Tennessee." (Doc. No. 1-4 at 2.) The letter explained that, in that capacity, Welty "advocates for and helps facilitate access to abortion care, including out-of-state abortion care and abortion-inducing drugs" and that she does not limit her work to adults or to minors who have been emancipated from the parents. (*Id.* at 2.)

Because Welty's work might plausibly be characterized as involving "recruitment," the letter explained, she feared prosecution by the DAGs. *Id.* Accordingly, the letter made two requests:

> *First*, because Ms. Welty needs reasonable notice of what Public Chapter No. 1032 prohibits, please provide your Office's position on what "recruits" means as used in Public Chapter No. 1032. I ask you to please define the proscribed behavior with sufficient particularity to provide a person of ordinary intelligence with reasonable notice of the conduct that is prohibited.

> *Second*, I have significant concerns that Public Chapter No. 1032 is constitutionally infirm. Even setting aside vagueness issues, any reasonable interpretation of the law appears to criminalize pure speech and advocacy—a viewpoint-based speech restriction. Worse: the law appears to criminalize advocating for and facilitating access to legal abortion care, including abortion care provided out-of-state in compliance with the laws of sovereign jurisdictions.

Given these constitutional infirmities, I ask you to disavow all enforcement of Public Chapter No. 1032's "recruit[ment]" prohibition against Ms. Welty once the law takes effect.

Please kindly respond to this letter with your Office's position on these two matters by 4:30 p.m. CST on June 20, 2024.

(*Id.* at 2–3.)

Welty and her lawyer received no responses. (Doc. No. 1 ¶ 28.)

## D. This Litigation

### 1. The Complaint and Motions

On June 24, 2024, Welty and Behn filed a Verified Complaint against the DAGs, all of whom refused to provide assurances regarding Chapter 1032. (Doc. No. 1.) Those DAGs are as follows:

| Defendant | Judicial District | Counties[5] |
|---|---|---|
| Bryant C. Dunaway | 13 | Clay, Cumberland, DeKalb, Overton, Pickett, Putnam, White |
| Jason Lawson | 15 | Jackson, Macon, Smith, Trousdale, Wilson |
| Jennings H. Jones | 16 | Cannon, Rutherford |
| Robert J. Carter | 17 | Bedford, Lincoln, Marshall, Moore |
| Ray Whitley | 18 | Sumner |
| Robert J. Nash | 19 | Montgomery, Robertson |
| Glenn Funk | 20 | Davidson |
| Stacey Edmondson | 21 | Williamson |
| Brent Cooper | 22 | Giles, Lawrence, Maury, Wayne |
| Ray Crouch | 23 | Cheatham, Dickson, Houston, Humphreys, Stewart |
| Hans Schwendimann | 32 | Hickman, Lewis, Perry |

Welty and Behn state three claims pursuant to 42 U.S.C. § 1983: first, that Chapter 1032 is unconstitutionally vague; second, that it violates the First Amendment as a form of content- and

---

[5] *See* Tenn. Code Ann. § 16-2-506.

viewpoint-based discrimination; and, third, that it is unconstitutionally overbroad. (*Id.* ¶¶ 47–84.) They seek declaratory and injunctive relief. (*Id.* at 15.)

Shortly after filing their Verified Complaint, Welty and Behn filed a Motion for Temporary Restraining Order and Preliminary Injunction, asking the court to "enjoin[] the Defendants from enforcing . . . Public Chapter No. 1032."[6] (Doc. No. 18.) On June 28, 2024, the court denied the request for an immediate restraining order based on the fact that Welty and Behn had unnecessarily delayed their motion until near the eve of the law's going into effect, but the court set a hearing and supplemental briefing schedule in connection with the request for a preliminary injunction. (Doc. No. 24 at 5.) Among other things, the court asked Welty and Behn to clarify the scope of their injunctive request, given that their challenge appeared to be exclusively focused on the recruitment provision. (*Id.*) In the supplemental briefing, Welty and Behn clarified that they "seek an injunction enjoining enforcement of Tenn. Code Ann. § 39-15-220(a)'s recruitment provision alone, not the law in full." (Doc. No. 30 at 4.)

Prior to the hearing, the defendants filed a Motion to Dismiss (Doc. No. 25), to which Welty and Behn responded. (Doc. No. 29). The defendants argue that Welty and Behn lack standing and that, in the alternative, their claims should fail on the merits. (*Id.*)

**2. The Hearing**

The court held a hearing on August 30, 2024. No defendant attended; they relied entirely on the arguments of their lawyers from the Tennessee Office of the Attorney General & Reporter. Welty and Behn each attended and testified.

<u>Welty's Testimony</u>

---

[6] The full phrase used in the motion is "enjoining the Defendants from enforcing Section 1 of Public Chapter No. 1032," but section 1 of the public chapter contains the entirety of its substantive content, with section 2 addressing only the law's effective date. (*See* Doc. No. 1-1.)

Welty provided more background regarding her advocacy and support work, which, she confirmed, has included "help[ing] unemancipated minors access legal abortion care." (Doc. No. 35 at 6.) She explained that, when a minor seeks her help, she does not specifically ask if she has obtained consent from her parents, for a variety of reasons, including that forcing a minor to discuss her intent to obtain an abortion with her parents "can be really dangerous." (*Id.* at 7.)

Welty explained that she is a single mother of three and that her ex-husband is often deployed on active military duty for substantial periods of time. A criminal prosecution could, therefore, be very disruptive for her family's life. (*Id.* at 20–21.) She explained why she fears that she could be accused of having "recruited" a minor for a legal abortion:

> Q. Have some number of pregnant unemancipated minors come to you for advice and guidance about what they should do?
>
> A. Yes.
>
> Q. Are some of those minors uncertain about the best option for them?
>
> A. They are at times.
>
> Q. In your experience, when presented with accurate information about abortion care and the legal options they have to obtain care, do some minors make the decision to have a legal abortion?
>
> A. They do.
>
> Q. Ma'am, I noticed that in some of your literature, which we will get into momentarily, it states that abortion is safe, common and normal; do you hold that view?
>
> A. I do.
>
> Q. Is that a view that you have historically shared with your clients?
>
> A. Absolutely.
>
> Q. In your experience does informing your clients that abortion is safe, common and normal cause some number of your clients that were uncertain about the best option for them to pursue abortion care?

13

A. Yes.

Q. Ma'am, when your clients decide they want an abortion, do you support and encourage that decision?

A. I do.

(*Id.* at 8–9.) Welty testified that she is on the board of directors of Abortion Care Tennessee, an "an abortion fund that raises money and gives block grants to abortion clinic[s] outside of the State of Tennessee earmarked for Tennessee residen[ts] to obtain abortion health services" and that her work with Abortion Care Tennessee includes providing informational resources about how to obtain a legal abortion and connecting minors with clinics in other states. (*Id.* at 14.)

Welty also discussed the ways in which her advocacy is particularly public-facing and likely to draw attention. She carries literature about how to obtain abortion care with her "in [her] work bag," so that she can freely "hand it out in different places." (*Id.* at 16–17.) Sometimes she leaves the materials in a public place, such as a restroom, for others to take freely. (*Id.* at 17.) She also operates "some social media handles to try to educate Tennesseans about the right to continue to seek abortion care" and gives speeches on the topic. (*Id.* at 18.) However, Welty testified that she has stopped updating the social media accounts out of concern that she will be prosecuted under Chapter 1032. (*Id.* at 19–20.)

