**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| RACHEL WELTY and<br>AFTYN BEHN, | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 3:24-cv-00768 |
| | § | |
| BRYANT C. DUNAWAY, | § | |
| JASON LAWSON, | § | |
| JENNINGS H. JONES, | § | |
| ROBERT J. CARTER, | § | |
| RAY WHITLEY, ROBERT J. NASH, | § | |
| GLENN FUNK, STACEY EDMONSON, | § | |
| BRENT COOPER, RAY CROUCH, and | § | |
| HANS SCHWENDIMANN, | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT**

# I. INTRODUCTION

Tennessee Code Annotated § 39-15-220(a)'s "recruit[ment]" provision is an unconstitutionally vague content- and viewpoint-based criminal speech restriction. The Defendants are District Attorneys who have both the authority and an admitted "affirmative statutory obligation" to prosecute violations of Section 39-15-220(a).[1] Here, because there is no material dispute that the Plaintiffs—two speakers who are credibly threatened by Section 39-15-220(a)—have standing to challenge it, and because Section 39-15-220(a)'s recruitment provision is unconstitutional on several grounds, the Plaintiffs are entitled to summary judgment.

Significantly, during an earlier stage of proceedings, this Court already adjudicated the dispositive legal disputes presented in this case. *See* Doc. 40. To be sure, the *factual* determinations that this Court made at that earlier stage are not binding here. *William G. Wilcox, D.O., P.C. Employees' Defined Ben. Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989). But absent some compelling justification for departing from this Court's earlier *legal* determinations, this Court should stick to them. *See, e.g., Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) ("issues, once decided, should be reopened only in limited circumstances, e.g., where there is 'substantially different evidence raised on subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest

---

[1] *Compare* Doc. 1 at ¶ 9 ("Each Defendant has criminal enforcement authority and an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto[.]'" (quoting Tenn. Code Ann. § 8-7-103(1)), *with* Doc. 51 at ¶ 9 ("Defendants submit that Tenn. Code Ann. § 8-7-103(1) says what it says. The remaining allegations contained in Paragraph 9 are admitted.").

injustice.'"); *Schenck v. City of Hudson*, 208 F.3d 215 (6th Cir. 2000) ("In this case, the procedural posture has changed but the facts before us have not"); *GMAC Mortg., LLC v. McKeever*, No. CIV.A. 08-459-JBC, 2012 WL 683165, at \*1 (E.D. Ky. Mar. 2, 2012) ("Because the court has previously decided the issues underlying each of the claims asserted by Haffey, judgment is appropriate, and the motion will be granted.").

Nevertheless, the Plaintiffs have re-briefed the issues here because they recognize that "[d]istrict courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991).

## II. FACTS

### A. PLAINTIFF RACHEL WELTY

Plaintiff Rachel Welty—an adult[2] and licensed Tennessee attorney[3]—is an outspoken and unapologetic advocate for safe and healthy access to abortion care.[4] In her role as an advocate for safe and healthy access to abortion care, Ms. Welty has on many occasions participated in informational campaigns and distributed literature about abortion access, including how to access legal abortion-inducing drugs.[5] Most of Ms. Welty's advocacy is concentrated in the Middle Tennessee area, including in each of the Defendants' judicial districts.[6] Ms. Welty also is a board member of an abortion fund that provides resources to clients who need safe and healthy access to legal abortion medication and legal out-of-state abortion care that they can no longer obtain in Tennessee.[7]

---

[2] Doc. 39-1 at 13:16–17.
[3] Doc. 1 at ¶ 20; Doc. 51 at ¶ 20; Doc. 39-1 at 4:6–7.
[4] Doc. 1 at ¶ 12; Doc. 39-1 at 22:25–23:5.
[5] Doc. 1 at ¶ 13; Doc. 39-1 at 22:25–23:5; *see also* Doc. 1-2.
[6] Doc. 1 at ¶ 14; Doc. 39-1 at 22:25–23:5.
[7] Doc. 1 at ¶ 15; Doc. 39-1 at 13:21–23.

-2-

Ms. Welty's advocacy for safe and healthy access to legal abortion care is not hidden, and it is not intended to be.[8] Ms. Welty advocates—accurately—that "'[a]bortion is safe, common, and normal[.]'"[9] She also advocates for and helps facilitate Tennesseans' access to legal abortion care, including out-of-state abortion care and abortion-inducing drugs.[10] Ms. Welty's advocacy is not limited to emancipated minors or to Tennesseans who happen to be over the age of 18, and it is not intended to be.[11] Ms. Welty has given speeches, participated in marches, and talks to a lot of reporters about abortion access, and minors receive her messages.[12] After the U.S. Supreme Court's decision in *Dobbs*, Ms. Welty started a social media account to try to educate Tennesseans about their right to continue to seek abortion care.[13]

Ms. Welty is well-known in Tennessee for helping pregnant, unemancipated minors obtain legal abortion care, having handled "'judicial bypass'" representations for years.[14] As a result of that work, Ms. Welty still receives calls from pregnant, unemancipated minors who want assistance accessing legal abortion care but do not have parental consent to do so.[15] Ms. Welty has historically helped those clients access legal abortion care, and she would like to continue helping pregnant, unemancipated minors access legal abortion care.[16]

Ms. Welty provides individuals who come to her for assistance with accurate information about ways they can legally obtain an abortion.[17] In Ms. Welty's experience, informing her clients

---

[8] Doc. 1 at ¶ 16; Doc. 39-1 at 35:2–4.
[9] Doc. 1 at ¶ 17; Doc. 39-1 at 22:25–23:5.
[10] Doc. 1 at ¶ 18; Doc. 39-1 at 7:19–22;
[11] Doc. 1 at ¶ 19.
[12] Doc. 39-1 at 18:22–19:7.
[13] *Id.* at 18:15–19:22.
[14] Doc. 1 at ¶ 20 (citing Doc. 1-3); Doc. 39-1 at 4:20–5:13.
[15] Doc. 1 at ¶ 21; Doc. 39-1 at 8:21–24.
[16] Doc. 1 at ¶¶ 22–23; Doc. 39-1 at 6:4–14.
[17] Doc. 39-1 at 7:19–22.

that abortion is safe, common, and normal causes some number of clients who were uncertain about the best option for them to have an abortion.[18]

Pregnant unemancipated minors—some of whom are uncertain about the best option for them—have come to Ms. Welty for advice and guidance about what they should do.[19] In Ms. Welty's experience, when presented with accurate information about abortion care and the legal options they have to obtain care, some minors make the decision to have a legal abortion.[20]

Ms. Welty intends to give information about abortion to her minor clients, and she is aware, based on her experience, that providing her minor clients accurate information about legal abortion care options persuades some of them to get an abortion.[21] Ms. Welty also is aware that the fact that her minor clients are communicating with and being advocated for by an attorney could increase the likelihood that they choose abortion.[22]

Whatever choice her clients make, Ms. Welty encourages and supports them.[23] Thus, when Ms. Welty's clients decide that they want an abortion, Ms. Welty supports and encourages that decision.[24] Further, "once they choose a path, [Ms. Welty] help[s] them execute it."[25] She does so by connecting them with resources, including financial resources; giving them information about what clinics are available for them out of state; or giving them information about abortion pills.[26] Ms. Welty's professional duty of loyalty to her clients—to which she adheres[27]—requires

---

[18] *Id.* at 9:16–20.
[19] *Id.* at 8:21–9:2.
[20] *Id.* at 9:3–7.
[21] *Id.* at 31:7–14.
[22] *Id.* at 31:14–17.
[23] *Id.* at 31:18–21.
[24] *Id.* at 9:22–25.
[25] *Id.* at 10:4–5.
[26] *Id.* at 24:22–25:2.
[27] *Id.* at 10:6–10.

-4-

as much.  Ms. Welty also "put[s] the word out" that she does this work.[28]

Section 39-15-220(a) forces Ms. Welty to treat her minor clients differently depending on whether they are seeking help obtaining abortion care or other medical care.[29]  Under Tennessee's Mature Minor Doctrine, minors can obtain a host of medical services—for instance, treatment for sexual transmitted diseases and birth control—without parental consent.[30]  Ms. Welty also has helped minors whom she represented access that sort of medical care,[31] and no Tennessee statute even arguably criminalizes the advice and guidance she gives her minor clients when it comes to medical care other than abortion care.[32]  As to abortion care, specifically, though, Ms. Welty's advice and guidance to her minor clients arguably is criminalized by Section 39-15-220(a).[33]  Thus, when Ms. Welty provides advice to her minor clients who are seeking assistance obtaining medical care, she does not have to worry about being prosecuted *unless* she is talking about abortion care.[34] Based on Section 39-15-220(a), Ms. Welty is concerned that she might be sued or criminally prosecuted for the guidance she gives her minor clients who are considering an abortion.[35]

In her role as a lawyer, Ms. Welty received inquiries concerning minors who want assistance seeking abortion care, both from minors directly and from adults on minors' behalf.[36] When she does, Ms. Welty does not ask whether they have parental consent to obtain an abortion.[37] The reason Ms. Welty does not ask is that "[i]t can be really dangerous for minors in regard to the

---

[28] *Id.* at 35:2–4.
[29] *Id.* at 11:22–12:2.
[30] *Id.* at 10:11–11:1.
[31] *Id.* at  11:2–8.
[32] *Id.* at 11:9–12.
[33] *Id.* at 11:14–21.
[34] *Id.* at 11:22–12:2.
[35] *Id.* at 13:10–14.
[36] *Id.* at 6:18–23.
[37] *Id.* at 6:24–7:3.

care that they are trying to get. There may be a lot of reasons why they don't see[k] the consent of their parent. Sometimes their parent is their abuser. So [Ms. Welty] just [dosen't] get into that question with them."[38]

Given the above context, in anticipation of Public Chapter No. 1032 taking effect, Ms. Welty developed serious concerns that the law—which directly affects her day-to-day operations—would criminalize her advocacy and subject her to civil wrongful death liability.[39] Thus, Ms. Welty sought reasonable notice from the Defendants of what Public Chapter No. 1032's recruitment provision—now codified at Tennessee Code Annotated Section 39-15-220(a)— prohibited.[40] In particular, on June 6, 2024, Ms. Welty—through counsel—sent a letter to the Defendants regarding Public Chapter No. 1032's "'recruit[ment]'" prohibition.[41] Ms. Welty asked the Defendants to "'define the proscribed behavior with sufficient particularity to provide a person of ordinary intelligence with reasonable notice of the conduct that is prohibited.'"[42] Ms. Welty asked for a response from the Defendants by 4:30 p.m. CST on June 20, 2024.[43] None of the Defendants responded to Ms. Welty's letter, and they have admitted as much.[44]

Through counsel, Ms. Welty also expressed her "'significant concerns that Public Chapter No. 1032 is constitutionally infirm.'"[45] She noted:

> Even setting aside vagueness issues, any reasonable interpretation of the law appears to criminalize pure speech and *advocacy*—a viewpoint-based speech restriction. Worse: the law appears to criminalize advocating for and facilitating

---

[38] *Id.* at 7:4–10.

[39] Doc. 1 at ¶ 24.

[40] *Id.* at ¶ 25; Doc. 51 at ¶ 25 ("Defendants admit that Plaintiff Welty's counsel sent a letter dated June 6, 2024, addressed to each of them regarding Public Chapter No. 1032 and that the letter says what it says.").

