# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RACHEL WELTY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00768** |
| | ) | **Judge Julia S. Gibbons** |
| **BRYANT C. DUNAWAY, et al.,** | ) | **Magistrate Judge Jeffrey S. Frensley** |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

Introduction ..........................................................................................................................1

Background .........................................................................................................................3

Legal Standard ...................................................................................................................8

Argument ...........................................................................................................................9

I.  Properly construed, the Act's "recruiting" provision criminalizes only the targeted
    inducement of a minor. ......................................................................................... 12

II. Plaintiffs lack standing because their desired conduct is not prohibited "recruiting." ........ 16

    A.  Plaintiffs demonstrated no intent to engage in arguably proscribed conduct. ..........16

    B.  Plaintiffs demonstrated no certain threat of prosecution. .........................................19

III. No sovereign immunity exception applies because there is no risk of relevant
    enforcement ........................................................................................................... 25

IV. The Act is not facially unconstitutional. ............................................................... 27

    A.  The Act does not violate the First Amendment ..................................................... 27

    B.  The Act is not unconstitutionally vague ..................................................................34

V.  Alternatively, any relief granted should be limited to the parties. ....................... 38

Conclusion .......................................................................................................................41

## INTRODUCTION

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court "return[ed] the issue of abortion to the people's elected representatives." 597 U.S. 215, 232 (2022). And in the wake of *Dobbs*, Tennessee's elected representatives, like many others across the country, passed laws to further the State's long-recognized interest in protecting fetal life. One of those laws was the Underage Abortion Trafficking Act. 2024 Tenn. Pub. Acts, Ch. 1032 (codified at Tenn. Code Ann. § 39-15-201) ("the Act").

The Act provides a targeted solution to a documented problem: groups seeking to thwart state abortion regulations by covertly facilitating minors' elective abortions—all without their parents' consent. Such conduct featured in real-world news stories and the legislative record. To protect against it, Tennessee lawmakers prohibited any adult from "intentionally recruit[ing], harbor[ing], or transport[ing] a pregnant, unemancipated minor within this state for the purpose" of obtaining an abortion that would be prohibited by Tennessee law without the consent of the "minor's parent or legal guardian." Tenn. Code Ann. § 39-15-201(a), (c)(1)-(2).

As enacted, the Act thus covers a narrow category of actors seeking to circumvent parental knowledge of their minor's undertaking sensitive medical procedures that terminate unborn life. The Act does not prohibit parents and guardians from facilitating their child's abortion; nor does it apply to common carriers or specified medical personnel. It does not prohibit anyone from traveling to another State. And it does not block anyone from obtaining an abortion.

Nonetheless, Plaintiffs argue that the Act's reference to "recruiting" is unconstitutional on its face. Neither Plaintiff has had the Act enforced against her. Instead, they posit in this pre-enforcement posture that the recruiting provision might sweep in pure speech, like pro-abortion social media posts or pamphlets distributed at a rally, and thus violates the First Amendment. They also argue that the meaning of "recruiting" is so unclear as to be void for vagueness. At an earlier

1

stage of the proceeding, this Court agreed with Plaintiffs, concluding that they were likely to succeed on the merits of their claims, and preliminarily enjoined enforcement of the Act's "recruiting" provision by all eleven district attorney Defendants—as to anyone. Defendants maintain that this Court was wrong to do so, and those preliminary likelihood-of-success determinations do not bind this Court now. This Court should thus reject Plaintiffs' claims, deny their motion for summary judgment, and instead enter summary judgment for Defendants.

Plaintiffs' claims fail because they ignore what "recruiting" plainly means in the context of the Act: It refers not to just any abortion-related advocacy, but *only* to targeted conduct intended to induce or enlist a pregnant, unemancipated minor for the purpose of obtaining an abortion considered unlawful in Tennessee without the consent of the minor's parent or guardian. Properly understood, the meaning of "recruiting" forecloses jurisdiction over this pre-enforcement challenge. Plaintiffs' pleadings and live testimony catalogued the abortion-related activities and speech in which they would like to engage. None involves—and indeed, Plaintiffs expressly disavowed intent to engage in—recruiting of minors to obtain an abortion. Plaintiffs' own proof thus confirms that they lack any intention to violate the Act and cannot show a certainly impending risk of prosecution, both prerequisites for a pre-enforcement suit. Plaintiffs fail to overcome defendants' sovereign immunity for similar reasons, since *Ex parte Young* requires connecting a plaintiff's injury to a state official's unlawful enforcement.

Nor does the "recruiting" provision fail constitutional review on its face. Governing law required Plaintiffs to show a substantial number of unlawful applications versus lawful ones. Yet the prohibition on "recruiting" is lawful in a wide range of scenarios, including where recruiting is undertaken in furtherance of criminally prohibited abortions. Plaintiffs' vagueness theory fails too. The term "recruit" carries a common meaning used and understood throughout federal and

state law, as other courts have noted in rejecting vagueness challenges to the same term. The Court's prior contrary conclusion misreads the statute and misapplies Tennessee law, which strongly favors interpreting statutes to save them rather than strike them down. Here, Defendants offered not just a reasonable reading that would render the Act valid, but the best one.

## BACKGROUND[1]

### A.     Tennessee Adopts the Underage Abortion-Trafficking Act

1.      In 2022, the Supreme Court held that the U.S. Constitution does not establish a right to abortion and "return[ed] the issue of abortion to the people's elected representatives." *Dobbs*, 597 U.S. at 231-32. In doing so, the Supreme Court recognized that States may adopt abortion regulations that reflect the moral view that "abortion ends an innocent life." *Id*. at 224.

Tennesseans have a centuries' long history of safeguarding fetal life through the democratic process. *See, e.g.*, 1883 Tenn. Pub. Acts, Ch. 140, pp.188-89 (generally criminalizing abortions except to preserve the life of the mother); Tenn. Const. art. I, § 36 (clarifying that nothing in the Tennessee Constitution "secures or protects a right to abortion" and affirming the legislature's authority to regulate abortion). Currently, Tennessee law prohibits performing or attempting to perform an abortion except to save the life of the mother or to "prevent serious risk of substantial and irreversible impairment of a major bodily function." Tenn. Code Ann. § 39-15-213. Tennessee thus prohibits purely elective abortions.

Not all share Tennessee's policy preferences with respect to abortion. After *Dobbs*, pro-abortion groups released statements promising to help people who live in Tennessee and other States that had adopted abortion restrictions to "access abortions outside [the] state," even offering to provide "financial and logistical support." ACLU of Tenn., *Tennessee Six-Week Abortion Ban*

---

[1] All record pincites refer to the "Page ID" numbers in the ECF file stamps for the cited documents.

*Takes Effect*, https://perma.cc/9VZ5-8MET (June 28, 2022) (quoting President and CEO of Planned Parenthood of Tennessee and North Mississippi).

An investigative-journalism report soon showed that groups were following through on their promise to facilitate out-of-state-abortion access. In an undercover video dated November 11, 2023, Planned Parenthood staff in Missouri admitted that the organization routinely facilitates the transportation of minors across state lines to obtain abortions without their parents' knowledge or consent. *See 'WE NEVER TELL': Planned Parenthood Helps 13 Year Olds Get Abortions in Nearby States to Evade Law*, Project Veritas, https://perma.cc/29UW-PLCY (Dec. 21, 2023). Staff stated they could do so for the undercover reporter's "13-year-old" niece by securing a "bypass" to "avoid the parents finding out," providing a doctor's note "to get the child out of school," and having someone "pick up the child and transport her" across state lines. *See* State of Missouri Pet. for Dec. Judgment and Inj. Relief 11-13, No. 24BA-CV00990 (Feb. 29, 2024), https://perma.cc/87MH-PLYX. A suit by the Missouri Attorney General followed and remains ongoing. *See generally id.*

2.      Against this backdrop, Tennessee lawmakers considered the issue of abortion trafficking in the 2024 legislative session. Planned Parenthood's practices in Missouri were top of mind. *See* Sen. Rose, Senate Session at 24:20-24:39, https://tinyurl.com/yws5mx56 (April 10, 2024); Rep. Zachary, House Session at 3:35:55-3:36:19, https://tinyurl.com/3nxm2s6u (Apr. 23, 2024). Nor were they an isolated incident. A Tennessee legislator recounted a similar story in which one of his constituents had reported that a person he and his wife thought was a "trusted adult" had taken the constituent's daughter out of state for an abortion without their consent. Rep. Zachary, *supra* at 3:36:50-3:38:18.

4

Lawmakers also heard testimony regarding research showing that minor girls are "more likely to feel pressured into an abortion than adult women," and that minors do not have fully developed decision-making capabilities. Pimentel Testimony, Population Health Subcommittee Hearing at 7:30-8:18, https://tinyurl.com/37bumxp4 (Feb. 13, 2024). And data presented indicated that perpetrators of sex trafficking often force their victims to get abortions, Rep. Zachary, House Session at 3:38:56-3:39:42, https://tinyurl.com/3nxm2s6u (Apr. 23, 2024)—presumably to try to cover up their crimes. Lawmakers also heard testimony that parental involvement helps ensure that a child who does opt for abortion can be monitored for any post-abortion complications, which "can be life-threatening." Pimentel Testimony, *supra*, at 8:18-8:30.

