# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| RACHEL WELTY and<br>AFTYN BEHN, | §<br>§<br>§ | |
| *Plaintiffs*, | §<br>§ | |
| v. | §<br>§ | Case No. 3:24-cv-00768 |
| BRYANT C. DUNAWAY, *et al.* | §<br>§ | |
| *Defendants*. | §<br>§ | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. 67]

## I. INTRODUCTION

The Defendant District Attorneys—prosecutors who have both the authority and an admitted "affirmative statutory obligation" to prosecute violations of the recruitment provision challenged here, *see* Doc. 70 at 26 ¶ 99—have filed a consolidated response to the Plaintiffs' Motion for Summary Judgment and counter-moved for summary judgment themselves. *See* Docs. 67, 69. But the District Attorneys' briefing suffers from case-dispositive deficiencies. It also supports *the Plaintiffs'* claim for summary judgment here.

For example, the District Attorneys do not contest that the challenged recruitment provision is a content- and viewpoint-based speech restriction. *See generally* Doc. 69. But that is one of the Plaintiffs' claims here, *see* Doc. 1 at 11–13; it is one of the grounds on which the Plaintiffs secured a preliminary injunction, *see* Doc. 40 at 31 ("There is, moreover, no plausible argument that the recruitment provision does not draw a content-based distinction. . . . The recruitment provision represents a content-based, viewpoint-based distinction in its purest, most pernicious form[.]");

and it is one of the grounds on which the Plaintiffs have moved for summary judgment, *see* Doc. 56 at 38–43. Moreover, as a content- and viewpoint-based speech restriction, the provision is *presumptively* unconstitutional. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). That means that *the Defendants* have the burden of proving that it satisfies strict scrutiny. *See id.* Even so, the Defendants have not even tried to meet that burden. Nor have the Defendants challenged—or even mentioned—the Plaintiffs' as-applied challenge here. *Compare* Doc. 69 (never mentioning the Plaintiffs' as-applied challenge), *with* Doc. 1 at ¶ 6 ("this Court should declare Section 1 of Public Chapter No. 1032 unconstitutional—both facially and as applied to the Plaintiffs"); *id.* at ¶ 72 ("Apart from its facial invalidity, Public Chapter No. 1032 is unconstitutional as applied to the Plaintiffs' intended speech.").

The Defendants' response also powerfully *supports* the Plaintiffs' standing, given that the Defendants assert that speech almost identical to Ms. Welty's "of course" would support liability. *Compare, e.g.*, Doc. 69 at 17 ("Of course, if someone were to intentionally target and induce a minor to be transported out of state without parental consent for the purpose of obtaining an elective abortion, liability might attach for 'recruiting.'"); *id.* at 33 (asserting that the Act criminalizes "offering to arrange . . . transportation" for an "out of state" abortion), *with* Doc. 70 at 7 ¶ 25 (not disputing for purposes of summary judgment that "Ms. Welty helps clients carry out their choice by connecting them with resources, including financial resources; giving them information about what clinics are available for them out of state; or giving them information about abortion pills[]"); *id.* at ¶ 24 (not disputing for purposes of summary judgment that once Ms. Welty's clients "choose a path, [Ms. Welty] help[s] them execute it[]"); *id.* at ¶ 27 (not disputing for purposes of summary judgment that "Ms. Welty 'put[s] the word out' that she does this work[]"); Doc. 35 at 14:1–15 (testifying that her abortion fund gives block grants to abortion

clinics outside of Tennessee that are earmarked for Tennessee residents, provides resources to minors seeking abortions, and "connect[s] those minors with clinics out of state[.]").

The Defendants' remaining arguments fare no better. That perhaps is why, to date, every judge to assess the same arguments the Defendants offer here has either rejected them on the merits, found that the Plaintiffs' exact claims support standing, or both. *Welty v. Dunaway*, No. 3:24-CV-00768, 2024 WL 4712759 (M.D. Tenn. Sept. 20, 2024); *Matsumoto v. Labrador*, 701 F. Supp. 3d 1032 (D. Idaho 2023), *aff'd in part, rev'd in part and remanded*, 122 F.4th 787 (9th Cir. 2024); *Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024); *id.* at 817–19 (Bea, J., concurring in the judgment in part and dissenting in part) (agreeing with the majority that "Plaintiffs have plausibly alleged, as an injury in fact, a 'credible threat of future prosecution[,]'" but reasoning that only the "county prosecutors" were proper defendants, and concurring in the judgment).

For all of these reasons, the Defendants' counter-motion for summary judgment should be **DENIED**. This Court should grant summary judgment to the Plaintiffs instead.

## II.  ARGUMENT

### A.  THE PLAINTIFFS HAVE STANDING.

"[I]n a pre-enforcement review case under the First Amendment (like this one), courts do not closely scrutinize the plaintiff's complaint for standing when the plaintiff 'claims an interest in engaging in protected speech that implicates, if not violates," a challenged law. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 451 (6th Cir. 2014) (plaintiff had standing where challenged law "at least chill[ed], and in some instances prohibit[ed], [plaintiff's intended] forms of communication" (citing *Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010))). In such cases, "[a] plaintiff meets the injury-in-fact requirement—and the case is ripe—when . . . (1) the plaintiff alleges 'an intention to engage in a course of conduct' implicating

the Constitution and (2) the threat of enforcement of the challenged law against the plaintiff is 'credible.'" *Id.* at 451–52 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

### 1. The Plaintiffs' speech at least arguably violates the recruitment provision.

The Defendants contest only whether the Plaintiffs' intended speech actually violates the recruitment provision. Doc. 69 at 18. But their arguments are unpersuasive for several reasons.

*First*, the Defendants misconstrue the relevant standard. For standing purposes, the question is not whether the Plaintiffs are correct that their intended speech violates the challenged law—it is whether the intended speech "implicates, if not violates," the challenged law. *Platt*, 769 F.3d at 451. Thus, a plaintiff may challenge a law that "implicates" and "at least chill[s]" a plaintiff's intended speech, even if it does not necessarily "prohibit" it. *Carey*, 614 F.3d at 196.

A plaintiff's position must be "'arguabl[e]'" to satisfy Article III. *Kareem v. Cuyahoga Cty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (the expression must be "arguably prohibited by Ohio's ballot laws") (cleaned up); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Steffel v. Thompson*, 415 U.S. 452, 480, (1974)); *Steffel*, 415 U.S. at 479–80 (Rehnquist, J., concurring) ("[T]he legislative history of the Declaratory Judgment Act and the Court's opinion in this case both recognize that the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity."). Otherwise, "[f]or standing purposes, [courts] accept as valid the merits of [a plaintiff's] legal claims, so [courts] must assume that [a challenged provision] unconstitutionally burdens speech" when a plaintiff alleges as much. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022).

