UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RACHEL WELTY and AFTYN BEHN,    )
                                )
  Plaintiffs,                   )
                                )
                                )
v.                              )
                                )
BRYANT   C.   DUNAWAY;   JASON   )
LAWSON;   JENNINGS   H.   JONES; )
ROBERT  J.  CARTER;  RAY WHITLEY; )   Case No.: 3:24-CV-768
ROBERT  J.  NASH;  GLENN  FUNK;  )
STACEY     EDMONSON;     BRENT   )
COOPER;  RAY  CROUCH;  and  HANS )
SCHWENDIMANN,                    )
                                )
  Defendants.                   )

MEMORANDUM OPINION AND ORDER

In the wake of *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022),

Tennessee's trigger ban took effect and prohibited abortion with limited medical emergency

exceptions. Tenn. Code Ann. § 39-15-213. A few years later, in 2024, Tennessee enacted a law

to prohibit "abortion trafficking of a minor." *Id.* § 39-15-201(a). The law makes it a crime to

"intentionally recruit[] . . . a pregnant unemancipated minor" in Tennessee "for the purpose of"

obtaining an abortion that would be illegal in Tennessee. *Id.* But § 39-15-201 does not merely

bar recruitment of minors to facilitate illegal abortions in Tennessee; it bars recruitment of minors

to facilitate abortions "regardless" of where the procedure occurs. *Id.* In other words, the law

prohibits recruiting an out-of-state abortion that is entirely *legal* in that state, so long as it would

be illegal in Tennessee.

Plaintiffs Rachel Welty and Aftyn Behn, both advocates of abortion rights in Tennessee, seek to counsel pregnant, unemancipated minors in Tennessee and to help them access legal abortion in other states. They moved to enjoin enforcement of § 39-15-201, arguing that it is an unconstitutional restriction on their free speech and void for vagueness. This court granted the motion on both grounds, and defendants appealed. With the appeal pending, both parties now move for summary judgment.

Section 39-15-201 prohibits speech encouraging lawful abortion while allowing speech discouraging lawful abortion. That is impermissible viewpoint discrimination, which the First Amendment rarely tolerates—and does not tolerate here. And because the statute discriminates in a substantial amount of its applications, it is facially overbroad. Thus, the court grants summary judgment for plaintiffs on their free speech claims and enjoins enforcement of the recruiting prong of the statute. The statute is not, however, void for vagueness. The court therefore grants summary judgment for defendants on plaintiffs' vagueness claim.

## I. BACKGROUND

### A. Statutory Background

Soon after the Supreme Court issued its 2022 decision in *Dobbs*, Tennessee's abortion ban took effect. *See* 2019 Tenn. Pub. Acts, ch. 351, § 3 (stating that the ban will take effect 30 days after "the issuance of the judgment . . . of the United States Supreme Court" overturning *Roe v. Wade*, which took place on July 24, 2022); *see* Tenn. Code Ann. § 39-15-213. Under Tennessee law, it is a felony "criminal abortion" to "perform[] or attempt[] to perform an abortion" unless an exception applies. *See* Tenn. Code Ann. § 39-15-213(b).

In May 2024, Tennessee enacted Chapter 1032, a so-called ban on "abortion trafficking," with an effective date of July 1, 2024. *See* Doc. 1-1, S.B. 1032, Page ID 16–18. The law provides

2

that it is a misdemeanor for an adult to "intentionally recruit[], harbor[], or transport[] a pregnant unemancipated minor within [Tennessee] for the purpose of" either (1) "[c]oncealing an act that would constitute a criminal abortion under" Tennessee law "from the parents or legal guardian of the pregnant unemancipated minor"; (2) "[p]rocuring an act that would constitute a criminal abortion under" Tennessee law, "regardless of where the abortion is to be procured"; or (3) "[o]btaining an abortion-inducing drug . . . for the purpose of an act that would constitute a criminal abortion under" Tennessee law, "regardless of where the abortion-inducing drug is obtained." Tenn. Code Ann. § 39-15-201(a). The statute does not define "recruit." *See id.*

Section 39-15-201 contains a few exceptions, including one for "the provision of a medical diagnosis or consultation regarding pregnancy care of an unemancipated minor," as long as that consultation does not involve an actual attempt to terminate the pregnancy or arranging for travel to do so. *Id.* § 39-15-201(f)(1)–(2). The statute also exempts four classes of individuals: a pregnant minor's parent or legal guardian; a person who has obtained consent from such parent or guardian; common carriers transporting passengers in the ordinary course of business; and emergency medical personnel acting within the course of their duties. *Id.* § 39-15-201(c)(1)–(4). The statute contains no exception, however, for family members besides parents or guardians—an unemancipated minor's aunt or uncle, adult sibling, or grandparent could be prosecuted for "recruiting" the minor to procure an abortion.

A person who violates the statute commits a Class A misdemeanor, which can result in nearly a year in jail. *Id.* § 39-15-201(b). The statute also provides that violators "may be held liable in a civil action for the wrongful death of an unborn child who was aborted." *Id.* § 39-15-201(e)(1).

3

## 2. Factual Background

Plaintiff Rachel Welty is a family law attorney and an abortion rights advocate. Doc. 35, PI Hr'g Tr., Page ID 354. As part of her legal practice, Welty has long helped minors access legal abortion. *Id.* at 354–356. Before *Dobbs*, Welty helped pregnant minors obtain judicial bypass authorization to obtain abortions in Tennessee. *Id.* at 354–356. As a result of this work, Welty is "known in the legal community" as someone who can provide "information about abortion services or the state of the law in Tennessee" to other family attorneys, advocacy groups, or pregnant minors. *Id.* at 385–86.

After *Dobbs*, Welty continues to counsel pregnant minors seeking abortions now that Tennessee's ban on abortion has gone into effect. *Id.* at 356–57. Welty rarely asks whether any given minor client has "the consent of their parent" to obtain an abortion. *Id.* Nor does she tell her minor clients whether they should obtain an abortion; she provides them with information so they can "make these decisions for themselves." *Id.* at 358. This information includes telling the minor that abortion is "safe, common and normal." *Id.* at 359. Welty knows that sometimes this information persuades her clients to seek a legal abortion. *Id.* at 359, 381. When that occurs, Welty "support[s] and encourage[s] that decision." *Id.* at 359. This support might involve "connecting them with resources" or informing them "what clinics are available for them," including ones "out of state." *Id.* at 374–75.

Along with her direct advocacy, Welty serves on the board of Abortion Care Tennessee ("ACT"), a fund that provides grants to out-of-state abortion clinics for use by Tennessee residents. *Id.* at 363–64. To spread the word about ACT, Welty hands out literature concerning these options, including information about accessing an abortion outside the state. *Id.* at 366–68; *see* Doc. 1-2, Welty Literature, Page ID 19–21.