Welty stated that it is "definitely known in the legal community" that she performs work supporting individuals who need abortion care and that individuals are "often" referred to her for that purpose. (*Id.* at 35–36.) In response to questioning by the court, however, Welty conceded that her work occurs "mainly" in "Davidson County and those surrounding counties that touch Davidson County." (*Id.* at 32–33.)

Behn's Testimony

14

Behn provided background regarding her prominence as a figure associated with abortion rights in Tennessee. Behn explained that she "ha[s] been one of [the] most vocal proponents of abortion access in this state for quite some time" and has been "very vocal in ensuring that people have information and know how to navigate the legal landscape in Tennessee." (*Id.* at 52.) She testified that, because "folks all across the State" have come to know her as a Representative who "care[s] about abortion access," she regularly receives communications from individuals, both in her district and outside of it, about abortion-related issues and situations. (*Id.* at 39.)

Behn confirmed that she is "solicited by families across the State asking about the legal status of abortion access in Tennessee and how they can access truthful and accurate information about the resources that exist." (*Id.*) While Chapter 1032 was under consideration, Behn operated a table in downtown Nashville with a sign reading "Need an abortion, ask me for help." (*Id.* at 41.) She also "frequently use[s] [her] social media platforms to demystify legislation and provide information" related to abortion, and she provides written materials regarding abortion-related funds and services at her physical office. (*Id.* at 41.) Behn testified that she has never assisted a person in obtaining an illegal abortion, but she has provided information regarding how to obtain an abortion either by going out of state or by performing a self-managed, medication-based abortion. (*Id.* at 42.)

In addition to Behn's work as a legislator, she is employed by a federal super PAC that is focused on "mobiliz[ing] rural and small town voters." (*Id.* at 38.) In this capacity, she is a "state-wide organizer" with "contacts all across the state," including "in some of the most rural parts," where she is known "as a safe person" to approach with abortion-related issues and concerns. (*Id.* at 63.) As part of Behn's political work, she "travel[s] across the state," and, when

15

she does, she often places stickers with information about abortion care in public places where they would be likely to be seen by members of the public, including minors. (*Id.* at 54.)

Behn testified that she will continue to engage in her advocacy and assistance regardless of whether the defendants are enjoined from enforcing the recruitment provision against her, but that she is concerned about the risk of criminal prosecution if they are not. (*Id.* at 62.)

<u>The DAGs' Arguments</u>

The defendants presented no witnesses and relied instead on their lawyers' briefing and oral arguments. (*Id.* at 66.) Those lawyers, who were provided by the Tennessee Office of the Attorney General and Reporter, focused largely on the argument that the recruitment provision, if "properly construed," is constitutionally unproblematic. (*Id.* at 81.) Specifically, the defendants argued that recruitment should be construed to refer only to "target[ed] conduct designed to induce a particular child to engage in a specific activity." (*Id.* at 84.) The defendants' argument for why that would be the only proper construction of the recruitment provision, however, was unclear. For example, counsel of the defendants claimed that its narrowed definition was supported by dictionaries, but he also listed several dictionary definitions that did not include any requirements about "targeting" or the "design" of an activity. (*Id.* at 83–84.) Counsel also suggested that the defendants' preferred interpretation of the recruitment provision is mandated by canons of statutory construction, but he did not engage with the substantial body of caselaw warning courts against mechanically applying canons of construction as a substitute for ordinary statutory interpretation. *See, e.g., Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 499 F. App'x 559, 564 (6th Cir. 2012) (collecting cases).

When asked, counsel stated that he did not believe that any of the actions described by Behn or Welty in their testimony constituted recruitment under Chapter 1032. (*Id.* at 84.) He did

not, however, provide much detail regarding how that could be the case, given that Behn and Welty both discussed speaking to individual minors and both expressed a desire to support and encourage minors to follow the course that is best for them, including, as applicable, by seeking an abortion. As far as the court can tell, counsel was arguing in favor of a hard distinction between convincing a person to do something and helping a person work through their decision to do it, but it is difficult to see how that abstract distinction could be mapped onto the complexity of real human interactions. In any event, the position conveyed by the defendants' lawyer was that the recruitment provision does not reach any of the following:

> [P]olitical speech about abortion access; social media posts providing information about where abortion is available; giving out literature about organizations that provide abortion services; talking to kids about what the options are in Tennessee for getting an abortion; telling people where they can obtain an abortion that may be legal in other states; giving a list of facilities where abortion is available, say in Illinois or Virginia or elsewhere[; or] . . . giving money to an nonprofit that helps provide resources for abortion access.

(Doc. No. 35 at 91.)

Counsel was asked to provide examples of actions that would, in fact, clearly constitute "recruitment" under Chapter 1032. Nearly all of the examples provided, however, involved additional elements of coercion, wrongdoing, and/or economic activity that counsel's proposed definition would not require:

> A rapist who coerces his pregnant victim to cross state lines to get an abortion to cover up his crime and to keep her parents from knowing about it; a softball coach who bribes his star player with financial incentives to get an abortion so she won't miss any playing time; a school teacher who promises a struggling student a perfect score in an upcoming exam if that student will go get an abortion so they don't have to miss any school; a youth group leader who convinces a teen to have his wife take her for an abortion so that she can keep the pregnancy hidden from her parents and from the church. Say a parent reaches out to his son's ex-girlfriend and convinces her to terminate her pregnancy and gives her money to cover the trip and the cost of getting the procedure, all without telling the girl's parents.

(*Id.* at 91.)

Given the centrality that counsel's narrowing constructions had to the defendants' arguments, the court inquired whether the defendants were willing to present any evidence that their offices would actually follow those narrowing constructions in their prosecution decisions. Counsel responded that he did not think that such evidence was "required" because it was this court's "duty to go through the process of construing a statute." (*Id.* at 92.) The court pressed the matter further, pointing out that it was not asking about the construction of the statute, but the policies and intentions of the defendants:

> You've given me a list of very specific things that don't violate the recruitment provision. You represent, however many DAs in the Middle District of Tennessee. . . . [W]hy can't you do a filing that specifically disavows that these DAs will prosecute—that they will not prosecute these specific things?

(Id. at 94.) Counsel responded that, "if the Court is asking us to make that filing with an affidavit from the defendants, then we can certainly consider that." (*Id.* at 96.) No such filing has been made.

### III. LEGAL STANDARDS

#### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the

18

lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

## B. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, the plaintiff's burden is significantly less demanding. *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating a facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Gentek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

## C. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The

19

Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## IV. ANALYSIS

### A. Standing, Sovereign Immunity, and Abstention

#### 1. Standing

A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). To do so, a plaintiff must show that: (1) she has suffered an "injury in fact" that is (a) concrete and (b) particularized, as well as (c) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by the relief requested. *Block v. Canepa*, 74 F.4th 400, 408 (6th Cir. 2023) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

The defendants argue that, because they have not prosecuted or expressly threatened to prosecute Welty or Behn, neither plaintiff has suffered an actual or imminent injury-in-fact. However, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" a law forbidding a person's already-ongoing behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007*); Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). A plaintiff may, in an appropriate situation, establish an injury-in-fact based on her "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). Whether such a showing is sufficient to confer standing in any given instance depends on whether the circumstances establish that the "threat" of enforcement is sufficiently "certain."[7] *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017) (emphasis omitted).