[41] Doc. 1. at ¶ 26 (quoting Doc. 1-4); Doc. 51 at ¶ 26.

[42] Doc. 1 at ¶ 26 (quoting Doc. 1-4 at 2); Doc. 51 at ¶ 26.

[43] Doc. 1 at ¶ 27.

[44] *Id.* at ¶ 28 ("None of the Defendants responded."); Doc. 51 at ¶ 28 ("Admitted.").

[45] Doc. 1 at ¶ 29 (quoting Doc. 1-4 at 2).

access to *legal* abortion care, including abortion care provided out-of-state in compliance with the laws of sovereign jurisdictions.[46]

Based on these infirmities, Ms. Welty asked each Defendant to "disavow all enforcement of Public Chapter No. 1032's 'recruit[ment]' prohibition against Ms. Welty once the law takes effect."[47] None of the Defendants disavowed any enforcement of Public Chapter No. 1032's "recruit[ment]" prohibition against Ms. Welty or responded to her at all, however.[48]

The scope of Section 39-15-220(a)'s "recruit[ment]" prohibition also gives rise to additional criminal liability well beyond its terms, including for related inchoate offenses like criminal attempt, solicitation, and conspiracy, *see* Tenn. Code Ann. § 39-12-107(a)–(c), and for additional crimes like criminal responsibility, *see* Tenn. Code Ann. § 39-11-402(1)–(3).[49] Thus, unless the Act's "recruit[ment]" prohibition is declared unconstitutional and enjoined, Ms. Welty cannot safely continue her advocacy for safe and healthy access to legal abortion care without risking criminal prosecution.[50]

Ms. Welty's fear of being subjected to criminal prosecution for violating Section 39-15-220(a)'s recruitment prohibition if she does not restrict her speech is both objectively and subjectively credible.[51] Especially when paired with the availability of civil enforcement by private parties, the criminal nature of the threat that Ms. Welty faces—a lengthy mandatory-minimum jail sentence following a criminal charge that may be initiated by any law enforcement officer or by an individual citizen through Tennessee's citizen grand jury process—significantly

---

[46] *Id.* at ¶ 29 (quoting Doc. 1-4 at 3).

[47] *Id.* at ¶ 30 (quoting Doc. 1-4 at 3).

[48] *Id.* at ¶ 31; Doc. 51 at ¶ 31 ("Defendants admit only that they did not respond to the June 6, 2024 letter sent by Plaintiff Welty's counsel regarding Public Chapter No. 1032."); Doc. 39-1 at 22:11–14.

[49] Doc. 1 at ¶ 32.

[50] *Id.* at ¶ 33.

[51] *Id.* at ¶ 34.

-7-

heightens the risk of chilled expression.[52]

Ms. Welty is a single mom of three children and the only income earner in her household.[53] If she were to be sued civilly for violating Section 39-15-220(a), it could devastate her ability to practice law and maintain financial stability for her children.[54] If she were prosecuted, put in jail, and it took time for her to be released, that could also have a negative impact on her children.[55] Given Ms. Welty's fear of being prosecuted and sued for the things she posted online, before this Court preliminary enjoined Section 39-15-220(a), Ms. Welty stopped providing information to the public via her social media account about how Tennesseans could legally obtain abortion care.[56]

## B.    PLAINTIFF AFTYN BEHN

Plaintiff Aftyn Behn is an elected Representative of the Tennessee General Assembly.[57] Representative Behn has "been one of [the] most vocal proponents of abortion access in [Tennessee] for quite some time."[58]

As an elected official, Representative Behn serves as a resource for information to her constituents, including about abortion.[59] In her capacity as a Representative, she has been solicited by families across the State asking about the legal status of abortion access in Tennessee and how they can access truthful and accurate information about the resources that exist.[60] In her office, Ms. Behn maintains materials and information about an abortion fund, the services that it provides, and information about how to contact the nearest abortion provider outside the State of

---

[52] *Id.* at ¶ 35.
[53] Doc. 39-1 at 20:16–17.
[54] *Id.* at 20:20–23.
[55] *Id.* at 20:24–21:1.
[56] *Id.* at 19:23–20:12.
[57] Doc. 1 at ¶ 36; Doc. 51 at ¶ 36; Doc. 39-1 at 38:5–8.
[58] Doc. 1 at 52:6–8.
[59] Doc. 39-1 at 38:20–39:3.
[60] *Id.* at 39:17–21.

-8-

Tennessee.[61]

Tennesseans outside of Representative Behn's own district contact her about abortion care.[62] When Representative Behn is contacted to provide resources or information about available and legal abortion care,[63] she does not verify the age of the individuals who contact her office.[64]

Representative Behn has spoken publicly about abortion care to audiences that likely included minors.[65] Representative Behn also has used social media to provide information about legislation as well as accurate and truthful information about legal abortion access.[66] As a result of Representative Behn's public advocacy and discussion of abortion care, she has become associated with the issue of abortion access.[67] Representative Behn's public advocacy and discussion of abortion care takes place across Tennessee, including in the Middle District of Tennessee.[68]

Before the bill that ultimately became section 39-15-220(a) was considered for a final floor vote, Representative Behn posted publicly in opposition to the bill, pledging to "'exercise [her] right to publicly share information about how to seek an abortion which could be considered illegal under this law.'"[69] Representative Behn further stated that she "'welcome[s] the opportunity to take a young person out of state who wants to have an abortion even if it lands [her] in jail.'"[70]

During the Tennessee House of Representatives' discussion of the bill that ultimately

---

[61] *Id.* at 41:10–19.
[62] *Id.* at 39:4–9.
[63] *Id.* at 39:17–21; *id.* at 53:7–15.
[64] *Id.* at 40:6–10.
[65] *Id.* at 40:11–41:3.
[66] *Id.* at 41:6–42:5; *id.* at 48:23–49:7; *id.* at 57:1–3.
[67] *Id.* at 39:4–9.
[68] *Id.* at 62:25–63:18.
[69] Doc. 1 at ¶ 37 (quoting Doc. 1-5 at 4); Doc. 39-1 at 46:7–47:25.
[70] Doc. 1 at ¶ 38 (quoting Doc. 1-5 at 5).

became section 39-15-220(a), another Representative sought clarification about the meaning of "'recruit[ment]'" under the bill.[71]  On the Tennessee House floor, the primary sponsor of the bill answered that Representative's question as follows:

> REPRESENTATIVE ZACHARY: "[U]nfortunately, there's even a member of this body that recently tweeted out, 'I welcome the opportunity to take a young person out of state who wants to have an abortion, even if it lands me in jail.' . . .
>
> REPRESENTATIVE ZACHARY: And so answering the question of recruitment, I'm answering the question of recruitment. Representative, that is what recruitment looks like."[72]

According to the sponsor of Public Chapter No. 1032, merely stating that: "I welcome the opportunity to take a young person out of state who wants to have an abortion, even if it lands me in jail"—even when that statement is not directed to any specific person—is a criminal violation of Public Chapter No. 1032's "recruit[ment]" prohibition.[73]  Representative Behn wants to continue her advocacy for young people who need legal abortion care, but she cannot do so safely without risking criminal prosecution.[74]  Representative Behn's fear of being subjected to prosecution for violating Public Chapter No. 1032's recruitment prohibition is objectively and subjectively credible.[75]  Further, when paired with the availability of civil enforcement by private parties, the criminal nature of the threat that Representative Behn faces significantly heightens the risk of chilled expression.[76]

As an elected official and legislator, Representative Behn's chilled expression regarding a matter of obvious public concern like abortion is especially destructive.[77]  Chilling Representative

---

[71] *Id.* at ¶ 39 (quoting Doc. 1-6 at 20:9–12).
[72] *Id.* at ¶ 40 (quoting Doc. 1-6 at 21:9–17); *see also* Doc. 39-1 at 49:20–51:8.
[73] Doc. 1 at ¶ 41.
[74] *Id.* at ¶ 42; Doc. 39-1 at 51:14–52:8; *id.* at 56:11–13.
[75] Doc. 1 at ¶ 43.
[76] *Id.* at ¶ 44.
[77] *Id.* at ¶ 45.

Behn's speech interferes with her role and duty as an elected official and simultaneously violates her constituents' right to hear and receive information from her.[78]

Beyond her role as an elected Representative, Ms. Behn is a licensed social worker.[79]  As a social worker, Ms. Behn has an ethical obligation to remain committed to her clients' wellbeing and self-determination.[80]  When individuals seek her assistance about abortion care, Ms. Behn provides them accurate information and resources about available abortion care, and often times, those individuals use those resources to obtain a legal abortion.[81]  When they do so, Ms. Behn validates and supports their decision.[82]  Individuals who were unsure about whether to have an abortion have sought information about abortion care from Ms. Behn and then decided afterward to obtain a legal abortion.[83]

In certain circumstances—such as rape or incest, if the health of the mother is at risk, or if the individual believes abortion is the right choice for them—Ms. Behn believes an abortion would be in the individual's best interest.[84]  Ms. Behn believes that she has an ethical duty as a licensed social worker to convey that an abortion might be in an individual's best interest.[85]  Ms. Behn conveys that belief by providing individuals information so that they can make an informed decision and by ensuring that the space that Ms. Behn offers her clients—and the professional advice she gives them—does not make them feel less than or invaluable, or as though harm will come from their decision.[86]  Often times, when Ms. Behn provides people resources and accurate

---

[78] *Id.* at ¶ 45.
[79] Doc. 39-1 at 37:13–24.
[80] *Id.* at 43:16–23.
[81] *Id.* at 44:18–45:10.
[82] *Id.* at 45:11–22.
[83] *Id.* at 45:23–46:6.
[84] *Id.* at 43:24–44:9.
[85] *Id.* at 44:10–13.
[86] *Id.* at 44:18–25.

and truthful information about abortion and obtaining a legal abortion, those people use the resources Ms. Behn has provided to obtain legal abortions.[87]  When people make that decision, Ms. Behn validates it, supports it, and encourages it.[88]  On "a few" occasions, someone began a conversation with Ms. Behn about abortion unsure about what they wanted to do, and they left that conversation convinced that they should have an abortion.[89]  In her role as a social worker, Ms. Behn feels compelled to give individuals permission to make the choice to have an abortion.[90]

Ms. Behn also works for a federal super PAC that mobilizes rural and small town voters.[91] Ms. Behn has spoken to broader audiences about abortion and had demonstrated publicly in support of abortion access, including by standing on Broadway with a sign that read: "Need an abortion[?]  [A]sk me for help."[92]  In her organizing capacity, Ms. Behn places materials about how to access abortion across rural Tennessee, including in places where there are minors.[93]

Based on the credible threat of Section 39-15-220(a) being enforced against her, before this Court preliminarily enjoined enforcement of the law against her, Ms. Behn could not safely express herself on matters of current public importance.[94]  A criminal prosecution or lawsuit against her under Section 39-15-220(a) would make it difficult for her to maintain her licensure for social work, and it would be very difficult for her to navigate as an elected official.[95]

## C.  PUBLIC CHAPTER NO. 1032 AND ADDITIONAL ENFORCEMENT CONCERNS

Public Chapter No. 1032's fiscal note assumes that it will result in actual incarcerations