Ultimately, the General Assembly passed the Underage Abortion Trafficking Act. *See* Tenn. Code Ann. § 39-15-201.[2] To protect "parental rights," *e.g.*, Sen. Rose, Senate Judiciary Committee at 4:00:40-43, the Act creates a new offense designated "abortion trafficking of a minor," Tenn. Code Ann. § 39-15-201(a). That offense applies when an adult "intentionally recruits, harbors, or transports a pregnant unemancipated minor within" Tennessee for the purpose of (1) "[c]oncealing an act that would constitute a criminal abortion" under Tennessee law from the minor's parents or legal guardian, or (2) "[p]rocuring an act that would constitute a criminal abortion" under Tennessee law, or (3) "[o]btaining an abortion-inducing drug for the purpose of an act that would constitute a criminal abortion" under Tennessee law. *Id.* These provisions apply "regardless of where the abortion" is ultimately procured or the abortion drug obtained. *Id.* § 39-15-201(a)(2)-(3). Persons committing abortion trafficking of a minor risk misdemeanor and civil liability. *Id.* § 39-15-201(b), -(e).

---

[2] The Act initially appeared at Tenn. Code Ann. § 39-15-220, but it has since been moved to Tenn. Code Ann. § 39-15-201.

The Act then sets forth several exceptions. It does not apply to a minor's "parents or legal guardian." *Id.* § 39-15-201(c)(1). Nor does it apply to persons who have "obtained the written, notarized consent of" of a minor's "parent or legal guardian." *Id.* § 39-15-201(c)(2). Common carriers and various medical personnel are also excluded from the Act's scope. *Id.* § 39-15-201(c)(3)-(4), (f).

Other than prohibiting adults from engaging in specified activities with a minor lacking parental consent, the Act does not affect abortion-related activities in Tennessee or any other State. It does not prohibit a minor's travel to another State. It does not prevent a minor from obtaining an elective abortion in a place where it remains legal to do so—either independently or with her parent's or guardian's consent. Sen. Rose, Senate Judiciary Cmte. Hearing at 4:00:40-4:01:32, https://tinyurl.com/yfnesurm (April 2, 2024). And the recruiting provision, in particular, does not prohibit general public advocacy for abortion, pregnancy-options counseling, or merely sharing information about the availability of abortion services in other states. Rep. Leatherwood, Health Committee Hearing at 1:06:30-1:06:55, https://tinyurl.com/4nez799r (Feb. 21, 2024); Rep. Zachary, Health Committee Hearing at 1:07:52-1:07:57, *id.*

## B. Plaintiffs Challenge the Act's "Recruitment" Provision

Plaintiffs allege that they advocate for abortion rights—Welty through her role as a family-law attorney, and Behn, through her role as a social worker and as an elected member of the General Assembly. Days before the Act took effect, Plaintiffs filed suit against eleven district attorneys general in Middle Tennessee. They claim the Act's "recruitment" provision is void for vagueness, violates the First Amendment as a form of content- and viewpoint-based discrimination, and is unconstitutionally overbroad. Compl., D.E.1, 1-15. Plaintiffs sought both a temporary restraining order and preliminary injunction barring enforcement of the "recruitment" provision. PI Mot., D.E.18, 157; PI Mem., D.E.19, 160-183.

6

This Court denied Plaintiffs' request for a temporary restraining order as too delayed. Order, D.E.24, 243-48. The Court added that Plaintiffs had not shown that they needed immediate relief given Defendants' assurance that the Act's "recruitment" provision does not cover "[m]erely providing information about out-of-state abortion services or abortion drugs." *Id*. at 246-47. The Court then set Plaintiffs' preliminary-injunction motion for hearing. *Id*. at 247.

Defendants opposed Plaintiffs' motion for preliminary relief. PI Resp., D.E.22, 208-33. They also moved to dismiss all claims on jurisdictional and merits grounds. MTD, D.E.25, 249; MTD Mem., D.E.26, 252-70.

## C. Plaintiffs Clarify the Scope of Their Intended Conduct

At the hearing on Plaintiffs' preliminary-injunction motion, both Plaintiffs testified regarding the abortion-related activities in which they'd like to engage. Such activities, their testimony showed, include distributing literature about the availability of abortion services and drugs in other States, providing information about legal abortion options to those who contact them, volunteering for an abortion fund that raises money for out-of-state abortion clinics, participating in interviews with the media, giving speeches, participating in marches, and posting information about abortion to their public social media accounts. Hearing Tr., D.E.39-1, 523-26, 531-35.

Plaintiffs also clarified the confines of their abortion-related interactions. Those discussions, they testified, seek only to provide others with information about available options so that they can make informed decisions. Both disavowed trying to persuade anyone to obtain an abortion. Welty testified: "My goal as an advocate is *never to persuade someone.* It is to give them options and then let them make their own decision." *Id.* at 527 (24:16-18). Behn confirmed the same. *Id.* at 535 (56:1-5).

In response, Defendants supplemented their preliminary-injunction filings to clarify that the "recruitment" provision does not cover Plaintiffs' desired conduct. Defendants represented, in

7

particular, that the Act's "recruitment" provision prohibits only targeted conduct intended to induce a minor within Tennessee to obtain an elective abortion without the consent of the minor's parent or legal guardian. Because Plaintiffs' testimony confirmed that they did not intend to engage in prohibited "recruitment," Defendants explained, they could not prove an "intent to engage in conduct proscribed by the Act[]," much less a "certain threat of prosecution" against them. Supp. PI Resp., D.E.39, 512-17.

## D. This Court Preliminarily Enjoins the "Recruitment" Provision

On September 20, 2024—more than two months after the Act had taken effect—this Court granted Plaintiffs' motion for a preliminary injunction and denied Defendants' motion to dismiss in part. Mem., D.E.40, 538-86; Order, D.E.41, 587-88. It then enjoined all eleven Defendants from enforcing the Act's "recruitment" provision against anyone, "other than in connection with obtaining or attempting to obtain an actually unlawful abortion." D.E.41, 587-88.

Following the issuance of the preliminary injunction, Plaintiffs moved for summary judgment on the preliminary-injunction record, forgoing any additional discovery. Defendants now respond in opposition and cross-move for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when a party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, the non-moving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). The non-moving party "must do more than show that there is some metaphysical doubt as to the material facts"; rather, it must "present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment." *Id.* A fact is "material" if it might affect the outcome.

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a reasonable juror could not return a verdict for the non-movant, the Court should grant summary judgment. *Id.* at 251-52.

## ARGUMENT

This Court should deny Plaintiffs' motion for summary judgment and should instead enter summary judgment in Defendants' favor. Properly construed, the Act's "recruiting" provision criminalizes only the targeted inducement of a minor for a specific purpose—obtaining an elective abortion without her parent's or guardian's consent. Because Plaintiffs make clear that they do not intend to engage in that behavior, they lack standing and, for similar reasons, cannot show the likelihood of enforcement necessary to overcome Defendants' sovereign immunity. This proper construction of the Act also dooms Plaintiffs' claims on the merits. Their First Amendment claims—both traditional and overbreadth—are premised on an improperly expansive conception of the Act. More than that, to the extent these claims seek facial invalidation of the Act, they necessarily fail because they do not account for the host of constitutional applications of the Act. Plaintiffs' vagueness claim also falls flat. It ignores the straightforward meaning of "recruiting" as used in the Act and, like the First Amendment claims, fails to demonstrate facial unconstitutionality. Before delving into these fatal flaws though, it's important to highlight three threshold points specific to the posture of this case.

*First*, while Defendants maintain that Plaintiffs' claims should have failed at the preliminary-injunction and motion-to-dismiss stages, their objections to those claims take on greater weight at the summary-judgment stage. "The proof required to establish standing," in particular, "increases at each successive stage of litigation." *Norton v. Beasley*, No. 21-6053, 2022 WL 17348385, at *6 (6th Cir. Dec. 1, 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). And "[a]t summary judgment, … [Plaintiffs] cannot rely on allegations alone but must set forth evidence demonstrating [their] standing." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458,

9

462 (6th Cir. 2019). What's more, because Plaintiffs here seek to establish pre-enforcement standing, that means they must produce "evidence demonstrating," *id.*, among other things, "a *certain* threat of prosecution." *Crawford v. Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017).

*Second*, much of Plaintiffs' statement of undisputed material facts should be excluded. To prevail on their motion for summary judgment, Plaintiffs must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To that end, they are required to support their motion with a "separate, concise statement of the material facts as to which [they] contend there is no genuine issue for trial." L.R. 56.01(b); *see also* Fed. R. Civ. P. 56(c)(1). But while Plaintiffs have filed a statement, much of what it contains is neither "fact[ual]" nor "material." Plaintiffs assert, for example, that "unless the Act's 'recruit[ment]' prohibition is declared unconstitutional and enjoined, Ms. Welty cannot safely continue her advocacy for safe and healthy access to legal abortion care without risking criminal prosecution." SUMF, D.E.55, 656; *see also id.* at 662 ("Representative Behn wants to continue her advocacy for young people who need legal abortion care, but she cannot do so safely without risking criminal prosecution."). Not only are these not "facts," *contra* L.R.56.01(b), they are among the most central legal questions in this case.