Here, the Plaintiffs' reading of the offending provision is arguable, and their intended speech "implicates, if not violates" it. *Platt*, 769 F.3d at 451. The Plaintiffs have the better reading

of the law. *See* Doc. 56 at 35–41. This Court also need not take the Plaintiffs' word for it. Instead, this Court need only consult:

1. The Tennessee Attorney General, *see, e.g.*, Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007) ("[T]he plain meaning of 'recruit' . . . is synonymous with 'induce or encourage . . . .'");

2. Commonly accepted definitions and applications of the term "recruit," *see, e.g.*, Doc. 40 at 36 ("The word 'recruit' can also refer to 'spread[ing] the word that' a particular option 'is available.'" (quoting *Rodriguez v. Jackson*, No. 85-2492 PHX WPC, 1988 WL 150697, at *1 (D. Ariz. Nov. 9, 1988))); *Escobar v. Baker*, 814 F. Supp. 1491, 1503 (W.D. Wash. 1993) ("'[R]ecruitment' includes 'indirect recruitment.'"); *Sandoval v. Rizzuti Farms, Ltd*., 656 F. Supp. 2d 1265, 1277 (E.D. Wash. 2009) ("[I]ndirect recruitment includes situations where the farm 'puts out the word' that work is available and workers respond by showing up at a farm to work[.]");

3. The Act's House sponsor's own understanding of his bill, *see* Doc. 70 at 18 ¶ 70 (admitting, in reference to a statement by bill sponsor that Plaintiff Behn's social media post constituted recruitment, that "[i]t is undisputed that this exchange occurred during the Tennessee House of Representatives' discussion of the bill that ultimately became the challenged law");

4. Any of the five previous judges who have interpreted the same provision, *see Welty*, 2024 WL 4712759; *Matsumoto*, 701 F. Supp. 3d 1032 (D. Idaho 2023); *Matsumoto*, 122 F.4th 787; *id.* at 817–19 (Bea, J., concurring in the judgment in part and dissenting in part) (agreeing with the majority that "Plaintiffs have plausibly alleged, as an injury in fact, a 'credible threat of future prosecution'"); or

5. The Defendants themselves, *see* Doc. 69 at 17 ("Of course, if someone were to intentionally target and induce a minor to be transported out of state without parental consent for the purpose of obtaining an elective abortion, liability might attach for 'recruiting.'"); *id.* at 33

(asserting that the Act criminalizes "offering to arrange . . . transportation" for an "out of state" abortion); Doc. 22 at 11–12 ("*successful* persuasion" is recruitment).

*Second*, the Defendants' attempt to rely on Tennessee law's definition of "intentional" conduct does not save them. The Defendants emphasize that persuading a minor to get an abortion is not the Plaintiffs' "goal," which the Defendants insist means the Plaintiffs have "disavowed any . . . intent" to violate the offending provision. *See* Doc. 69 at 20. But acting "intentionally with respect . . . to a result of the conduct when it is the person's conscious objective or desire to . . . cause the result" is only one way a person can satisfy Tennessee law's definition of "intentional" conduct. Tenn. Code Ann. § 39-11-302(a). Thus, apart from one's "conscious objective" to "cause the result" of one's conduct, a person acts "intentionally" under Tennessee law when she "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire *to engage in the conduct*" itself. *Id.* (emphasis added); *see also State v. Crowe*, 914 S.W.2d 933, 938 (Tenn. Crim. App. 1995) ("Contrary to appellant's argument, the state did not have to demonstrate that appellant intended to cause serious bodily injury to the victim. If the jury could conclude beyond a reasonable doubt that appellant kicked her intentionally, that is, he acted 'intentionally with respect to the nature of the conduct,' the mens rea requirement of aggravated assault is satisfied.").

The Plaintiffs' intentional speech qualifies. *See, e.g.*, Doc. 70 at 6 ¶ 20; *see also* Doc. 35 at 31:7–9, 45:5–10. Further, when the Plaintiffs' clients decide they want an abortion, the Plaintiffs intentionally support them, encourage them, and otherwise act for the purpose of helping them procure one legally or obtain one medically. *Id.* at 9:22–10:5, 45:1–22.

The Defendants themselves also offer what they characterize as "[r]eal-world examples" of violations of the Act that do not depend on any conscious objective to persuade a minor to get

an abortion, but rely instead on intentional speech that "induces" an abortion that a minor has already decided she wants. *See* Doc. 69 at 33. Earlier in this case, the Defendants also insisted that the challenged provision could be violated through "*successful* persuasion," *see* Doc. 22 at 11–12, which both Plaintiffs testified is an assured result of their intentional speech even if it is not their goal. Doc. 35 at 31:7–14, 45:5–10.

> *Third*, the Defendants do not address the credible threats that arise from the fact that:

> The scope of Section 39-15-220(a)'s "recruit[ment]" prohibition also gives rise to additional criminal liability well beyond its terms, including for related inchoate offenses like criminal attempt, solicitation, and conspiracy, *see* Tenn. Code Ann. § 39-12-107(a)–(c), and for additional crimes like criminal responsibility, *see* Tenn. Code Ann. § 39-11-402(1)–(3).

Doc. 56 at 8.

But this concern is valid and serious. As the Ninth Circuit just explained, a huge amount of speech that does not violate the recruitment provision directly nevertheless

> could be considered an "attempt" to procure an abortion for a minor by recruiting that minor without parental consent. If done in tandem with another adult who did procure an abortion, the above could be form of "aiding and abetting" such procurement. With prosecutions for attempting or aiding and abetting procurement on the table, the reach of the statute could extend even further. For example, an attorney advising a minor about the minor's rights to obtain a legal abortion outside of Idaho and promising absolute confidentiality (including from the minor's parents), coupled with arrangements to procure an abortion, could be prosecuted for attempting or aiding and abetting a violation of Section 18-623. The same could be said of an employee of an advocacy organization counseling a minor about her healthcare options, providing the minor with the contact information of a partner organization in a neighboring state that can provide logistical or financial assistance in procuring or obtaining an abortion, and promising to keep the conversation a secret from the minor's parents.

*Matsumoto*, 122 F.4th at 811.

Thus, with inchoate offenses and other crimes that emanate from the challenged recruitment provision "on the table, the reach of the statute could extend even further[.]" *Id.*; *see also* Doc. 56 at 8. And to the extent the Defendants respond to this problem at all, it is to

*exacerbate* it by suggesting that the Act's related provisions lawfully proscribe speech that overlaps with, but reaches broadly beyond, recruitment. *See* Doc. 69 at 32 (arguing "that speech incident to the crimes of 'harboring' and 'transporting' . . . can be constitutionally proscribed").

*Fourth*, on the merits, the District Attorneys' proposed reading of the challenged recruitment provision is wrong and incoherent, while the Plaintiffs' is not. *See* Doc. 56 at 35–41.

For all of these reasons, the Plaintiffs' speech arguably violates the recruitment provision.