Welty also speaks publicly about abortion access. She created a social media account "[t]o provide information to Tennesseans about abortion care," including that abortion is "safe." Doc. 35, PI Hr'g Tr., Page ID 369. She has posted "information about abortion pills and their safety and where they can be accessed." *Id.* Once the recruitment provision was enacted, however, Welty stopped using her social media account to post information about abortion, concerned that her posts might subject her to criminal prosecution. *Id.* at 369–70.

Plaintiff Aftyn Behn is a licensed social worker and elected official who represents District 51 in the Tennessee House of Representatives. *Id.* at 387–89. As a state legislator, Behn communicates with her constituents and other Tennesseans every day and often about abortion access in Tennessee. *Id.* at 388–89. Behn advises these Tennesseans about how to obtain a legal abortion, including by going to a clinic outside the state. *Id.* at 390–91. Although Behn does not verify the age of the Tennesseans who reach out to her, she believes that some are minors. *Id.* at 389–90.

As a social worker, Behn counsels pregnant clients about their options, including obtaining a legal abortion. While Behn does not pressure her clients to obtain an abortion, in some cases, she will convey to them that "an abortion might be in their best interest." *Id.* at 394. And when a client decides to seek abortion care, Behn "support[s] them in doing so." *Id.* at 395.

Before the Tennessee legislature enacted § 39-15-201, Behn spoke out against the proposed legislation, specifically the recruitment provision. *Id.* at 396; *see* Doc. 1-5, Behn Tweet, Page ID 38–39. Behn also stated that "I welcome the opportunity to take a young person out of state who wants to have an abortion even if it lands me in jail." Doc. 1-5, Behn Tweet, Page ID 40. During the House debate on the bill, the bill's sponsor pointed to Behn's tweet as an example of "what recruitment looks like." Doc. 1-6, House Tr., Page ID 60.

### 3. Procedural History

Shortly before § 39-15-201's effective date, plaintiffs brought this pre-enforcement challenge, naming as defendants the district attorneys general for the Middle District of Tennessee. Doc. 1, Compl., Page ID 1–15; *see id.* at 3. Plaintiffs alleged that § 39-15-201's recruitment provision violated the First Amendment as applied to them because it regulates speech based on its content and viewpoint and on its face because it is overbroad. *Id.* at 11–14. Plaintiffs also alleged that the provision was unconstitutionally vague.[1] *Id.* at 9–11.

Plaintiffs moved to preliminarily enjoin enforcement of the statute. Doc. 18, PI Mot., Page ID 157; Doc. 19, PI Mem., Page ID 160–83. Defendants moved to dismiss all claims on jurisdictional and merits grounds. Doc. 25, Deft MTD, Page ID 249; Doc. 26, Deft MTD Mem., Page ID 252–70. At the preliminary injunction hearing, plaintiffs testified about their abortion advocacy work, which includes counseling pregnant minors about their options, including abortion, and providing support and encouragement when the minor decides to obtain a legal abortion. Doc. 35, PI Hr'g Tr., Page ID 351–478.

After the hearing, this court granted plaintiffs' motion for a preliminary injunction and denied defendants' motion to dismiss in part.[2] Doc. 40, PI Mem., Page ID 538–86; Doc. 41, PI Order, Page ID 587–88. This court enjoined each defendant from enforcing the recruitment provision against anyone "other than in connection with obtaining or attempting to obtain an actually unlawful abortion." Doc. 41, PI Order, Page ID 587–88. Such abortions are those that

---

[1] Plaintiffs challenged only the recruitment prong of § 39-15-201; they did not challenge either the harboring or transporting prongs. *See generally* Doc. 1, Compl., Page ID 1–5.

[2] The court granted defendants' motion to dismiss with respect to Welty's claims against defendants Dunaway, Carter, Cooper, and Schwendimann. Doc. 40, PI Mem., Page ID 564; Doc. 41, PI Order, Page ID 587.

6

"necessarily involve[] the violation of a criminal law," other than § 39-15-201 itself, "in the jurisdiction where the relevant conduct is performed." *Id.* at 587. Defendants appealed this court's decision granting injunctive relief to plaintiffs and denying defendants' motion to dismiss in part, Doc. 47, Notice of Appeal, Page ID 601, which remains pending.

Defendants then moved to stay proceedings while the appeal is pending. Doc. 48, Mot. to Stay, Page ID 604–609. Meanwhile, plaintiffs moved for summary judgment. Doc. 54. This court denied defendant's motion to stay. Doc. 66, Order Den. Stay, Page ID 801–802 (explaining that defendants failed to show "any hardship or inequity will result if the stay is denied" and granting a stay "would only serve to delay the case and would not serve judicial economy"). Defendants moved for summary judgment. Doc. 69, Deft SJ Mt. & Mem., Page ID 812–855.

## II. LEGAL STANDARD

Summary judgment is appropriate when a party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, the non-moving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).

The standards on which this court evaluates motions for summary judgment does not change when, as here, "both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quotation omitted).

## III. DISCUSSION

The parties' motions for summary judgment raise issues concerning this court's jurisdiction as well as plaintiffs' rights under the First and Fourteenth Amendments. As for jurisdiction,

7

defendants argue that plaintiffs lack Article III standing to pursue their pre-enforcement challenge and that plaintiffs' suit is barred under the doctrine of sovereign immunity. As for the merits, the parties debate whether § 39-15-201's recruitment provision is an unconstitutional restriction on plaintiffs' free speech, facially overbroad, and void for vagueness. Lastly, defendants argue that if the court grants summary judgment for plaintiffs and awards injunctive relief, any such relief should be limited to the parties and their intended speech.

A. <u>Standing</u>

Defendants argue that plaintiffs lack standing because their abortion-related advocacy and counseling fall outside the scope of the recruitment provision. Doc. 69, Deft SJ Mem., Page ID 829–838.

Article III of the Constitution allows this court to resolve constitutional issues only when necessary to decide the legal rights of litigants in live "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1; *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc). To satisfy Article III's standing requirements, plaintiffs must show that they "have suffered an injury in fact, that was caused by the conduct complained of, and which a favorable decision is likely to redress." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (citation modified). Although at the pleading stage, plaintiffs needed only to plausibly allege standing, at the summary judgment stage, they "must present enough evidence to create a genuine issue of material fact over each standing element." *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022).