Welty and Behn have clearly and credibly asserted that they intend to engage in behavior for which the defendants could prosecute them under the recruitment provision. The defendants nevertheless suggest that the court should find a lack of standing pursuant to the so-called "*McKay* factors"—set out in *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)—that the

---

[7] This court recently addressed the Sixth Circuit's "certain threat" language at length in *Tennessee Education Association v. Reynolds*, No. 3:23-CV-00751, 2024 WL 1942430 (M.D. Tenn. May 2, 2024), and the court will not reiterate that analysis here, other than to restate its conclusion that the Sixth Circuit's use of the somewhat confusing phrase "certain threat" was not, in context, a "repudiation of the long line of caselaw recognizing standing based on, for example, a 'substantial probability' or 'credible threat' of enforcement." *Id.* at *12 (collecting cases).

Sixth Circuit has sometimes looked to in pre-enforcement challenges. The Sixth Circuit has been clear that the *McKay* factors "are not exhaustive, nor must each be established." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). Nevertheless, the factors, taken together, capture many of the circumstances relevant to the court's analysis in an ordinary pre-enforcement challenge to a law under § 1983:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024) (quoting *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021)).

The first two factors do not provide much support for standing, but that would likely be true of any case involving a recently enacted Tennessee criminal statute. There was no history of enforcement against Welty or Behn when they filed their Complaint, because the law had not yet gone into effect. The Sixth Circuit, however, has suggested that a lack of history of enforcement may be a less important factor when the law being challenged is criminal in nature. *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1026 (6th Cir. 2024). As for the lack of warning letters, there is no evidence that any of the defendant prosecutors has a usual practice of sending a warning letter to a potential defendant before prosecuting her, as other enforcement authorities sometimes do. Finding a lack of standing based solely on the lack of support from those two factors would, therefore, effectively be an outright bar on any suit challenging a newly enacted Tennessee criminal law. There is, however, no basis in the caselaw or the Constitution for such a bar. The fact that these factors are inapplicable simply means that, if the plaintiffs have standing, support for that standing must be based on other factors.

22

The third *McKay* factor—features making enforcement "more likely"—supports a finding of actual or imminent injury. This factor looks to any features of a law that might make enforcement more likely, not merely whether there is a citizen enforcement mechanism. Citizen-initiated enforcement of Chapter 1032's criminal prohibition, however, is possible. As a practical matter, criminal cases are usually initiated by law enforcement, but, in Tennessee, that is not a requirement. Rather, Tennessee law requires that grand jury meetings be publicly announced with the following notice:

> It is the duty of your grand jurors to investigate any public offense which they know or have reason to believe has been committed and which is triable or indictable in this county. Any person having knowledge or proof that an offense has been committed may apply to testify before the grand jury . . . .

Tenn. Code Ann. § 40-12-105. As that mandatory notice suggests, "[a]ny person having knowledge or proof of the commission of a public offense triable or indictable in [a] county may testify before the grand jury" for that county, and the grand jury must consider the allegations—with the local DAG acting in only a consulting role. Tenn. Code Ann. § 40-12-104(a), (c). Accordingly, any person—such as, for example, an activist or a disgruntled peer or family member—could initiate grand jury proceedings for alleged "recruitment" under Chapter 1032.

Tennessee's grand jury structure, taken alone, makes enforcement more likely than it would be if only DAGs could initiate charges, but it would do so for any Tennessee criminal statute being challenged, and the court does not find that fact, in isolation, to provide strong support for standing. The citizen-initiated indictment structure, however, becomes more likely to result in actual enforcement when one considers it alongside two other, significantly more unique features of Chapter 1032: (1) the fact that it involves abortion and (2) the fact that it criminalizes actions taken in connection with activity that is wholly lawful but strongly disfavored by many Tennesseans. The acrimonious environment surrounding issues of abortion in Tennessee is well

known, and the court has no obligation to feign blindness to it. Even if the court were to disregard the general hostility and conflict surrounding abortion in Tennessee, however, there is no way to ignore the fact that Chapter 1032's principal sponsor and advocate in the Tennessee House of Representatives actively touted it as a tool to be used against supporters of abortion access, including one of his own colleagues.

The defendants urge the court to remember that Representative Zachary is not a prosecutor, and that is true—but he also is not unique in his attitudes, and there is no reason to think that he will be unique in his reading of Chapter 1032's text. The court has little doubt that, if the recruitment provision remains in effect, it will be used directly against activists who do exactly the kind of work that Welty does and advocates who say exactly the things that Behn has said. The Tennessee General Assembly wrote the invitation; no one should be surprised when some of the recipients read it exactly as it was intended.

Welty and Behn, moreover, have presented specific, unrefuted evidence establishing that they are among the individuals most likely to be targets of enforcement. Both are high-profile supporters of abortion access to whom individuals, including unemancipated minors, come and are referred when considering termination of a pregnancy. Each has a history of going about her work in attention-grabbing ways, and, while the plaintiffs' respective methods may have been chosen in order to spread their messages to potentially receptive audiences, there is little doubt that those methods have been, and will be, perceived by some—including, potentially, elected officials like DAGs—as provocative. The Tennessee General Assembly is a real legislative body enacting real, binding laws, and it would be an insult to that body to assume that it does not intend for its laws to be enforced. (*See* Doc. No. 29-1 (fiscal note for Chapter 1032 assuming that

24

Case 3:24-cv-00768    Document 40    Filed 09/20/24    Page 24 of 49 PageID #: 561

it will result in actual incarcerations).) Welty and Behn have every reason to believe that, when that enforcement comes, they will be targets.

Of course, the DAGs could simply explain that they are not, in fact, planning to enforce Chapter 1032 in the manner that Welty and Behn fear. That brings the court to the fourth *Frisch* factor—a refusal to disavow enforcement—which, in this instance, strongly supports a finding of standing. The defendants have had an unusual number of opportunities to explain how they will or will not enforce the statute. Welty sent them letters, and she gave them plenty of time to respond—so much time that it ultimately interfered with her ability to obtain a temporary restraining order. Nevertheless, the defendants completely ignored her. The defendants could have explained that refusal at the court's hearing, but not one defendant even *attended*, let alone testified.[8] At the hearing, the court made very clear that its consideration of the case would benefit from some shred of evidence regarding the defendants' intentions—even simply signed declarations confirming that the lawyers representing them are accurately representing the defendants' understanding of the statute. Still, however, they provided nothing.