---

[87] *Id.* at 45:5–10.
[88] *Id.* at 45:1–22.
[89] *Id.* at 45:23–46:6.
[90] *Id.* at 59:6–10.
[91] *Id.* at 37:25–38:4.
[92] *Id.* at 40:17–41:17.
[93] *Id.* at 54:4–8; *id.* at 63:14–18.
[94] Doc. 1 at ¶ 46.
[95] Doc. 39-1 at 52:11–16.

resulting from annual prosecutions.[96]  Despite the legislature's expectation that violations of Public Chapter No. 1032 will be prosecuted, the Defendants "admit that Public Chapter No. 1032 does not contain a definition of the word 'recruits[.]'"[97]  The Defendants also have admitted that the word recruits is "susceptibil[e] to a wide array of possible meanings[.]"[98]  Nevertheless, when asked before Public Chapter No. 1032 took effect to clarify how they would construe the term "recruits," the Defendants "admit that they did not respond to a June 6, 2024 letter sent by Plaintiff Welty's counsel requesting that each of them provide their office's respective view of what 'recruits' means under Public Chapter No. 1032."[99]

The Defendants admit that "[e]ach Defendant has criminal enforcement authority and **an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto**[.]'"[100] Based on a recent Tennessee law—Tennessee Code Annotated § 8-7-106(a)(2)—that took effect in November 2021, if a District Attorney fails to adhere to that affirmative statutory obligation by "peremptorily and categorically refus[ing] to prosecute all instances of a criminal offense[,]" the District Attorney is subject to consequences that include having the Tennessee Supreme Court "appoint some other attorney as district attorney general pro tem in the district attorney general's place for the sole purpose of prosecuting persons accused of committing that offense."[101]

In previous constitutional challenges to Tennessee statutes that predate Tenn. Code Ann. §

---

[96] Doc. 29-1.
[97] Doc. 51 at ¶ 4; *id.* at ¶ 50.
[98] Doc. 22 at 11; *see also* Doc. 51 at ¶ 4 (admitting "that the term "recruits" is susceptible to various possible meanings in the abstract").
[99] Doc. 51 at ¶ 4.
[100] *Compare* Doc. 1 at ¶ 9 (emphasis added), *with* Doc. 51 at ¶ 9 ("Defendants submit that Tenn. Code Ann. § 8-7-103(1) says what it says. The remaining allegations contained in Paragraph 9 are admitted.").
[101] Tenn. Code Ann. § 8-7-106(a)(2).

-13-

8-7-106(a)(2)—including a previous constitutional challenge to a Tennessee statute concerning abortion—the Attorney General, while representing a defendant district attorney, and Defendant Funk, specifically, have filed documentation disavowing, under oath, prosecution of a challenged statute.[102] Thus, the Defendants know how to disavow prosecution when they want to.[103] Here, however, neither Defendant Funk nor any other Defendant has done so—even in response to the Court's specific invitation.[104] The Defendants also have represented to the Court, through counsel, that they "do not anticipate filing a formal declaration" disavowing prosecution of Tennessee Code Annotated § 39-15-220(a).[105] The Defendants have further maintained that "even if the Act could be read to cover the sort of speech Plaintiffs allegedly intend to engage in, it would still pass constitutional muster."[106]

Violations of Section 39-15-220(a)'s "recruit[ment]" provision are privately enforceable through civil wrongful death lawsuits.[107] Tennessee also authorizes both citizens' arrests[108] and citizen-initiated indictments by citizen complainants who: (1) may address Tennessee's citizen

---

[102] Doc. 34 at Exs. 6, 7; *see also* Doc. 55-1; Doc. 55-2.

[103] *Id.*

[104] *See* Docket Case No. 3:24-cv-00768; *see also Welty v. Dunaway,* No. 3:24-CV-00768, 2024 WL 4712759, at *12 (M.D. Tenn. Sept. 20, 2024) ("The defendants have had an unusual number of opportunities to explain how they will or will not enforce the statute. Welty sent them letters, and she gave them plenty of time to respond—so much time that it ultimately interfered with her ability to obtain a temporary restraining order. Nevertheless, the defendants completely ignored her. The defendants could have explained that refusal at the court's hearing, but not one defendant even attended, let alone testified. At the hearing, the court made very clear that its consideration of the case would benefit from some shred of evidence regarding the defendants' intentions—even simply signed declarations confirming that the lawyers representing them are accurately representing the defendants' understanding of the statute. Still, however, they provided nothing.").

[105] Doc. 55-3.

[106] Doc. 22 at 14.

[107] Tenn. Code Ann. § 39-15-220(e)(1)–(4).

[108] Tennessee Code Annotated § 40-7-109(a)(1); *State v. Smith,* 695 S.W.2d 954, 959 (Tenn. 1985)

-14-

grand juries directly, and (2) are expressly encouraged to do so.[109]

### III. LEGAL STANDARDS

The Plaintiffs' motion for summary judgment is subject to familiar standards.

> Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir.2010). When considering a motion for summary judgment, the court should, viewing the evidence in a light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lanier v. Bryant*, 332 F.3d 999, 1003 (6th Cir.2003), determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *Int'l Union v. Cummins*, Inc., 434 F.3d 478, 483 (6th Cir.2006).

*Wholesale Petroleum Partners, L.P. v. S. Cent. Bank of Daviess Cnty., Inc.*, 565 F. App'x 361, 363 (6th Cir. 2014).

Under this standard, "a mere scintilla of evidence in support of the non-moving party's position will be insufficient to defeat a motion for summary judgment; there must be evidence on which the jury could reasonably find for the non-moving party." *Slapak v. Tiger Mgmt. Grp., LLC*, 594 F. App'x 290, 293 (6th Cir. 2014).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response, the non-moving party must set

---

[109] Tenn. R. Crim. P. 6 Adv. Comm. Cmt. ("T.C.A. §§ 40-12-104–40-12-107 provide a procedure designed to give citizens free access to the local grand jury.") (citing Tenn. Code Ann. §§ 40-12-104 – 107); Tenn. Code Ann. § 40-12-105(a) (requiring clerks to publish in a newspaper of general circulation notice of the time and place the grand jury will meet and that "Any person having knowledge or proof that an offense has been committed may apply to testify before the grand jury").

forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

## IV. ARGUMENT

### A. THE PLAINTIFFS HAVE STANDING.

"When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that [s]he claims deters the exercise of his constitutional rights.'" *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Instead, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Thus,

> [I]n a pre-enforcement review case under the First Amendment (like this one), courts do not closely scrutinize the plaintiff's complaint for standing when the plaintiff "claims an interest in engaging in protected speech that implicates, if not violates, each [provision of the law at issue]." *Carey*, 614 F.3d at 196; *see also Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). A plaintiff meets the injury-in-fact requirement—and the case is ripe—when the threat of enforcement of that law is "sufficiently imminent." *Susan B. Anthony List*, 134 S.Ct. at 2342. This occurs when (1) the plaintiff alleges "an intention to engage in a course of conduct" implicating the Constitution and (2) the threat of enforcement of the challenged law against the plaintiff is "credible." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 451–52 (6th Cir. 2014).

Here, there is little doubt that the Plaintiffs have "allege[d]" an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute.[110] This Court also has already made that determination. *See Welty v. Dunaway*, No. 3:24-CV-00768,

---

[110] *See generally* Doc. 1.

2024 WL 4712759, at *11 (M.D. Tenn. Sept. 20, 2024) ("Welty and Behn have clearly and credibly asserted that they intend to engage in behavior for which the defendants could prosecute them under the recruitment provision.").

Further, "[f]or standing purposes," the Supreme Court has instructed that courts must "accept as valid the merits of appellees' legal claims . . . ." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (a court's "threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal[.]'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal")); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989) ("although federal standing 'often turns on the nature and source of the claim asserted,' it 'in no way depends on the merits of the [claim].'") (cleaned up). Despite the clarity of the Supreme Court's instructions on this point, *see supra*, two recent Sixth Circuit cases contravene it by holding, contrarily, that "the standing analysis inevitably bleeds into the merits. . . ." *Friends of George's, Inc.*, 108 F.4th at 438 n.4; *see also Bowles v. Sabree*, No. 23-1256, 2024 WL 4661857, at *7 n.4 (6th Cir. Nov. 4, 2024) ("To be sure, the standing inquiry sometimes reaches forward a bit to borrow from the merits.").

Regardless of the Sixth Circuit's failure to apply the Supreme Court's guidance—and even "reach[ing] forward a bit to borrow from the merits[,]" *id.*—the Plaintiffs' claim that their intended speech "arguably" is proscribed by Section 39-15-220(a) is correct. The Plaintiffs' interpretation of the provision is superior; the Defendants themselves have alternatively defended the statute under the Plaintiffs' interpretation of it, *see* Doc. 22 at 14 ("even if the Act could be read to cover the sort of speech Plaintiffs allegedly intend to engage in, it would still pass constitutional muster."); the Defendants have conceded that the word recruits is "susceptibil[e] to a wide array

-17-

of possible meanings[;]"[111] the sponsor of Public Chapter No. 1032 agrees with the Plaintiffs' reading; and Tennessee law routinely considers a bill sponsor's statements about legislative intent when interpreting statutes, *see, e.g.*, *Donovan v. Hastings*, 652 S.W.3d 1, 8 (Tenn. 2022); *Strode*, 232 S.W.3d at 13; *Perrusquia v. Bonner*, No. W2023-00293-COA-R3-CV, 2024 WL 1026395, at *10 (Tenn. Ct. App. Mar. 11, 2024). Thus, the first two standing criteria are satisfied here.

As to the credible threat of enforcement that the Plaintiffs face: "[B]ecause 'self-censorship' is 'a harm that can be realized even without an actual prosecution,' the rationale for pre-enforcement challenges applies with particular force to the First Amendment." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1023 (6th Cir. 2024). "Beyond chill, a variety of facts can demonstrate a credible threat of enforcement." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022). Sixth Circuit cases

> have highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?

*Id.* (citing *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016))). "This isn't a laundry list; [plaintiffs] don't have to satisfy all the factors." *Id.* at 307–08. The factors also **"are not exhaustive[.]"** *Online Merchants Guild*, 995 F.3d at 550 (emphasis added). And here, the recency of the Act, its criminal provisions, the Defendants' refusal to disavow enforcement, and its private civil enforcement mechanism tip the scale.

      1.      <u>**Recency of the Enactment:**</u> Standing is measured from the filing of a plaintiff's

---

[111] Doc. 22 at 11; *see also* Doc. 51 at ¶ 4.

complaint. *See Sumpter v. Wayne Cnty.*, 868 F.3d 473, 490 (6th Cir. 2017) ("standing applies at the sound of the starting gun, and mootness picks up the baton from there."). Here, this lawsuit was filed after Public Chapter No. 1032 was enacted but before it took effect. Thus, although the Defendants had not yet initiated a prosecution when the Plaintiffs filed their Complaint, that fact "carries little weight here" because the Defendants *could not* have prosecuted violations of Public Chapter No. 1032 before it took effect. *Cf. Online Merchants Guild*, 995 F.3d at 550 ("Although the record does not establish a particularly significant history of enforcement for the Commonwealth's price-gouging laws, this first factor carries little weight here. Because § 367.374 is enforceable only during a declared emergency, it makes sense that there would be at best limited evidence of a history of enforcement"); *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 849–50 (6th Cir. 2024) ("given the short duration of the ELCRA's application to sexual orientation and gender claims, 'it makes sense that there would be at best limited evidence of a history of enforcement' in those categories.") (quoting *Online Merchs.*, 995 F.3d at 550).