This is impermissible. "A party cannot dictate the court's ruling on legal issues by attempting to disguise 'legal conclusions' as 'statements of undisputed material facts' and then ask the court to deem them admitted." *Nichols v. Chacon*, 110 F. Supp. 2d 1099, 1100 (W.D. Ark. 2000), *aff'd*, 19 F. App'x 471 (8th Cir. 2001). As this Court itself has recognized, "to the extent that a statement is a statement of law, it simply *does not belong* in a statement of material facts." *McLemore v. Gumucio*, 619 F. Supp. 3d 816, 821 (M.D. Tenn. 2021). Said another way, "if a statement is an assertion of a fact but not a material fact, or an assertion of something that is not a

fact at all (but rather, say, an opinion or a legal principle)," it "is not properly included in a Rule 56.01 statement." *Id.* at 826; *see also New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 690 & n.1 (M.D. Tenn.). The bottom line: "a statement included in a Rule 56.01 statement should be excluded if it is (i) not a statement of *fact* at all or (ii) a statement of fact but not properly considered a statement of *material* fact." *McLemore*, 619 F. Supp. 3d at 823. This Court, then, should exclude the non-factual statements identified in Defendants' response to Plaintiffs' statement of undisputed material facts. *See generally* Defs.' Resp. to SUMF, D.E. 70.

*Finally*, despite Plaintiffs' insistence to the contrary, this Court is not bound by any prior decisions in this case. It is true, of course, that "during an earlier stage of proceedings, this Court already adjudicated the dispositive legal disputes presented in this case," but it does not follow that this Court "should stick to" those earlier adjudications. MSJ Mem., D.E.56, 687. "As a general rule, decisions on preliminary injunctions do not constitute law of the case and 'parties are free to litigate the merits." *William G. Wilcox, D.O., P.C. Emps.' Defined Ben. Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989); *see also In re B & P Baird Holdings, Inc.*, 759 F. App'x 468, 477-78 (6th Cir. 2019) (same for rulings on motions to dismiss). More specifically, the Sixth Circuit has observed that "[b]ecause of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is *not* dispositive of those substantive issues on the merits." *Wilcox*, 888 F.2d at 1114 (emphasis added). That goes double for this Court's earlier jurisdictional rulings, to which the law-of-the-case doctrine "has *no* applicability." *Dickson v. Direct Energy*, LP, 69 F.4th 338, 349 (6th Cir. 2023) (emphasis added).

## I. Properly Construed, the Act's "Recruiting" Provision Criminalizes Only the Targeted Inducement of a Minor.

Before assessing Plaintiffs' claims, the Court must interpret the Act's proper meaning. That's because this is a "pre-enforcement" challenge, which requires Plaintiffs to show both that they "intend to engage" in conduct covered by the Act, and that such conduct is "'affected with a constitutional interest.'" *Bowles v. Sabree*, 121 F.4th 539, 552 n.4 (6th Cir. 2024) (quoting *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 438 n.4 (6th Cir. 2024)). And to determine whether Plaintiffs have satisfied those two requirements, it is necessary to map the Act's proper scope onto the Plaintiffs' desired abortion-related activities.

**A.** Interpreting the "recruits" provision involves a question of Tennessee law. In answering it, this Court applies the "general rules of statutory construction as embraced by" the State's courts. *First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 680 (6th Cir. 2020) (citation omitted). Those rules look to the "natural and ordinary meaning of the statute," *Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn. 2003) (internal quotations omitted), which courts can discern using tools like "dictionary definitions," *Shockley v. Mental Health Coop., Inc.*, 429 S.W.3d 582, 591 (Tenn. 2013). Courts are also to account for "any limiting construction" that a state "enforcement agency has proffered." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 495 n.5 (1982).

Applying those rules, the meaning of "recruits" in the Act is plain. As "widely used and well understood," *Cameron v. Johnson*, 390 U.S. 611, 616 (1968), the term refers to targeted conduct intended to induce or enlist a pregnant, unemancipated minor for the purpose of obtaining an abortion considered unlawful in Tennessee without the consent of the minor's parent or guardian.

Start with the ordinary meaning of "recruit." Dictionaries specify that the term means "to induce or enlist (a person) to participate or provide assistance," "to fill up the number of with new

members," "to increase or maintain the number of," or "to secure the services of." *Recruit*, Oxford English Dictionary (Online), https://perma.cc/Y6JL-CTM8; *Recruit*, Merriam-Webster's Dictionary (Online), https://perma.cc/6AVQ-9MVD.[3] Courts have understood "recruit" similarly. *See, e.g.*, *In re Pro. Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005) ("The dictionary definition of 'recruit' means 'to secure the services of ... [or to] enlist new members.'"); Post Trial Jury Instructions, *United States v. Withers*, No. 3:16-cr0005-wmc, Doc. 126-2, at 12 (W.D. Wis. Apr. 28, 2017) ("To recruit means to persuade someone to join in or to help with some activity").

The throughline is that "to recruit" involves some affirmative, targeted conduct that seeks to drive a person to engage in a particular action (in the Act's case, a minor's taking certain abortion-related steps without parental consent). "Recruits" does not extend to the generalized provision of information or advocacy to the public, nor to the distribution of information to an individual for merely educational purposes. While a college basketball coach, for example, might "recruit" a particular candidate to come play at a certain university, no one would understand a public announcement about an "open tryout" as "recruiting." So too here. The term "recruits" necessarily *excludes* things like public advocacy about abortion, pregnancy-options counseling, or mere publication of information about available abortion services.

**B.** Other interpretive tools confirm the "recruitment" provision's proper scope. Consider the canon of "*noscitur a sociis*," which "counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *accord Flade v. City of Shelbyville*, 699 S.W.3d 272, 286 (Tenn. 2024). Reading

---

[3] *See also, e.g.*, American Heritage Dictionary of the English Language 1471 (5th ed. 2016) ("To enlist (persons) in military service"; "[t]o hire or enroll, or seek to hire or enroll (new employees, members, or students."); *Recruit*, Webster's Ninth New Collegiate Dictionary 985 (1986) ("[T]o secure the services of: ENGAGE, HIRE.").

statutes this way helps ensure that courts "avoid giving the statutory [provisions] unintended breadth." *Maracich v. Spears*, 570 U.S. 48, 62–63 (2013) (internal quotations omitted). Applied here, the canon tethers the meaning of "recruit" to the Act's other key verbs—harboring and transporting. Each involves conduct tied to facilitating a particular minor's obtaining an elective abortion without parental consent. "Recruit" should be read to similarly require targeted inducement or persuasion of a minor to pursue abortion, rather than public advocacy, options counseling, or mere information sharing.

Principles of avoidance counsel similarly. Tennessee's preference for saving constructions is robust: Tennessee Supreme Court precedent recognizes the judiciary's "duty to adopt a construction which will sustain a statute and avoid constitutional conflict if *any* reasonable construction exists that satisfies the requirements of the Constitution." *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 7 (Tenn. 2000) (citation omitted) (emphasis added); *see Brooks v. Bd. of Pro. Resp.*, 578 S.W.3d 421, 426 (Tenn. 2019). Statutes must always be construed with "the saving grace of common sense." *State ex rel. Maner v. Leech*, 588 S.W. S.W.2d 534, 540 (Tenn. 1979) (citation omitted). This is especially true in First Amendment cases. *See, e.g.*, *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529-30 (Tenn. 1993).

**C.**     This Court's prior interpretation of recruiting rests on several interpretive missteps, and Plaintiffs' statutory-interpretation arguments incorporate those same fatal flaws.

Earlier, this Court opined that recruiting "simply means to persuade [someone] to do something," including by merely "spreading the word that a particular option is available." Mem., R.40, 573 (cleaned up). Under that view, someone could be liable for "recruiting" a minor to obtain an abortion by simply providing her with "information regarding childcare costs" or telling her that "whatever she does, she is entitled to love and support." *Id*. at 577. But in reaching that broad

interpretation, this Court not only gave little weight to the State's proposed limiting construction—which the State consistently advanced both at the hearing and in post-hearing briefing, Hearing Tr., R.35, 84:8-87:24; Supp. PI Resp., R.39, 514—it gave short shrift to Tennessee's stringent avoidance rule. *Sundquist*, 38 S.W.3d at 7. It also ignored the statute's scienter requirement, surmising that liability could attach regardless of a speaker's "subjective motivation." Mem., R.40, 576.

Compounding these errors, this Court's earlier decision veered from Tennessee's rule against relying on legislative history rather than "the plain language of the … statute." *State v. Welch*, 595 S.W.3d 615, 624 (Tenn. 2020); *see also State v. Deberry*, 651 S.W.3d 918, 930 (Tenn. 2022). The decision homed in on one statement by Representative Zachary, one of the Act's House sponsors, that a social media post by Plaintiff Behn offering to take minors out of state for an abortion could be considered "recruitment." Mem., D.E.40, 546, 561. Of course, if someone were to intentionally target and induce a minor to be transported out of state without parental consent for the purpose of obtaining an elective abortion, liability might attach for "recruiting." More facts would be needed besides a generalized social media post. Regardless, any such legislative history is too thin a reed to override the best reading of "recruiting" as confirmed by the "traditional tools of statutory construction." *Deberry*, 651 S.W.3d at 930 (citation omitted).