## 2. __The threat of enforcement is credible.__

As to the credible threat of enforcement the Plaintiffs face, the Plaintiffs have established their standing based on the non-exhaustive *McKay* factors and other relevant considerations, including the recency of the challenged provision and the criminal nature of the threat. *See McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016); Doc. 56 at 18–27. Because there is no benefit to rehashing those correct arguments here, the Plaintiffs incorporate them by reference and respond to the Defendants' unpersuasive counterarguments.

To begin, the Defendants assert that, "[u]nder a test where '[n]o single factor is controlling,' it is only 'logical that the importance of [one] factor should vary in inverse proportion to the strength of [another].'" *See* Doc. 69 at 21 (quoting *Allied Delivery Sys., Inc. v. I.C.C.*, 908 F.2d 972, 1990 WL 104828, at *4 (6th Cir. 1990) (Table decision)). But their only support for that proposition is a citation to an unpublished table opinion in a case concerning a carrier's use of "interstate routings as a 'subterfuge' to avoid state regulation" for a reason. *See Allied Delivery Sys., Inc.,* 1990 WL 104828 at *3. The reason is the Sixth Circuit has never held anything resembling that when it comes to *McKay*'s pre-enforcement standing considerations, which the Sixth Circuit has held—contrarily—"are not exhaustive, nor must each be established." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021); *see also Kareem*, 95 F.4th at

1023 ("Because these factors are not exhaustive, any analysis must also be guided by certain general considerations that pre-enforcement challenges raise in the First Amendment context."); *Fischer v. Thomas*, 52 F.4th 303, 307–08 (6th Cir. 2022) ("[T]he first and most important factor is whether the challenged action chills speech. . . . Beyond chill, a variety of facts can demonstrate a credible threat of enforcement. Our cases have highlighted four commonly recurring factors to consider[.] . . . This isn't a laundry list; [plaintiffs] don't have to satisfy all the factors.").

   a. **Chill.** "[T]he first and most important factor is whether the challenged action chills speech." *Id.* Here, the Plaintiffs have offered extensive evidence to support their Complaint's allegations that their speech is chilled. *See* Doc. 55 at 13–20 ¶¶ 48–76. Those facts include specific allegations that "Ms. Welty cannot safely continue her advocacy for safe and healthy access to legal abortion care without risking criminal prosecution[,]" *id.* at 13 ¶ 49; that "Representative Behn wants to continue her advocacy for young people who need legal abortion care, but she cannot do so safely without risking criminal prosecution[,]" *id.* at 19 ¶ 72; and that "before this Court preliminarily enjoined enforcement of the law against her, Ms. Behn could not safely express herself on matters of current public importance[,]" *id.* at 25 ¶ 92. Ms. Welty also has explained that, "[g]iven [her] fear of being prosecuted and sued for the things she posted online, before this Court preliminary enjoined Section 39-15-220(a), Ms. Welty stopped providing information to the public via her social media account about how Tennesseans could legally obtain abortion care." *Id.* at 15 ¶ 55.

   The District Attorneys do not dispute any of these facts. *See* Doc. 70 at ¶¶ 48–76. They do, however, object to some of them on the asserted basis that chill is a "disputed legal question[]," not a fact "proper for inclusion in a Local Rule 56.01 statement." *See, e.g.*, *id.* at 14 ¶ 51. But *McKay* explains that chill is a "subjective" criterion. 823 F.3d at 869 ("We have, however, found

a credible threat of prosecution where plaintiffs allege a *subjective* chill and point to some combination of the following factors[.]") (emphasis added). And because the Plaintiffs have "allege[d]" subjective chill while presenting undisputed material evidence demonstrating that their speech actually has been chilled, the Plaintiffs have established this factor—doubly so because the Defendants *admit* that each Plaintiffs' fear of prosecution "is 'subjectively credible.'" *See* Doc. 70 at 13 ¶ 50, 19 ¶ 73. The Plaintiffs also note that, elsewhere in their Memorandum, the Defendants concede that "[c]ourts undertaking Article III standing analyses, particularly in First Amendment chilling-effect cases, often employ a high level of generality—e.g., by focusing on chilling effects that allegedly follow from a law, rather than from a specific defendant's real-world actions." Doc. 69 at 28.

In sum: the Plaintiffs satisfy *McKay's* "first and most important factor[.]" *Fischer*, 52 F.4th at 307.

**b. Enforcement history**. Because the Plaintiffs challenged the offending recruitment provision before it took effect, it is true that, necessarily, none of the Defendants had prosecuted violations under the provision when the Plaintiffs filed suit. But the recency of the enactment *supports* the Plaintiffs' pre-enforcement standing, not the other way around. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) ("[T]he threat of prosecution is greater under a statute enacted relatively recently."); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Doe v. Bolton*, 410 U.S. 179, 188–89 (1973) (emphasizing that "Georgia's statute . . . is recent and not moribund."); *cf. Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) ("The contemporaneity of those enactments reinforces the inference that the legislature intends to target plaintiffs.").

Moreover, the District Attorneys' history of enforcing criminal laws in general matters here. *See Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023) (standing supported where a wine merchant showed that "Ohio *does prosecute* violations of" the law generally, even if not against wine specifically); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019) (student group had standing, despite failure to identify a prior prosecution against the student's exact speech, because there were "sixteen disciplinary cases" under the university's policy generally for conduct unrelated to protected speech). And far from contesting the Plaintiffs' assertions about the Defendants' "undisputed history of prosecuting violations of the criminal law in general[,]" *see* Doc. 56 at 27, the District Attorneys have *admitted* that "[e]ach Defendant has criminal enforcement authority and an affirmative statutory obligation to 'prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto.'" *See* Doc. 70 at 26 ¶ 98. Thus, this factor favors standing, too.

     **c. Warnings**. The Plaintiffs have explained that:

> Plaintiff Behn has been warned that her exact speech violates the . . . recruitment prohibition. The Defendants' own briefing also warns alternatively that if the Plaintiffs' speech—including Ms. Behn's pure advocacy and Ms. Welty's provision of truthful information about abortion medication and legal options for safe abortion—"persuade[s] someone" to get a legal abortion out of state or "convinc[es]" a minor to do so, then the Plaintiffs may be subject to criminal prosecution that the Defendants perceive no constitutional problems initiating. *See* Doc. 26 at 7, 15. At any rate, "the Supreme Court and at least four other circuits have sustained pre-enforcement standing without a past enforcement action or an overt threat of prosecution directed at the plaintiff." *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 140 (2d Cir. 2023) (per curiam)

Doc. 56 at 24.