1. Injury

In pre-enforcement challenges against a statute, standing "often turns upon whether [the plaintiff] can demonstrate an 'injury in fact' before the state has actually commenced an

8

enforcement proceeding against [it]." *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014). The injury-in-fact requirement helps to "ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). To meet it, plaintiffs must establish "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). An injury is "imminent" if it "is certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158 (citation modified).

Plaintiffs asserting a pre-enforcement challenge can establish an injury by showing "(1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (quoting *Driehaus*, 573 U.S. at 159).

i.   *Plaintiffs intend to engage in expression that the First Amendment arguably protects.*

Plaintiff's intended speech generally falls into three categories:   public advocacy, information-sharing, and counseling. All three expressions are protected speech. *First*, plaintiffs' publicly express their views on abortion, including the recruitment provision. Welty gives public speeches, attends "marches" and "talks," and participates in "interview[s]" with "reporters" about abortion. Doc. 35, PI Hr'g Tr., Page ID 365–69. Behn speaks publicly on issues concerning her constituents, which often include abortion. *See id.* at 388–89. When the recruitment provision was proposed in the General Assembly, Behn "spoke out against" it. *Id.* at 396; *see* Doc. 1-5, Behn Tweet, Page ID 36–39. Plaintiffs' advocacy on an issue of public interest is protected

political speech. *See Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 470 (2007).

*Second*, plaintiffs share information about legal abortion, including how to obtain a legal out-of-state abortion. Welty donates to an abortion fund that publishes a "website with lots of information on it"; distributes "handouts about abortion care [and] abortion pills" at "different places" where "anyone" could pick them up; and leaves "little cards" with a list of websites about abortion options in "different places," like the "bathrooms of bars." *Id.* at 364–367. Behn shares abortion-related information on social media, makes literature available in her office with "information as to how to contact the nearest abortion provider outside of the State of Tennessee," and leaves "stickers in places where there are minors" who might see them. *Id.* at 390–92, 404. The First Amendment protects these communications. *See Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (holding advertising of legal out-of-state abortions was protected speech).

*Third*, plaintiffs counsel, support, and encourage unemancipated minors seeking legal abortions. As an attorney, Welty offers legal advice to unemancipated minors in Tennessee seeking abortions. *Id.* at 354–58. Because abortion is largely illegal in Tennessee, Welty usually informs her clients that "[t]heir options are to get abortion pills and do a self manage[d] abortion or to seek abortion care outside of the State of Tennessee." *Id.* at 355. Behn advises individuals in Tennessee, some of whom she believes are minors, on how to obtain a legal abortion, including an abortion outside the state. *Id.* at 389–91. If the client or constituent decides to obtain an abortion, plaintiffs provide verbal support and encouragement. *Id.* at 359, 392–95. These one-on-one conversations are protected speech. *Cf. McCullen v. Coakley*, 573 U.S. 464, 472–73, 487, 496 (2014) (recognizing that "sidewalk counseling," which involves "close, personal conversations" intended to dissuade women from obtaining abortions, was protected speech); *Hill v. Colorado*,

10

530 U.S. 703, 708, 714–15 (2000) (same); *see also Meyer v. Grant,* 486 U.S. 414, 424 (1988) (observing that "one-on-one communication" is "the most effective, fundamental, and perhaps economical avenue of political discourse").

Defendants argue that plaintiffs' intended speech is not protected speech because it is speech integral to criminal conduct. *See* Doc. 69, Deft SJ Mem., Page ID 841–842; Doc. 75, Deft SJ Reply, Page ID 936. The First Amendment does not protect "[s]peech intended to bring about a particular unlawful act." *United States v. Hansen*, 599 U.S. 762, 783 (2023); *United States v. Williams*, 553 U.S. 285, 297 (2008). Because abortion is generally illegal in Tennessee, the state may constitutionally punish speech made in direct furtherance of in-state abortions (with limited exceptions). In other words, Tennessee may criminalize speech recruiting a minor to procure an abortion in Tennessee (again, with limited exceptions). The state may not, however, criminalize speech recruiting a minor to procure a legal abortion in another state. Because plaintiffs wish to speak about legal abortions and seek to help minors obtain legal, out-of-state abortions, their intended speech is protected under the First Amendment. Of course, these out-of-state abortions would be illegal if they occurred in Tennessee. But they do not occur in Tennessee. And Tennessee cannot criminalize "disseminating information about an activity that is legal in [another] [s]tate." *Bigelow v. Virginia*, 421 U.S. 809, 824-25 (1975); *cf. Katt v. Dykhouse*, 983 F.2d 690, 696 n.3 (6th Cir. 1992) (explaining that "a city may not ban speech describing a lawful underlying commercial activity taking place outside the city's boundaries," even if the activity is illegal within the city). Because plaintiffs promote only legal abortions, the speech integral to crime exception does not apply and plaintiffs' speech remains protected. *See Yellowhammer Fund v. Marshall*, No. 23-CV-450, 2025 WL 959948, at *21–22 (M.D. Ala. Mar. 31, 2025) (declining

11

to apply speech-integral to crime exception to plaintiffs' counseling services regarding lawful out-of-state abortions).

    ii.    *The recruitment provision arguably proscribes plaintiffs' intended speech.*

        Plaintiffs must also show that their intended speech is arguably proscribed by the recruitment provision. Determining whether plaintiffs intended speech falls within the scope of § 39-15-201's recruitment provision is a question of state law. In interpreting state law, this court applies the "general rules of statutory construction as embraced by" the state's courts. *First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 680 (6th Cir. 2020) (quotation omitted). Tennessee state courts generally apply its "natural and ordinary meaning." *Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn. 2003) (quotation omitted); *see* Tenn. Code Ann. § 1-3-105(b).

        The recruitment provision makes it a crime for any adult to "intentionally recruit[] . . . a pregnant unemancipated minor within the state for the purpose of. . . . procuring" an abortion. Tenn. Code Ann. § 39-15-201(a)(1). The key statutory term is "recruit." When, as here, the statute does not define the term, this court may discern the statute's ordinary meaning by drawing on "dictionary definitions." *Shockley v. Mental Health Coop., Inc.*, 429 S.W.3d 582, 591 (Tenn. 2013); *see also New Commonwealth v. Dabney*, 90 N.E.3d 750, 764 (Mass. 2018) (looking to dictionary definitions to define the word "recruit"). Perhaps the most common definition of "recruits" is to enlist someone in the military.[3] *See, e.g., Recruit*, Merriam-Webster Dictionary,