This startling disjunction between what the defendants' lawyers claim and what the defendants are actually willing to endorse is unusual, but not wholly without precedent. The Sixth Circuit, when presented with a similar situation a number of years ago, declined to treat the representations of counsel as an inherently reliable indication of government officials' position, because, among other things, "it is not clear that counsel can bind" its government client without that client's consent. *Vittitow v. City of Upper Arlington*, 43 F.3d 1100, 1106 (6th Cir. 1995). The question of when and how the defendants' lawyers can "bind" them is a complex one, and it

---

[8] Because standing is assessed at the time of the filing of the Complaint, these post-filing events could not give rise to standing, in and of themselves. The court mentions these facts, however, as backwards-looking evidence of the defendants' state of mind at the time of their earlier refusal to respond to Welty's letter—much as, for example, a declaration drafted on one date can still provide a relevant account of events that occurred on an earlier date.

25

would be premature, if not wholly unnecessary, to resolve it now. On the question of what the actual evidence shows about the defendants' intentions, however, their silence is impossible to ignore. If the defendants intend to apply only a narrowed, less problematic version of the recruitment provision, they simply need to say so, but they refuse. That fact strongly supports a finding of imminent risk of prosecution.

The defendants argue that the court should not hold this factor against them, because Welty's letter asked them to renounce enforcement of Chapter 1032 more broadly than would be required to address the questions raised by this challenge. The court, however, is not faulting the defendants for having failed to respond in precisely the manner that Welty requested; it is basing its analysis on the defendants' refusal to disavow *any* application of Chapter 1032 to Welty's activities at all, no matter how abusive or tendentious that application would be. If any DAG defendant had responded by declining to give Welty the full assurances that she seeks, but by confirming his or her unwillingness to apply Chapter 1032 in certain problematic ways, then that response undoubtedly would have weighed against standing, regardless of the fact that it did not comply with Welty's specific demands. These defendants, however, have notably refused to disavow the enforcement of the recruitment provision against even the "specific speech" in which Welty and Behn routinely engage, which is what matters the most. *Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 174 (6th Cir. 2022). They will not even sign off on the narrowed construction of Chapter 1032 suggested by *their own lawyers*. This factor, accordingly, supports a finding of a substantial likelihood of imminent enforcement against Welty, and, by extension, Behn, whose actions are similar and who simply happened not to have been the one who sent a letter.

The one aspect of the defendants' standing argument that the court does find to be supported involves Welty's standing to sue the DAGs of judicial districts in which she is only occasionally active. The court finds that Welty has failed to establish an imminent injury in connection with her actions in any county other than Davidson, Robertson, Sumner, Wilson, Rutherford, Williamson, and Cheatham. She can, therefore, pursue claims against Funk, Nash, Whitley, Lawson, Jones, Edmondson, and Crouch, but the court will dismiss her claims against Dunaway, Carter, Cooper, and Schwendimann.

### 2. Sovereign Immunity

The State of Tennessee, like every other U.S. state, possesses certain immunities from suit that "flow[] from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (*en banc*). Consequently, a state may not be sued for money damages in federal court by a private party, subject to a few exceptions. *Id.* at 358–59; *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'") (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). Sovereign immunity extends not only to a state itself but to "arms of the state," such as certain state agencies. *Ernst*, 427 F.3d at 358 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). The fact that a state-created entity, like a judicial district, exercises territorial authority that could colloquially be described as "local," rather than statewide, does not necessarily preclude that entity from being an arm of the state, particularly if it is part of a "unified state . . . system" and under some degree of "state control." *See Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 762–64 (6th Cir. 2010).

However, a government official charged with enforcing an allegedly unlawful policy may still be sued for injunctive relief through the well-established *Ex parte Young* framework, even if his agency is an arm of the state. *See Stanley v. W. Michigan Univ.*, No. 23-1808, 2024 WL 3100987, at *3 (6th Cir. June 24, 2024). This is an *Ex parte Young* case—about as straightforward of one as a person is likely to find, given that enforcing state criminal statutes is the core function of the defendants' offices. Nevertheless, the defendants initially argued that they are entitled to sovereign immunity because they have not sufficiently "enforced []or threatened to enforce" Chapter 1032 against Welty and Behn. (Doc. No. 26 at 17.)

For such an argument ever to prevail in an actual case, the bar for establishing an imminent threat of enforcement in connection with *Ex parte Young* would have to be higher than the bar for establishing pre-enforcement standing. Otherwise, this sovereign immunity argument would be, by definition, redundant; it could only prevail if the court lacked jurisdiction anyway. As Welty and Behn have pointed out, however, the Sixth Circuit has flatly rejected the idea that *Ex parte Young* requires a greater likelihood of enforcement than the standing analysis does, holding that "[i]t would be a perverse reading of *Young* to say that, although [a plaintiff] might have an Article III injury before [a prosecutor] directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar [the courts] from enjoining the" prosecution. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015).

In the defendants' Reply, they accuse Welty and Behn of having "mischaracterize[d]" the defendants' position by suggesting "that *Young* 'requires more than the credible threat of enforcement necessary to establish an Article III injury.'" (Doc. No. 33 at 3 (quoting Doc. No. 29 at 24).) The defendants assure the court that they "have argued nothing of the sort." (Doc. No. 33 at 3.) If Welty and Behn did mischaracterize the defendants' position, they did so only by

28

assuming that the defendants were advancing the version of the argument that would actually make sense. Now that the defendants have clarified their position, their argument regarding sovereign immunity, by definition, fails. For most of the plaintiffs' claims, they have established a sufficient threat of enforcement to give rise to an Article III injury, which is also sufficient for *Ex parte Young* purposes. For the handful of remaining claims—those by Welty against a few prosecutors whose jurisdictions she is only minimally active in—the court has no jurisdiction and, therefore, is in no place to make any ruling regarding sovereign immunity.

### 3. Abstention

The "*Pullman* abstention doctrine"—named for *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 497 (1941)— "instructs courts to avoid exercising jurisdiction in cases involving an ambiguous state statute that may be interpreted by state courts so as to eliminate, or at least alter materially, the constitutional question raised in federal court." *Fowler v. Benson*, 924 F.3d 247, 255 (6th Cir. 2019). The appellate courts have been clear, however, that *Pullman* abstention is an "extraordinary and narrow exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it." *Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017) (quoting *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959)).

Although the defendants urge this court to abstain from addressing Chapter 1032 in this case, they have not explained any way in which the manifest issues surrounding the recruitment provision are likely to be addressed in state court litigation. They have not identified any currently pending prosecutions or civil suits that would result in such a clarification, and the defendants—who are among the only parties in a position to actually know their own plans regarding how to enforce the law—have notably refused to provide any evidence of what they plan to do. The nature of these issues, moreover, means that it is unlikely that any one case—or

29

even several cases—would resolve the underlying questions of ambiguity or overbreadth. At most, individual state court cases *might* lead to clarification that certain specific actions raised in those cases are or are not within the scope of Chapter 1032, but the issues raised by Welty and Behn would still largely remain. The court, accordingly, has no grounds for abstention.