Instead, Public Chapter No. 1032's recency *favors* standing. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) ("The contemporaneity of those enactments reinforces the inference that the legislature intends to target plaintiffs."). That is because "the threat of prosecution is greater under a statute enacted relatively recently." *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006); *see also Minn. Democratic-Farmer-Lab. Party by Martin v. Simon*, 970 N.W.2d 689, 696 (Minn. Ct. App. 2022) ("When analyzing whether a 'credible threat of prosecution' exists, federal courts have considered the history of the statute's enforcement, as well as how recently it was enacted.") (collecting cases). The U.S. Supreme Court agrees. *See, e.g., Virginia*, 484 U.S. at 393 ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will

not be enforced, and we see no reason to assume otherwise."); *Doe v. Bolton*, 410 U.S. 179, 188–89 (1973) (emphasizing that "Georgia's statute, in contrast, is recent and not moribund.").

Put another way: "a court presumes that a legislature enacts a statute with the intent that it be enforced." *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021), *as amended* (June 23, 2021). And here, that presumption is supported (among other things) by the legislature's own fiscal note for Public Chapter No. 1032, which assumes that it will result in actual incarcerations resulting from annual prosecutions.[112]

Under these circumstances, federal courts should "assume a credible threat of prosecution in the absence of compelling contrary evidence." *See N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) ("When dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (same); *Bookfriends, Inc. v. Taft*, 223 F. Supp. 2d 932, 941 (S.D. Ohio 2002) (applying the First Circuit's approach that a credible threat of enforcement should be assumed in challenges to non-moribund statutes—which "the Fourth, Seventh and Eleventh Circuits have followed"—"[i]n the absence of Sixth Circuit authority to the contrary"); *accord Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) ("we believe *the statutory language of the Ordinance* evinces a credible threat of prosecution against Planned Parenthood. Accordingly, we find that Planned Parenthood meets the 'injury in fact' requirement of standing.") (emphasis added); *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 237–39 (3d Cir. 2010) (determining standing based on policies alone); *Ariz. Right to*

---

[112] Doc. 29-1.

*Life PAC v. Bayless*, 320 F.3d 1002, 1006–07 (9th Cir. 2003); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999); *Bryant*, 1 F.4th at 286 ("we cannot assume the State's acquiescence in violations of the law."); *Frogge v. Joseph*, No. M2020-01422-COA-R3-CV, 2022 WL 2197509, at *13 (Tenn. Ct. App. June 20, 2022) ("Aside from any history of *enforcement*, however, we conclude that the history and circumstances surrounding the very *adoption* of the Severance Agreement are relevant.").

In this case, there is no "compelling contrary evidence" that would justify dispensing with the assumed credible threat of prosecution that Section 39-15-220(a) poses. *See N.H. Right to Life Pol. Action Comm.*, 99 F.3d at 15. Instead, if anything, the history and circumstances surrounding the legislature's enactment of Public Chapter No. 1032 suggest an aggressive desire for prosecutions under Section 39-15-220(a).

The legislature's expectation that violations of Public Chapter No. 1032 will be prosecuted also is well founded. After all, as the Defendants have admitted, "[e]ach Defendant has criminal enforcement authority and an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto[,]'"[113] and any Defendant who "peremptorily and categorically refuses to prosecute all instances of a criminal offense" under Public Chapter No. 1032 is subject to being replaced with a prosecutor who will "prosecut[e] persons accused of committing that offense." *See* Tenn. Code Ann. § 8-7-106(a)(2). Thus, Section 39-15-220(a)'s recency supports the Plaintiffs' standing.

**2.** **Criminal Nature of the Threat:** "[T]he nature of the restrictions"—namely, whether a plaintiff "challenges criminal laws"—also affects the pre-enforcement standing inquiry.

---

[113] *Compare* Doc. 1 at ¶ 9, *with* Doc. 51 at ¶ 9 ("Defendants submit that Tenn. Code Ann. § 8-7-103(1) says what it says. The remaining allegations contained in Paragraph 9 are admitted.").

*Kareem*, 95 F.4th at 1025. The reason is that "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. Am. C.L. Union*, 521 U.S. 844, 872 (1997); *see also Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 745 (9th Cir. 2012) ("The threat to infringement of such First Amendment rights is at its greatest when, as here, the state employs its criminalizing powers."). Under such circumstances, the "danger of [a] statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393; *cf. Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965) ("We have fashioned this exception to the usual rules governing standing . . . because of the 'danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.'" (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963))).

For these reasons, a threat of enforcement carries more credence when, as here, a statute—especially a *vague* statute—carries criminal penalties. *See, e.g.*, *id.*; *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("[B]ecause most people are frightened of violating criminal statutes especially when the gains are slight, as they would be for people seeking only to make a political point and not themselves political operatives, there is standing."). As the Third Circuit explained recently:

> The attenuated risk of enforcement here matters less for Article III standing than many pre-enforcement cases because the Law is exclusively civil. In *Driehaus* and every pre-enforcement case that it recounted, the statutes at issue included criminal penalties. 573 U.S. at 158–60, 166, 134 S. Ct. 2334. Indeed, as we noted at the start, much of the point of pre-enforcement challenges is to let people vindicate their constitutional rights without having to risk prosecution. *See id.* at 161, 134 S. Ct. 2334. But civil penalties lower the temperature.

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 222–23 (3d Cir. 2023).

Thus, the fact that the Plaintiffs risk criminal prosecution under Section 39-15-220(a) supports their standing to challenge it. *See id.*; *see also Bryant*, 1 F.4th at 286 ("As we have

-22-

previously explained, '[p]ublic policy should encourage a person aggrieved by laws he [or she] considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his [or her] chances in the ensuing suit or prosecution.' . . . Establishing standing does not require that a litigant fly as a canary into a coal mine before she may enforce her rights.") (quoting *Mobil Oil Corp. v. Att'y Gen. of Commonwealth of Va.*, 940 F.2d 73, 75 (4th Cir. 1991), and citing 13B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3532.5 (3d ed. 1998) ("[C]itizens should be allowed to prefer official adjudication to private disobedience.")).

3. **Warnings:**  Plaintiff Behn has been warned that her exact speech violates the Section 39-15-220(a)'s recruitment prohibition.[114]  The Defendants' own briefing also warns alternatively that if the Plaintiffs' speech—including Ms. Behn's pure advocacy and Ms. Welty's provision of truthful information about abortion medication and legal options for safe abortion— "persuade[s] someone" to get a legal abortion out of state or "convinc[es]" a minor to do so, then the Plaintiffs may be subject to criminal prosecution that the Defendants perceive no constitutional problems initiating.  *See* Doc. 26 at 7, 15.  At any rate, "the Supreme Court and at least four other circuits have sustained pre-enforcement standing without a past enforcement action or an overt threat of prosecution directed at the plaintiff."  *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 140 (2d Cir. 2023) (per curiam)

4. **Private Enforcement Available:**  Section 39-15-220 is enforceable by private plaintiffs.  *See* Tenn. Code Ann. § 39-15-220(e)(1)–(4).  This feature of Section 39-15-220—which makes enforcement "easier or more likely"—supports standing.  *See Fischer*, 52 F.4th at 308 ("the

_____

[114] Doc. 1 at ¶¶ 39–42; Doc. 1-6 at 21:9–17; Doc. 39-1 at 49:20–51:8.

-23-

Code contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints.") (quoting *McKay*, 823 F.3d at 869); *see also Online Merchants Guild*, 995 F.3d at 551 ("As the Attorney General concedes, private plaintiffs may bring a damages action to remedy price-gouging violations, which increases the likelihood that Guild members will have to defend against price-gouging suits.").

Tennessee also authorizes both citizens' arrests, *see* § 40-7-109(a)(1); *State v. Smith*, 695 S.W.2d 954, 959 (Tenn. 1985), and citizen-initiated indictments by citizen complainants, *see* Tenn. R. Crim. P. 6 Adv. Comm. Cmt. (citing Tenn. Code Ann. §§ 40-12-104 – 107). Such citizen complainants may address Tennessee's citizen grand juries directly and are encouraged to do so. *See id.* This practice supports standing. *See Christian Healthcare Centers, Inc.*, 117 F.4th at 849 (standing supported where "citizen-initiated complaints are the method by which the [government's] investigations and enforcement proceedings are initiated in practice."); *see also id.* ("Statutes that allow 'any person' to 'file a complaint' make enforcement more likely because the law's **initiation** is not limited to 'a prosecutor or an agency.'") (emphasis added) (quoting *Driehaus*, 573 U.S. at 164, 134 S.Ct. 2334; *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014)).

"The allowance of complaints from members of the public creates a 'real risk of complaints from, for example, political opponents' with an intent to frustrate speech they oppose." *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 116 F.4th 586, 595 (6th Cir. 2024) (quoting *Driehaus*, 573 U.S. at 164) ("Because the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents."). "Such complaints could trigger burdensome investigations and administrative or criminal proceedings against [the Plaintiffs] in

-24-

the heat of an election cycle." *Id.*

Moreover, "'[A]dministrative action, **like arrest** or prosecution, may give rise to harm sufficient to justify pre-enforcement review.'" *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (emphasis added) (cleaned up). *Driehaus*, 573 U.S. at 165 ("arrest . . . may give rise to harm sufficient to justify pre-enforcement review."). Given the "acrimonious environment surrounding issues of abortion in Tennessee[,]" the fact that "Welty and Behn have every reason to believe that, when that enforcement comes, they will be targets[,]" and the fact that "any person—such as, for example, an activist or a disgruntled peer or family member—could initiate grand jury proceedings for alleged 'recruitment' under Chapter 1032[,]" *Welty*, 2024 WL 4712759, at *11–12, this also is not a situation where the risk of being subjected to a baseless enforcement action is "too remote to confer standing." *White v. United States*, 601 F.3d 545, 554 (6th Cir. 2010); *see also Fischer*, 52 F.4th at 308–09 (a plaintiff's standing is supported where "'political opponents' [have] incentives to file 'frivolous complaints'"). Thus, this factor, too, supports the Plaintiffs' standing.

**5.    Defendants' Refusal to Disavow Enforcement:**   The Defendants refused to disavow enforcement pre-suit.[115]   Afterward, the Defendants continued to refuse to disavow enforcement in any "formal" way even after this Court specifically invited them to do so.[116]  *Cf. Wollschlaeger v. Governor*, 848 F.3d 1293, 1306 (11th Cir. 2017) (government's equivocation about law's application supported standing where government refused to "engage[] in any formal (i.e., binding)" interpretive commitment).  And far from providing "clear assurances that they will not prosecute" violations of section 39-15-220(a), *see Universal Life Church*, 35 F.4th at 1035, the Defendants maintain that such prosecutions would "pose[] no constitutional problem."[117]

---

[115] *See* Doc. 1 at ¶¶ 30–31.
[116] Doc. 55-3.
[117] Doc. 26 at 2, 3.