And other legislative history cuts the State's way. One testifying witness—like Plaintiffs here—expressed concern that "recruits" could be interpreted to prohibit mere "counseling" or giving someone the phone number or address of a reproductive healthcare clinic. Schlechter Testimony, Health Committee Hearing at 1:05:08-1:05:52, https://tinyurl.com/4nez799r (Feb. 21, 2024). But one of the Act's House sponsors, Representative Leatherwood, immediately rejected such a broad interpretation: "I do see a difference between the words 'counseling' and 'recruits';

15

I can counsel someone about the pros and cons on something, as opposed to if I'm recruiting … I am trying to get them to take an action.  So, I see a difference in words that *are* and *are not* used in the bill."  *Id*. at 1:06:30-1:06:55 (emphasis added).  Representative Zachary echoed that "counseling" "had nothing to do with the bill."  *Id*. at 1:07:52-1:07:57.[4]  Neither Plaintiffs nor this Court's prior ruling engage with either of these exchanges from the legislative history.

## II.  Plaintiffs lack standing because their desired conduct is not prohibited "recruiting."

Article III standing requires a plaintiff to show "an injury in fact … fairly traceable to the challenged conduct of the defendant … that is likely to be redressed by the requested relief."  *FEC v. Cruz*, 596 U.S. 289, 296 (2022).  To establish an imminent injury *before* enforcement, a plaintiff must first prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act.  *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (citation omitted).  Next, the plaintiff must demonstrate "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct."  *Id.* at 455.  Plaintiffs show neither.

### A.  Plaintiffs demonstrated no intent to engage in arguably proscribed conduct.

As discussed, the "recruits" provision prohibits only affirmative conduct intended to induce a minor, without parental consent, to engage in certain abortion-related activities the Act specifies.  But at the preliminary-injunction hearing and in their filings, Plaintiffs' proof made clear that they have not engaged in and do not plan to participate in that sort of conduct—let alone with the Act's required *mens rea*.

---

[4] *See also* Rep. Zachary, Population Health Subcommittee Hearing at 11:18-11:52, https://tinyurl.com/37bumxp4 (Feb. 13, 2024) (noting that "recruits" in this context carries its dictionary definition and means "to entice someone … in order to get them to do something that you would have them to do").

Plaintiff Welty testified that, in her capacity as a lawyer who advocates for abortion access, she engages in different types of abortion-related communications. The first category of communications includes provision of abortion "information" to the generalized public or to minors who reach out to her. Hearing Tr., D.E.39-1, at 6:18-23, 7:19-22; *see id.* at 13:21-14:12, 16:6-7 (donating to a fund that publishes a "website with lots of information on it"); *id.* at 14:10-12, 16:4-17:9, 18:5-7 (distributing "handouts about abortion care [and] abortion pills" at "different places" where "anyone" could pick them up); *id.* at 17:5-9 (citing D.E.1-2 at 21) (leaving "little cards" with a list of websites about abortion options in "different places," like the "bathrooms of bars"). A second category includes volunteering with organizations that support abortion clinics "outside of the State of Tennessee." *Id.* at 13:21-14:5, 14:9-10, 16:6-7. And the third includes giving public speeches, attending "marches," giving talks, and participating in "interview[s]" with "reporters" about abortion. *Id.* at 15:6-7, 16:3-4, 18:23-19:3.

Plaintiff Behn testified along the same lines. She desires to give her constituents and social-work clients information about available abortion services "so that they can make an informed decision." Hearing Tr., D.E.39-1 at 39:17-40:5, 44:18-19. She also disseminates abortion-related information on social media, makes literature available in her office with "information as to how to contact the nearest abortion provider outside of the State of Tennessee," and leaves "stickers in places where there are minors" who might see them. *Id.* at 41:4-9, 41:10-19, 47:3-49:7, 54:4-12. And in her role as a state representative, she participates in "Day on the Hill" to discuss legislation-related issues, including abortion. *Id.* at 40:13-19.

Plaintiffs' own testimony should have ended this case. *None* of the activities described by Plaintiffs are proscribed by the Act's "recruiting" provision, which—properly construed, *see supra* 12-14—prohibits only targeted conduct intended to induce or enlist a minor within this State to

17

obtain an abortion considered illegal in Tennessee without the consent of the minor's parent or legal guardian. Indeed, Welty made clear that she does not target minors and does not know if minors are among the recipients of her advocacy efforts. *See, e.g.*, Hearing Tr., D.E.39-1 at 33:15-34:19, 36:8-13 (confirming that Welty does not reach out to or target any particular minor); *id.* at 18:2-8 (acknowledging that she "does not "know … specifically" whether unemancipated minors are among those who pick up her handouts). Behn, too, clarified that she does not target minors or even interact with them "on an individual basis" in many of the situations she described. *Id.* at 40:13-19.

If doubt remained that Plaintiffs' intended conduct falls outside the "recruiting" provision, the Act's scienter requirement removes it. The Act requires that a person act "intentionally" and "for the purpose of" facilitating a minor's abortion without their parents' consent. Tenn. Code Ann. § 39-15-220(a). But Plaintiffs disavowed any such intent: Instead, they testified that their activities aim only to provide people with information about available options so that they can make informed decisions—not to persuade anyone to do anything, let alone drive minors to take steps without parental consent. Welty explained that her "goal as an advocate is *never to persuade someone*," but always to "let them make their own decision." Hearing Tr., D.E.39-1, 24:16-18 (emphasis added). Behn agreed. *Id*. at 56:1-5 (confirming that her lone goal when communicating with a pregnant minor is to "provide her information about abortion so that she can make her own decision" and *not* "to persuade her to get an abortion").

Plaintiffs' proof, in short, confirms that they fall outside the "recruits" provision twice over. Their conduct does not constitute recruiting, period. And even if it did, they do not have the requisite intent to induce a minor to undertake the relevant abortion-related action without parental consent. Because Plaintiffs cannot demonstrate an "intention to engage in a course of conduct …

18

proscribed by" the Act's "recruiting" provision, they lack standing to press a pre-enforcement suit. *Crawford*, 868 F.3d at 454 (citation omitted).

Neither Plaintiffs' summary-judgment arguments nor this Court's earlier decision square with the record. The previous decision asserted without explanation that "Welty and Behn have clearly and credibly asserted that they intend to engage in behavior for which the defendants could prosecute them under the recruitment provision." Mem., D.E.40, 558. But to reach that conclusion, one must not only jettison Defendants' reasonable and lawful construction of the "recruits" provision, but also disregard Plaintiffs' *own* testimony that they do not intend to persuade any minor to obtain an abortion, much less without her parents' consent. Without such intent, the Act does not apply. Any contrary conclusion would be error. *See Friends of George's*, 108 F.4th at 438 & n.4 (recognizing that the "standing analysis inevitably bleeds into the merits a bit" and considering the proper construction of the challenged law); *see also id.* at 437 ("By its own testimony, [the plaintiff] has failed to show any intention to even arguably violate [the challenged law].").

**B.    Plaintiffs demonstrated no certain threat of prosecution.**

For risk of future enforcement to confer pre-enforcement standing, a plaintiff also must demonstrate "a '*certainly impending*' threat of prosecution." *Id.* at 439 (quoting *Crawford*, 868 F.3d at 454). "[M]ere allegations of a 'subjective chill' on protected speech" are insufficient. *McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). To determine whether a "certainly impending" risk of prosecution exists, this Court uses the four-part test set out in *McKay*. 823 F.3d at 868; *see Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

As discussed below, all four considerations—history of past enforcement, receipt of enforcement letters, ease of enforcement, and refusal to disavow enforcement—cut against Plaintiffs' standing. Plaintiffs, as this Court already recognized, lack a history of past enforcement or

19

enforcement letters, so "support for [their] standing must be based on other factors." Mem., D.E.40, 559. But the absence of these factors means that Plaintiffs need to make a *stronger* showing on the remaining two factors. Under a test where "[n]o single factor is controlling," it is only "logical that the importance of [one] factor should vary in inverse proportion to the strength of [another]." *Allied Delivery Sys., Inc. v. I.C.C.*, 908 F.2d 972, 1990 WL 104828, at *4 (6th Cir. 1990). Ignoring unestablished factors rather than counting them against Plaintiffs' standing would perversely lower the jurisdictional requirements for pre-enforcement challengers with the *least* evidence of enforcement risk.

*History of past enforcement*. "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014). But Plaintiffs sued before the Act even went into effect, so they necessarily cannot establish a history of prior enforcement. For that reason, as this Court already acknowledged, this factor "do[es] not provide much support for standing." Mem., D.E.40, 559.

*Receipt of enforcement letters*. "[E]nforcement warning letters," had they been "sent to" Plaintiffs "regarding [their] specific conduct," could lend credibility to their fear of prosecution. *Online Merchs.*, 995 F.3d at 550 (citation omitted). Plaintiffs failed to cite any such letters, leading this Court to again remark that this factor does not support standing. Mem., D.E.40, 559. More than that, though, Defendants have clarified time and again that they do *not* read the "recruits" provision to prohibit Plaintiffs' desired conduct. *See, e.g.*, PI Resp., D.E.22, 224-29; MTD Mem., D.E.26, 265-69; Supp. PI Resp., D.E.39, 512-17.

*Ease of enforcement*. The Act does not allow just "any member of the public to initiate an enforcement action" for criminal liability. *Online Merchs.*, 995 F.3d at 550 (citation omitted).