     In response, the Defendants: (1) emphasize the absence of "letters[,]" and (2) claim they "have clarified time and again that they do not read the 'recruits' provision to prohibit Plaintiffs' desired conduct." *See* Doc. 69 at 22. As to the first point, though, if there is some basis for

distinguishing between warnings communicated in legal briefing (or on the floor of the Tennessee House) and warnings communicated through "letters[,]" the Plaintiffs are not aware of it. The Defendants certainly do not offer any authority to support that claim. *See id.*

As to the second point, it is factually inaccurate for many reasons. To begin, although the District Attorneys have at times suggested, through counsel only, that the challenged provision does not reach the Plaintiffs' speech, that argument *always* has been made in the alternative. *See* Doc. 70 at 28 ¶ 104 (admitting it is undisputed that "[t]he Defendants have maintained that 'even if the Act could be read to cover the sort of speech Plaintiffs allegedly intend to engage in, it would still pass constitutional muster[]'"). That has not changed even now, as the District Attorneys continue to press, in the alternative, astonishing claims about Tennessee's purported authority to criminalize pure speech about legal out-of-state abortions. *See, e.g.,* Doc. 69 at 34 (arguing that "*Bigelow* hinged on abortion's 'constitutionally protected' status. . . . But things have changed since *Bigelow*. . . . So whatever weight *Bigelow*'s 'dictum' may have once carried, . . . it offers little help in a post-*Dobbs* world.").

The Defendants also have variously maintained that the recruitment provision strictly "targets *conduct*—not speech." *See* Doc. 26 at 3; *see also id.* at 7 (arguing that the provision should only "be understood to target conduct"). At the same time, they have repeatedly offered examples of violations that inarguably target *speech*. *See, e.g.*, Doc. 26 at 6 (arguing that "recruit means to persuade"); *id.* at 11 ("convinc[ing]" a minor to get an abortion out of state is recruitment); *id.* at 14 (same); Doc. 22 at 16 ("reaching out to and convincing a minor" to get an abortion out of state is recruitment); *id.* at 11–12 ("*successful* persuasion" is recruitment). And they have done so while insisting that "any speech the Act does cover can be constitutionally prohibited." Doc. 26 at 11. Such an incoherent, all-of-the-above approach to the challenged

provision does not resemble disavowal. Instead, as this Court has previously observed, the Defendants' only consistent position is that the recruitment provision, whatever it means, "means something that would prevent them from losing this case." *See* Doc. 40 at 36–37.

The Defendants' alternatively-stated, all-of-the-above positions also have come only from the Defendants' *attorneys*, whose statements are not evidence of anything. *See Plumbers Loc. 98 Defined Ben. Funds v. Controlled Water, Inc.*, No. 03-CV-72888-DT, 2006 WL 2708544, at *2 (E.D. Mich. Sept. 19, 2006) ("It is universally settled that 'statements of counsel are not evidence' and do not create issues of fact.") (collecting cases); *Metropolitan Life Ins. Co. v. Biggs*, 68 Fed. App'x 644, 648 (6th Cir. 2003) ("Counsel's bare statements . . . are not sufficient to defeat" summary judgment). That fact matters, too, given that every single one of the Defendants has refused—and continues to refuse even now—this Court's now nearly six-month-old invitation to submit an affidavit disclosing whether he agrees with defense counsel's positions here. Doc. 40 at 18 (citing Doc. 35 at 94); *cf. Universal Life Church Monastery Storehouse*, 35 F.4th at 1035 (emphasizing that "in the district court below, defendants took no meaningful steps—like submitting an affidavit forswearing prosecution—to mitigate plaintiffs' fears.").

Most importantly, the Defendants' position *right now* is that Plaintiff Welty "[o]f course" has reason to fear liability. *See* Doc. 69 at 17. They assert that "offering to arrange [for] transportation" concerning "an abortion out of state" is a "[r]eal-world" violation of the law. *See id.* at 33. And they assert further that: "Of course, if someone were to intentionally target and induce a minor to be transported out of state without parental consent for the purpose of obtaining an elective abortion, liability might attach for 'recruiting.'" *Id.* at 17.

This is almost exactly what Ms. Welty has explained she does. *See* Doc. 35 at 14:1–15 (testifying that her abortion fund gives block grants to abortion clinics outside of Tennessee that

are earmarked for Tennessee residents, provides resources to Tennessee minors seeking abortions, and "connect[s] those minors with clinics out of state"); Doc. 70 at 7 ¶ 25 (not disputing for purposes of summary judgment that "Ms. Welty helps clients carry out their choice by connecting them with resources, including financial resources; giving them information about what clinics are available for them out of state; or giving them information about abortion pills."); *id.* at ¶ 24 (not disputing for purposes of summary judgment that once Ms. Welty's clients "choose a path, [Ms. Welty] help[s] them execute it."); *id.* at ¶ 27 (not disputing for purposes of summary judgment that "Ms. Welty 'put[s] the word out' that she does this work"). Thus, the Defendants' most recent interpretive position ratchets *up* the credibility of the threat that Ms. Welty faces.

For these reasons, *McKay*'s enforcement warning criterion favors the Plaintiffs, too.

**d. Private enforcement**. The District Attorneys do not dispute either that the challenged recruitment provision "is enforceable by private plaintiffs" or that this feature of the law—"which makes enforcement 'easier or more likely'—supports standing." *See* Doc. 56 at 24 (quoting *Fischer*, 52 F.4th at 308 ("[T]he Code contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints.")). Thus, *McKay*'s private enforcement factor supports standing based on the extraordinary danger posed by the recruitment provision's private civil enforcement feature alone. *See, e.g.*, *Online Merchants Guild*, 995 F.3d at 551 ("As the Attorney General concedes, private plaintiffs may bring a damages action to remedy price-gouging violations, which increases the likelihood that Guild members will have to defend against price-gouging suits.").

Instead, the District Attorneys address only the Act's criminal enforcement provision. And while they acknowledge that Tennessee allows citizen-initiated criminal enforcement, they assert that the Sixth Circuit has "squarely rejected" the relevance of that consideration. Doc. 69 at 23.

The question is whether private parties can "initiate" enforcement, though, not complete it. *See Platt*, 769 F.3d at 452 ("[A]s in *Susan B. Anthony List*, any person—not just a prosecutor or state agency—may ***initiate*** enforcement of the Code. . . . This feature of the Code '"bolster[s]' the credibility of enforcement.") (emphasis added); *Fischer*, 52 F.4th at 308 ("[T]he Code contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public ***to file complaints***.") (emphasis added). Indeed, even dissenters in pre-enforcement standing cases have acknowledged that whether private citizens can "initiat[e]" enforcement is the relevant inquiry. *See Fischer*, 52 F.4th at 314–15 (Griffin, J., dissenting) ("[T]he Kentucky Code of Judicial Conduct has a public-initiation feature. . . . That feature may 'bolster[ ]' the credibility of an enforcement threat, . . . but it alone is insufficient[.]" (citing *Susan B. Anthony List*, 573 U.S. at 164; *McKay*, 823 F.3d at 869)).