---

[3] Defendants cite several dictionary definitions that define "recruit" in the military context. *See* Doc. 69, Deft SJ Mem., Page ID 826 n.3. For these definitions, "recruit" has a specific and narrow meaning. *See id.* But applying these definitions here, a non-military context, makes little sense. The court therefore declines to adopt a similar, narrow definition of "recruit" in Tennessee's abortion trafficking law. *See Waldschmidt v. Reassure Am. Life Ins.*, 271 S.W.3d 173, 177 n.2 (Tenn. 2008) ("While consulting a dictionary may help identify the possible meanings of a word

12

https://www.merriam-webster.com/dictionary/recruit (defining verb "recruit" as "to enlist as a member of an armed service"). That definition, of course, does not apply in the abortion context. But other definitions of "recruit" clarify the meaning of the term in non-military contexts. Under these definitions, to "recruit" means to induce, enlist, or persuade someone to join a group or participate in some undertaking. *See Recruit*, Oxford English Dictionary, https://www.oed.com/dictionary/recruit_v (defining verb "recruit" as "to seek or enlist new members, supporters, or employees" and "[t]o induce or enlist (a person) to participate or provide assistance"); *Recruit*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/recruit (defining verb "recruit" as "to persuade someone to become a new member of an organization"); *see also* Tenn. Op. Att'y Gen. No. 07-64 (May 10, 2007). The question, then, is whether plaintiffs' abortion-related advocacy and counseling arguably induces, enlists, or persuades unemancipated minors in Tennessee to obtain abortions that would be unlawful if they occurred in Tennessee.

There are several plausible interpretations of "recruit" in this context. *See* Doc. 22, Deft PI Mem., Page ID 218 (acknowledging that "recruit" is "susceptib[le] to a wide array of possible meanings"). Defendants propose a narrow interpretation, limiting recruitment to the "targeted inducement of a minor for a specific purpose—obtaining an elective abortion without her parent's or guardian's consent." Doc. 69, Deft SJ Mem., Page ID 822. Plaintiffs propose a broader interpretation, which would include "encouragement, persuasion, and 'put[ting] out the word' that an option is available." Doc. 56, Plaintiff SJ Mem., Page ID 724 (quotation omitted).

---

or phrase, the search for the General Assembly's purpose calls for an appropriate consideration of the statutory context.").

Under the narrow interpretation of "recruit," some of plaintiffs' intended speech might fall outside the scope of the recruitment provision. When sharing information and meeting clients or constituents, plaintiffs testified that they do not intend to persuade or convince them to obtain an abortion. Welty testified that her "goal as an advocate is never to persuade someone" but "to give them options and then let them make their own decision." Doc. 35, PI Hr'g Tr., Page ID 374. Behn also testified that her goal was not to "persuade" the minor to get an abortion, but to "provide her information about abortion so that she can make her own decision." *Id.* at 406. Both plaintiffs testified, however, that once the minor decides to obtain a legal abortion, plaintiffs "support and encourage that decision." *Id.* at 359. Thus, at that point, plaintiffs would possess the specific intent to procure an abortion for the minor. Plaintiffs' verbal "support and encourage[ment]" would be recruitment under defendants' proposed interpretation.[4] *Id.*

Under the broader interpretation of "recruit," all of plaintiffs' intended speech would be covered under the recruitment provision. Plaintiffs' abortion-related advocacy encourages and, at times, persuades unemancipated minors to obtain legal abortions. *See id.* at 359–60. For example, Welty testified that she often tells minor clients that abortion is "safe, common and normal." *Id.*

---

[4] For similar reasons, defendants' argument that plaintiffs' intended speech falls outside the scope of the recruitment provision because they lack the necessary mental state also falls short. To be liable under the provision, a person must "intentionally recruit[]" a minor "for the purpose of" "[p]rocuring" an abortion that would be illegal in Tennessee. Tenn. Code Ann. § 39-15-201(a). Because plaintiffs testified that they do not set out to persuade any individual to obtain an abortion, defendants argue that plaintiffs have "disavowed any such intent." Doc. 69, Deft SJ Mem., Page ID 831. It is unclear whether the provision imposes a specific intent requirement. The provision proscribes "intentional[]" recruitment, *id.*, which Tennessee law defines as conduct committed with the "conscious objective *or desire to engage in the conduct*," *Id.* § 39-11-302(a) (emphasis added). Thus, plaintiffs might violate the recruitment provision if they intend to engage in the conduct—their abortion-related advocacy and counseling—but do not intend any specific result. But even if the recruitment provision imposes a specific intent element, plaintiffs testified that once a minor client decides to obtain a legal abortion, plaintiffs intend to help the minor obtain the desired abortion. Doc. 35, PI Hr'g Tr., Page ID 359. Thus, at that point, plaintiffs would end up speaking with the conscious objective of helping those minors procure lawful abortions.

14

at 359. This information has caused some clients who "were uncertain about the best option for them to pursue" an abortion. *Id.*

Under either proposed interpretation of "recruit," plaintiffs' abortion-related advocacy and counseling would be proscribed by the recruitment provision. That is more than enough for standing purposes. *See Kentucky v. Yellen*, 54 F.4th 325, 349 n.16 (6th Cir. 2022). Thus, the recruitment provision arguably encompasses plaintiffs' intended speech.

iii.     *Plaintiffs face a credible threat of enforcement.*

Even if plaintiffs' intended speech is arguably protected by the First Amendment and arguably proscribed by the recruitment provision, they still must show that they face a "credible threat of enforcement." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam) (citations omitted). Although plaintiffs need not expose themselves to actual arrest or prosecution to bring a pre-enforcement challenge to a statute, *Driehaus*, 573 U.S. at 158, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact." *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quotation omitted). Beyond chilled speech, several factors inform this court's analysis of whether a threat of enforcement is credible enough to support a claim for pre-enforcement prospective relief: (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.* at 869. These "factors are not exhaustive, nor must each be established." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021); *see McKay*, 823 F.3d at 869 (noting that standing might exist when "some combination' of the factors is present).

15

*Enforcement history.* The first factor is whether there is "a history of past enforcement" of the statute "against the plaintiffs or others." *McKay*, 823 F.3d at 869. A threat of enforcement is particularly credible when "the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser*, 765 F.3d at 609.

Plaintiffs concede that there is no enforcement history under the recruitment provision. Doc. 56, Plaintiff SJ Mem., Page ID 705. A lack of enforcement history, however, does not automatically defeat pre-enforcement review. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *see also Tingley v. Ferguson*, 47 F.4th 1055, 1069 (9th Cir. 2022) ("[T]he history of enforcement[] carries little weight when the challenged law is relatively new." (citation modified)). The Sixth Circuit has discounted this factor when there was a plausible explanation for the lack of enforcement history.[5] And there is a good reason for the lack of enforcement history here: plaintiffs sued before the recruitment provision went into effect. *See* Doc. 1, Compl., Page ID 1; Doc. 1-1, S.B. 1032, Page ID 17. Thus, "the fact that no one has been prosecuted under the provision is unsurprising." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022).