## B. Content Neutrality

It is well-settled that, "[w]hen the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed" and the restriction is "presumptively invalid.'" *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, (1992)). In most cases, that presumption can only be overcome if the government satisfies what is usually referred to as "strict scrutiny." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020). A law will survive strict scrutiny "only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

There may be room to debate the precise boundaries of the term "recruitment," but its ordinary meaning—to "induce or encourage" a person into a situation, organization, or course of action, Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) (quoting Webster's New Collegiate Dictionary (G.&C. Merriam Co., ed. 1977))—plainly involves speech implicating the First Amendment. While some definitions of the word "recruit" focus on the effect of recruitment—for example, "fill[ing] up" an organization "with new members," *People v. Martinez*, 55 Cal. App. 5th 428, 444, 269 Cal. Rptr. 3d 430, 443 (2020) (quoting Merriam-Webster Dictionary Online (2020))—the mechanisms through which that recruitment is performed unavoidably involve communication. *See In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir.

30

2005) (interpreting "recruit" in a Colorado statute to involve a "request or plea"). The recruitment provision, therefore, is a regulation of speech.

There is, moreover, no plausible argument that the recruitment provision does not draw a content-based distinction. It can sometimes be unclear whether a particular distinction in a law is really about the "content" of speech, as opposed to something else—such as the speech's context or form—but the recruitment provision of Chapter 1032 presents no such challenge. It "is facially content based" because "it 'target[s] speech based on its communicative content'" and "'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163). Chapter 1032 does not make any speech to an unemancipated minor unlawful other than speech amounting to "recruitment" for an abortion. That is an unambiguous distinction based on content.

Indeed, the content-based distinctions in Chapter 1032 rise to the level of presenting what the Supreme Court has identified as a particularly "egregious form of content discrimination": discrimination about not only the content of speech, but the "viewpoint" of the speaker. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Even where some content-based restrictions are permissible, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* Chapter 1032 does not criminalize recruitment for family planning services that would disfavor abortion, nor does it impose any consequences on a person who, against the wishes of an unemancipated minor's parents, convinces the unemancipated minor *not* to pursue an abortion. The recruitment provision represents a content-based, viewpoint-based distinction in its purest, most pernicious form: a criminal prohibition, backed by

31

the threat of imprisonment, for communicating a message that the government simply dislikes, when there are no such consequences for espousing the alternative viewpoint that the government prefers.

The defendants' primary response to this argument is that Chapter 1032 does not, in their view, regulate "pure speech," because the speech at issue is speech made in the furtherance of action. But the Supreme Court and Sixth Circuit have long applied the content neutrality framework to laws governing speech intended to induce action. For example, the Supreme Court has acknowledged that the content-based distinction framework applies to billboard laws, which largely govern advertisements—that is, speech intended to recruit customers. *See Reed,* 576 U.S. at 164; *see also See Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 708 (6th Cir. 2020). The Supreme Court has also applied the framework to laws regulating automated calling, or "robocalls," including those involving "commercial advertising." *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 621 (2020). The defendants' imagined exception—that content-based distinctions do not require strict scrutiny if the speech at issue encourages a person to take some type of action—simply does not exist in, and could not be reconciled with, the Supreme Court's own cases applying that framework. Strict scrutiny, therefore applies.

The court, however, finds it unlikely that the recruitment provision would survive strict scrutiny. Tennessee has no legitimate interest—let alone a compelling interest—in regulating medical care rendered outside the state's borders. The defendants claim that the recruitment provision is instead justified by Tennessee's "compelling interest in safeguarding the wellbeing of children and protecting the relationship between children and their parents," but it completely fails to explain how the recruitment provision is tailored to address the first of those two interests—the wellbeing of Tennessee children. (Doc. No. 35 at 80.) If anything, Chapter 1032 is

32

particularly striking for its *lack* of any provision focusing on the best interests of the minor at issue. Numerous Tennessee statutes do require officials to consider and protect the best interests of the children affected by their policies, *see, e.g.*, Tenn. Code Ann. § 34-2-103 (appointment of a guardian); Tenn. Code Ann. § 36-1-113 (termination of parental rights); Tenn. Code Ann. § 36-6-401 (custody and visitation), but this is not one of them. The Tennessee General Assembly apparently determined that, when the topic at hand is "abortion trafficking," the best interests of the pregnant child are not merely a secondary consideration, but unworthy of particularized consideration at all.

The only plausible compelling interest that could support the recruitment provision of Chapter 1032, then, is Tennessee's interest in what the defendants' lawyers call "protecting the relationship between children and their parents." Even if that interest is sufficient, however, there is no plausible argument that the recruitment provision has been narrowly tailored to further it. Indeed, the defendants' own oral arguments proved as much. When asked to list actions that would be within the "legitimate sweep" of the recruitment provision, the defendants' attorneys responded with a list of situations that could plainly be reached with a significantly narrower prohibition or set of prohibitions that largely avoided the First Amendment issues present here. Many of the examples involved coercion, and the state could simply outlaw coercion in the area of reproductive healthcare. Other examples involved money changing hands, meaning that they could be regulated as commercial transactions without forbidding any speech. If anything, the defendants' lawyers provided a powerful illustration of how unnecessary the recruitment provision is, even for its professed purposes.

In a last-ditch effort to save the provision, the defendants argue that it is permissible pursuant to the ordinary rule that "[o]ffers to engage in illegal transactions" receive no protection

under the First Amendment. *Williams*, 553 U.S. at 297. They do not dispute that Chapter 1032 makes it unlawful to "recruit" an unemancipated minor for a wholly legal abortion in another jurisdiction, but they argue that that does not matter, because "[s]o long as an essential element of the charged offense . . . takes place within Tennessee, it can be prosecuted here, even if the abortion itself takes place elsewhere." (Doc. No. 26 at 11.) That argument, however, relies on the conflation of two entirely different issues. No one in this litigation disputes that, when an unlawful course of action spans two states, either state, broadly speaking, may prosecute the actor based on the actions taken within its borders. The question at hand is whether Tennessee can rely on the fact that it would like to outlaw abortions in other states, but is constitutionally forbidden from doing so, in order to reduce the scope of First Amendment protection in Tennessee. The Supreme Court, however, has specifically held that a state may not, "under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Bigelow v. Virginia*, 421 U.S. 809, 824–25 (1975). While Welty and Behn are citizens of Tennessee, not another state, this court is aware of no reason why that distinction would call for a different rule under the First Amendment.

Finally, even if one accepts every one of the above-described arguments by the defendants, it would, at most, justify a law forbidding an adult from encouraging *or discouraging* a minor from obtaining an abortion. The decision only to outlaw speech advocating for one of two controversial positions is a transparent, and wholly unjustified, form of viewpoint discrimination. When the Supreme Court issued *Dobbs*, it established only that "the Constitution is neutral on the issue of abortion." *Dobbs*, 597 U.S. at 338 (Kavanaugh, J., concurring). It did not grant prohibitions on abortion any kind of special, favored constitutional status. A law creating criminal exposure for statements encouraging abortion, but imposing no consequences

34

for otherwise identical statements discouraging abortion, involves a picking and choosing between viewpoints that is wholly incompatible with either the First Amendment or the neutrality that the Supreme Court espoused in *Dobbs*.

The plaintiffs have, therefore, established a high likelihood of success with regard to their claim that the recruitment provision entails unconstitutional content-based regulation and discrimination on the basis of viewpoint. The court will not dismiss this claim, and the plaintiffs' likelihood of success weighs strongly in favor of a preliminary injunction.