The Defendants also have both the authority and an admitted "affirmative statutory obligation" to prosecute violations of Section 39-15-220(a).[118]  Combining those facts with the Defendants' claims to this Court that—if the Plaintiffs' speech "persuade[s] someone" to get a legal abortion out of state or "convince[es]" a minor to do so, then the Plaintiffs are properly subject to prosecution, Doc. 26 at 7, 15—the Defendants have refused to disavow enforcement against the Plaintiffs' specific speech during this litigation, too.  The Defendants' obligation to prosecute and their undisputed history of prosecuting violations of the criminal law in general matters for standing purposes as well.  *See Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023) (standing supported where a wine merchant showed that "Ohio *does prosecute* violations of" the law generally, even if not against wine specifically); *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019) (student group had standing, despite failure to identify a prior prosecution against the student's exact speech, because there were "sixteen disciplinary cases" under the university's policy generally for conduct unrelated to protected speech).

At any rate, where—as here—a challenged statute applies to a plaintiff, a defendant's post-filing litigation position carries little weight.  *See, e.g., Planned Parenthood Ass'n of Cincinnati, Inc.*, 822 F.2d at 1395 ("We disagree with the City's analysis. The permit application form, and its exclusionary provision, was drafted only after Planned Parenthood initiated the instant suit, and it did not alter the actual terms of the Ordinance. Thus, the express statutory language of the Ordinance, which clearly renders the Ordinance applicable to a clinic such as that operated by Planned Parenthood, still could provide a basis for prosecution of Planned Parenthood."); *see also Cruz*, 596 U.S. at 299–300 (finding standing while noting that "[t]hese arguments have an Alice in Wonderland air about them, with the Government arguing that appellees would not violate the

---

[118] Doc. 1 at ¶ 9; Doc. 51 at ¶ 9.

statute by repaying Cruz, and the appellees arguing that they would."); *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710–11 (4th Cir. 1999) ("The State's litigation position—that it does not interpret section 163–278.6(14) to encompass issue advocacy—fails to alter our analysis in this case. . . . NCRL is left, therefore, with nothing more than the State's promise that NCRL's officers will face no criminal penalties if NCRL distributes its voter guide without registering as a political committee. NCRL's First Amendment rights would exist only at the sufferance of the State Board of Elections. It has no guarantee that the Board might not tomorrow bring its interpretation more in line with the provision's plain language.").

*    *    *

For all of these reasons, the Plaintiffs have standing to prosecute their challenge under the non-exhaustive *McKay* factors, and that showing is equally dispositive of the Defendants' sovereign immunity defense, *see Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("It would be a perverse reading of *Young* to say that, although Russell might have an Article III injury before the Attorney General directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar us from enjoining the Attorney General's initiating a prosecution."). But it also is important to note that *McKay*'s considerations should not even matter here. *Id.* That is because the Plaintiffs are the object of the statute they challenge, which interferes, at minimum, with Ms. Welty's ability to practice law and "directly affects her day-to-day operations."[119] *Cf. Whole Woman's Health v. Jackson*, 595 U.S. 30, 47 (2021) (standing supported when plaintiffs "plausibly alleged" that a challenged law had "a direct effect on [abortion providers'] day-to-day operations"); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (standing supported when law "directly operate[d]" against abortion providers).

---

[119] Doc. 1 at ¶ 24.

This theory of standing is well established. When a litigant "is himself an object of" challenged action, the Supreme Court has held that "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). The Sixth Circuit recognizes this rule. *See Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 67 F.4th 773, 783–84 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2628 (2024) ("When the party is 'an object of the action ... at issue ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'") (quoting *Lujan*, 504 U.S. at 561–62). Other circuits do, too. *See, e.g., Contender Farms, L.L.P., v. United States Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) ("[A] basic question …underlies all three elements of standing—'whether the plaintiff is himself an object' of the challenged regulation.") (quoting *Lujan*, 504 U.S. at 561); *Sierra Club v. E.P.A.*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) (when a plaintiff is the object of challenged action, "standing to seek review . . . is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it.").

With these considerations in mind, there is "no question" that litigants have standing to challenge a legal restriction that "is directed at them in particular[,]" especially when—as here— "they are quite clearly exposed to the imposition of strong sanctions" if they do not comply. *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967); *see also West Virginia v. EPA*, 597 U.S. 697, 719 (2022) ("there can be 'little question' that the rule does injure the States, since they are 'the object of' its requirement that they more stringently regulate power plant emissions within their borders.") (quoting *Lujan*, 504 U.S. at 561-62). As one former Justice explained it:

> [W]hen an individual who is the very *object* of a law's requirement or prohibition seeks to challenge it, he always has standing. That is the classic case of the law bearing down upon the individual himself, and the court will not pause to inquire whether the grievance is a "generalized" one.

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 894 (1983).

Thus, the Plaintiffs have standing to challenge § 39-15-220(a)'s "recruit[ment]" provision.

**B.**      **TENNESSEE CODE ANNOTATED § 39-15-220(a)'S "RECRUIT[MENT]" PROHIBITION IS UNCONSTITUTIONAL.**

Section 39-15-220(a) restricts protected speech. The Defendants also cannot meet their heavy burden of establishing its constitutionality. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *United States v. Alvarez*, 567 U.S. 709, 726 (2012) (noting "the Government's heavy burden when it seeks to regulate protected speech."). Thus, this Court should permanently enjoin the Defendants from enforcing Section 39-15-220(a).

     **1.**      <u>**Section 39-15-220(a) is unconstitutionally vague.**</u>

"The void-for-vagueness doctrine requires that [a] statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Kerns*, 9 F.4th 342, 351 (6th Cir. 2021) (quoting *United States v. Farah*, 766 F.3d 599, 614 (6th Cir. 2014)) (alteration in original). "To withstand a facial challenge [that a statute is unconstitutionally vague], an enactment must define the proscribed behavior with sufficient particularity to provide a person of ordinary intelligence with reasonable notice of prohibited conduct and to encourage non-arbitrary enforcement of the provision." *Am. Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010) (quoting *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999)) (alterations in original).

When—as here—"a statute 'interferes with the right of free speech . . . , a more stringent

-29-

vagueness test should apply.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). The standard of certainty is also higher still when, as here, a speaker risks *criminal* punishment. *Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. The crime 'must be defined with appropriate definiteness.'") (cleaned up); *see also Maldonado v. Morales*, 556 F.3d 1037, 1045 (9th Cir. 2009); *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) ("[W]here criminal sanctions are involved and/or the law implicates First Amendment rights such as here, a 'more demanding' standard of scrutiny applies.").

The Plaintiffs have contested § 39-15-220(a)'s vagueness, asserting that: (1) the statute's failure to define the term "recruits," (2) that term's unclarified meaning, and (3) its susceptibility to arbitrary enforcement contravene the Fourteenth Amendment's prohibition against vague laws. Doc. 1 at ¶¶ 47–57. In response, the Defendants have insisted that none of that matters.

Beginning with Section 39-15-220(a)'s failure to define the term "recruits," the Defendants acknowledge that failure. *See* Doc. 26 (conceding "[t]he fact that the law does not define 'recruits'"); *see also* Doc. 51 at ¶ 50 ("Defendants admit that Public Chapter No. 1032 does not contain a definition of the word 'recruits' and that the term 'recruits' is susceptible to various possible meanings in the abstract"). The Defendants also conceded earlier in this litigation that the term "recruits" is "susceptibl[e] to a wide array of possible meanings[.]" Doc. 22 at 11.

The undefined nature of a *criminal* prohibition that is "susceptibil[e] to a wide array of possible meanings" notwithstanding, *id.*, the Defendants insist that the defect "can be rejected out of hand" because the term "shall be" given its "'natural and ordinary meaning'" under state law. *See* Doc. 26 at 6 (citing Tenn. Code Ann. § 1-3-105(b) ("[U]ndefined words shall be given their

-30-

natural and ordinary meaning, without forced or subtle construction that would limit or extend the meaning of the language, except when a contrary intention is clearly manifest.")).   The problem, though, which the Defendants have conceded, is that the natural and ordinary meaning of the term "recruits" is susceptible to a "wide array" of potential definitions, Doc. 22 at 11, any of which would criminalize some pure speech—including, for instance, mere encouragement, or persuasion, or even just "put[ting] out the word" that an option is available.[120]  *Cf.* Doc. 39-1 at 35:2–4 (Q. "Do you put the word out that you do this work?"  A. "Yes.").

Thus, it is impossible to determine "with sufficient definiteness" the meaning of the word "recruits" simply by reading the statute and consulting a dictionary.  *Am. Booksellers*, 601 F.3d at

---

[120] *See, e.g.*, Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) ("[T]he plain meaning of 'recruit' . . . is synonymous with 'induce or encourage . . . .'"); Doc. 19-1, *United States v. Withers*, No. 3:16-cr-00005-wmc, Doc. 126-2, at 12 (W.D. Wis. Apr. 28, 2017) ("***To recruit means to persuade someone to join in or to help with some activity.***"); *In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005) ("The dictionary definition of 'recruit' means 'to secure the services of . . . [or to] enlist new members.' As such, the construction of 'recruit' most likely correct under Colorado law requires a direct request or plea.") (internal citation omitted); *Sandoval v. Rizzuti Farms, Ltd.*, 656 F. Supp. 2d 1265, 1277 (E.D. Wash. 2009) ("[I]ndirect recruitment includes situations where the farm 'puts out the word' that work is available and workers respond by showing up at a farm to work"); *Contreras v. Mt. Adams Orchard Corp.*, 744 F. Supp. 1007, 1007 (E.D. Wash. 1990) ("[T]he term 'recruit' . . . shall be interpreted as meaning 'to hire or otherwise obtain or secure the services of,' and shall include all pre-employment discussions that relate to a worker's employment."); *Escobar v. Baker*, 814 F. Supp. 1491, 1503 (W.D. Wash. 1993) ("'[R]ecruitment' includes 'indirect recruitment.'"); *id.* at 1504 ("'Recruiting' encompasses not only direct contacts with prospective workers but also indirect efforts to attract or solicit workers for agricultural employment."); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001), ("'Recruit' means to 'hire or otherwise obtain to provide services . . . secure the services of.'" (quoting Webster's Third New International Dictionary 1899 (1986))), *abrogated on other grounds by Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116 (Colo. 2007); *State v. Cartee*, 577 N.W.2d 649, 652 (Iowa 1998) ("The court instructed the jury that 'recruit' means 'to seek out a person to perform a specific task or service.'" (quoting Webster's Ninth New Collegiate Dictionary 985 (1986) ("recruit" defined as "to secure the services of: ENGAGE, HIRE"))); *Commonwealth v. Dabney*, 90 N.E.3d 750, 764 (Mass. 2018) ("[T]o 'recruit' means to 'hire or otherwise obtain to perform services,' to 'secure the services of' another, to 'muster,' 'raise,' or 'enlist.'  Such recruitment does not require force or coercion.") (internal citation omitted); *State v. Gregg*, 834 N.W.2d 871 (Iowa Ct. App. 2013) ("The district court instructed the jury that 'recruit' means 'to seek out a person to perform a specific task or service.'")

627. The Defendants do not contest that fact, either. Doc. 26 at 7 (suggesting that the Court should apply the *noscitur a sociis* canon because the term at issue is "'capable of many meanings'").