20

The "universe of potential" criminal enforcers is limited to "state officials who are constrained by … ethical obligations." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). "Only law enforcement officials can investigate" potential violations of the Act, and "only prosecutors can bring charges." *Plunderbund Media, LLC v. DeWine*, 753 F. App'x 362, 371 (6th Cir. 2018). Criminal prosecution under the Act is thus subject to the same restrictions as other Tennessee criminal laws.

Plaintiffs, echoing this Court's earlier reasoning, maintain that certain "features" of the Act make it "more likely" to be enforced. Mem., D.E.40, 560; MSJ Mem., D.E.56, 709-11. But unlike this Court's earlier decision, they decline to rely on floor statements by legislators, *cf.* Mem., D.E.40, 561., or their "high-profile" status as prominent abortion advocates, *cf. id.* Rather, they rest their ease-of-enforcement argument on the possibility of "private enforcement." MSJ Mem., D.E.56, 709. Specifically, they point to Tennessee's grand-jury structure, which allows citizen-initiated indictments, and the permissibility of citizen arrests under Tennessee law. This, they say, creates a higher risk of enforcement because of the "acrimonious environment surrounding issues of abortion in Tennessee." *Id.* at 711 (quoting Mem., D.E.40, 560). But while Tennessee may permit citizen-initiated indictments and arrests, it's hard to see how those possibilities prove a risk that *Defendants* will enforce the law against Plaintiffs. Indeed, Plaintiffs' counsel raised this exact argument in *Friends of George's*, *see* Intervenors' Br., No. 23-5611, Doc. 42, at 14-15, and the Sixth Circuit squarely rejected it. Whatever Tennessee law permits citizens to do, district attorneys general, that court observed, retain "the sole duty, authority, and discretion to prosecute criminal matters." *Friends of George's*, 108 F.4th at 439 (quoting *State v. Spradlin*, 12 S.W.3d 432, 433-34 (Tenn. 2000)).

And beyond that, any public dispute over abortion policy is not an "attribute of the challenged [Act]" itself. *Contra McKay*, 823 F.3d at 869. Whether Plaintiffs prove a risk of enforcement shouldn't hinge on a judge's subjective sense of a social issue's salience. Nor does this Court's earlier, contrary reasoning hold up on its own terms: Abortion has been criminal in Tennessee absent certain health scenarios since 2022, Tenn. Code Ann. § 39-15-213, and had long been subject to certain criminal restrictions before that, *see id.* § 39-15-209 (prohibiting partial-birth abortions); *id.* § 39-15-211 (prohibiting post-viability abortions). Missing is any flood of citizen-initiated criminal cases supporting risk here.

<u>*Refusal to disavow enforcement*</u>. There has been no meaningful "refusal to disavow enforcement" of the Act, *Online Merchs.*, 995 F.3d at 550 (citation omitted). This Court's contrary conclusion cited Defendants' failure to "disavow all enforcement" of the "recruiting" provision in response to Plaintiff Welty's pre-suit letter. *See* Compl., PageID# 5-6; Mem., D.E.40, 562. But what matters for pre-enforcement-standing purposes is not the refusal to disavow enforcement "in the *abstract*," but the refusal to disavow enforcement against the Plaintiffs' "*specific* speech." *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022). Only that situation-specific refusal to disavow could shed light on the likelihood of enforcement against *Plaintiffs*, which is the very reason the *McKay* factors exist. *See Online Merchs.*, 995 F.3d at 550. Nor could any post-filing silence bear on the standing inquiry, *contra* MSJ Mem., D.E.56, 711, since standing is "assessed at the time of the filing of the [c]omplaint." Mem., D.E.40, 562 n.8.

In all events, Defendants *have* disavowed enforcement of the Act's "recruitment" prohibition as to Plaintiffs' intended conduct at nearly every turn this case has presented. *See, e.g.*, PI Resp., D.E.22, 224-29; MTD Mem., D.E.26, 265-69; Supp. PI Resp., D.E.39, 512-17. Plaintiffs assert that Defendants' "post-filing litigation position carries little weight." MSJ Mem., D.E.56,

22

712. But Defendants are bound by their represented position with respect to any subsequent litigation against Plaintiffs. *Chaney-Snell v. Young*, 98 F.4th 699, 711 (6th Cir. 2024) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)); *see Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 545 (6th Cir. 2014) (estoppel precludes a party from "achieving success on one position, then arguing the opposite to suit an exigency of the moment") (citation omitted); *Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 245 (6th Cir. 2021) (rejecting argument that party's statement in prior case must have been made through sworn testimony to trigger estoppel).

All four *McKay* factors, then, cut decisively against Plaintiffs' standing. Perhaps aware of this, and pointing out that the factors are "not exhaustive," MSJ Mem., D.E.56, 704, Plaintiffs point to two other factors they believe support standing here: the recency of the Act and its criminal penalties. These other factors, though, get them nowhere.

Start with recency. The Act's recency, Plaintiffs claim, "favors standing." *Id.* at 705. Their argument, in essence, is that courts should presume that newly enacted laws will be enforced. *See generally id.* But even if that's true, it misses the point. The question this Court must ask in the pre-enforcement standing context is not whether the challenged law will be enforced somewhere against someone, but whether it is likely to be enforced against *these Plaintiffs*. *See McKay*, 823 F.3d at 869 (looking for a "history of past enforcement against the *plaintiffs* or others," and questioning whether "enforcement warning letters [were] sent to the *plaintiffs*," and whether the defendant had refused to disavow enforcement "against a *particular plaintiff*" (emphasis added)). An abstract assumption that new statutes are intended to be enforced is of little help in answering that question, especially when Defendants have consistently maintained that Plaintiffs' intended behavior is not even covered by the law. *See supra* 18-19. At the end of the day, Plaintiffs'

23

recency-equals-risk approach runs aground on an even more basic rule: "the mere existence of a statute … is not sufficient" to establish standing. *NRA v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997). If Plaintiffs were right that recency alone could establish a plaintiff-specific risk of enforcement, *every* newly enacted law could be challenged immediately.[5]

Turn now to the Act's criminal penalties. In Plaintiffs' view, "the fact that [they] risk criminal penalties under [the Act] supports their standing to challenge it." MSJ Mem., D.E. 56, 708. But the presence of criminal penalties does not make enforcement more *likely*. Indeed, the Third Circuit decision Plaintiffs cite makes clear only that an "attenuated risk of enforcement … matters *less*" when criminal penalties are at stake. *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 222 (3d Cir. 2023) (emphasis added). It still stresses that a plaintiffs' failure to "show[] a substantial likelihood" of enforcement "suffices to defeat standing." *Id.* It's not hard to see why this general rule holds despite the existence of criminal penalties. Once again, if Plaintiffs were right that the mere presence of criminal penalties could establish a plaintiff-specific risk of enforcement, newly enacted criminal laws would be always subject to immediate challenge. *Contra Magaw*, 132 F.3d at 293; *Friends of George's*, 108 F.4th at 440 (rejecting the argument that "felony penalties" made a challenged law "easier to enforce," reasoning that it was "a standard criminal law with no attributes making enforcement easier or more likely").

Finally, trying a different tack, Plaintiffs claim that "*McKay*'s considerations should not even matter here." MSJ Mem., D.E.56, 713. This is because, they continue, they "are the object of the statute they challenge, which interferes, at a minimum, with Ms. Welty's ability to practice

---

[5] The Sixth Circuit's decision in *Universal Life Church Monastery Storehouse v. Nabors* does not say otherwise; the court there was discussing *two* contemporaneous enactments—one that arguably authorized prosecution and another that raised the possible penalties—and concluded that "the contemporaneity of those enactments" added legitimacy to the plaintiffs' fears of prosecution. 35 F.4th 1021, 1035 (6th Cir. 2022).

24

law and directly affects her day-to-day operations." *Id.* (first citing *Whole Woman's Health v. Jackson*, 595 U.S. 30, 47 (2021); and then citing *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). This argument can be rejected out of hand. For one thing, neither *Whole Woman's Health* nor *Bolton* support the existence of a freestanding object-of-the-law standing theory; both cases involved plaintiffs who had established a credible threat of enforcement in the traditional way. *See Whole Woman's Health*, 595 U.S. at 47; *see also Bolton*, 410 U.S. at 188. And for another, no matter how "well established" this object-of-the-law theory might be, it is wholly irrelevant to individual plaintiffs challenging a generally applicable criminal law. Even a cursory read of the remaining decisions Plaintiffs cite confirms as much. Those cases, without exception, involve administrative actions targeting particular entities or groups. *See Consumers' Rsch. v. FCC*, 67 F.4th 773, 783 (6th Cir. 2023); *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015); *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). Not one of them involves a challenge to a run-of-the-mill criminal statute. The reason is obvious: if every person were treated as the "object" of a criminal law simply because they could theoretically violate it, there would be little left of Article III's standing requirements.

## III. No sovereign immunity exception applies because there is no risk of relevant enforcement.

Defendants, all of whom are sued in their official capacities only, are entitled to sovereign immunity. And because sovereign immunity is "immunity from suit" entirely, *Alden v. Maine*, 527 U.S. 706, 712 (1999), Plaintiffs' claims should be dismissed outright.