Here, the Defendants concede that Tennessee law allows citizens to "initiate" criminal enforcement. *See* Doc. 69 at 23 ("Tennessee's grand-jury structure . . . allows citizen-initiated indictments"); *id.* ("Tennessee may permit citizen-initiated indictments and arrests"). Nevertheless, the Defendants insist that *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024), forecloses the relevance of that consideration.

Even if the Defendants were correct about *Friends of George's*—which made an important but inaccurate assumption that Tennessee law does *not* allow citizen-initiated criminal enforcement, *see id.*—*Friends of George's* post-dates multiple published panel decisions that held that whether a member of the public can "initiate" enforcement is the relevant inquiry. *See, e.g.*, *Platt*, 769 F.3d at 452; *Fischer*, 52 F.4th at 308. And Sixth Circuit law instructs that a "prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or [the Sixth Circuit] sitting en banc overrules

the prior decision." *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). Thus, *Friends of George's* cannot displace earlier published panel decisions on the same point.

*Friends of George's* analysis conflicts with other preceding published panel decisions on a related matter, too. It suggests, with no corresponding analysis, that the only harm about which a pre-enforcement plaintiff needs to be concerned is "prosecut[ion]." *Friends of George's,* 108 F.4th at 439 (emphasizing that "'a district attorney general has the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee[]'"). But earlier published panel decisions held otherwise, discussing arrests separately from prosecutions and holding that *either one* (or even mere "administrative action") qualifies as a relevant harm. *See Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) ("'[A]dministrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review.'") (cleaned up). So, too, has the U.S. Supreme Court, which *Friends of George's* majority opinion also lacked authority to overrule. *See Susan B. Anthony List*, 573 U.S. at 165 ("We take the threatened Commission proceedings into account because administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review.").

*Friends of George's* emphasis that "'a district attorney general has the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee'" also does not matter. 108 F.4th at 439. A published, preceding Sixth Circuit panel held as much in *Kareem*, 95 F.4th at 1024, where the defendant there unsuccessfully advocated a distinction between a private right of action and a private mechanism to "bring grievances to the attention of" a government official who had independent duties. *Id.*; *see also id.* at n.2 ("Defendants characterize this as akin to a private right of action or citizen suit provision and try to distinguish *Platt* on this basis. Not so. **In the case of a grievance raised by an individual, the rule in *Platt* required the disciplinary board to**

independently review the allegations to determine whether they were supported by evidence, upon which the board would launch an investigation.") (emphasis added). Indeed, the case even emphasized, as a distinct harm, the "risk" that private individuals can "direct" an alleged violation to an independent government official's attention. *See id.* ("We note that given the relatively public nature of ballot photographs displayed online and the ease of taking a screenshot of another's ballot photograph, **there is a related risk in this case that individuals could direct a ballot photograph to the attention of the County Board of Elections and other Defendants**.") (emphasis added).

Once more, the Sixth Circuit's earlier published panel decision "remains controlling authority" here. *Salmi*, 774 F.2d at 689. That *Friends of George's* majority opinion contravened other long-settled Supreme Court doctrine does not improve the case for relying on it, either. *Compare, e.g., Friends of George's, Inc.*, 108 F.4th at 438 n.4 ("[P]art of the standing analysis inevitably bleeds into the merits a bit"), *with Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (a court's "threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal[.]'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))).

**5. Refusal to disavow enforcement**. It is undisputed that, before initiating this action, Plaintiff Welty asked the Defendants disavow enforcement against her, and in response to that request, none of them did. *See* Doc. 70 at 10–12 ¶¶ 40–47. The Defendants nevertheless insist that "[t]here has been no meaningful 'refusal to disavow enforcement' of the Act," apparently on the basis that "what matters for pre-enforcement-standing purposes is not the refusal to disavow enforcement 'in the *abstract*,' but the refusal to disavow enforcement against the Plaintiffs' '*specific* speech.'" *See* Doc. 69 at 24.

This distinction makes no difference here. Even after Ms. Welty asked them to do so pre-suit, *see* Doc. 70 at 12 ¶ 46, the Defendants did not disavow enforcement either in the abstract *or* against Ms. Welty's specific speech. Instead, they chose not to respond at all. *Id.* at ¶ 47 ("It is undisputed that no Defendant responded to Welty's letter."). And that reality "strongly supports a finding of standing." *See* Doc. 40 at 25. Doubly so because "[t]he defendants have had an unusual number of opportunities to explain how they will or will not enforce the statute" and not only have persistently refused to say, *see id.*—they have insisted that prosecutions under the recruitment provision would "pose[] no constitutional problem[,]" Doc. 26 at 2, 3.

The Defendants respond by insisting that "post-filing silence" cannot "bear on the standing inquiry[.]" *See* Doc. 69 at 24. But there are two problems with this position. For one, controlling Sixth Circuit authority holds otherwise. *Platt*, 769 F.3d at 452 ("[W]hen directly asked at oral argument, the State refused to disavow the enforcement of the Code as applied to Platt, further adding credibility to Platt's alleged fear."). For two, the Defendants' mere "silence" is not the issue; instead, the Defendants have affirmatively asserted that prosecuting cases under Tennessee's recruitment provision would "pose[] no constitutional problem." Doc. 26 at 2, 3; *see also* Doc. 70 at 28 ¶ 104 (admitting it is undisputed that "[t]he Defendants have maintained that 'even if the Act could be read to cover the sort of speech Plaintiffs allegedly intend to engage in, it would still pass constitutional muster.'").

Nor is it true that the "Defendants have disavowed enforcement of the Act's 'recruitment' prohibition as to Plaintiffs' intended conduct at nearly every turn this case has presented." *See* Doc. 69 at 24. To the contrary, they have insisted that, if the Plaintiffs' speech "persuade[s] someone" to get a legal abortion out of state or "convince[es]" a minor to do so, then the Plaintiffs may appropriately be prosecuted. Doc. 26 at 7, 15. Even now, they insist that speech nearly

identical to Ms. Welty's would "[o]f course" trigger liability. *Compare, e.g.*, Doc. 69 at 17 ("Of course, if someone were to intentionally target and induce a minor to be transported out of state without parental consent for the purpose of obtaining an elective abortion, liability might attach for 'recruiting.'"); *id.* at 33 (asserting that the Act criminalizes "offering to arrange . . . transportation" for an "out of state" abortion); *with* Doc. 35 at 14:1–15 (testifying that her abortion fund gives block grants to abortion clinics outside of Tennessee that are earmarked for Tennessee residents, provides resources to minors seeking abortions, and "connect[s] those minors with clinics out of state[.]"); Doc. 70 at 7 ¶ 25 (not disputing for purposes of summary judgment that "Ms. Welty helps clients carry out their choice by connecting them with resources, including financial resources; giving them information about what clinics are available for them out of state; or giving them information about abortion pills."); *id.* at ¶ 24 (not disputing for purposes of summary judgment that once Ms. Welty's clients "choose a path, [Ms. Welty] help[s] them execute it."); *id.* at ¶ 27 (not disputing for purposes of summary judgment that "Ms. Welty 'put[s] the word out' that she does this work.").