*Warning letters.* The second factor is whether "enforcement warning letters" have been sent to plaintiffs "regarding their specific conduct" could also lend credibility to their fear of

---

[5] *See, e.g.*, *Nabors*, 35 F.4th at 1035 (noting that it was "unsurprising" that "no one ha[d] been prosecuted under" a law enjoined "[a]lmost as soon as [it] went into effect"); *Online Merchs. Guild*, 995 F.3d at 550 (holding lack of enforcement history "carries little weight" because the challenged law "is enforceable only during a declared emergency"); *Nessel*, 117 F.4th at 849–50 ("[G]iven the short duration of the ELCRA's application to sexual orientation and gender claims, 'it makes sense that there would be at best limited evidence of a history of enforcement' in those categories." (quoting *Online Merchs.*, 995 F.3d at 550)).

16

prosecution. *McKay*, 823 F.3d at 869. Plaintiffs cite no such letters.[6] *See generally* Doc. 56, Pl. SJ Mem., Page ID 686–738; Doc. 71, Pl. SJ Reply Mem., Page ID 886–916. But because plaintiffs sued before the statute went into effect and thus enforceable, the lack of warning letters carries little weight. As this court observed in its preliminary injunction order: "Finding a lack of standing based solely on the lack of support from those two factors would, therefore, effectively be an outright bar on any suit challenging a newly enacted Tennessee criminal law." Doc. 40, PI Order, Page ID 559. The Sixth Circuit, moreover, has found standing when there was no enforcement history or warning letters from prosecutors. *E.g.*, *Nessel*, 117 F.4th at 848–50; *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019); *see also Vitagliano v. County of Westchester*, 71 F.4th 130, 140 (2d Cir. 2023) (per curiam) ("[T]he Supreme Court and at least four other circuits have sustained pre-enforcement standing without a past enforcement action or an overt threat of prosecution directed at the plaintiff.").

Given that plaintiffs challenged § 39-15-201 before it went into effect, the lack of enforcement history and warning letters does not defeat standing.

*Statutory attributes.* The third factor is whether there is "an attribute of the challenged statute that makes enforcement easier or more likely." *McKay*, 823 F.3d at 869. One such attribute is when the statute allows "private plaintiffs" to "bring a damages action." *Online Merchs. Guild*, 995 F.3d at 551. The statute here does just that: it allows private parties to bring civil actions against anyone who violates the recruitment provision and obtain damages. *See* Tenn. Code. § 39-15-201(e). But although this feature of the statute makes *civil* enforcement easier, it does not make

---

[6] Plaintiffs insist only that "Behn has been warned that her exact speech violates" the recruitment provision, relying on Representative Zachary's statements during the hearing. Doc. 56, Pl. SJ Mem., Page ID 709 (citing Doc. 1-6, House Tr., Page ID 61).

criminal enforcement easier—the type of enforcement that plaintiffs fear and that has chilled their speech. *See Nessel*, 117 F.4th at 850 ("Any threat of injury from the civil-enforcement aspect of the statute is not traceable to the defendants here, and does not represent a statutory attribute increasing the risk of enforcement by these defendants.").

Other features of § 39-15-201, however, bolster plaintiffs' fear of enforcement. *First*, the potential broadness of "recruit" gives prosecutors significant discretion to enforce the provision. As defendants concede, "recruit" is "susceptib[le] to a wide array of possible meanings." Doc. 22, Deft PI Mem., Page ID 218. It could encompass a whole host of protected speech, like providing "information—especially information trying to persuade a girl to have an abortion or regarding the provider, time, place, or cost of an available abortion," offering "financial support and logical assistance," giving "[l]egal advice," and general "expressions of persuasive encouragement." *Matsumoto v. Labrador*, 122 F.4th 787, 809–10 (9th Cir. 2024).

*Second*, the statute criminalizes "recruiting" regardless of whether the minor actually obtains an abortion. *See* Tenn. Code Ann. § 39-15-201 (2024). Recruitment need only be "for the purpose of" procuring an abortion. *Id.* The Idaho statute in *Matsumoto*, by contrast, prohibited recruitment of an unemancipated minor who actually "procures an abortion."[7] Idaho Code Ann. § 18-623(1) (2024). Because the statute required actual procurement, the Ninth Circuit acknowledged that not all recruitment would fall within the scope of the statute. *See Matsumoto*, 122 F.4th at 810–11. For example, "[a]n adult merely distributing a pamphlet of information on states' laws regarding abortion, or displaying a pro-choice bumper sticker," would not be subject to prosecution. *Id.* at 810. In both cases, there might "be an effort to persuade a minor to consider an abortion, but in neither case did the adult procure an abortion for a minor." *Id.* at 810–11. The

---

[7] Or "obtains an abortion-inducing drug." Idaho Code Ann. § 18-623(1) (2024).

Ninth Circuit nonetheless concluded that plaintiffs faced a credible fear of enforcement for standing purposes. *See id.* at 798–99. Because Tennessee's version of the statute does not require that the adult actually procure the abortion, it is broader than Idaho's statute and encompasses more protected speech, making plaintiffs' fear of enforcement credible.

*Third*, the potential consequences for violating § 39-15-201 include criminal prosecution, conviction, and imprisonment. *See* Tenn. Code Ann. § 39-15-201(b). These are "real consequence[s] that objectively chill[] speech." *Schlissel*, 939 F.3d at 765; *see Kareem*, 95 F.4th at 1025 ("[T]he threat of [criminal] punishment significantly heightens the risk of chilled expression.") The Sixth Circuit has found far less serious consequences to be supportive of standing. *E.g.*, *Schlissel*, 939 F.3d at 765 (concluding university's referral process for alleged bias, which could result in formal disciplinary proceedings, objectively chilled plaintiffs' speech). Because the statute has several attributes that make enforcement easier, this factor supports standing.