## C. Overbreadth

"A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications' relative to the law's legitimate sweep." *Schickel v. Dilger*, 925 F.3d 858, 880 (6th Cir. 2019) (quoting *East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 366 (6th Cir. 2009)). Under that standard, whether a particular provision is impermissibly broad hinges not just on the language at issue, but also the actual, real-world facts to which the law may be applied. For that reason, the fact that language similar to the recruitment provision appears in other "trafficking" statutes does not mean that the court can assume that it is equally appropriate in this one. It is almost certainly true that the "plainly legitimate sweep" of a statute forbidding "recruitment" of minors into sex work far exceeds any range of impermissible applications, *see United States v. Snead*, No. 21-4333, 2022 WL 17975015, at *4 (4th Cir. Dec. 28, 2022), but that does not mean that the word "recruit" can simply be plucked from that context and clumsily wedged into another with that same ratio of permissible applications to impermissible ones intact. What matters is whether the challenged "law's unconstitutional applications substantially outweigh its constitutional ones," and that weighing exercise depends on the specific subject matter and background facts at issue. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024).

Overbreadth challenges are more likely to succeed if the law at issue is "specifically addressed to speech or to conduct necessarily associated with speech." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). That is the case with the recruitment provision, because there is no way to "recruit" a person without communicating with her, either directly or indirectly. For example, when one wants to "recruit customers," he usually does so by advertising—which is speech. *Bell v. Disner*, No. 3:14CV91, 2014 WL 6978690, at *3 (W.D.N.C. Dec. 9, 2014). The word "recruit" can also refer to "spread[ing] the word that" a particular option "is available." *Rodriguez v. Jackson*, No. 85-2492 PHX WPC, 1988 WL 150697, at *1 (D. Ariz. Nov. 9, 1988). Spreading the word is also speech. More fundamentally, "recruit," in its ordinary usage, simply means to "persuade to do . . . something." *Hongxia Wang v. Enlander*, No. 17 CIV. 4932 (LGS), 2018 WL 1276854, at *6 (S.D.N.Y. Mar. 6, 2018) (quoting Oxford Dictionaries, https://en.oxforddictionaries.com/definition/recruit). Persuasion is speech.

The defendants ask the court to ignore all of that, on the ground that, if the recruitment provision is "properly construed," that construction will avoid the most serious problems that the plaintiffs have identified.[9] (Doc. No. 26 at 2.) And the defendants are, broadly speaking, correct that the court has an obligation to consider whether there is a "narrowing construction" of the recruitment provision that might salvage its constitutionality. *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 434 (6th Cir. 2024). The defendants' arguments that their proposed narrower constructions are sufficient to defeat the plaintiffs' challenge, however, fail for three reasons. First, despite the defendants' repeated references to what the recruitment provision would mean if "properly" read or construed, it is still unclear what the defendants are suggesting that the provision *does* mean—other than, generally, that it means something that would prevent

---

[9] Or, more specifically, the defendants' lawyers express that position, while the defendants—themselves Tennessee lawyers with their own obligations of candor—remain remarkably silent about whether they actually intend to abide by their lawyers' representations of their position.

36

them from losing this case. Second, the narrowing features that the defendants urge the court to adopt—insofar as the defendants actually commit to any clearly defined narrowing construction at all—simply are not plausible interpretations of the underlying statutory language. Third, even if the court were to adopt that narrowed construction, it would not actually resolve the constitutional problems that the defendants say that it will.

On the first point, for example, the defendants claim that the "canon of *noscitur a sociis*"—that is, the rule that words listed alongside each other should be construed together—compels this court to conclude that the recruitment provision governs only "conduct," not speech, because the word "recruit" appears alongside the terms "transport" and "harbor," which describe actions. (Doc. No. 26 at 6.) It is not clear, though, what non-speech "conduct" the defendants suggest would amount to recruitment, and it is difficult to reconcile this aspect of their arguments with the rest of their briefing. For example, the defendants suggest that the recruitment provision would reach "a youth-group leader who convinces a teen to have his wife take her to obtain an abortion so that she can keep her pregnancy hidden from her religious parents." (Doc. No. 26 at 10.) Whatever one might think of such conduct, it is still purely communicative (other than the part about driving, which is separately covered by the "transport" provision and ordinary doctrines of conspiracy or facilitation). It is, therefore, unclear what the defendants even mean by suggesting that the recruitment provision targets "conduct," as opposed to speech. The conduct they refer to *is speech*.

It is, moreover, impossible to reconcile defendants' preferred interpretation with Chapter 1032's exceptions. "In interpreting statutes, . . . [the court] is required to construe them as a whole, read them in conjunction with their surrounding parts, and view them consistently with the legislative purpose." *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 897 (Tenn. 2011)

37

(quoting *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995)). With that in mind, one has to ask: why would there need to be an exception for "the provision of a medical diagnosis or consultation regarding pregnancy care," Tenn. Code Ann. § 39-15-220(f)(1), if the law did not govern speech? The only interpretation that makes sense of the whole statute is that the General Assembly excepted certain speech because such speech, coming from other actors outside the exception, is outlawed.

As to the court's second point, the plaintiffs neglect the fact that canons like *noscitur a sociis* are, despite the air of ancient authority that their Latin names may suggest, merely situational tools for "giv[ing] more precise content" to statutory language, not grounds for disregarding a statute's plain meaning altogether. *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). Courts routinely decline to apply canons when they are a poor fit, particularly if doing so would "unjustifiably 'rob'" the term being construed "'of its independent and ordinary significance.'" *United States v. Buluc*, 930 F.3d 383, 391 (5th Cir. 2019) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010)). The defendants have failed to identify any intelligible definition of "recruit" that does not involve speech, at least implicitly, and the fact that the word "recruit" happens to appear in a list behind two verbs that do not necessarily involve speech cannot change that fact. By the defendants' logic, a person who said that he had eaten "corn, green beans, and steak" for dinner would be saying that steak is a vegetable, because applying the actual definition of "steak" would violate the wise edict of *noscitur a sociis*. Of course, no one would read "corn, green beans, and steak" in that way, any more than a person would read "recruit" to exclude speech, because the ordinary meaning of a word governs. Tennessee courts agree; it is well-settled that "canons of construction, though helpful," should

38

not be "applied mechanically" and "should always be tested against the other interpretive tools at a court's disposal." *In re Est. of Tanner*, 295 S.W.3d 610, 625 n.13 (Tenn. 2009).

Finally, the defendants' proposed modifications of the recruitment provision, insofar as the court can tell what those modifications actually are, might remove some protected speech from its scope, but they would still leave a great deal of protected speech plainly outlawed. For example, during the plaintiffs' oral argument, they focused significantly on their position that an individual only "recruits" a person for the purposes of Chapter 1032 if the underlying communications were "targeted" at a particular individual. (*See* Doc. No. 35 at 87.) Nothing in the statute supports that qualification, but, even if it did, protected speech does not become unprotected simply because it is directed at a particular listener.