Given the uncertainty involved, Plaintiff Welty asked the Defendants to clarify pre-suit the meaning of the word "recruits," as used in Section 39-15-220(a). In response, the Defendants declined to do so. The Defendants admit that, too. *See* Doc. 1 at ¶ 28 ("None of the Defendants responded."); Doc. 51 at ¶ 28 ("Admitted."). Indeed, they claim that even their own beliefs about Section 39-15-220(a)'s meaning—or the bill sponsor's beliefs—are irrelevant. *See id.* (arguing that "what an individual district attorney—or even an individual legislator—believes it to mean" does not matter).

This underscores the problem, though. During this litigation, the Defendants have proposed various definitions of the term "recruits." The definitions they propose *conflict with their own speech-based examples*, however, *see infra* at 33, and they also conflict with how the bill's sponsor defined the same term while enacting § 39-15-220(a) into law. The Defendants also assert, simultaneously, that what any of them believes the term means does not matter. Doc. 26 at 6.

This leaves speakers in a quandary. To understand the meaning of "recruits," speakers cannot just consult the statute itself, which does not define the term. *See* § 39-15-220(a). Because the term "recruits" is susceptible to a wide range of normal, ordinary definitions, *see* Doc. 22 at 11, standard interpretive sources do not clarify the problem with "appropriate definiteness," either. Speakers also apparently cannot look to the bill's legislative history for guidance, because according to the prosecutors who are tasked with prosecuting violations of the law, what the bill's sponsor "believes" the term "recruits" means does not matter. Doc. 26 at 6. Nor can a speaker rely on the Defendants to clarify the unresolved ambiguity, both because they refused to do so, *see supra*, at 6–7, and because they have taken the position that "what an individual district attorney"

-32-

thinks the term "recruits" means is irrelevant, *see* Doc. 26 at 6.

The Defendants' own attempts to clarify the meaning of the term "recruits" for the purpose of this litigation compound the problem. Four times now, the Defendants have presented examples of recruitment that restrict pure speech. *See id.* (arguing that "recruit means to persuade"); *id.* at 11 ("convinc[ing]" a minor to get an abortion out of state is recruitment); *id.* at 14 (same); Doc. 22 at 16 ("reaching out to and convincing a minor" to get an abortion out of state is recruitment). The Defendants also have maintained that "any speech the Act does cover can be constitutionally prohibited." Doc. 26 at 11. At the same time, though, the Defendants assert that the Act "targets *conduct*—not speech[,]" *id.* at 3, and that it should only "be understood to target conduct[,]" *see id.* at 7—a conclusion incompatible with their own proposed examples.

In summary: No reasonable person can determine with necessary specificity what "recruits" means as used in section 39-15-220(a). The Defendants do not know themselves, and they cannot settle on a coherent definition even in heavily lawyered briefing designed to address a vagueness challenge. Section 39-15-220(a) is unconstitutionally vague as a result. *See Welty*, 2024 WL 4712759, at *2 ("When exactly a communication regarding how to obtain a legal abortion would fall within the scope of the recruitment provision is a matter of debate, and the provision itself provides little guidance. No one associated with Chapter 1032 seems to have a particularly clear picture of what the provision is supposed to prohibit—not the prosecutors who will be called on to enforce it; not the state attorneys called on to defend the statute in court; and, it seems, not even the individuals who drafted the provision itself, who appear to have simply pulled the recruitment-focused language from other, preexisting statutes in which that language makes more sense."); *see also Matsumoto v. Labrador*, 701 F. Supp. 3d 1032, 1065–66 (D. Idaho 2023) ("Idaho Code Section 18-623 fails to provide fair notice or ascertainable standard of what

-33-

is and what is not abortion trafficking. The terms 'recruiting, harboring, or transporting' are undefined, overbroad, and vague, making it impossible for a reasonable person to distinguish between permissible and impermissible activities. . . . Most notably, as relevant to Plaintiff's intended activities, there is no definition for what constitutes 'recruiting.'").

The Defendants' various other arguments do not help them, either. For instance, they insist that a scienter requirement that prohibits only *intentionally* doing something that no reasonable person can discern avoids vagueness problems. *See* Doc. 26 at 9. But a scienter requirement does nothing to clarify *what* the proscribed conduct is, and a speaker's mistake about what section 39-15-220(a) proscribes is no defense to prosecution. *See State v. Jones*, No. W2009-01478-CCA-R3-CD, 2010 WL 1687785, at *5 (Tenn. Crim. App. Apr. 27, 2010) ("mistake of law is no defense to criminal prosecution"). Unlike mere civil penalties, the consequence of the uncertainty also is severe and all but controls the outcome of the Plaintiffs' vagueness claim. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99 ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); Doc. 26 at 9–10 (citing *Vill. of Hoffman Ests.*, 455 U.S. at 497, 499).

The Defendants' insistence that they can clarify Section 39-15-220(a)'s unconstitutional vagueness through their attempt at statutory construction is unpersuasive, too. They have asserted that the Plaintiffs have attempted "to pluck the word 'recruits' from its context and analyz[e] it in a vacuum," which the Defendants maintain is "not how statutory interpretation works." Doc. 26 at 7. Instead, the Defendants insist that "[t]he key verbs accompanying 'recruits' in the Act— 'harbors' and 'transports'—plainly refer to conduct, not speech[,]" and as a result, the term "recruits" "should be understood to target conduct" alone. *Id.* at 7–8.

This analysis is reductive to an extreme. To be sure, the *noscitur a sociis* canon is useful

in illuminating a statutory term "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *United States v. Buluc*, 930 F.3d 383, 390 (5th Cir. 2019) (cleaned up). But it "is no help absent some sort of gathering with a common feature to extrapolate." *See S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 379–80 (2006); *cf. United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 432 (6th Cir. 2021) ("[H]alf of the terms on the list can refer to former employees, thereby reducing the value of the noscitur a sociis canon in this case."); *Soc'y Ins. v. Cermak Produce No. 11, Inc.*, 684 F. Supp. 3d 739, 752 (N.D. Ill. 2023) ("[T]he *noscitur a sociis* doctrine is equally unhelpful in resolving the Employment Exclusion's ambiguity because there is no consistency among the employment practices listed that the court can use to narrow the scope of the catch-all provision.").

Put another way: "For the associated-words canon to apply, the terms must be conjoined in such a way as to indicate that they have some quality in common[.]" *Buluc*, 930 F.3d at 391 (quoting ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 196 (2012)). "That principle defeats application of the canon here," *id.*, because the term "recruits"—which the Act criminalizes separately from the terms "harbors" or "transports"—has nothing in common with the terms "harbors" or "transports[,]" which have little in common, either. Indeed, the Defendants do not even suggest such a commonality, other than noting that "harbors" and "transports" refer generally to an action. The takeaway? Applying the *noscitur a sociis* canon to the dissimilar terms here—all of which are criminalized independently—"would unjustifiably 'rob' [the term 'recruits'] 'of its independent and ordinary significance.'" *Id.* (citing *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288, (2010)).

The Defendants' nod to other criminal statutes that use the term "recruits" also supports *the Plaintiffs'* reading, rather than the Defendants'. Take Tennessee's human trafficking statute,

for instance, which provides that: "A person commits the offense of trafficking persons for forced labor or services who knowingly: (1) Recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport, provide, or obtain by any means, another person, intending or knowing that the person will be subjected to involuntary servitude[.]" Tenn. Code Ann. § 39-13-308(a). The reason the term "recruits"—as used in Tennessee's human trafficking statute—poses no constitutional problem is not because it does not encompass speech. Plainly, it *does* encompass speech, because both the natural and ordinary meaning of the term and the context in which it is used indicate as much. Instead, the issue is that speech that is intended to subject a person "to involuntary servitude" *is not constitutionally protected*, given that slavery is unlawful and "[s]peech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *United States v. Hansen*, 599 U.S. 762, 783 (2023); *cf.* Tenn. Code Ann. § 39-13-309(b) (listing examples of unlawful acts that constitute "means" of sex-trafficking).

Section 39-15-220(a)'s recruitment provision falls into a different category entirely. It, too, prohibits "recruit[ment]." Doc. 1-1 at 1. But it prohibits recruitment intended to bring about *lawful* conduct. *See* Doc. 1 at ¶¶ 61–62. Thus, unlike Tennessee's human-trafficking and sex-trafficking statutes, "Public Chapter No. 1032's 'recruit[ment]' prohibition is not limited to speech that is integral to, or that is intended to bring about, unlawful conduct." *Id.* at ¶ 62. Further, these "unconstitutional applications of Public Chapter No. 1032's 'recruit[ment]' provision are the heart of the law[,]" "intended by" it, and "integral to" it. *Id.* at ¶¶ 80, 82.

For these reasons, the Defendants' insistence that rejecting their proposed interpretation "would call into question the validity of dozens of state and federal trafficking statutes—and the criminal convictions attendant to each of them"—is nonsense. Doc. 26 at 9. Indeed, *the opposite* is true. Persons who have been convicted of "recruit[ing]" victims of human trafficking and sex

trafficking should remain convicted even if their recruitment was strictly speech-based. Under the Defendants' proposed view, though, pure speech *would not be within the scope of* state and federal trafficking statutes that criminalize recruitment, because (the Defendants claim) the term "recruits" refers only to conduct. *Id.* at 3; *see also id.* at 11 (asserting that "principles of statutory interpretation mandate that the law's reference to 'recruit[ment]' be read to require *more than* 'pure speech.'") (emphasis added). Thus, if this Court is concerned about preserving the integrity of criminal convictions under state and federal trafficking statutes, then it should reject Defendants' position that the meaning of the word "recruits" solely "targets *conduct*—not speech[.]" *Id.* at 3.

2. **Section 39-15-220(a)'s recruitment provision criminalizes pure speech, and it is presumptively unconstitutional.**

The Defendants next insist that "the Act does not burden constitutionally protected speech" because "well-settled and 'commonsense' principles of statutory interpretation mandate that the law's reference to 'recruit[ment]' be read to require more than 'pure speech.'" *Id.* at 11. As noted, though, the Defendants' attempts at statutory interpretation are clumsy, and accepting their view would undermine a host of trafficking-related criminal convictions to boot.

Competent statutory interpretation also yields a clear conclusion: The term "recruits," as used in Section 39-15-220(a), restricts some amount of pure speech. Because Section 39-15-220(a) does not define the term "recruits," Tennessee Code Annotated § 1-3-105(b) provides the starting point. *Id.* ("[U]ndefined words shall be given their natural and ordinary meaning, without forced or subtle construction that would limit or extend the meaning of the language, except when a contrary intention is clearly manifest."). Some definitions can also be rejected out-of-hand here, because they don't make sense in context. For example, while the definition "to fill up the number of with new members" is natural and ordinary when the term "recruitment" is used in connection with a membership-based organization—for instance, the army, or a "street gang," *see* Doc. 26 at

-37-

9, n.2—it makes little sense when used in the context of *obtaining a medical procedure*. Thus, context precludes that definition here, even though it is a common one. *See Waldschmidt v. Reassure Am. Life Ins. Co*., 271 S.W.3d 173, 177 n.2 (Tenn. 2008) ("While consulting a dictionary may help identify the possible meanings of a word or phrase, the search for the General Assembly's purpose calls for an appropriate consideration of the statutory context in which the words are used, the underlying facts, the legislative history, and prior judicial decisions.").