Generally, a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). Official-capacity suits are considered suits against the State for sovereign-immunity purposes. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). That means this suit can

25

proceed only if Defendants fall within the "exception to States' sovereign immunity under the doctrine announced in *Ex Parte Young*." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046-47 (6th Cir. 2015). But that exception "has been read narrowly." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019). To successfully invoke it, a plaintiff must show that the defendant state official has threatened and is "about to commence proceedings." *Id.*, 920 F.3d at 445.

Plaintiffs cannot carry that burden. Plaintiffs sued eleven district attorneys, but failed to demonstrate that any of these Defendants has "enforced []or threatened to enforce" the Act against them. *See Russell*, 784 F.3d at 1047. Rather, they claim only that Defendants have "criminal enforcement authority and an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto.'" Compl., D.E.1, 3 (quoting Tenn. Code Ann. § 8-7-103(1)). But *Ex parte Young* requires "likely" enforcement, not potential enforcement. *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018). Plaintiffs' legally flawed speculation about how the Act might apply fails this hurdle by definition.

Plaintiffs wrongly collapse the standing and sovereign-immunity inquiries, claiming that their showing "under the *McKay* factors … is equally dispositive of the Defendants' sovereign immunity defense." MSJ Mem., D.E.56, 713. Defendants of course disagree that Plaintiffs have standing to start with. And anyway, there are important reasons why official-capacity defendants might raise both standing and sovereign-immunity arguments even if related. Courts undertaking Article III standing analyses, particularly in First Amendment chilling-effect cases, often employ a high level of generality—e.g., by focusing on chilling effects that allegedly follow from a *law*, rather than from a specific defendant's real-world actions. *Ex parte Young* serves as a check on

improper or unripe suits by requiring that plaintiffs and courts link any alleged harms to the actual or threatened enforcement by the named *defendants* themselves. In so doing, it guards against improper challenges both to laws "in the abstract," *L.W.*, 83 F.4th at 490 (citation omitted), or against state officials with no "connection" to enforcement, *DeWine*, 910 F.3d at 848 (quotation omitted).

In sum, *Ex parte Young*'s requirement of threatened enforcement by the named official-capacity defendant is both important and not satisfied here, where Plaintiffs lack any allegations of enforcement activity by the named Defendants. Plaintiffs thus cannot overcome sovereign immunity, which requires both vacatur of the existing injunction and dismissal of the case.

## IV.    The Act is not facially unconstitutional.

Setting aside these fatal jurisdictional defects, Plaintiffs' claims also fail on the merits. "Even in the First Amendment context, facial challenges are disfavored" and "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723, 744 (2024); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (en banc). And this case is not the rare winner.

### A.    The Act does not violate the First Amendment.

When plaintiffs choose "to litigate … cases as facial challenges, … that decision comes at a cost." *NetChoice*, 603 U.S. at 723. To succeed in a facial overbreadth challenge, a plaintiff must show that a law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (internal quotations omitted) (citation omitted). Hypothesizing "some impermissible applications of a statute is not sufficient." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Courts must define the law's total "scope," determine "which of [its] applications violate the First Amendment," and then decide whether "the law's unconstitutional applications *substantially outweigh* its constitutional ones." *NetChoice*, 603 U.S. at 708, 724-26 (emphasis added). That requires an "inquiry into how

27

a law works in *all* of its applications." *Id.* at 744 (emphasis added). Plaintiffs did not—and cannot—carry their burden under that standard.

Return once more to the Act's proper construction. As Defendants have explained, the Act does not prohibit public advocacy regarding abortion or the mere sharing of information about the availability of abortion in other states for educational purposes. It only applies to targeted conduct intended to induce or enlist a pregnant, unemancipated minor in Tennessee to engage in specific action, i.e., obtaining an elective abortion without parental consent. And that application is constitutional in a plethora of contexts involving speech integral to criminal conduct.

Speech that is an "integral part of conduct in violation of a valid criminal statute" is not protected by the First Amendment. *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 498 (1949); *see Hansen*, 599 U.S. at 783 (same); *Williams*, 553 U.S. at 297-300 (same). That is why laws promoting a "particular piece of contraband," or banning the "solicitation of unlawful employment" are valid, even though they represent content and viewpoint-based determinations. *Hansen*, 599 U.S. at 783 (citation omitted); *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."). Here, much of the speech covered by the Act is unquestionably incident to criminal conduct.

*First*, the Act constitutionally prohibits the recruiting of minors to obtain illegal abortions performed *in Tennessee*. As discussed, Tennessee prohibits abortion except in certain circumstances that present a serious risk to the life or health of the mother. Tenn. Code Ann. § 39-15-213. Intentionally recruiting a minor to obtain an abortion that violates Tennessee law is speech that is integral to a crime. And, as this Court has recognized, "[t]he First Amendment does not confer the right to persuade others to violate the law." *Kasper v. Brittain*, 245 F.2d 92, 95 (6th

28

Cir. 1957) (citing *Giboney*, 336 U.S. at 502); *see also Bullock v. United States*, 265 F.2d 683, 694 (6th Cir. 1959) (same). These in-state applications fall within the heartland of the "speech-integral-to-unlawful-conduct exception." *Hansen*, 599 U.S. at 784; *see Williams*, 553 U.S. at 297-99.

This Court has already recognized as much. "[B]ecause it is now generally illegal to perform an abortion in Tennessee, Tennessee also has the authority to punish communications made in the direct furtherance of any such illegal, Tennessee-based abortion procedure." Mem., D.E.40, 539-40. The Ninth Circuit, too, has concluded that the in-state application of Idaho's analogous law was constitutionally permissible. "Idaho," it explained, was "correct that recruiting an Idaho minor to get an illegal abortion in Idaho qualifies as speech integral to criminal conduct." *Matsumoto v. Labrador*, 122 F.4th 787, 813 (9th Cir. 2024). Like that law, Tennessee's law can be constitutionally applied to attempts to recruit minors to obtain illegal in-State abortions.

*Second*, the Act constitutionally prohibits the recruiting of minors to obtain illegal abortions performed *in other States in which abortion is illegal absent parental notification or consent*. Tennessee's prohibition on intentionally concealing a minor's abortion from her parent or guardian, *see* Tenn. Code Ann. § 39-15-201(a)(1), is no outlier. Indeed, it tracks the laws of most other States. As it stands, "36 states require parental involvement in a minor's decision to have an abortion." Guttmacher Inst., *Parental Involvement in Minors' Abortions*, https://perma.cc/S9G5-5BEQ, (Sept. 1, 2023). Focusing closer to home, every State that borders Tennessee—Kentucky, Virginia, North Carolina, Georgia, Alabama, Mississippi, Arkansas, and Missouri—requires parental consent or notification in some form before a minor can obtain an abortion.[6]

---

[6] Ky. Rev. Stat. Ann. § 311.990(12)(a); Va. Code Ann. § 18.2-76; N.C. Gen. Stat. Ann. § 90-21.7; Ga. Code Ann. § 15-11-682(a)(1)(B); Ala. Code § 26-21-3(a); Miss. Code Ann. § 41-41-53 (1); Ark. Code Ann. § 12-18-210; Mo. Ann. Stat. § 188.028(1).

Indeed, the Seventh Circuit recently employed this exact reasoning to uphold an Indiana law barring doctors from making out-of-state referrals for "gender transition procedures to a minor." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 628 (7th Cir. 2024) (citation omitted). Relying on *Giboney* and *Hansen*, the court concluded that the law was a valid prohibition on speech integral to unlawful conduct. *Id.* at 628-30. The plaintiffs had argued that the law prohibited speech incident to *legal* gender-transition procedures. *Id.* at 630-31. But the court refused to invalidate the statute on those grounds. The law, it recognized, could be constitutionally applied to referrals for illegal in-state procedures, as well as referrals for procedures in other States where they were *also* banned. *Id.*

*Third*, the Act constitutionally prohibits speech intended to induce or facilitate the "harboring" or "transporting" of a minor within this State for the purpose of obtaining an elective abortion without parental consent. The Act's prohibitions on "harboring" and "transporting" are independent of its "recruiting" prohibition. *See* Tenn. Code Ann. § 39-15-201(a) (connecting the prohibited actions with the disjunctive "or"); *see also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) ("Or is almost always disjunctive.") (cleaned up). These separate prohibitions against "harboring" and "transporting"—both of which regulate conduct and neither of which has been challenged here, *see* Compl., D.E.1, 9-14—enjoy a presumption of constitutionality, and their violation remains subject to criminal prosecution. So it remains a crime for adults to "harbor[]" or "transport[]" a minor without parental consent for the purpose of obtaining an abortion, no matter what State they are transporting the minor to. That means that speech incident to the crimes of "harboring" and "transporting," then, can be constitutionally proscribed. *See Hansen*, 599 U.S. at 783; *Williams*, 553 U.S. at 297-99; *Giboney*, 336 U.S. at 502.

30

Real-world examples abound. Imagine, for instance, a father who induces his son's pregnant girlfriend to get an abortion out of state by offering to arrange her transportation, lodging, and the abortion itself. Or imagine a staffer at an abortion advocacy organization who induces a minor to be transported out of state for an abortion by offering to provide her with a doctor's note to get out of school and having one of its volunteers drive her to a clinic across state lines to keep her parents from finding out.