The District Attorneys also *cannot* disavow prosecution. As the Plaintiffs have observed:

> Based on a relatively recent Tennessee law—Tennessee Code Annotated § 8-7-106(a)(2)—that took effect in November 2021, if a District Attorney fails to adhere to his affirmative statutory obligation by "peremptorily and categorically refus[ing] to prosecute all instances of a criminal offense[,]" the District Attorney is subject to consequences that include having the Tennessee Supreme Court "appoint some other attorney as district attorney general pro tem in the district attorney general's place for the sole purpose of prosecuting persons accused of committing that offense."

Doc. 70 at 26 at ¶ 99.

The District Attorneys do not dispute this. Instead, they "object" to that fact being considered here because the Plaintiffs have "cite[d] only a Tennessee statute and thus" (the Defendants claim) "violate[d]" rules governing undisputed material facts. *Id.* But this Court "may

- 19 -

take judicial notice of . . . state statutes." *Val Decker Packing Co. v. Corn Prods. Sales Co.*, 411 F.2d 850, 852 (6th Cir. 1969) (citing *Lamar v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.")). Thus, the Defendants cannot prevent this Court from considering that Tennessee Code Annotated section 8-7-106(a)(2) precludes them from disavowing enforcement without risking *their own* consequences.

There is more. The Plaintiffs set out their understanding of the challenged provision in their Complaint. *See generally* Doc. 1. That included making specific allegations about how the Plaintiffs understand the recruitment provision to function. *See, e.g.*, *id.* at ¶ 1 ("Beginning July 1, 2024, Tennessee will criminalize both pure speech about legal abortion care and helping young people access legal abortion care."); *id.* at ¶ 2 ("The effect of Public Chapter No. 1032—which is also its intended purpose—is to criminalize helping a pregnant unemancipated minor obtain *legal* abortion care "regardless of where the abortion is to be procured" and "regardless of where the abortion-inducing drug is obtained."); *id.* at ¶ 3 ("In addition to criminalizing assistance obtaining legal abortion care, Public Chapter No. 1032 separately criminalizes pure speech about such care."); *see also id.* at ¶¶ 5, 32, 52, 59, 60, 61, 62, 64, 65, 66, 76, 77, 78.

In response, the Defendants refused to disclose whether they disputed or agreed with the Plaintiffs' legal conclusions. Instead, they pleaded that "Defendants submit that Public Chapter No. 1032 says what it says" and that "no response is required" when it comes to the "legal conclusions" alleged in the Plaintiffs' Complaint. *See, e.g.*, Doc. 51 at ¶¶ 1, 2, 3; *see also id.* at ¶¶ 5, 32, 52, 59, 60, 61, 62, 64, 65, 66, 76, 77, 78. But "legal conclusions are an 'integral part of the federal notice pleading regime.'" *Thompson v. Ret. Plan for Emps. of S.C. Johnson & Sons,*

*Inc.*, No. 07-CV-1047, 2008 WL 5377712, at *1 (E.D. Wis. Dec. 22, 2008) (quoting *Hotel Emps. & Rest. Emps. Int'l Union Welfare Fund v. Aramark Servs., Inc.*, No. 99 C 5726, 1999 WL 1016260, at *1 (N.D. Ill. Nov. 4, 1999)). "Therefore, legal conclusions must be addressed in one of the three ways contemplated by Rule 8." *Id.*; *see also Kegerise v. Susquehanna Township Sch. Dist.*, 321 F.R.D. 121, 124 (M.D. Pa. Feb. 3, 2016) ("Rule 8(b) does not permit a party to refuse to respond to an allegation by asserting it is a conclusion of law."); *Certain Underwriters at Lloyd's v. SSDD, LLC*, 2013 WL 6801832, at *4 (E.D. Mo. Dec. 23, 2013) (holding that the defendant's "answer that it need not respond to 'legal conclusions' finds no support in the language of Rule 8(b), which requires a response to all allegations.").

Put another way: "Refusing to answer an allegation because it calls for legal conclusions 'flies in the face of the established doctrine that legal conclusions are a proper part of federal pleading, to which Rule 8(b) also compels a response.'" *Donnelly v. Frank Shirey Cadillac, Inc.*, No. 05 C 3520, 2005 WL 2445902, at *2 (N.D. Ill. Sept. 29, 2005) (quoting *Gracedale Sports & Ent., Inc. v. Ticket Inlet, LLC*, No. 99 C 2781, 1999 WL 618991, at *2 (N.D. Ill. Aug. 9, 1999)). Nevertheless, the Defendants are so opposed to stating, with any degree of consistency or clarity, their views of the law that they opted to violate pleading requirements instead.

**e. Other considerations**. The Defendants also do not have a persuasive response to the Plaintiffs' arguments that other considerations beyond *McKay*'s "not exhaustive" factors favor standing. *See Online Merchants Guild*, 995 F.3d at 550. As to recency, for instance, the Defendants assert that "[i]f Plaintiffs were right that recency alone could establish a plaintiff-specific risk of enforcement, every newly enacted law could be challenged immediately." *See* Doc. 69 at 26. But apart from their unsuccessful attempt, in a footnote, to distinguish *Universal Life Church Monastery Storehouse*, *see id.* at n.5, the Plaintiffs have never argued that "recency

- 21 -

alone" establishes standing. Instead, they have argued that "Public Chapter No. 1032's recency *favors* standing[,]" *see* Doc. 56 at 20, and that "here, the recency of the Act, its criminal provisions, the Defendants' refusal to disavow enforcement, and its private civil enforcement mechanism tip the scale[,]" *id.* at 19. And the reasons why a law's recency favors standing (rather than being dispositive of it) are straightforward: (1) "the threat of prosecution is greater under a statute enacted relatively recently[,]" *see St. Paul Area Chamber of Com.*, 439 F.3d at 486; and (2) "a court presumes that a legislature enacts a statute with the intent that it be enforced[,]" *see Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021), *as amended* (June 23, 2021). Pairing these considerations with the fact that Public Chapter No. 1032's fiscal note *presumes prosecutions*, *see* Doc. 29-1, Public Chapter No. 1032's recency favors the Plaintiffs' standing.

So does the Plaintiff's observation that Public Chapter No. 1032 carries criminal penalties. "Pre-enforcement challenges are an important part of the First Amendment's protections because self-censorship is a harm that can be realized even without an actual prosecution." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 481 (6th Cir.) (Batchelder, J., dissenting) (quoting *Am. Booksellers Ass'n*, 484 U.S. at 393), *reh'g en banc granted, op. vacated,* 120 F.4th 536 (6th Cir. 2024). And the risk of self-censorship increases "significantly" when criminal penalties are in play. *Kareem*, 95 F.4th at 1025 ("[A] violation of Ohio's ballot laws is certainly a felony and a first-degree misdemeanor, . . . and the threat of such punishment significantly heightens the risk of chilled expression."); *see also Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("[B]ecause most people are frightened of violating criminal statutes especially when the gains are slight, as they would be for people seeking only to make a political point and not themselves political operatives, there is standing.").