*Disavowal.* The final factor considers the defendant's "refusal to disavow enforcement of the challenged statute." *McKay*, 823 F.3d at 869. Although a defendant's "assertion that it intends to enforce its laws in the abstract . . . does not meaningfully increase the risk of enforcement," *Nessel*, 117 F.4th at 850, refusal to disavow enforcement "against a particular plaintiff" makes the threat of enforceable more credible. *McKay*, 823 F.3d at 869. Before plaintiffs filed this suit, Welty sent a letter to defendants, asking each of them to "disavow all enforcement" of the recruitment provision against her. Doc. 1-4, Welty Ltr., Page ID 27; *see* Doc. 35, PI Hr'g Tr., Page ID 371–72. Defendants did not respond. *See id.*

Defendants contend that they have disavowed enforcement of the recruitment provision during this litigation. *See* Doc. 69, Deft SJ Mem., Page ID 835–36. They point to their proposed

interpretation of "recruit," which they argue does not include plaintiffs' intended speech. But even if counsel's arguments in a brief could bind defendants, "standing is determined at the time the complaint is filed." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 580 (6th Cir. 2012). Thus, defendants' post-filing conduct does not alter the standing analysis. Because defendants have refused to disavow enforcement against the specific plaintiffs and their specific speech, this factor favors standing.

In sum, the *McKay* factors show that plaintiffs' fear of prosecution is "credible." Although the first two factors do not support standing, they carry little weight here because plaintiffs filed their suit before § 39-15-201 went into effect. And the other two factors strongly support standing. The statute has several attributes that ease enforcement, and defendants have refused to disavow enforcement of it against plaintiffs for their specific speech.

2. Causation and Redressability

Plaintiffs must also show that their injuries are fairly traceable to the challenged law and that those injuries are likely to be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560. Plaintiffs have satisfied both elements. As district attorneys general, defendants "have the direct authority (and even duty) to enforce Tennessee's criminal" laws, including the recruitment provision. *Nabors*, 35 F.4th at 1041 (quoting Tenn. Const. art. VI, § 5; Tenn. Code Ann. § 8-7-103(1)). Because plaintiffs seek to enjoin a potential prosecution under the recruitment provision, defendants "would cause that injury by filing the charges, and [this] court could redress it by enjoining [them] from doing so." *Id.* at 1034. Thus, plaintiffs' injuries are fairly traceable to the recruitment provision and redressable by an order enjoining enforcement of the provision.

Plaintiffs have standing to pursue their pre-enforcement challenge in federal court.

20

B. <u>Sovereign Immunity</u>

Defendants also claim that they are entitled to sovereign immunity, which requires dismissal of the entire suit. Doc. 69, Deft SJ Mem., Page ID 838–40. Under the doctrine of sovereign immunity, a state is generally not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). A suit against a state official in his official capacity is considered a suit against the state. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Because plaintiffs sued defendants in their official capacities, this case can proceed only if defendants fall within the "exception to States' sovereign immunity under the doctrine announced in *Ex Parte Young*." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046–47 (6th Cir. 2015). Under this exception, a defendant who "seeks to enforce" a law that is "a violation of the Federal Constitution" is "stripped of his official ... character" and thus his ability to rely on sovereign immunity. *Ex parte Young*, 209 U.S. 123, 159-60 (1908). The *Ex parte Young* exception applies, and the court may enjoin the state official, when he has "some connection with the enforcement of the act" and "there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell*, 784 F.3d at 1048 (quotation omitted).

As Tennessee district attorneys general, defendants "have the requisite enforcement connection to the challenged laws." *Nabors*, 35 F.4th at 1040. That is because they "have the direct authority (and even duty) to enforce Tennessee's criminal" laws, including the recruitment provision. *Id.* (citing Tenn. Const. art. VI, § 5; Tenn. Code Ann. § 8-7-103(1)). And for the reasons discussed above, there is a realistic probability that defendants will take legal action against plaintiffs. *See Russell*, 784 F.3d at 1047 ("[A]t the point that a threatened injury becomes

21

sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex parte Young*.").

Defendants argue that because plaintiffs cannot establish Article III standing, they also cannot overcome sovereign immunity, which requires an even greater showing. *See* Doc. 69, Def't SJ Mem., Page ID 839–40. Defendants' argument falls short for several reasons. First, as discussed, plaintiffs have standing to pursue their pre-enforcement challenge. Second, the Sixth Circuit has explicitly rejected the argument that *Ex parte Young* imposes a higher burden than standing. *See Russell*, 784 F.3d at 1047 ("It would be a perverse reading of *Young* to say that, although Russell might have an Article III injury before the Attorney General directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar us from enjoining the Attorney General's initiating a prosecution."). Thus, defendants' argument is foreclosed by binding Sixth Circuit precedent.

Because plaintiffs have Article III standing and defendants are not shielded by sovereign immunity, the court considers plaintiffs' claims on the merits.

C. Free Speech

Plaintiffs assert both as-applied and facial challenges to the recruitment provision. *See* Doc. 1, Compl., Page ID 11–14. An as-applied constitutional challenge "consists of a challenge to the statute's application only to the party before the court. *Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000). A facial challenge, by contrast, consists of a challenge that shows either "(1) that there truly are 'no' or at least few 'circumstances' in 'which the Act would be valid,' or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (citations omitted).

22

When the plaintiff asserts a free speech challenge, however, courts "lighten this load." In these cases, the challenged law is facially invalid "'if it prohibits a substantial amount of protected speech' both 'in an absolute sense' and 'relative to the statute's plainly legitimate sweep." *Id.* at 335–36.

    1. As-Applied Challenge

    Plaintiffs argue that the recruitment provision is an unconstitutional content-based restriction. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). A content-based law is therefore "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is considered content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.*

    The recruitment provision is a content-based restriction. As discussed, it prohibits "recruiting" an unemancipated minor in Tennessee to "[p]rocur[e]" an abortion that would be illegal in Tennessee. *See* Tenn. Code Ann. § 39-15-201(a). The provision does not, by contrast, prohibit recruiting an unemancipated minor to dissuade the minor from obtaining a lawful abortion—adults can lawfully counsel minors that they should carry their pregnancies to term, even without parental consent. *See id.* But the provision goes beyond the content of the speech. It favors speech that dissuades abortion over speech that encourages abortion. This is "an egregious form of content discrimination" that punishes speech based on "the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

Defendants do not contest that the recruitment provision is a content- or viewpoint-based restriction. *See generally* Doc. 69, Deft SJ Mem., Page ID 812–855. In fact, in some parts of their brief, they appear to concede the very point. *See id.* at 841 ("That is why laws promoting a 'particular piece of contraband,' or banning the 'solicitation of unlawful employment' are valid, *even though they represent content and viewpoint-based determinations*." (quotation omitted) (emphasis added)). They argue instead that this is permissible because "much of the speech covered by the Act is unquestionably incident to criminal conduct." *Id.* But plaintiffs' intended speech seeks only to recruit minors for purposes of obtaining a *legal* abortion. Thus, plaintiffs' speech cannot be speech integral to crime. And, for the reasons discussed, it is protected speech. The recruitment provision therefore regulates plaintiffs' speech because of its message—"that abortion is safe, common and normal" and available in certain states—and is presumptively unconstitutional. Doc. 35, PI Hr'g Tr., Page ID 359. And defendants fail to show—indeed, they do not even argue—that the law survives strict scrutiny.