Similarly, the defendants focused a great deal on the intent of the speaker—that is, whether the speaker specifically intended, from the start of a conversation, to persuade the unemancipated minor to obtain an abortion, as opposed to simply intending to help the unemancipated minor take whatever step she decides is appropriate, including potentially abortion. (*Id.* at 90.) The protected nature of the underlying speech, however, would be entirely unaffected by such fine distinctions involving subjective motivation.[10]

In some of the defendants' briefing, they effectively concede that the recruitment provision, as written, reaches a great deal of ordinary, First Amendment-protected speech. Despite their attempts to narrow the construction of "recruitment," the defendants ultimately

---

[10] Moreover, Chapter 1032 already has a provision addressing the speaker's motivations—its intent requirement—and that provision does not draw the line that the defendants propose. Rather, it reaches any "recruitment" that is "intentional"—which, by its plain language, would reach both (1) intentionally steering a person toward abortion because the speaker believes that abortion is the better option and (2) intentionally steering a person toward abortion, if that is the route that the listener ultimately decides that she prefers. The second option may involve a more nuanced set of motivations, but it is no less intentional than the first. The defendants, therefore, are not simply asking the court to draw a line that the statute does not draw, but to substitute one of the most important lines that it does draw with a judge-created alternative.

39

describe the conduct prohibited by the recruitment provision as "intentionally convincing a minor to cross state lines, without parental consent, to obtain an abortion Tennessee law prohibits." (Doc. No. 26 at 12.) "Convincing" a person of something, however, is speech—and obviously so. For example, a teenager might be convinced to pursue an abortion by being told that she has great educational potential and should focus on her schooling, or she might be convinced by receiving information regarding childcare costs. She could be convinced by being told, accurately, that there are many religious congregations that would not condemn her decision to terminate a pregnancy, or she might be convinced by having her exaggerated medical fears about complications assuaged. She might even be convinced simply by being told that, whatever she does, she is entitled to love and support. Every such statement, if made to an unemancipated minor considering abortion with the intention of helping the minor choose the correct course for her—including, potentially, by obtaining a legal abortion—could lead to criminal prosecution under the recruitment provision. And that is under the *defendants'* supposedly less problematic interpretation of the statute.

Because the test for overbreadth calls on the court to weigh the challenged statute's "legitimate sweep" against its unconstitutional applications, the defendants could still theoretically prevail if they established a substantial core of constitutionally permissible uses of the prohibition on recruitment. The defendants, however, have struggled to articulate any legitimate, likely application of the provision. As the court has already discussed, the examples that they have given largely involved either coercion or direct facilitation, and there is no need for a "recruitment" ban to reach those activities. Indeed, one can give any law a seemingly large legitimate sweep if one includes, in its "legitimate" applications, prosecution of individuals based on other, constitutionally prohibitable activity that is not essential to the statutorily defined

40

offense. One might as well argue that the recruitment provision is constitutionally permissible because it would be constitutionally unproblematic to bring theft charges against an adult who stole a cell phone and then later used that cell phone to send supportive text messages to a minor considering abortion. Just slapping some additional bad acts onto a hypothetical offender's conduct cannot save a statute that does not require that extraneous wrongdoing in order to apply.

What matters is the legitimate sweep of the actual offense, as defined by the challenged statute. The defendants have confirmed that they do not read the recruitment provision to, for example, apply only to efforts by out-of-state clinics to recruit Tennessee patients, but rather to *any* intentional communication by *any* non-excepted adult to a minor that the adult knows may lead the minor to choose to obtain an entirely legal abortion. The impermissible applications of such a prohibition are innumerable, whereas the defendants' supposedly legitimate applications all, or nearly all, rely on tacking on some additional element that the state could simply outlaw, if it has not already done so, without saying a word about "recruitment." The court, therefore, finds that the plaintiffs are very likely to succeed on their overbreadth claims.

**D. Vagueness**

The defendants have conceded that the term "recruits" is "susceptib[le] to a wide array of possible meanings." (Doc. No. 22 at 10.) Statutes with uncertain meanings are, of course, nothing new, and the fact that there is room for debating a statute's scope does not, in and of itself, render that statute constitutionally suspect. Vagueness, however, comes in degrees, and there is a point at which a statute's lack of clarity goes beyond simply posing an occasion for disagreement and becomes, instead, an invitation to abuse. "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)

(quoting *Lanzetta v. State of N.J.*, 306 U.S. 451, 452 (1939)). After all, laws are directives, and something can only be a directive if a person can actually understand it well enough to follow it. A law that cannot be understood "is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). In recognition of that basic principle, federal courts have long recognized that a law that does not define its prohibitions with at least some bare minimum of clarity is "repugnant to the due process clause of the Fourteenth Amendment." *Lanzetta*, 306 U.S. at 452.

Impermissibly vague laws "may take two forms, both of which result in a denial of due process." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1183–84 (6th Cir. 1995) (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)). The first form of vagueness focuses on the lack of notice to the regulated party, who is entitled to be made aware of "the standard of conduct to which a citizen is held accountable." *Id.* The second, but closely related, facet of vagueness focuses on the power and discretion that a vague law grants an enforcing party. Legal specificity is also a form of legal restraint. Without specificity, a prohibition is simply an "unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement." *Id.* Accordingly, to succeed on a vagueness challenge, a plaintiff typically must show that the relevant terms either "(1) 'fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Platt*, 894 F.3d at 246 (quoting *Hill*, 530 U.S. at 732).[11]

---

[11] The Supreme Court has suggested, at times, that a court can find a law impermissibly vague, on its face, "only if the enactment is impermissibly vague in all of its applications.*" Vill. of Hoffman Ests.*, 455 U.S. at 495. That language, taken in isolation, can give the impression that, as long as the defendant can concoct some hypothetical—any hypothetical—in which even a single act would be clearly prohibited by the statute, then the statute is not impermissibly vague. The Supreme Court, however, expressly rejected that approach in *Johnson v. United States*, 576 U.S. 591 (2015), clarifying that, "although statements in

The Supreme Court has been clear that the degree of vagueness permissible depends on the nature of the laws and rights at issue, and, while there are an array of relevant factors, two of the most important ones apply in this case to increase the government's burden. First, it is well-established that "'a more stringent vagueness test should apply' to laws abridging the freedom of speech . . . ." *Id.* (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503, 1982)). Similarly, laws that include criminal prohibitions typically require a higher level of specificity than purely civil laws. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99 ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). As a criminal law governing speech, the recruitment provision, therefore, faces a relatively strong requirement of specificity. That requirement is slightly reduced by the fact that Chapter 1032 includes a scienter provision, but that is true of nearly all criminal statutes. *Id.*

Moreover, the court is permitted to consider whether a challenged law, in practice, "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Papachristou*, 405 U.S. at 170 (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 97 (1940)); *cf. Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (noting that even the highly deferential "rational basis" review standard permits a court to consider whether a law was improperly enacted out of a "bare . . . desire to harm a politically unpopular group.") (quoting *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). "Statutory language of such a standardless sweep" that it leaves individuals at the

some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602. Indeed, even before the Supreme Court clarified matters, it had already urged that its standards for vagueness are not to be "mechanically applied." *Vill. of Hoffman Ests.*, 455 U.S. at 503.

mercy of the "personal predilections" of authorities is dangerous enough, but it becomes more so when its subject matter is one that lends itself to politicized enforcement. *Smith v. Goguen*, 415 U.S. 566, 575 (1974). While the court does not find this factor decisive in the vagueness analysis, it also should not be ignored.