When used in connection with an *activity*, the natural and ordinary meaning of the term "recruits" encompasses pure speech—including mere encouragement, persuasion, and "put[ting] out the word" that an option is available, and including "indirectly." *See, e.g.*, Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) ("[T]he plain meaning of 'recruit' . . . is synonymous with 'induce or encourage . . . .'"); *United States v. Withers*, No. 3:16-cr-00005-wmc, at 12 (W.D. Wis. Apr. 28, 2017) ("***To recruit means to persuade someone to join in or to help with some activity*.**") (emphasis in original); *Escobar v. Baker*, 814 F. Supp. 1491, 1503–04 (W.D. Wash. 1993) ("'[R]ecruitment' includes 'indirect recruitment.' . . . . 'Recruiting' encompasses not only direct contacts with prospective workers but also indirect efforts to attract or solicit workers for agricultural employment."); *Sandoval v. Rizzuti Farms, Ltd*., 656 F. Supp. 2d 1265, 1277 (E.D. Wash. 2009) ("[I]ndirect recruitment includes situations where the farm 'puts out the word' that work is available and workers respond by showing up at a farm to work"). As noted above, the Defendants' own examples also reflect agreement on this point. *See* Doc. 26 at 6 (arguing that "recruit means to persuade"); *id.* at 11 ("convinc[ing]" a minor to get an abortion out of state is recruitment); *id.* at 14 (same); Doc. 22 at 16 ("reaching out to and convincing a minor" to get an abortion out of state is recruitment).

The rest of section 39-15-220(a) confirms this reading. *Cf. Lind v. Beaman Dodge, Inc.*,

-38-

356 S.W.3d 889, 897 (Tenn. 2011) ("In interpreting statutes, . . . we are required to construe them as a whole, read them in conjunction with their surrounding parts, and view them consistently with the legislative purpose." (quoting *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995))). Section 39-15-220(f)(1) **expressly exempts from the statute's liability two examples of pure speech**: (1) "the provision of a medical diagnosis[,]" and (2) "consultation regarding pregnancy care of an unemancipated minor." *See id.* ("This section does not apply to the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor."). Under the Defendants' proposed "conduct-only" reading of the term "recruits," though, these examples *already* were exempt from liability under section 39-15-220(a). Thus, the Defendants' proposed reading "would violate the rule against surplusage[,]" *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 248 n.7 (Tenn. 2009), given that it treats an entire subsection as purposeless, *but see State v. Strode*, 232 S.W.3d 1, 11–12 (Tenn. 2007) ("This Court presumes that the General Assembly used each word in a statute deliberately, and that the use of each word conveys a specific purpose and meaning. . . . Accordingly, we 'must give effect to every word, phrase, clause, and sentence in constructing a statute.'") (internal citation omitted). By contrast, the Plaintiffs' speech-inclusive reading of section 39-15-220 properly gives section 39-15-220(f)(1) its intended meaning and effect as specific speech-based *exceptions* to Section 39-15-220(a)'s broader speech restriction.

If there were still doubt about whether 39-15-220(a) restricts pure speech, though, then the legislative history settles it. *See Beckham v. City of Waynesboro*, No. M2023-00654-COA-R3-CV, 2024 WL 2153536, at *5 (Tenn. Ct. App. May 14, 2024) ("[W]hen a statute is ambiguous, a court may reference . . . the history of the legislation . . . to determine the statute's meaning. . . . Generally, a statute is ambiguous when the parties derive different, reasonable interpretations from the statutory language.") (cleaned up). Here, the legislative history is clear: Section 39-15-220(a)'s

"recruitment" provision not only prohibits pure speech; it prohibits Plaintiff Behn's specific speech. *See* Doc. 1 at ¶ 40 (quoting Doc. 1-6 at 21:9–17).

Once more, the Defendants' proposed conduct-only interpretation of Section 39-15-220(a) requires this Court to disregard this crystal-clear indication of contrary legislative intent. That is why the Defendants insist that what "an individual legislator"—in this case, the bill's own sponsor—"believes [recruitment] to mean" does not matter. *See* Doc. 26 at 6. But "[w]hen the statutory language is ambiguous, the legislative history often offers guidance in discerning the General Assembly's purpose and intent[,]" *Powers v. State*, 343 S.W.3d 36, 50 (Tenn. 2011), and Tennessee law routinely considers a bill sponsor's statements about legislative intent when interpreting statutes. *See, e.g.*, *Donovan*, 652 S.W.3d at 8; *Strode*, 232 S.W.3d at 13; *Perrusquia*, 2024 WL 1026395, at *10. Thus, the House sponsor's position that Section 39-15-220(a) criminalizes pure speech—and Plaintiff Behn's speech, specifically—matters here.

In summary: Section 39-15-220(a) criminalizes some amount of pure speech. Moreover, it does so based on both "its communicative content[,]" *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)—namely, speech about abortion—and based on the specific viewpoint that a speaker expresses. *But see Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") (collecting cases); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination is "an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). As the Plaintiffs have noted:

> Whatever "recruit" means, as used in Public Chapter No. 1032, the law does *not* criminalize recruiting unemancipated minors for the purpose of *forgoing* legal

-40-

abortion care. But it *does* criminalize recruiting unemancipated minors for the purpose of *procuring* legal abortion care. Thus, Public Chapter No. 1032 targets speech based not only on the subject matter involved, but also based on the viewpoint a speaker expresses.

Doc. 19 at 14–15.

It is exactly these content- and viewpoint-based defects that force Ms. Welty to treat her minor clients differently depending on whether they are seeking help obtaining abortion care or other types of medical care.[121] Content- and viewpoint-based speech restrictions also are *presumptively* unconstitutional and trigger strict scrutiny, so the burden of proving section 39-15-220(a)'s constitutionality rests with the Defendants. *See Reed*, 576 U.S. at 163;

Section 39-15-220(a) cannot survive strict scrutiny. To begin, to the extent that the Government asserts some compelling interest in limiting speech that is integral to, or that is intended to bring about, unlawful conduct, Public Chapter No. 1032's "recruit[ment]" prohibition is not limited to such speech. Instead, by applying to "recruit[ment]" for the purpose of: (1) procuring an abortion "regardless of where [an] abortion is to be procured" (including in jurisdictions where abortion care is legal) and (2) "regardless of where [an] abortion-inducing drug is obtained" (including legally), *see* Doc. 1-1 at 1, Section 39-15-220(a)'s "recruit[ment]" prohibition criminalizes—and it is intended to criminalize—speech about *legal* abortion care. Under these circumstances, Section 39-15-220(a)'s "recruit[ment]" prohibition is fatally overinclusive, criminalizing far more speech than is necessary to further any compelling governmental interest in proscribing speech "that is integral to, or that is intended to bring about, unlawful conduct." *Hansen*, 599 U.S. at 783. Tennessee has no lawful interest—much less a compelling one—in criminalizing speech about legal abortion care based on a speaker's viewpoint,

---

[121] Doc. 39-1 at 11:22–12:2.

either.  *See Welty*, 2024 WL 4712759, at *17 ("even if one accepts every one of the above-described arguments by the defendants, it would, at most, justify a law forbidding an adult from encouraging *or discouraging* a minor from obtaining an abortion. The decision only to outlaw speech advocating for one of two controversial positions is a transparent, and wholly unjustified, form of viewpoint discrimination."); *cf. Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 436 (3d Cir. 2019) ("[V]iewpoint discrimination is impermissible in any forum." (citing *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 10 (2018); *Matal v. Tam*, 582 U.S. 218, 243–44 (2017); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111–12 (2001); *Rosenberger*, 515 U.S. at 829)).

At the same time, Section 39-15-220(a)'s "recruit[ment]" prohibition is fatally *underinclusive*.  For instance, assuming for the sake of argument that the Government has some compelling interest in promoting parental rights and prohibiting recruitment of minors generally, that interest cannot plausibly be limited to the subject of abortion alone.  Further, whatever the State's asserted interest here, Public Chapter No. 1032 gives waivers to some speakers (including any non-adult) while denying them to others.  *See* Doc. 1-1 at 1 (reflecting that the proscription applies only to "[a]n adult" and provides waivers for "[t]he parents or legal guardian of the unemancipated minor," "[a] person who has obtained the written, notarized consent of the unemancipated minor's parent or legal guardian," "[a] common carrier transporting passengers in the course and scope of their business[,]" and "[a]n ambulance driver or operator and any corresponding emergency medical services personnel, as defined in § 68-140-302, acting within the course and scope of their duties.").  Such speaker-based discrimination is "of course" unconstitutional.  *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of

-42-

course be unconstitutional[.]"); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 194 (1999) ("[D]ecisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment."). Thus, whatever the State's asserted interest in the provision, Section 39-15-220(a)'s recruitment prohibition is fatally underinclusive as well.

The Defendants alternatively suggest that section 39-15-220(a) criminalizes only *un*protected speech; specifically: "'[o]ffers to engage in illegal transactions [that] are categorically excluded from First Amendment protection.'" Doc. 26 at 11–12. In doing so, though, they claim inaccurately that Section 39-15-220(a) only "prohibits recruiting an unemancipated minor 'for the purpose of' procuring an abortion that is illegal in Tennessee without parental consent." *Id.* at 16. In reality, however, the provision applies to recruitment "regardless of where the abortion is to be procured" and "regardless of where the abortion-inducing drug is obtained[.]" Doc. 1-1 at 1. The Plaintiffs also note that even if the Defendants were correct that section 39-15-220(a) exclusively criminalizes speech intended to bring about unlawful conduct (they are not), Section 39-15-220(a) *still* could not survive strict scrutiny under the theory that it promotes "the 'fundamental right of parents to make decisions regarding the care, custody, and control of their children[,]'" *see* Doc. 26 at 2, because Section 39-15-220(a) engages in second-tier content discrimination by proscribing only speech interfering with the fundamental rights of parents *that supports abortion*. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–84 (1992) (constitutionally proscribable content limitations may not "be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government.").

Alternatively, the Defendants suggest that Section 39-15-220(a) violations "can be

-43-

prosecuted here even if the abortion itself" *is legal* and "takes place elsewhere." Doc. 26 at 12.

No authority supports that extraordinary proposition, though, which the Supreme Court has rejected in almost exactly this context. *Bigelow v. Virginia*, 421 U.S. 809, 822–24 (1975) ("[T]he placement services advertised in appellant's newspaper were legally provided in New York at that time. The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State. Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded, prosecute them for going there."); *id.* at 827–28 ("Here, Virginia is really asserting an interest in regulating what Virginians may hear or read about the New York services. It is, in effect, advancing an interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers *do not reach*.") (emphasis added). It also is "not especially difficult" to understand why the Defendants are wrong. *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 346 (2022) (Kavanaugh, J., concurring) ("[S]ome of the other abortion-related legal questions raised by today's decision are not especially difficult as a constitutional matter. For example, may a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel.").

Apart from the fact that Tennessee lacks any authority to impose (or any compelling interest in imposing) its abortion policy extraterritorially to other states, Tennessee's abortion policy is not even the central issue here. The issue, instead, is that Section 39-15-220(a) *criminalizes speech*. And while "[s]peech intended to bring about a particular unlawful act . . . is unprotected[,]" *Hansen*, 599 U.S. at 783, speech intended to bring about a *lawful* act is not.

That distinction controls here. *Dobbs* "returned" the issue of abortion regulation to the States and "their elected representatives." *Dobbs*, 597 U.S. at 292; *see also id.* at 338 (Kavanaugh,

-44-

J., concurring) ("The Constitution is neutral and leaves the issue for the people and their elected representatives to resolve through the democratic process in the States or Congress[.]").  That means that—while Tennessee may criminalize abortion—other states may permit it, and many of them have done so.  Accordingly, abortion in a host of other sovereign states is a lawful act.  Tennessee thus has no authority to criminalize speech intended to bring it about, because obtaining an abortion in states that permit abortion is not "unlawful[,]" *Hansen*, 599 U.S. at 783, and there is no comparable First Amendment exception for speech that the State of Tennessee dislikes.  The Supreme Court's holding in *Bigelow* thus controls the matter.  *See Bigelow*, 421 U.S. at 811−29 (holding that Virginia's conviction of speaker for providing information about legal abortion services available in New York contravened the First Amendment notwithstanding Virginia law criminalizing "encourag[ing] or prompt[ing] the procuring of abortion").

### 3. <u>Section 39-15-220(a)'s recruitment provision is unconstitutionally overbroad.</u>

There are a "few historic and traditional categories" of speech that the government may lawfully proscribe based on their content.  *United States v. Alvarez*, 567 U.S. 709 (2012) (cleaned up).  Speech disfavored by the State of Tennessee that is intended to bring about a lawful act is not among them.  *See id.*  Instead, that exception is limited narrowly to "[s]peech intended to bring about a particular *unlawful* act . . . ."  *Hansen*, 599 U.S. at 783 (emphasis added).

With the above context in mind, Section 39-15-220(a)'s recruitment provision is unconstitutional as applied to all speech about legal out-of-state abortion care and legal medication abortion.  *Matsumoto*, 2023 WL 7388852, at *8 ("Plaintiffs' activities aimed at providing information, support, and assistance about reproductive health options, including legal abortion services, to pregnant individuals constitute protected speech." (citing *Bigelow*, 421 U.S. at 824−25 (1975) (holding that an advertisement providing information about legal abortion services

-45-

available in other states was constitutionally protected speech))).  These unconstitutional applications of Section 39-15-220(a)'s "recruit[ment]" provision—which are "realistic, not fanciful[,]" *Hansen*, 599 U.S. at 770 ("To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep.")—also are the heart of the law; they are expressly intended by it; and they are integral to it.  That is why Section 39-15-220 expressly states that its provisions apply "regardless of where the abortion is to be procured"—including in jurisdictions where abortion is legal—and "regardless of where the abortion-inducing drug is obtained" (including legally).  *See* Doc. 1-1 at 1.

Under these circumstances, then, the Plaintiffs are entitled to obtain the "strong medicine" of facial invalidation of Section 39-15-220(a)'s "recruit[ment]" provision "to vindicate the rights of the silenced, as well as society's broader interests in hearing them speak."  *Hansen*, 599 U.S. at 770; *see also Welty*, 2024 WL 4712759, at *20 ("The impermissible applications of such a prohibition are innumerable, whereas the defendants' supposedly legitimate applications all, or nearly all, rely on tacking on some additional element that the state could simply outlaw, if it has not already done so, without saying a word about 'recruitment.' The court, therefore, finds that the plaintiffs are very likely to succeed on their overbreadth claims.").

## C.   THE PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION ENJOINS "ALL" ENFORCEMENT OF SECTION § 39-15-220(a)'S "RECRUIT[MENT]" PROVISION.

The Plaintiffs have demonstrated that they are entitled to an injunction to protect their own rights.  Further, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."  *See G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).  Thus, an injunction favors the public's interest, too.  *Id.*

The Plaintiffs also are entitled to relief that suspends "all enforcement" of Tenn. Code Ann.

-46-

§ 39-15-220(a)'s recruitment provision. That is because unlike traditional claims (even traditional claims for facial invalidation), "[t]he First Amendment doctrine of overbreadth is an exception to [the Supreme Court's] normal rule regarding the standards for facial challenges." *Virginia v. Hicks*, 539 U.S. 113, 118 (2003). In particular:

> The showing that a law punishes a "substantial" amount of protected free speech, "judged in relation to the statute's plainly legitimate sweep," *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), suffices to invalidate *all* enforcement of that law, "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression," *id.,* at 613, 93 S.Ct. 2908. *See also Virginia v. Black*, 538 U.S. 343, 367, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); *New York v. Ferber*, 458 U.S. 747, 769, n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Dombrowski v. Pfister*, 380 U.S. 479, 491, and n.7, 497, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

*Id.* at 118–19 (emphasis in original).

The Supreme Court "ha[s] provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech— especially when the overbroad statute imposes criminal sanctions." *Id.* at 119 (citing *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). As *Virginia v. Hicks* explains: "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech— harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* (internal citation omitted). Thus, "[o]verbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech." *Id.*

The question of whether a district court has "authority to enjoin the State from enforcing

[a challenged] law against entities other than" a plaintiff was recently presented to the Supreme Court.  *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023) (Kavanaugh, J., concurring).  The Supreme Court declined review, but in a concurring opinion, Justice Kavanaugh addressed Florida's claim "that it should be able to enforce the [enjoined] law against [] non-parties during the pendency of its appeal." *Id.* at 1–2.  Noting the crucial distinction that "the issue arises here in the context of a First Amendment overbreadth challenge," Justice Kavanaugh's opinion explained:

> No federal statute expressly grants district courts the power to enter injunctions prohibiting government enforcement against non-parties in the circumstances presented in this case. The question of whether a district court, after holding that a law violates the Constitution, may nonetheless enjoin the government from enforcing that law against non-parties to the litigation is an important question that could warrant our review in the future. But the issue arises here in the context of a First Amendment overbreadth challenge, which presents its own doctrinal complexities about the scope of relief. This case is therefore an imperfect vehicle for considering the general question of whether a district court may enjoin a government from enforcing a law against non-parties to the litigation. For that reason, the Court is not likely to grant certiorari on that issue in this particular case.
>
> In sum, because this Court is not likely to grant certiorari on the only issue presented in Florida's stay application, it is appropriate for the Court to deny the application.

*Id.* at 2.

Sixth Circuit precedent shares the view that a facially overbroad speech restriction may be enjoined broadly.  As it has explained, "the First Amendment rule is different under the overbreadth doctrine[,]" so when a plaintiff's overbreadth challenge prevails, "[c]ourts invalidate such statutes *in their entirety* to prevent a 'chilling effect,' whereby speakers self-censor protected speech to avoid the danger of possible prosecution." *Russell*, 784 F.3d at 1054 (emphasis added) (citing *Hicks*, 539 U.S. at 118–19, *Broadrick*, 413 U.S. at 615).  "Consequently, because it impairs a substantial amount of speech beyond what is required to achieve acceptable objectives, 'a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated.'" *Id.* (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010)).

*L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), and *Does #1-9 v. Lee*, 659 F. Supp. 3d 865, 891 (M.D. Tenn. 2023), *aff'd in part, rev'd in part and remanded sub nom. Doe v. Lee*, 102 F.4th 330 (6th Cir. 2024), are not to the contrary. Neither case involved a First Amendment facial overbreadth claim. And because "the First Amendment rule is different" in facial overbreadth cases, *see Russell*, 784 F.3d at 1054; *Hicks*, 539 U.S. at 119 (explaining why a different "expansive remedy" is available in First Amendment overbreadth cases), it is little surprise that the outcome would be different in First Amendment overbreadth cases. That is because—unlike traditional litigation where only "the legal rights of litigants in actual controversies" are at stake, *United States v. Raines*, 362 U.S. 17, 21 (1960)—facially overbroad speech restrictions harm "not only [litigants] but society as a whole, which is deprived of an uninhibited marketplace of ideas[,]" *Hicks*, 539 U.S. at 119, and the right to "receive" information. *See, e.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 757 (1976) ("in *Kleindienst v. Mandel*, 408 U.S. 753, 762-763[ . . .] (1972), we acknowledged that this Court has referred to a First Amendment right to 'receive information and ideas,' and that freedom of speech 'necessarily protects the right to receive.'"); *see also id.* (collecting cases); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *Smith v. United States*, 431 U.S. 291, 319, n.18 (1977) (Stevens, J., dissenting) ("the First Amendment necessarily protects the right to 'receive information and ideas.'"); *Citizens United*, 558 U.S. at 339 (referencing "[t]he right of citizens . . . to hear").

Further, an injunction that suspends all enforcement of section 39-15-220(**a**)'s "recruit[ment]" provision is necessary to afford the Plaintiffs "'complete relief.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up). As this Court found at an

earlier stage of these proceedings:

> Welty and Behn are entitled to, and will receive, an injunction against all enforcement of the recruitment provision by the defendants against any party. The court does not reach that conclusion simply because this is an overbreadth challenge, but because such relief is necessary to prevent Welty's and Behn's own irreparable injuries. This is a case about the free flow of information, and it would be naive to think that the plaintiffs' injuries can be addressed simply by preventing the application of the recruitment provision to them and them alone, while leaving their messages to die on the vine because no one else can pass them along. There is no evidence that Behn or Welty is involved in advocacy simply for her own glory or gratification. They share the information that they do—much of which is presented in forms, such as flyers and social media posts, specifically designed to be easily disseminated—because they want that information to be available to anyone who needs it. That can only happen if the message can be freely spread by others, not just Welty and Behn, in the manner that the First Amendment protects.

> An injunction that simply created a narrow zone of protection around Welty and Behn—while permitting the defendants to criminally prosecute anyone else who shares the messages that Welty and Behn espouse—would not be an injunction that "provide[s] complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The freedom of speech guaranteed by the First Amendment is not simply a special protection that the Constitution grants to a few, high-profile speakers so that those speakers can hear themselves talk; it is a protection available to everyone, for the interconnected benefit of everyone, because messages do not gain their fullest power by being uttered, but by being spread.

> Welty and Behn do not just have a right to speak their message; they have a right to live in a state where that message can be repeated by all who find it valuable to all who wish to hear it. Otherwise, there would be no actual freedom of speech—just freedom of a few speakers to address a silenced populace. The First Amendment guarantees more, and, under the law of this circuit, the plaintiffs' overbreadth challenge permits this court to provide it. The court, accordingly, will enjoin all enforcement of the recruitment provision by the [Defendants].

*Welty*, 2024 WL 4712759, at *23.

Now that the Plaintiffs have shown that they are entitled to final merits relief, this Court should adopt and reapply this analysis in full.

## V. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment should be granted.

Respectfully submitted,

/s/ Daniel A. Horwitz
DANIEL A. HORWITZ, BPR #032176
MELISSA DIX, BPR #038535
SARAH L. MARTIN, BPR #037707
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
(615) 739-2888
daniel@horwitz.law
melissa@horwitz.law
sarah@horwitz.law

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of November, 2024, a copy of the foregoing and all exhibits and attachments were sent via CM/ECF, USPS Mail, and/or via email, to:

STEVEN J. GRIFFIN (BPR# 040708)
MATTHEW D. CLOUTIER (BPR# 036710)
DONNA L. GREEN (BPR# 019513)
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-9598
Steven.Griffin@ag.tn.gov
Matt.Cloutier@ag.tn.gov
donna.green@ag.tn.gov

*Counsel for Defendants*

/s/ Daniel A. Horwitz_____
Daniel A. Horwitz, BPR #032176