*Fourth*, the Act constitutionally prohibits speech intended to induce abortions through extortion, coercion, or to conceal criminal conduct. *See, e.g.,* Tenn. Code Ann. §§ 39-14-112, 39-16-503. Consider for example a college freshman who blackmails his high-school girlfriend into getting an abortion by threatening to share intimate photos of her with her family. Or imagine someone who forces a 15-year-old girl he impregnated to get an abortion through threats of physical harm to try to hide the statutory rape from her parents (and authorities). As long as the speech is used to violate or conceal the violation of an otherwise valid Tennessee law, an application of the recruiting provision would be valid.

The takeaway: The Act has numerous constitutional applications. It can be constitutionally applied to the recruitment of minors for illegal abortions in Tennessee. It can be constitutionally applied to the recruitment of minors for illegal abortions in other States. It can be constitutionally applied to recruitment incident to "harboring" and "transporting" minors in this State. And it can be constitutionally applied to recruitment intended to induce abortions through extortion, coercion, or to conceal criminal conduct. Yet neither Plaintiffs nor this Court considered these constitutional applications of the Act. That is fatal to Plaintiffs' facial challenge. "[N]either parties nor courts," after all, "can disregard the requisite inquiry into how a law works in *all* of its

31

applications." *NetChoice*, 603 U.S. at 744 (emphasis added); *see also id.* at 745 (vacating and remanding for the courts below to conduct that inquiry in the first instance).

In turning a blind eye to these constitutional applications, Plaintiffs and this Court's prior order took the same flawed path that led to vacatur in *NetChoice*: they "focused" on certain "applications" while "disregard[ing] the requisite inquiry into how [the Act] works in all of its applications." *Id.* at 744. Both Plaintiffs and this Court focused solely on applications to speech intended to induce minors' abortions in the minority of states where abortion is "entirely legal," without parental consent. Mem., D.E.40, 540. And, painting with a broad brush, this Court deemed unconstitutional *all* applications of the Act to *that* sort of speech.

Instead of conducting the *NetChoice* inquiry, this Court claimed that *Bigelow v. Virginia*, 421 U.S. 809 (1975) settled the matter by holding that states cannot punish speech within their borders about legal abortions available elsewhere. Mem., D.E.40, 571. This reads too much into *Bigelow*. When that case was decided, courts treated abortion as a federal constitutional right in every State, and that fact was an express basis for the decision. *See Bigelow*, 421 U.S. at 829. In other words, *Bigelow* hinged on abortion's "constitutionally protected" status. *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 345 (1986), *abrogated on other grounds by 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996). But things have changed since *Bigelow*. As it stands, thirty-six States require some form of parental involvement for a minor to obtain an abortion. *See* Guttmacher Inst., *supra* 29. So whatever weight *Bigelow*'s "dictum" may have once carried, C. Steven Bradford, *What Happens If Roe Is Overruled? Extraterritorial Regulation of Abortion by the States*, 35 Ariz. L. Rev. 87, 164 (1993), it offers little help in a post-*Dobbs* world.

And the Ninth Circuit's decision in *Matsumoto* does not salvage this flawed analysis. There, the Ninth Circuit held that Idaho's abortion-trafficking law violated the First Amendment

overbreadth doctrine. *Matsumoto*, 122 F.4th at 813-15. Aspects of that opinion—the statutory interpretation and vagueness analysis—were correct. For example, the court interpreted "recruiting" to mean "to seek to persuade, enlist, or induce someone to join an undertaking or organization, to participate in an endeavor, or to engage in a particular activity or event." *Id*. at 808. And it rightly noted that "to qualify as speech integral to unlawful conduct, the speech must be done in furtherance of the commission of an underlying criminal offense." *Id.* at 813–14 (quotation omitted).

But the Ninth Circuit misapplied its own interpretation of "recruits." Despite acknowledging the term's plain meaning of seeking to "persuade, enlist, or induce someone" to participate or engage in certain conduct, it incorrectly speculated that the term could cover things like simply "providing information … regarding the provider, time, place, or cost of an available abortion." *Id*. at 809.

And it committed the same error as Plaintiffs (and as found in this Court's prior order) by failing to properly apply the *NetChoice* analysis for facial invalidation. It ignored the dozens of States around the country that have the same or similar *underlying prohibitions* as Idaho and Tennessee. *Id.* at 813-14. By not taking those States' similar prohibitions into consideration, *Matsumoto* did not fully recognize the law's "plainly legitimate sweep." *Hansen*, 599 U.S. at 770. And so its facial invalidation of Idaho's "recruiting" prohibition was wrong.

At bottom, to succeed on their First Amendment claims—overbreadth and otherwise—Plaintiffs needed to show that the Act "prohibits a *substantial* amount of protected speech relative to its plainly legitimate sweep." *Id.* (emphasis added and cleaned up). And the recruitment provision's legitimate sweep plainly includes speech intended to facilitate illegal abortions in

33

Tennessee and in the many other States with similar prohibitions or parental-consent require-ments.[7] It also includes speech incident to the crimes of "transporting" or "harboring" minors, both of which are independently proscribed by the Act (and are unchallenged here). And it applies to speech used for extortion or to cover up otherwise criminal conduct, like statutory rape. Plain-tiffs failed to prove a *substantial* number of unconstitutional applications "from the text of the law and from actual fact." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up).

### B. The Act is not unconstitutionally vague.

Plaintiffs' void-for-vagueness claim likewise fails as a matter of law. The Due Process Clause's "void for vagueness" doctrine ensures only that a "person of ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "Perfect clarity and precise guidance have never been required," even for laws "that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Indeed, the law is full of "flexible" "standards," *id.*, and "[c]lose cases can be imagined under virtually any statute," *Williams*, 553 U.S. at 306. The vagueness doctrine thus serves a narrow purpose: to protect against those rare laws that altogether fail "to give ordinary people fair notice of the criminalized conduct" or are "so standardless as to invite arbitrary enforcement." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (cleaned up).

1. The Act does not rise to that level. The fact that it does not define "recruits," for instance, is hardly unusual, let alone cause for vagueness concerns. "When a word is not defined

---

[7] That some States have variations on parental involvement—*e.g.*, judicial bypass or require noti-fication rather than consent—changes nothing. This Court still erred in in failing to recognize the post-*Dobbs* state of the law. A proper facial-challenge analysis required the Court to consider how the Act functions when applied to speech related to abortions in the many States with abortion laws like Tennessee's. This Court and Plaintiffs, though, simply assumed that abortion regulation was an on/off switch, not the complex matrix of federalism that exists today.

by statute," courts "normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993); *see also* Tenn. Code Ann. § 1-3-105(b) (providing that "undefined words shall be given their natural and ordinary meaning."). And as explained above, *see supra* 12-24, the term "recruits" has a "well understood" and "widely used" meaning in both common usage and in similar state and federal statutes. *Cameron*, 390 U.S. at 616. The common dictionary definitions of "recruit" collectively confirm that, in this context, the Act's "recruitment" provision applies to targeted conduct intended to induce or enlist a pregnant, unemancipated minor in Tennessee to engage in specific action, i.e., obtaining an elective abortion without parental consent. *Supra* 12-24. The term is also routinely used in other similar statutes across the country that prohibit the "trafficking" of persons for certain purposes. *See, e.g.*, Tenn. Code Ann. §§ 39-13-308 (making it a crime to "recruit," "harbor," or "transport" another person for the purpose of human trafficking), 39-13-309 (same for sex trafficking); 18 U.S.C. §§ 1590(a) (human trafficking), 1591(a) (sex trafficking).[8] In fact, the federal code uses "recruit" (and "harbor" and "transport") to *define* "trafficking." 22 U.S.C. § 7102(11)(B), (12).

Courts have repeatedly rejected vagueness challenges to trafficking statutes that use the *same term* challenged here. The Fourth Circuit, in *United States v. Snead*, for example, held that "each of the verbs at issue in [18 U.S.C.] § 1591"—including "recruits," "harbors," and "transports"—"has an ordinary meaning that would provide a person of ordinary intelligence fair notice of what conduct is prohibited." 21-4333, 2022 WL 17975015, at *4 (4th Cir. Dec. 28, 2022). The

---

[8] *See also, e.g.*, Ala. Code § 13A-6-152; Ark. Code § 5-18-103; Colo. Rev. Stat. § 18-3-504; Ga. Code Ann. § 16-5-46; 720 Ill. Comp. Stat. § 5/10-9; Ind. Code § 35-42-3.5-1; Ky. Rev. Stat. § 529.110; La. Stat. Ann. § 14:46.2; Mass. Gen. L. Ann. 265 § 50(a); Mich. Comp. L. Ann. § 750.462e; Miss. Code Ann. § 97-3-54.1; N.C. Gen. Stat. § 14-43.11; Neb. Rev. Stat. § 28-830; Nev. Rev. Stat. § 201.300; N.Y. Penal Law § 135.35; Ohio Rev. Code Ann. § 2905.32; Tex. Penal Code Ann. § 20A.01; Utah Code Ann. §§ 76-5-308-308.5; Wash. Rev. Code § 9A.40.100; Wis. Stat § 948.051.

35

Massachusetts Supreme Judicial Court likewise rejected a vagueness challenge to a near-identically worded state law in *Commonwealth v. McGhee*, 35 N.E.3d 329, 339-40 (Mass. 2015).  And the Alabama Court of Criminal Appeals similarly upheld a state sex-trafficking law that prohibited "recruit[ing]," "harbor[ing]," and "transport[ing]," concluding that it was "not unconstitutionally vague."  *Alonso v. State*, 228 So.3d 1093, 1101–02 (Ala. Crim. App. 2016).

The ready availability of commonly accepted meanings coupled with the widespread use of the term in similar statutes dooms Plaintiffs' vagueness claim.  The Ninth Circuit's recent decision in *Matsumoto* confirms this.  There, the court was faced with an Idaho law that, much like the Act, prohibits "'procur[ing] an abortion' … for an unemancipated minor by 'recruiting … [a] pregnant minor' with the intent to conceal the abortion from the minor's parents or guardian."  *Matsumoto*, 122 F.4th at 794 (quoting Idaho Code Ann. § 18-623).  The law, the court concluded, did "not fall afoul of the vagueness line."  *Id.* at 805.  The term "recruiting" was "subject to an 'imprecise but comprehensible normative standard.'"  *Id.* (quotation omitted).

The Act's scienter requirement eliminates any lingering constitutional concerns.  Such requirements, the Supreme Court has explained, "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  *Vill. of Hoffman Ests.*, 455 U.S. at 499.  This is because, "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law."  *Screws v. United States*, 325 U.S. 91, 102 (1945).  And the Supreme Court has consistently followed this reasoning to conclude that a scienter requirement "alleviate[s any] vagueness concerns."  *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *Wright v. New Jersey*, 469 U.S. 1146, 1152 n.5 (1985) (Brennan, J., dissenting); *Boyce Motor Lines v. U.S.*, 342 U.S. 337 (1952).

Here, the Act applies only when an "adult *intentionally* recruits … a pregnant unemancipated minor within [Tennessee]" for a specific purpose. Tenn. Code Ann. § 39-15-201(a) (emphasis added). The Act, then, sets a high bar. "Intentional" is the most culpable mental state. *See* Tenn. Code Ann. § 39-11-302(a). It "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* And when the Act is read with that steep requirement in mind, it is hard to see how anyone could accidentally violate the law's "recruitment" prohibition. Again, the law does not prohibit recruiting in the abstract; it prohibits it when done "*for the purpose* of" facilitating a minor's elective abortion without parental consent. Tenn. Code Ann. § 39-15-201(a). The Act's recruiting provision, in short, is not unconstitutionally vague.

**2.** Even if the term "recruits" could be considered impermissibly vague in certain applications, Plaintiffs failed to carry their burden of establishing *facial* invalidity.

Normally, "litigants mounting a facial challenge to a statute … 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *Hansen*, 599 U.S. at 769 (citation omitted). In the context of a facial vagueness challenge, that generally means "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 497. That rule has been relaxed somewhat in vagueness challenges implicating First Amendment rights and other narrow circumstances. *United States v. Requena*, 980 F.3d 30, 39-40 (2d Cir. 2020). But the Supreme Court has never clearly stated that facial vagueness challenges require courts to compare constitutional applications to unconstitutional applications, as they do in First Amendment overbreadth challenges. And even assuming an overbreadth-like comparison is required, courts "vigorously enforce[] the requirement that a statute's"

37

unconstitutional applications "be *substantial ...* relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292, and place the burden of making that showing squarely on the challenger, *Hicks*, 539 U.S. at 122.

But, here, Plaintiffs did not prove any vague applications—much less establish that "the ratio of unlawful-to-lawful applications" is "lopsided enough to justify the strong medicine of facial invalidation." *Hansen*, 599 U.S. at 784 (quotations omitted). Indeed, many applications of the law will fall in the heartland of the Act—a rapist who convinces his underage victim to leave the State to get an abortion to hide his crime, or an employee of an abortion-advocacy organization who induces a minor to go to another State to obtain an abortion without her parents' consent *despite* the parental-consent requirements of that State. Examples abound. *See supra* 28-32.

Put simply, there are countless applications of the Act that raise no vagueness issue whatsoever. The Act, then, is not *facially* invalid for vagueness and Defendants are entitled to summary judgment in their favor.

## V.      Alternatively, Any Relief Granted Should Be Limited to the Parties.

Even if this Court grants summary judgment for Plaintiffs and awards injunctive relief, any such relief must be limited to the parties and their desired abortion-related conduct.

The Supreme Court has been clear that any remedy awarded to a plaintiff must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). In a similar vein, this Court has observed that "[d]istrict courts "should not issue relief that extends further than necessary to remedy the plaintiff's injury." *L.W.*, 83 F.4th at 490 (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). This limitation follows directly from "the nature of federal judicial power," and indeed from Article III itself. *Id.* Article III "confines the 'judicial power' to 'Cases' and 'Controversies.'" *Id.* (quoting U.S. Const. art. III, § 2). It does not permit

38

federal courts to "issue advisory opinions or address statutes 'in the abstract.'" *Id.* (quoting *California v. Texas*, 593 U.S. 659, 672 (2021)). Instead, courts "must operate in a party-specific and injury-focused manner." *Id.*

This Court's earlier decision, however, sidestepped these foundational limits by taking an expansive view of the First Amendment's protections. Because this "is a case about the free flow of information," it reasoned, Plaintiffs' injuries could not "be addressed simply by preventing the application of the recruitment provision to them and them alone." Mem., R.40, 585. The Court reasoned that "[a]n injunction that simply created a narrow zone of protection around Welty and Behn—while permitting the defendants to criminally prosecute anyone else who shares the messages that [they] espouse—would not be an injunction that 'provide[s] complete relief to the plaintiffs.'" *Id.* (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). This is because, it continued, the First Amendment does not simply grant Welty and Behn the "right to speak their message," but also the "right to live in a state where that message can be repeated by all who find it valuable to all who wish to hear it." *Id.* at 586.

But neither the First Amendment generally nor the overbreadth doctrine specifically gives courts carte blanche to disregard binding remedial rules. Supreme Court precedent confirms as much. In *United States v. National Treasury Employees Union*, the Court held that a statute banning federal employees' receipt of honoraria was unconstitutionally overbroad to the extent it covered certain classes of employees. 513 U.S. 454, 477 (1995). Still, the Court held that injunctive relief "should be limited to the parties before the Court." *Id.* It declined "to provide relief to nonparties when a narrower remedy [would] fully protect the litigants." *Id.* at 478. Likewise, in *Doran v. Salem, Inn Inc.*, the Court deemed a law overbroad yet limited the injunction to the parties. 422 U.S. 922, 931, 933-34 (1975). The Court observed that "neither declaratory nor

39

injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id.* at 931. "[T]he State," in short, "is free to prosecute others who may violate the statute." *Id.*

The upshot: While assessing the *merits* of an overbreadth challenge may turn on the range of a law's potential applications, that is distinct from the court's permissible *remedy*, which must be "'no more burdensome to the defendant than necessary to provide complete relief.'" *HM Fla.-Orl, LLC v. Governor of Fla.*, No. 23-12160, 2023 WL 6785071, at *5 (11th Cir. Oct. 11, 2023) (Brasher, J., dissenting) (citation omitted); *accord Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (Gorsuch, J., concurring) (collecting cases). Broader relief "conflates the merits" of a legal claim "with the scope of the remedy for that claim" and authorizes a special remedy unavailable to "plaintiff[s] with any other successful claim." *HM Fla.-Orl, LLC*, 2023 WL 6785071, at *5 (Brasher, J., dissenting).

Any alternative downstream-speech theory would explode Article III limitations in First Amendment cases. If every First Amendment plaintiff could obtain injunctive relief to protect not only his individual right to speak, but also the rights of every possible speaker who might "re-peat[]" a message down the line, there would be no stopping point. Mem., D.E.40, 586. Every First Amendment injunction would be per se universal. Such remedies exceed "the power of Article III courts" and conflict with "longstanding limits on equitable relief." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see also L.W.*, 83 F.4th at 490. And what's more, they are "patently unworkable," *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring), and "intrude on powers reserved for the elected branches," *United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring in the judgment).

40

## CONCLUSION

There are no genuine issues of material fact that would preclude the entry of judgment in favor of Defendants as a matter of law. Accordingly, the Court should grant Defendants' motion for summary judgment, deny Plaintiffs' motion for summary judgment, and dismiss all claims asserted. Alternatively, should the Court find that Plaintiffs are entitled to summary judgment, any relief awarded should be limited to the parties.

Dated: January 16, 2024

Respectfully Submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

*/s/ Steven J. Griffin*
Steven J. Griffin
  *Senior Counsel for Strategic Litigation*

Matthew D. Cloutier
  *Assistant Solicitor General*

State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Steven.Griffin@ag.tn.gov
(615) 741-3491
*Counsel for Defendants-Appellants*

41

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2025, a copy of the foregoing document was filed using

the Court's electronic court-filing system, which sent notice of filing to the following counsel of

record:

> Daniel A. Horwitz
> Melissa Dix
> Sarah L. Martin
> HORWITZ LAW, PLLC
> 4016 Westlawn Dr.
> Nashville, TN 37209
> (615) 739-2888
> daniel@horwitz.law
> melissa@horwitz.law
> sarah@horwitz.com
>
> *Counsel for Plaintiffs*

/s/ *Steven J. Griffin*
STEVEN J. GRIFFIN