For these reasons, the Plaintiffs have established their standing to sue.

**B.** **THE DEFENDANTS DO NOT HAVE SOVEREIGN IMMUNITY FROM THIS SUIT.**

As this Court has already explained: "A government official charged with enforcing an allegedly unlawful policy may still be sued for injunctive relief through the well-established *Ex parte Young* framework, even if his agency is an arm of the state." Doc. 40 at 28. And "[t]his is an *Ex parte Young* case—about as straightforward of one as a person is likely to find, given that enforcing state criminal statutes is the core function of the defendants' offices." *Id.*

Nevertheless, the Defendants maintain that sovereign immunity prompts heightened requirements beyond Article III. *See* Doc. 69 at 28 (asserting that "Plaintiffs wrongly collapse the standing and sovereign-immunity inquiries"). But as this Court explained back in September 2024:

> [T]he Sixth Circuit has flatly rejected the idea that *Ex parte Young* requires a greater likelihood of enforcement than the standing analysis does, holding that "[i]t would be a perverse reading of *Young* to say that, although [a plaintiff] might have an Article III injury before [a prosecutor] directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar [the courts] from enjoining the" prosecution.

Doc. 40 at 28 (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015)); *see also Universal Life Church Monastery Storehouse*, 35 F.4th at 1040 (under *Ex parte Young*, it is "sufficient to show that there is 'a realistic possibility the official will take legal or administrative actions against the plaintiff's interests'").

The Supreme Court agrees. *See, e.g.*, *Whole Woman's Health v. Jackson*, 595 U.S. 30, 45–47 (2021) (permitting an *Ex parte Young* claim against officials "who may or must take enforcement actions against the petitioners if they violate" a challenged statute, and holding that, to satisfy *Ex parte Young*, a plaintiff "must show at least a credible threat of such an action against them"); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (citing *Ex parte Young* and pre-enforcement standing cases for the proposition that: "Given this genuine threat of enforcement,

we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action.").

The law has not changed since September. Nor are the Defendants correct that a heightened *Ex parte Young* standard is necessary to guard against "unripe suits" (which standing's ripeness requirement handles), or improper challenges to laws "in the abstract" (which Article III's injury requirement handles), or challenges "against state officials with no 'connection' to enforcement" (which Article III's traceability and redressability requirements handle). The Defendants simply are wrong about the law, and their "reading of *Young*" is "perverse." *Russell*, 784 F.3d at 1047.

## C. THE DEFENDANTS HAVE FAILED TO ADDRESS TWO OF THE PLAINTIFFS' CLAIMS.

The Plaintiffs have asserted that the challenged recruitment provision is a content- and viewpoint-based speech restriction. Doc. 1 at 11–13. That also is one of the grounds on which the Plaintiffs secured a preliminary injunction, *see* Doc. 40 at 31, and it is one of the grounds on which the Plaintiffs have moved for summary judgment, *see* Doc. 56 at 38–43.

Even so, the Defendants do not mention—let alone contest—the Plaintiffs' claim that the recruitment provision is a content- and viewpoint-based speech restriction. *See generally* Doc. 69. And because it is, *the Defendants* have the burden of proving that the challenged provision satisfies strict scrutiny. *Reed*, 576 U.S. at 163. Under these circumstances, then, the Defendants not only are not entitled to summary judgment; they have waived opposition to a case-dispositive claim, and summary judgment should issue in the Plaintiffs' favor instead.

Nor do the Defendants challenge—or mention—the Plaintiffs' as-applied challenge in their briefing, even though the Plaintiffs have raised an as-applied challenge alongside their facial challenge. *Compare* Doc. 69 (never mentioning the Plaintiffs' as-applied challenge), *with* Doc. 1 at ¶ 6 ("this Court should declare Section 1 of Public Chapter No. 1032 unconstitutional—both

facially and as applied to the Plaintiffs"); *id.* at ¶ 72 ("Apart from its facial invalidity, Public Chapter No. 1032 is unconstitutional as applied to the Plaintiffs' intended speech.").  Thus, at minimum, the Plaintiffs' as-applied challenge survives.

**D.**     **THE PLAINTIFFS WIN ON THE MERITS, BOTH FACIALLY AND AS APPLIED.**

The Defendants emphasize that facial challenges are generally "'hard to win[,]'" even in First Amendment cases.  Doc. 69 at 29.  But most First Amendment cases do not present facially content-, speaker-, and viewpoint-based speech restrictions so obvious that opposing parties do not even contest them.  And such defects render the challenged recruitment provision "facially unconstitutional[,]" not merely unconstitutional as-applied.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992); *see also Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021) (viewpoint-based speech restrictions violate the First Amendment "facially and as-applied").

The Defendants' proposed examples of constitutional applications do not assist them, either.

*First*, the Defendants insist that "the Act constitutionally prohibits the recruiting of minors to obtain illegal abortions performed *in Tennessee*."  Doc. 69 at 30.  But Tennessee law already enforces "equal criminal liability for principals, accessories before the fact, and aiders and abettors."  *See* Tenn. Code Ann. § 39-11-401 at cmt.; *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997) ("[T]he Sentencing Commission comments to Tenn. Code Ann. §§ 39–11–401 and –402 clearly indicate the legislative intent that the statutory provisions embrace the common law principles governing aiders and abettors and accessories before the fact.").  Thus, what the Defendants characterize as a "constitutional application" of the Act's recruitment provision *is already illegal generally*, and not as to only some speakers and some hearers on some topics, but

as to everyone. Thus, all the provision does is act as an impermissible "vehicle[] for content discrimination unrelated to [its] distinctively proscribable content." *R.A.V.*, 505 U.S. at 383–84.

*Second*, the Defendants insist that "the Act constitutionally prohibits the recruiting of minors to obtain illegal abortions performed *in other States in which abortion is illegal absent parental notification or consent*." Doc. 69 at 31. But once more, by definition, such an application only duplicatively criminalizes—selectively—behavior that is already illegal under the law of the jurisdiction where the illegal act occurs. Thus, once again, all that the recruitment provision would add under this scenario is selective speaker- and content-based discrimination.

*Third*, the Defendants assert that "the Act constitutionally prohibits speech intended to induce or facilitate the 'harboring' or 'transporting' of a minor within this State for the purpose of obtaining an elective abortion without parental consent." *See* Doc. 69 at 32. But even if that were true, the Plaintiffs have explained that they are not challenging the Act's harboring and transporting provisions here. *See* Doc. 30 at 5. Furthermore, to the extent that "speech incident to the crimes of 'harboring' and 'transporting'" encompasses speech intended to assist someone obtain an abortion in a jurisdiction where abortion care is legal, such speech *cannot lawfully be criminalized*, given that Tennessee's lawful police power "do[es] not reach" speech about legal abortion care available in other states. *Bigelow v. Virginia*, 421 U.S. 809, 822–24 (1975).

*Fourth*, the Defendants insist that "the Act constitutionally prohibits speech intended to induce abortions through extortion, coercion, or to conceal criminal conduct." *See* Doc. 69 at 33. But the Act does not do *any* of these things, none of which falls within any normal definition of "recruitment." And that fact aside, extortion is separately criminalized *generally*, *see* Tenn. Code Ann. § 39-14-112—not just as to some speakers or as to abortion specifically—as is any attempt to coerce criminal conduct, *see* Tenn. Code Ann. § 39-12-101(a)(2), as is attempting to conceal

- 26 -

criminal conduct in the way the Defendants mean, *see* Tenn. Code Ann. § 39-16-503. Thus, once more, the Act's recruitment provision—even if it did encompass extortion, coercion, and criminal concealment—would serve as nothing more than a "vehicle[] for content discrimination unrelated to [its] distinctively proscribable content." *R.A.V.*, 505 U.S. at 383–84.

The takeaway: Even in heavily lawyered briefing, the Defendants cannot identify any constitutional application of the Act's recruitment provision that is not already criminalized by another general criminal law. And the Defendants' own list of ostensible "constitutional applications" does not contest that constitutional protection must be afforded to the very speech that motivated this lawsuit and underlies the Plaintiffs' as-applied challenge: "the Plaintiffs' intended advocacy about legal out-of-state abortion care and legal medication abortion care[.]" Doc. 1 at ¶ 57; *see also* Doc. 70 at 13 ¶ 49 ("[U]nless the Act's 'recruit[ment]' prohibition is declared unconstitutional and enjoined, Ms. Welty cannot safely continue her advocacy for safe and healthy access to legal abortion care without risking criminal prosecution."); *id.* at 19 ¶ 72 ("Representative Behn wants to continue her advocacy for young people who need legal abortion care, but she cannot do so safely without risking criminal prosecution."). Thus, this Court should at least grant the Plaintiffs summary judgment on their as-applied claim.

Nor do the Defendants persuasively argue that this Court should selectively depart from the Ninth Circuit's recent decision in *Matsumoto*. True, that decision rejected a vagueness challenge similar to the one the Plaintiffs raise here—a part of the decision the Plaintiffs assert was correct. But *Matsumoto* did so only because it found that the term "recruiting" plainly and unambiguously encompassed "a broad swath of protected speech" (including the same speech for which the Plaintiffs have sought this Court's protection), thus obviating any vagueness problems. *See Matsumoto*, 122 F.4th at 811 ("We see no inconsistency in treating 'recruiting' as a

comprehensible standard, even if that standard impermissibly sweeps in a broad swath of protected speech, as discussed below. . . .   These plain language applications of 'procur[ing] … by recruiting' underscore that the statutory language covers a wide array of speech and conduct."); *id.* at 809 (providing "information—especially information . . . regarding the provider, time, place, or cost of an available abortion—could satisfy the plain meaning of 'recruit.'"); *id.* ("provid[ing] advice on how . . . minors . . . can legally access [a]bortions," "provid[ing] information and options counseling to . . . pregnant minors, about abortion," "giving advice and support to organizations that assist pregnant minors who are survivors of domestic violence and sexual assault[,]" "providing . . . minors, with reproductive health care information, including information about abortion[,]" and "providing 'emotional . . . and informational assistance' to pregnant minors— "[a]ny of these activities could arguably satisfy the plain meaning of 'recruiting' and, coupled with 'procuring' or 'obtaining' an abortion, put individuals and organizations at risk of criminal penalties."); *id.* at 810 ("Legal advice, too, might constitute recruiting"); *id.* ("[E]xpressions of persuasive encouragement might be prosecuted under the statute."); *id.* ("[A]n adult concerned for the wellbeing of an underage victim of incest would be prohibited from counseling and then assisting that victim in obtaining an abortion without informing a parent—who may well be the perpetrator.").

Nor did *Matsumoto* misapply overbreadth standards.  Instead, it recognized—correctly— that: (1) "'recruiting' has broad contours that overlap extensively with the First Amendment[,]" and (2) whether "assessed against all activities covered by the individual 'recruiting' component . . . or benchmarked against the statute as a whole," the amount of protected speech that the provision proscribed "is substantial in proportion."  *Id.* at 814–15.  This analysis is correct.

Further, as the Plaintiffs have observed, by expressly drafting the challenged provision to

apply to "recruit[ment]" for the purpose of: (1) procuring an abortion "regardless of where [an] abortion is to be procured" (including in jurisdictions where abortion care is legal) and (2) "regardless of where [an] abortion-inducing drug is obtained" (including legally), *see* Doc. 1-1 at 1, the Act's "recruit[ment]" prohibition criminalizes—and *it is intended to criminalize*—speech about *legal* abortion care, which is the heart of the law.  It also is easier to get a legal abortion than an illegal one.  *See, e.g., Medication Abortion Accounted for 63% of All US Abortions in 2023— An Increase from 53% in 2020*, Guttmacher, Policy Analysis (Mar. 2024), https://www.guttmacher.org/2024/03/medication-abortion-accounted-63-all-us-abortions-2023. Thus, the overwhelming majority of actual applications proscribed by the recruitment provision will concern speech about *legal* abortion care, which is the law's intended target.

For these reasons, this Court should follow *Matsumoto*.  The Plaintiffs also note that *Matsumoto* did not consider a separate argument for facially invalidating the challenged recruitment provision that the Plaintiffs have raised here: It is a content-, viewpoint-, and speaker-based criminal speech restriction that cannot survive strict scrutiny.  *See* Doc. 56 at 41–44.  Further, if this Court disagrees with *Matsumoto*'s analysis concerning the clarity of the overbroad criminal speech restriction challenged here, then the Plaintiffs' vagueness challenge prevails for the reasons already detailed in their motion for summary judgment.  *See* Doc. 56 at 30–37.

### III.  CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. 67) should be **DENIED**.

Respectfully submitted,

/s/ Daniel A. Horwitz
DANIEL A. HORWITZ, BPR #032176
MELISSA DIX, BPR #038535
SARAH L. MARTIN, BPR #037707
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
(615) 739-2888
daniel@horwitz.law
melissa@horwitz.law
sarah@horwitz.law

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2025, a copy of the foregoing was sent via CM/ECF, USPS Mail, and/or via email, to:

STEVEN J. GRIFFIN
MATTHEW D. CLOUTIER
DONNA L. GREEN
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
Steven.Griffin@ag.tn.gov
Matt.Cloutier@ag.tn.gov
donna.green@ag.tn.gov

*Counsel for Defendants*

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176