2. Facial Challenge

To determine whether a statute is overbroad under the First Amendment, this court must first determine what it covers. *United States v. Hansen*, 599 U.S. 762, 770 (2023). As discussed, to "recruit" plainly means to induce, enlist, or persuade someone to join a group or participate in some undertaking. In the abortion context, recruiting includes "providing information," "especially information trying to persuade a girl to have an abortion or regarding the provider, time, place, or cost of an available abortion"; "subsidizing or fully funding an abortion—whether through donations or discounted services—by making the abortion more attractive (persuading) or more feasible (inducing)"; "financial support and logistical assistance"; "[l]egal advice" that "persuades a minor to obtain a legal abortion"; and "expressions of persuasive encouragement" all

24

"might be prosecuted" under this statute. *Matsumoto*, 122 F.4th at 809–10. And each of these applications involves protected speech.[8]

The next question is whether the recruitment provision is unconstitutional in a "substantial number of its applications . . . judged in relation to [its] legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The recruitment provision reaches a substantial amount of speech—"from encouragement, counseling, and emotional support; to education about available medical services and reproductive health care; to public advocacy promoting abortion care and abortion access." *Matsumoto*, 122 F.4th at 814–15. Because the First Amendment protects all of this speech, these applications would be unconstitutional.

Defendants identify several constitutional applications, which they argue outweigh any potential unconstitutional applications. *First*, defendants argue that the law validly applies to "recruiting [] minors to obtain illegal abortions performed *in Tennessee*" and "*in other States in which abortion is illegal absent parental notification or consent*." Doc. 69, Deft SJ Mem., Page ID 841–42 (emphases in original). To be sure, recruiting a Tennessee minor to procure an illegal abortion is speech integral to criminal conduct. *See* Tenn. Code Ann. § 39-15-213 (criminalizing nearly all abortions in Tennessee). Because the First Amendment does not protect this speech, the recruitment provision may validly proscribe it. *Hansen*, 599 U.S. at 783; *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Yet these "circumstances reflect a small subset of the protected speech covered within recruitment." *Matsumoto*, 122 F.4th at 813. That is because abortion remains legal in many states and, as a result, a Tennessee minor has several legal options

---

[8] *See, e.g., McCullen*, 573 U.S. at 472–73 (sidewalk counseling of abortion options); *Hill v*, 530 U.S. at 714–15 (same); *Bigelow*, 421 U.S. at 824–25 (advertising of legal out-of-state abortions); *In re Primus*, 436 U.S. 412, 432 (1978) (legal advice); *Wisconsin Right To Life*, 551 U.S. at 470 (public advocacy and education campaigns).

if she decides to terminate a pregnancy. Why would an adult recruit a Tennessee minor to obtain an illegal abortion in Tennessee, or another state where it is illegal, when many other states allow for legal abortion and a Tennessee minor can legally obtain abortion medication drugs?[9] Defendants do not say. Although these applications are possible, the court finds them less likely and less weighty than the unconstitutional applications. That is because recruiting an illegal abortion is both unnecessary and dangerous to the adult who risks criminal liability and the minor who risks death or severe health complications associated with unregulated abortion.

The statutory language and the legislative record confirm that the recruitment provision is directed at recruitment of lawful abortions. The recruitment provision criminalizes speech encouraging or persuading minors to obtain abortions "regardless" of where they occur, so long as they are illegal in Tennessee. Tenn. Code Ann. § 39-15-201(a). The statute's fiscal note also shows that the recruitment provision was chiefly aimed at speech inducing minors to obtain legal, out-of-state abortions. *See* Doc. 29-1, Fiscal Note, Page ID 328–329. It contemplates future prosecutions only in relation to abortions in states "where abortion is legal in some capacity." Doc. 29-1, Fiscal Note, Page ID 328–29. The law's sponsor, when asked about the recruitment provision, suggested it would apply to Planned Parenthood's recent conduct "recruiting children . . . across state lines" and to Behn's tweet, offering to transport minors "out of state." Doc. 1-6, House Tr., Page ID 60–61. Both the statutory text and legislative record therefore show that the recruitment provision sought to prohibit recruitment of lawful abortions. While applications involving recruitment of an unlawful abortion are not implausible, they are far from

---

[9] Although Tennessee bans medication abortions, "the pregnant woman upon whom an abortion is performed" is exempt from criminal liability. Tenn. Code Ann. § 39-15-213(a)(1), (e). Thus, an unemancipated minor who obtains abortion medication drugs during a telehealth visit with an out-of-state doctor could lawfully take them.

"the principal thing[] regulated" and thus entitled to little "weight in the facial analysis." *Moody v. NetChoice, LLC*, 603 U.S. 707, 726 (2024).

*Second*, the defendants argue that the recruitment provision validly applies to "speech intended to induce or facilitate the 'harboring' or 'transporting' of a minor within this State for the purpose of obtaining an elective abortion without parental consent." Doc. 69, Deft SJ Mem., Page ID 843. Speech incident to an act of harboring or transporting a Tennessee minor to obtain an *illegal* abortion would be unprotected. *See Hansen*, 599 U.S. at 783. But such speech is rare compared with speech incident to an act of harboring or transporting a Tennessee minor to obtain a *legal* abortion. And the latter is protected speech—the recruitment provision cannot constitutionally proscribe it. *See Bigelow*, 421 U.S. at 822–24.

*Lastly*, defendants assert that the recruitment provision "constitutionally prohibits speech intended to induce abortions through extortion, coercion, or to conceal criminal conduct." Doc. 69, Deft SJ Mem., Page ID 844. It seems unlikely that "recruitment," which involves encouraging or persuading a person to voluntarily engage in some activity, *see supra* Part III.A.1., embraces extortion or coercion. But even if it did, Tennessee law already criminalizes extortion and attempting to coerce another or to conceal criminal conduct. *See* Tenn. Code Ann. §§ 39-12-101(a)(2) (attempt), 39-14-112 (extortion and coercion), 39-16-503 (concealment). Because the law already proscribes this conduct, the recruitment provision would be merely a "vehicle[] for content discrimination unrelated to [its] distinctively proscribable content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–84 (1992).

Although the recruitment provision reaches some unprotected speech, its unconstitutional applications to protected speech are much more "realistic" and "substantial" in comparison with

27

the "statute's lawful sweep." *Hansen*, 599 U.S. at 770 (quotation omitted). The recruitment provision is therefore unconstitutionally overbroad.

D. <u>Vagueness</u>

Plaintiffs also challenge the recruitment provision as unconstitutionally vague. They argue that they do not know the scope of the provision because the statute does not define "recruit," the word is ambiguous, and susceptible to arbitrary enforcement. Doc. 56, Pl. SJ Mem., Page ID 716.

The Due Process Clause's "void for vagueness" doctrine ensures that a "person of ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A law is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). When a statute "interferes with the right of free speech," courts apply "a more stringent vagueness test." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quotation omitted). Nonetheless, "[p]erfect clarity and precise guidance have never been required," even for laws "that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

The recruitment provision does not sink to that level. The provision makes it a crime to "intentionally . . . recruit[]" an unemancipated minor for the purpose of "[c]oncealing" or "[p]rocuring" an abortion that would be illegal in Tennessee or "[o]btaining an abortion-inducing drug" for an abortion that would be illegal in Tennessee. *See* Tenn. Code Ann. § 39-15-201(a). Although the law does not define "recruit," that alone does not make the term unconstitutionally vague. Rather, when a statute leaves a term undefined, courts "normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993); *see also* Tenn. Code Ann. § 1-3-105(b) ("[U]ndefined words shall be given their natural and ordinary

28

meaning[.]"). The ordinary meaning of "recruit," while broad, is sufficiently clear "to give ordinary people fair notice of the criminalized conduct." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (citation modified). Certain speech is almost certainty prohibited recruitment under the provision: for example, a pregnant minor's 20-year-old sister, hoping to persuade her younger sister to obtain an abortion, says, "if I were in your shoes, I would get an abortion" and then tells her where to obtain an out-of-state abortion. The provision's scienter requirement also mitigates any potential vagueness. *See McFadden v. United States*, 576 U.S. 186, 197 (2015) ("[A] scienter requirement in a statute alleviates vagueness concerns." (citation modified)). To violate the recruiting provision, the adult must "intentionally" recruit an unemancipated minor. *See* Tenn. Code Ann. § 39-15-201(a). Thus, at a minimum, the adult must act "intentionally with respect to the nature of the conduct." *Id.* § 39-11-302(a). In other words, an adult who accidentally recruits a minor does not violate the recruiting provision.

Because the recruiting provision gives fair warning of the proscribed conduct, it is not unconstitutionally vague. *See Matsumoto*, 122 F.4th at 805–06 (rejecting void for vagueness challenge to Idaho's abortion trafficking statute).

E. Scope of Relief

Lastly, defendants argue that even if the court grants summary judgment for plaintiffs and awards injunctive relief, any such relief should be limited to the parties in the case and their intended speech. The plaintiffs, however, seek an injunction barring all enforcement of the recruitment provision.

In granting relief to plaintiffs, this court is mindful of its obligation to award no more than necessary to remedy plaintiffs' injuries. *Commonwealth v. Biden*, 57 F.4th 545, 556–57 (6th Cir. 2023). When a law is facially overbroad, however, "*all* enforcement of that law" may be enjoined.

29

*Virginia v. Hicks*, 539 U.S. 113, 119 (2003); *see Moody*, 603 U.S. at 723 (recognizing that an overbroad law "may be struck down in its entirety"). Afterall, an overbreadth challenge necessarily entails consideration of "the statute's effect on other parties not before the court." *Zillow, Inc. v. Miller*, 126 F.4th 445, 456 (6th Cir. 2025). That is because an overbroad law may chill constitutionally protected speech—"especially when [it] imposes criminal sanctions." *Hicks*, 539 U.S. at 119. Facing the threat of criminal prosecution, many people, rather than "vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* (citation omitted). Thus, an injunction suspending all enforcement of the overbroad law is necessary to "reduce[] these social costs caused by the withholding of protected speech." *Id.*

The Supreme Court's recent decision in *Trump v. CASA, Inc.*, limiting the use of "universal injunctions" by lower federal courts, does not alter the court's analysis. 606 U.S. ----, ----, 2025 WL 1773631, at *8 (2025). In *CASA*, the Supreme Court held that because universal injunctions are a relatively modern phenomenon, they fall outside the bounds of a federal court's equitable authority under the Judiciary Act. *Id.* at ----, 2025 WL 1773631, at *6. *CASA* therefore limits the availability of universal injunctions, not statewide injunctions. *See id.* at ----, 2025 WL 1773631, at *5 ("The issue before us is one of remedy: whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions."). And it explicitly recognized the validity of equitable relief under *Ex parte Young*—the precise relief plaintiffs seek here—based on "a long line of cases authorizing suits against state officials in certain circumstances." *Id.* at ---- n.9, 2025 WL 1773631, at *8. So while universal injunctions lack "historical pedigree," statewide injunctions appear to have more historical support. *Id.*

*CASA* also does not address the need for broader injunctions in the First Amendment context. But the Supreme Court has repeatedly affirmed that when a law is unconstitutionally overbroad, "all enforcement of that law" may be enjoined. *Hicks*, 539 U.S. at 119; *see also Moody*, 603 U.S. at 723. The court sees no reason to disregard the Supreme Court's prior First Amendment jurisprudence because of *CASA*.

Lastly, the many "practical problems" created by universals injunctions simply do not arise when a federal court issues statewide injunctive relief. *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). Universal injunctions impede the national government's ability to enforce executive rules and orders, effectively requiring it to "prevail in all 94 district courts and all 12 regional courts of appeals"; incentivize national forum shopping; and "short-circuit" the decision making process and produce rushed judgments. *Id.*; *see CASA*, 606 U.S. at ----, 2025 WL 1773631, at *12 (discussing various policy concerns with universal injunction). None of these problems arise when a court grants relief under *Ex parte Young*.

## IV. CONCLUSION

The court holds as follow. First, this court has jurisdiction to consider plaintiffs' pre-enforcement challenge under Article III and the Eleventh Amendment. Second, plaintiffs have established that § 39-15-201(a) unconstitutionally regulates speech based on content and is facially overbroad. Plaintiffs have failed to show, however, that the recruitment provision is unconstitutionally vague. Lastly, plaintiffs are entitled to an injunction enjoining all enforcement of the recruitment provision. Accordingly, plaintiffs' motion for summary judgment, Doc. 54, is granted in part and denied in part and defendants' motion for summary judgment, Doc. 67, is granted in part and denied in part. Defendants are hereby enjoined from enforcing § 39-15-

201(a)'s recruitment provision, effective as of the date of this order and lasting until otherwise ordered by the court.

*Julia S. Gibbons*
JULIA S. GIBBONS
Senior United States Circuit Judge
(Sitting by designation as United States District Judge for the Middle District of Tennessee)

32