The vagueness of the recruitment provision is clear both on its face and from the litigation of this case. There are countless things that a person could intentionally say that might make a minor more inclined to seek an abortion, and the defendants have been markedly incapable of providing a clear picture of when such a statement rises to the level of recruitment. Such "indeterminacy" about "precisely what" standard a law imposes is what the prohibition on vague laws is intended to prevent. *United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

The defendants' attempts to rely upon the use of the word "recruit" in other trafficking statutes, if anything, highlights just how difficult it is to understand what the word means here. The Supreme Court has recognized the fact that, in some instances, laws that might seem vague on first reading can be understood, in context, to be "employ[ing] words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) (collecting cases). Chapter 1032, however, presents a corollary principle: when a word with a technical or special meaning is removed from the context in which that special meaning applies, the fact that it was sufficiently clear in the original context does not mean that it will be clear in the new one. In drafting Chapter 1032, the Tennessee General Assembly took language that did have an established meaning in some situations—that is, conventional trafficking—and imported it, with little apparent thought or consideration, into an entirely new context where its meaning is

44

unclear. Maybe, sometimes, re-homing language from one statute to another, despite a significant difference in contexts, works out fine. In this instance, however, it did not, and the result was a statute whose meaning no one can apparently surmise. The court, accordingly, finds that Welty and Behn have a high likelihood of success with regard to their vagueness claim.

**D. Preliminary Injunction Factors and Scope**

**1. Irreparable Injury**

The Sixth Circuit has suggested that, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). At the very least, "irreparable injury is presumed." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Moreover, although it appears that the plaintiffs are likely to continue to engage in some version of their advocacy regardless of whether the law is enjoined, Welty has testified that she has changed her tactics in order to reduce the potential risk of prosecution. Any pregnant person that Welty fails to reach due to those changes cannot be retroactively informed of her options at the end of this litigation. Moreover—and as the court will discuss further in the context of the injunction's scope—even if Behn continues her actions and Welty continues some of hers, the efficacy of those actions will be significantly hampered if they are performed under the threat of criminal prosecution for sharing the messages conveyed. The plaintiffs, therefore, have established irreparable injury.

**2. Equities/Public Interest**

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). It is, moreover, well-established that "the public interest is served by

45

preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). These factors, accordingly, strongly support a preliminary injunction, based simply on the nature of the rights at issue and the strong likelihood that the plaintiffs are correct that their constitutional rights are imperiled.

There is, however, another major way that this factor favors an injunction: the severe potential chilling effects of the recruitment provision on free and fair discussion of issues surrounding abortion. As things currently stand, anyone who wishes to honestly discuss the landscape of abortion availability within earshot of a minor must do so with the knowledge that he or she is simply one politically enterprising prosecutor or vindictive grand jury witness away from criminal charges. That is not a healthy—or constitutionally permissible—status quo. Welty and Behn are high-profile participants in discussions surrounding abortion in Tennessee, and those discussions—which are an indispensable part of the democratic process—cannot thrive under the threat of prosecution. The public interest, accordingly, supports a preliminary injunction even more strongly than it would in an ordinary constitutional challenge with a high likelihood of success.

### 3. Scope of Injunction

All of the preliminary injunction factors favor granting relief, and the court will do so. The fact that relief is warranted, however, leaves open the question of what form that relief will take. It is clear that an appropriate preliminary injunction would prevent the defendants—or, in Welty's case, the defendants serving judicial districts in and around Nashville—from enforcing the recruitment provision of Chapter 1032 against the plaintiffs in connection with any lawful abortion. The plaintiffs, however, have also requested an injunction barring enforcement of the provision against anyone else. Ordinarily, their right to such an injunction would be highly

46

questionable, given that it is not usually necessary to enjoin enforcement against nonparties in order to protect the rights of specific plaintiffs. As the plaintiffs point out, however, that usual calculus is significantly complicated by the fact that one of the claims on which the plaintiffs have demonstrated a high likelihood of success is an overbreadth challenge, and overbreadth challenges have long been recognized to support a more nuanced—and potentially expansive—approach to relief.

The law in this area is, admittedly, somewhat difficult to parse. The Sixth Circuit has suggested that overbreadth challenges, broadly speaking, present "an exception to the usual prudential standing requirement 'that a party may assert only a violation of its own rights.'" *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007). Doctrines of "prudential standing," however, are controversial in their own right, with the term increasingly dismissed by courts as a misnomer applied to statute-specific limitations that are substantive, not standing-based, in nature. *See Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016). In the § 1983 context, that statute-specific doctrine is that § 1983's reference to the plaintiff's "rights, privileges, or immunities secured by the Constitution and laws" has generally been construed to mean that a plaintiff may only "assert his own legal rights and interests," even if he has constitutional standing to assert the rights of others because the violation of those third parties' rights has also injured the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Constitutional standing, however, is still subject to the particularity requirement, meaning that, in order to be entitled to an injunction that would protect the rights of third parties, there must still be some sufficient connection between those third parties' rights and the plaintiff's injury. The law, accordingly, is not so simple as saying that a plaintiff in an overbreadth challenge will always be entitled to a blanket injunction protecting nonparties. Rather, the law is that, insofar as

47

the plaintiff is entitled to, and has constitutional standing to seek, such an injunction based on the plaintiff's own injury, § 1983 poses no obstacle.

The court finds that Welty and Behn are entitled to, and will receive, an injunction against all enforcement of the recruitment provision by the defendants against any party. The court does not reach that conclusion simply because this is an overbreadth challenge, but because such relief is necessary to prevent Welty's and Behn's own irreparable injuries. This is a case about the free flow of information, and it would be naive to think that the plaintiffs' injuries can be addressed simply by preventing the application of the recruitment provision to them and them alone, while leaving their messages to die on the vine because no one else can pass them along. There is no evidence that Behn or Welty is involved in advocacy simply for her own glory or gratification. They share the information that they do—much of which is presented in forms, such as flyers and social media posts, specifically designed to be easily disseminated—because they want that information to be available to anyone who needs it. That can only happen if the message can be freely spread by others, not just Welty and Behn, in the manner that the First Amendment protects.

An injunction that simply created a narrow zone of protection around Welty and Behn—while permitting the defendants to criminally prosecute anyone else who shares the messages that Welty and Behn espouse—would not be an injunction that "provide[s] complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The freedom of speech guaranteed by the First Amendment is not simply a special protection that the Constitution grants to a few, high-profile speakers so that those speakers can hear themselves talk; it is a protection available to everyone,

48

for the interconnected benefit of everyone, because messages do not gain their fullest power by being uttered, but by being spread.

Welty and Behn do not just have a right to speak their message; they have a right to live in a state where that message can be repeated by all who find it valuable to all who wish to hear it. Otherwise, there would be no actual freedom of speech—just freedom of a few speakers to address a silenced populace. The First Amendment guarantees more, and, under the law of this circuit, the plaintiffs' overbreadth challenge permits this court to provide it. The court, accordingly, will enjoin all enforcement of the recruitment provision by the defendant DAGs.

## V. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 18) will be granted as to the preliminary injunction, and the defendants' Motion to Dismiss (Doc. No. 25) will be denied.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge